**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:24-cv-21213-KMW**

**JAMES SMITH,**

      Plaintiff,

v.

**CARNIVAL CORPORATION,**

      Defendant.

_____/

**DEFENDANT CARNIVAL CORPORATION'S MOTION IN LIMINE TO EXCLUDE
CERTAIN OPINIONS AND TESTIMONY OF DR. NICHOLAS SUITE, DR. HITESH
RAVAL, PAUL RAMOS, AND KRISTI KIRBY
<u>PURSUANT TO DAUBERT v. MERRILL DOW PHARM, INC.</u>**

Defendant, CARNIVAL CORPORATION (hereinafter "Defendant"), by and through its undersigned counsel, hereby files this Motion in Limine to Exclude Certain Opinions and Testimony of DR. NICHOLAS SUITE, DR. HITESH RAVAL, PAUL RAMOS and KRISTY KIRBY at trial pursuant to <u>Daubert v. Merrill Dow Pharm., Inc</u>., 509 U.S. 579 (1993), and in support thereof would state as follows:

## I.      INTRODUCTION

1.      This is a personal injury action in which Plaintiff, James Smith, currently alleges medical negligence against Carnival for treatment he received while he was a passenger aboard the *Carnival Glory*, on January 24, 2024.  [DE 97, ¶13] In his Fifth Amended Complaint, Plaintiff now contends that the shipboard medical staff aboard the *Glory* deviated from acceptable care standards during their treatment of a "neck and spinal cord injury" he sustained during the subject voyage.  [Id. at ¶ 15].  Specifically, Plaintiff contends that the ship's medical staff committed

medical malpractice and caused him to become a quadriplegic when they removed his cervical collar in the medical center before "more definitive diagnostic testing" could be performed on his spine at a shoreside facility.  [Id.]

2.      The following timeline of material events is undisputed between the parties:

➢ Plaintiff falls from scooter shortly before 9:00 PM. A response team is dispatched, and Plaintiff's neck is immobilized with a neck collar.  He is placed on a stretcher and brought to the medical center. [DE 135 SUMF ¶5]
➢ Plaintiff reports to the medical center at 9:12 PM. [Id. at ¶10]
➢ Spinal clearance completed and the collar is removed at 11:00 PM, while Plaintiff still had feeling/movement in the right side of his body. [Id. at ¶11]
➢ Nurse noted Plaintiff's movement of right side at 12:20 AM on February 24, 2024. [Id. at ¶12]
➢ Nurse noted Plaintiff not complaining of neck pain at 1:07 AM. [Id. at ¶13]
➢ Nurse noted Plaintiff was sleeping comfortably and still moving his right arm at 2:10 AM. [Id. at ¶14]
➢ Nurse noted Plaintiff was sleeping comfortably at 4:10 AM. [Id. at ¶15]
➢ Plaintiff first reports loss of sensation in right side at 4:40 a.m. [Id. at ¶16]

3.      In support of his criticisms against Carnival, Plaintiff identified Drs. Nicholas Suite, MD and Hitesh Raval, DO as medical expert witnesses.  [See Plaintiff's Expert Witness Disclosure dated February 28, 2025 attached hereto as Compositive Ex. A] Dr. Suite (a neurologist) performed a physical examination of the Plaintiff over a year ago on March 19, 2024 and followed up with a telephonic conferral with Plaintiff's wife on October 31st.  Despite the fact that Plaintiff's criticism of the ship's staff is premised upon their failure to obtain more definitive diagnostic imaging studies before removing his cervical collar, Dr. Suite ironically admits that he did not review any diagnostic imaging studies of Plaintiff's spine in support of his causation opinion in this case. Instead, his causation opinion is based entirely upon his interpretation of the Carnival shipboard medical chart.  In his expert summary report dated November 7, 2024 (notably written prior to the deposition of the involved shipboard physician, Dr. Muhammad Waris), Dr. Suite opined that,

> "The removal of the cervical collar at 11:00 PM on January 23, 2024, when the X-ray of the cervical spine was assumed to be

> normal, even in the setting of new neurological deficits and complaints following a fall, was an action that contributed completely and directly to causing the quadriplegia that Mr. Smith must now live with." [See pg. 9 of Suite Report, Comp. Ex. A]

Similarly, Dr. Raval (an emergency room physician) authored an expert summary report on February 27, 2025 stating that,

> "…it is my opinion that Mr. Smith clearly did not have the optimal and most medically appropriate treatment of his injuries, and the shipboard treatment fell below the prevailing standard of care and more like than not, within a reasonable degree of medical certainty and probability, contributed to Mr. Smith's enduring suffering and the progression to paraplegia" [See pg. 7 of Raval Report, Comp. Ex. A]

4.      Defendant's medical experts disagree with the foregoing opinions and contend that the removal of Plaintiff's cervical collar while he was in the ship's medical center had no causal effect on his condition whatsoever.  Instead, Defendant's experts contend that Mr. Smith's condition was caused by an epidural hematoma he sustained at the time of his initial injury that progressed over time and eventually compressed upon his spinal cord, causing irreversible and unavoidable neurologic damage that ultimately rendered him quadriplegic.  [See Defendant's Expert Witness Disclosure dated February 28, 2025 attached hereto as Composite Ex. B]

5.      In the meantime, Plaintiff's Expert Witness Disclosure propounded on February 28 included a "Preliminary" Life Care Plan (hereinafter "Preliminary LCP") authored by Paul Ramos (a physical therapist and certified life care planner).  [See Ramos "Preliminary Report" at Comp. Ex. A].  During his deposition, Mr. Ramos explained that he was tasked with completing the Preliminary LCP on an unusually expedited basis, and consequently, was unable to confer with a medical physician regarding his recommendations for Mr. Smith's future care needs within the time frame for disclosure established in the Court's Scheduling Order.  [See PG 30 LN 1-13 of deposition of Paul Ramos attached hereto Ex. G].  The Preliminary LCP offers numerous

recommendations for future care needs ranging from evaluations with medical doctors in various fields of specialty to specific medications, yet it did not provide a proposed duration of need.  Four (4) days later on March 4th, Plaintiff provided a "Supplemental" Life Care Plan (hereinafter "Supplemental LCP") authored by Mr. Ramos purportedly after he conferred with Dr. Suite regarding his recommendations. [1] [See Supplemental Life Care Plan dated March 4, 2025 attached hereto as Comp. Ex. C] Despite an apparent conferral with Dr. Suite (the only medical doctor he purportedly spoke to regarding Ms. Smith's future care needs), Mr. Ramos' Supplemental LCP only made minor changes to his initial proposed treatment recommendations and still does not provide a total duration of need.  When questioned in this regard at his deposition, Mr. Ramos conceded that his Supplemental LCP does not provide a total duration of need because none of Plaintiff's experts offered a life expectancy opinion in this case.  [See deposition of Ramos at PG. 70 LN 13-15]

6.      Despite the foregoing, on March 26, 2025 (nearly a month after the Expert Disclosure Deadline), Plaintiff propounded for the first time a "Preliminary" Economic Damage Report authored by economist Kristi S. Kirby, MBA, M.Ed.  [See Plaintiff's Supplemental Expert Witness Disclosure dated March 26, 2025 attached hereto as Composite Ex. D].  In the Preliminary Economic Damage Report, Ms. Kristy states that "information on cost, frequency, and duration of future medical requirements" were derived from Mr. Ramos' LCP.  [See PG 3 of Kristy Report, Comp. Ex. D] However, since Mr. Ramos' Supplemental LCP did not provide a total duration of need, Ms. Kirby projected future medical care expenses over 19.1 total years based upon a vague citation in her report to "2021 data."  Id.  Notably, there is no indication anywhere in Ms, Kirby's

---

[1] It bears noting that when questioned at his deposition on April 4, 2025 regarding the Supplemental LCP, Dr. Suite contends that he never consulted with Mr. Ramos at all regarding his Life Care Plan in this case, stating "I haven't seen his report yet."  [See deposition of Dr. Suite at PG 83, LN 6-10 attached hereto as Ex. E]

report that Mr. Smith's current medical condition was factored into her durational analysis, a factor Dr. Suite found significant enough to completely preclude him from being able to offer an opinion in this case.

7.        Pursuant to Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993) and Federal Rules of Evidence 403 and 702, Defendant seeks to prevent the following opinions at trial that lack a fundamental predicate for admissibility, including:

A)        Any and all opinions, testimony or reference by either Drs. Suite or Raval that suggests that the action or inaction of the shipboard medical staff, including but not limited to the removal of Plaintiff's cervical collar, caused his quadriplegia;  and

B)        Any and all speculative opinions by Drs. Suite and Raval or Paul Ramos and Kristy Kirby concerning Plaintiff's life expectancy, particularly the possibility that he may incur expenses for future care needs beyond one (1) year.

## II.      LEGAL STANDARD

The district court serves as a gatekeeper to the admission of scientific testimony by ensuring that "speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005) (*quoting* McCorvery v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002)). In determining the admissibility of expert evidence, the court engages in a rigorous three-part inquiry pursuant to *Daubert* and its progeny. Relevant expert testimony is admissible only if the trial court finds that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of

scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Rosenfeld v. Oceania Cruises Inc., 2009 U.S. Dist. LEXIS 86714 *2-3(S.D. Fla. 2009) (*quoting* United States v. Frazier, 387 F.3d at 1260); *see also* Daubert, 509 U.S. at 589. The Eleventh Circuit has referred to these requirements as the "qualification," "reliability," and "helpfulness" prongs, and although there may inevitably be overlap, the three prongs remain distinct concepts that must be individually analyzed. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

Moreover, "[t]he burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). "Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact." Masferrer, 367 F.Supp.2d at 1372 (interpreting *Allison*, 184 F.3d at 1306).

### A. Qualifications

"Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.' " Clena Investments, Inc. v. XL Specialty Ins. Co., 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting Jack v. Glaxo Wellcome, Inc., 239 F.Supp.2d 1308, 1314–16 (N.D. Ga. 2002)). "In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters he intends to address." Clena Investments, Inc., 280 F.R.D. at 661 (citing City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562–63 (11th Cir. 1998)). After a review of the relevant issues and an expert's qualifications, "the determination regarding qualification to testify rests within the district court's discretion." Clena Investments, Inc., 280 F.R.D. at 661

(*citing* Berdeaux v. Gamble Alden Life Ins. Co., 528 F.2d 987, 990 (5th Cir. 1976) (footnote omitted)).

### B. Methodology

To evaluate the reliability of an expert opinion, courts consider, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique and (4) whether the technique is generally accepted in the scientific community. These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. *See* Farley v. Oceania Cruises, Inc., 2015 WL 1131015 (S.D. Fla. Mar. 12, 2015) (*citing* United States v. Frazier, 387 F.3d 1244, 1261-62 (11th Cir. 2004) (en banc)). It is an evidentiary requirement that expert opinions be connected to existing data by something more than the "it is so because I say it is so" of the expert. *See* Holesapple v. Barrett, 5 Fed. Appx. 177 (4th Cir. 2001); Slaughter v. Southern Talc. Co., 919 F.2d 304, 307 (5th Cir. 1990) ("[W]ithout more than credentials and a subjective opinion, an expert's opinion that 'it is so' is not admissible."); FED. R. EVID. 702 advisory committee's note (2000 amendments) ("The trial judge in all cases of proffered must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.).

### C. Helpfulness

"[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person" and offers something "more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262–63 (citations omitted). Furthermore, while "[a]n expert may testify as to his opinions on an ultimate issue of fact ... he 'may not testify as to his opinion regarding ultimate legal conclusions.' " Umana–Fowler v. NCL (Bahamas) Ltd., 49

F.Supp.3d 1120, 1122 (S.D. Fla. 2014) (*quoting* <u>United States v. Delatorre,</u>308 Fed.Appx. 380, 383 (11th Cir. 2009)). The Eleventh Circuit has also made clear that "merely telling the jury what result to reach is unhelpful and inappropriate." <u>Umana–Fowler</u>, 49 F.Supp.3d at 1122 (citing <u>Montgomery v. Aetna Cas. & Sur. Co.</u>, 898 F.2d 1537, 1541 (11th Cir. 1990)). Legal conclusions or statements instructing what conclusion the jury should reach are impermissible to pass muster under *Daubert*. *See* <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.</u>, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) ("[C]ourts must remain vigilant against the admission of legal conclusions") (citations & quotations omitted); *see also* <u>Montgomery</u>, 898 F.2d at 1541 (11th Cir. 1990) ("An expert may not ... merely tell the jury what result to reach."). "A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law." <u>Montgomery</u>, 898 F.2d at 1541 (*citing* <u>United States v. Poschwatta</u>, 829 F.2d 1477, 1483 (9th Cir. 1987); <u>United States v. Baskes</u>, 649 F.2d 471, 479 (7th Cir. 1980)).

### III.     ARGUMENT

**A.     DRS. NICHOLAS SUITE AND HITESH RAVAL'S CAUSATION OPINIONS ARE SPECULATIVE, LACK APPROPRIATE METHODOLOGY AND ARE THUS UNHELPFUL TO THE JURY AND UNFAIRLY PREJUDICIAL TO THE DEFENDANT**

   **1.     Dr. Nicholas Suite: "I have no idea.  That would be speculative"**

Plaintiff has proffered several medical experts but only one, Dr. Nicholas Suite, opined that the removal of Plaintiff's cervical collar <u>caused</u> his paralysis.[2] However, Dr. Suite's causation opinion, *by his own admission,* is entirely speculative.  Dr. Suite agrees that Plaintiff's neck was properly immobilized by the ship's medical staff on scene immediately following his fall from his scooter.  He similarly agrees that Plaintiff did not demonstrate or report right sided deficits at 11:00

---

[2] It is undisputed that Plaintiff suffered a stroke in 2016 that resulted in permanent left-sided neurologic deficits. Hence, Dr. Suite's causation opinion is directed to Plaintiff's subsequent loss of right sided sensation and functionality following the subject incident.

PM when the cervical collar was removed, nor during follow up nursing assessments performed at 12:10 AM and 2:10 AM that morning.  In fact, Dr. Suite agrees that the first indication of right sided paralysis was when it was reported by the ship's nurse at 4:40 AM.  Therefore, Dr. Suite admits that in order for his causation opinion to be valid, some movement of Plaintiff's neck must have occurred between 11:00-4:40 AM after the collar was removed in order to cause his resulting quadriplegia.  [See PG 49, LN 14-PG 50 LN 5 of deposition of Dr. Suite attached hereto as Ex. E]  However, when questioned in this regard, Dr. Suite admitted that he could not pinpoint *anything* that specifically occurred during this critical timeframe to actually cause the paralysis:

> Q:     Okay.  What happened to him between 11:00 PM, and 4:40 AM?
>
> A:     Between that time, again, it would be speculation because no camera was on him.  I was not there to watch him.  Only the nurse was who was checking on him ascertained those findings.  So we don't know what happened between the 11:00 PM and 4:40 AM to produce his paralysis, which was discovered around that time.
>
> Q:     Okay.  But my question was much more specific.  As you sit here today, would you agree that between 11:00 PM and 4:40 AM, you have no evidence that you can point to—to indicate that he moved his neck?
>
> MR. ARONFELD: Objection to form.
>
> **A:     I have no idea.  That would be speculative.**
>
> [See PG 48 LN.  7-14; PG 49 LN 5-11 of deposition of Dr. Nicholas Suite attached hereto as Ex. E]

In addition to the speculative nature of his causation opinion, Dr. Suite's methodology is further flawed because he did not consider an alternative explanation, stating instead that movement of his neck after removal of the collar "*is the only possible way*" Plaintiff could have become paralyzed. (emphasis added) PG 49 LN 14-23.  See e.g. Guerrero v. BP Expl. & Prod.

Inc., No. 8:20-cv-0263-KKM-JSS, 2024 U.S. Dist. LEXIS 55792, at *27 (M.D. Fla. Mar. 20, 2024) (excluding a medical causation expert for failing to consider alternative causes).

However, Dr. Suite offers this exclusive opinion despite his concession that he did not evaluate the diagnostic imaging studies that were taken of the Plaintiff's cervical spine (particularly cervical CT images at Hospiten in Montego Bay and Jackson Memorial Hospital in Miami) following the subject cruise, and is therefore unable to testify as to the anatomy of his cervical spine [See deposition of Suite at PG 18 LN 1-8; PG 19 LN 8-20]. This results in a significant analytical gap between his interpretation of the facts and the formulation of his conclusion considering the unchallenged anatomical interpretation of Plaintiff's cervical spine by Defendant's experts, and particularly, how the anatomical findings explain the evolution of his neurological injury over an extended period of time.

Carnival's experts all conclude that Plaintiff's eventual paralysis was the result of his initial fall and completely unrelated to the removal of the cervical collar. Dr. Harold Keyserling, a board certified radiologist and neuroradiologist and Professor of Neuroradiology at Stanford University, found that in addition to the fracture of the cervical spine from the fall from the scooter, Plaintiff's imaging from Hospiten Montego Bay, taken on January 24, 2024 (the day after the incident and the day he was medically disembarked), revealed an epidural hematoma (bleeding within the spinal canal) that was enlarged two days later on January 26, 2024.[3] As Dr. Keyserling explains in his report, "contrary to a fracture causing immediate SCI, [a hematoma] can cause a subacute SCI developing within hours."[4] This is so because the hematoma progressively compresses the spinal cord which can lead to SCI [spinal cord injury]. Id. Dr. Keyserling concluded that the hematoma,

---

[3] [See PG 4 of Expert Report of Dr. Keyserling attached hereto as Comp. Ex. B].

[4] [Id. at PG 9].

compounded by Plaintiff's other pre-existing health conditions, "support a diagnosis of delayed spinal cord injury due to spinal epidural hematoma." Id.

Dr. Andrew Zelby, a board certified neurosurgeon, similarly concluded that Plaintiff's paralysis "was due to the development of an anterior epidural hematoma from the fracture," compounded by Plaintiff's use of blood thinner medication due to his previous stroke.[5] Dr. Zelby explains in his report, "[b]ased on the medical facts and findings, it is much more likely than not that the gradual expansion of an anterior hematoma, which caused progressive spinal cord compression, resulted in Mr. Smith's delayed neurological deterioration. This neurological deterioration, as well as his current neurological condition, were not caused or contributed to by his management on board the ship." Id.

Thus, as outlined by Carnival's experts, the explanation for Plaintiff's paralysis is evidenced within his diagnostic imaging studies; a hematoma that formed as a result of his fall out of his scooter, which occurred hours before the cervical collar was removed in the medical center and was caused by the fracture that occurred in the fall from the motorized scooter. Serial interpretation of the CT images by Dr. Keyserling undisputedly establishes that the hematoma gradually and progressively compressed his spinal cord over time, causing the delayed onset of his eventual paralysis. Therefore, contrary to Dr. Suite's contention, an alternative cause for his paralysis does exist, yet as a consequence of his failure to interpret CT imaging, he was incapable (or unwilling) to consider it.

Neither Daubert nor the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert". *See* General Electric v. Joiner, 522 U.S. 136, 148 (1997).  Instead, a court may conclude that there is simply

---

[5] [See PG 1 of Expert Report of Dr. Zelby attached hereto as Comp. Ex. B].

too great an analytical gap between the data and the opinion offered. Id; *see also* <u>Guinn v.</u> <u>AstraZeneca Pharmaceuticals LP</u>, 602 F.3d 1245 (11th Cir. 2010); <u>McDowell v. Brown</u>, 392 F.3d 1283, 1301-02 (11th Cir. 2004)("Under Daubert, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts.") Here, Dr. Suite is attempting to pin exclusive responsibility for Plaintiff's quadriplegia upon the decision to remove his cervical collar *solely* because Plaintiff did not report any right sided paralysis before his cervical collar was removed, but subsequently developed neurologic deficits nearly six hours after removal of the collar. This is not a medical expert opinion at all…it is simply Dr. Suite parroting the allegations in Plaintiff's Fifth Amended Complaint like any other layperson.

As one court put it:

> Simply stated, just because someone has a medical degree or is board certified in emergency medicine, that does not authorize him to testify to a theory not based on a solid foundation. As Judge Posner explained: "A district judge asked to admit that scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculations offered by a genuine scientist." <u>Rosen v. Ciba-Geigy Corp.</u>, 78 F.3d 316, 318 (7th Cir. 1996). Here we have a genuine doctor presenting unsupported medical speculation. He cannot just make up facts to support his opinions—he cannot offer opinions that are "educated guesses dressing up in evening clothes." <u>Siharatha v. Sandoz</u> <u>Pharm. Corp.</u>, 131 F.Supp.2d 1347, 1373 (N.D. Ga. 2001).

> **2.    Dr. Hitesh Raval: Plaintiff made "marginally worse" after movement**

Dr. Raval is a board-certified emergency room physician who has been offered by the Plaintiff to provide a standard of care opinion. Although Dr. Raval claims he reviewed Plaintiff's shoreside diagnostic imaging studies, he made no mention of any interpretative findings in his expert summary reports or during his subsequent deposition, nor did he rebut any of the interpretative findings of the defense experts. In fact, Dr. Raval readily admits he did not review the expert summary reports of Drs. Keyserling or Zelby at all. [See PG 26 LN 18-PG 27 LN. 5 of

deposition of Dr. Raval attached hereto as Ex. F].  Nevertheless, Dr. Raval has stopped short of concluding in this case that the removal of the collar *caused* the Plaintiff's paralysis.  Instead, Dr. Raval contends that subsequent movement of the Plaintiff's neck at 5:00 AM *after* he reported a loss of sensation and a nearly complete loss of movement on his right side at 4:40 AM "marginally" worsened his paralysis.

When repeatedly questioned during his deposition as to how he reached his causation opinion, Dr. Raval finally relented, explaining that the only basis for his conclusion that Plaintiff's paralysis was "marginally" worsened was from his interpretation of purportedly differing descriptions of Plaintiff's condition written in the Carnival medical chart by Dr. Waris and one of the ship's nurses.  Specifically, Dr. Raval pointed to a note entry written by Dr. Waris at 4:40 AM when the reports of paralysis first arose describing his right sided deficits as "right fingers shows 1/5 power, *flexion and extension absent*, patient can extend and flex the elbow" (emphasis added) and compared it to a note entry written in the chart by a ship nurse at 10:00 AM stating that he cannot grip with his right hand.  [See DE 135, Ex. 4] According to Dr. Raval, the differing description of functionality (written by two different medical staff personnel with significantly different scopes of expertise) is evidence that Plaintiff was made "marginally worse":

> Q:     So just so that we're clear, what you're saying then is your evidence of worsening is that he was described by Dr. Waris as having 1 out of 5 power in his right hand, and he's described by a nurse at 10:00 AM as not being able to grip things, that's your evidence of worsening paralysis?
>
> A:     Well, it's also documented that time that this flexion and extension is completely absent at that same time frame.
>
> Q:     Okay.

> A:      So what I'm saying is that he didn't improve at all, in fact, made marginally worse after the movement.[6]

[See PG 99 LN 2-14 of deposition of Dr. Hitesh Raval attached as Ex. F]

Dr. Raval's opinion that Plaintiff was rendered "marginally worse" after his neck was moved at 5:00 AM is entirely speculative advocacy based upon an erroneous interpretation of someone else's medical notes. His self-serving interpretation of the medical entries in the shipboard medical chart is not a reliable basis upon which to premise a causation opinion, considering there is no deposition testimony from anyone (let alone the ship doctor or nurse) stating that the Plaintiff's paralysis "worsened" subsequent to the onset of his right sided deficits at 4:40 AM, or that the clinical findings were different at any time thereafter. Moreover, Dr. Raval admits that Dr. Waris' initial note written at 4:40 AM specifically documents a <u>complete loss of flexion and extension of the right hand</u>, which entirely contradicts his opinion (offered for the first time at deposition) that the ship nurse's description at 10:00 AM noting Plaintiff's inability to grip with his right hand is evidence of his paralysis "worsening."

The unreliably speculative nature of both Drs. Suite and Raval's causation opinions should be excluded not only because they are flawed conclusions based on faulty methodology, but also because they will unfairly confuse and/or mislead the jury. It is axiomatic that the district courts "have broad authority over the management of trials." <u>Tran v. Toyota Motor Corp.</u>, 420 F.3d 1310, 1315 (11th Cir. 2005). Such authority includes the power to exclude evidence which is unfairly prejudicial or could serve to mislead/confuse the jury. See Fed.R.Evid. 403 (providing that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger

---

[6] As an aside, Dr. Raval's suggestion that Plaintiff's neurologic symptoms "did not improve at all" following the removal of his cervical collar as further evidence of causation is inconsistent with Dr. Suite's opinion that when the right sided deficits arose at 4:40 AM they were already "permanent" and "irreversible." See PG. 70 LN 20-22; PG. 98 LN. 4-10 of deposition of Dr. Suite attached as Ex. E]

of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). As the Eleventh Circuit explained in U.S. v. Frazier, 387 F.3d 1244, 1263 (11th Cir. 2004), "[b]ecause of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403," noting that "[e]xclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury…"(citations omitted); *see also* Hull v. Merck & Co., Inc., 758 F.2d 1474, 1477 (11th Cir. 1985)(finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed.R.Evid. 702"); United States v. Stevens, 935 F.2d 1380, 1399 (3d Cir. 1991).

**B.    THE OPINIONS FROM ALL OF PLAINTIFF'S EXPERTS CONCERNING LIFE EXPECTANCY AND FUTURE CARE NEEDS ARE SPECULATIVE, LACK APPROPRIATE METHODOLOGY AND ARE THUS UNHELPFUL TO THE JURY AND UNFAIRLY PREJUDICIAL TO THE DEFENDANT**

As a threshold matter, the Life Care Plan offered by Plaintiff's expert, Paul Ramos has a particularly troubling evolutionary history in this case. By his own candid admission, Mr. Ramos was unconventionally forced to complete the Preliminary LCP within eight (8) days of his retention on February 20th in order to meet the Court's Scheduling Deadline for disclosure on February 28th, an expedited time frame even he admitted was "unusual." [See PG 30, LN 1-13 of deposition of Paul Ramos attached hereto as Ex. G] As a consequence, his Preliminary LCP had not been reviewed by a medical doctor before he disclosed it to the Defendant, something he also admits he cannot recall ever happening before. Id. at PG. 36 LN 1-15. Moreover, his Preliminary LCP also did not provide a life expectancy/total time period for the future medical care needs he was recommending either. Four (4) days later on March 4th, Plaintiff provided a "Supplemental"

LCP authored by Mr. Ramos purportedly after he conferred with Dr. Suite regarding his recommendations (something Dr. Suite is now bizarrely disputing in this case as well).  Again, the Supplemental LCP does not offer a life expectancy/total duration of need because Mr. Ramos concedes that he is not qualified to offer such opinions, nor did he receive a life expectancy opinion from any other Plaintiff expert in the case-including Dr. Suite.  As a result, his Supplemental LCP offers a vague description forecasting future care needs for "life" without any specific time period whatsoever.

Meanwhile, Dr. Suite's expert summary report dated November 7, 2024 offers competing future "neurological care needs" that initially forecast a fifteen (15) year life expectancy.  [See Pg. 8 of Dr. Suite's expert witness summary report contained within Plaintiff's Expert Witness Disclosure at Comp. Ex. A] When questioned in this regard at his deposition, Dr. Suite explained that his initial "future neurological care needs" assessment was based upon a physical examination he performed on the Plaintiff over a year ago on March 19, 2024.  In support of his initial fifteen (15) year forecasted life expectancy, Dr. Suite contends he applied his knowledge, training and experience treating similar patients and compared Plaintiff's various co-morbidities to life tables for an average man of the same age.  [Id. at PG 71 LN. 23-PG 72 LN 7]

However, despite Dr. Suite's fifteen (15) year life expectancy opinion initially provided in his expert summary report written on November 7th, Plaintiff filed his first Motion to Expedite Trial just five (5) days later on November 12th seeking an expedited trial setting, "due to the real possibility that Plaintiff may pass away in the near future." [DE 59].  Notably, the Motion was not accompanied by any medical reports or opinions from any medical doctors, including Dr. Suite. After the Court denied a revised Motion to Expedite on November 19th [DE 68], Plaintiff followed with yet another Renewed Motion to Expedite Trial on December 21st, arguing that given recent

changes in his condition "it appears not just a real possibility that (Plaintiff) may pass away in the near future, but an imminent likelihood…" [DE 86] In light of the foregoing, the parties appeared before the Court on January 14th for a Status Conference, during which Defendant was provided fourteen (14) days to complete a compulsory medical examination by its own medical expert.  [DE 96]

On January 27th, Defendant's retained neurology expert, Dr. Alexander Merkler, a board certified neurologist and neurointensivist and Assistant Professor of Neurology and Neuroscience from Cornell University, traveled from New York to personally examine Plaintiff in the Intensive Care Unit of Wellstar Hospital in Atlanta, Georgia.  Following his review of Plaintiff's medical records and personal examination, Dr. Merkler opined that as a result of his numerous co-morbidities and complications he already has and will continue to develop, Plaintiff has "at most one year left to live from the time of my evaluation."  [See expert report of Dr. Merkler attached as Comp. Ex. B]

During his deposition, Dr. Suite agreed that "he has not seen (Plaintiff) as recently as Dr. Merkler," and that "his life expectancy is further and considerably reduced beyond the fifteen (15) years I had originally estimated" as a result of his changes in his medical condition since the time he last saw him.  However, although he admitted that he could not state that Dr. Merkler is wrong, he was unwilling to opine within a reasonable degree of medical certainty that Plaintiff would only live one more year or less.  [See PG 83 LN 11-18 of deposition of Suite attached as Ex. E].  In fact, Dr. Suite is now unwilling to provide _any_ numeric life expectancy opinion at all.  [Id. at PG. 84 LN 10-17]

Conversely, on March 26, 2025 (nearly a month after the Expert Disclosure Deadline), Plaintiff propounded for the first time a "Preliminary" Economic Damage Report authored by

economist Kristi S. Kirby, MBA, M.Ed. [See Plaintiff's Supplemental Expert Witness Disclosure dated March 26, 2025 attached hereto as Composite Ex. D].[7] In the Preliminary Economic Damage Report, Ms. Kristy states that "information on cost, frequency, and duration of future medical requirements" were derived from Mr. Ramos' LCP. [See PG 3 of Kristy Report, Comp. Ex. D] However, since Mr. Ramos' Supplemental LCP did not provide a total duration of need (and both he and Dr. Suite conceded when specifically questioned at their respective depositions that they cannot offer such an opinion), Ms. Kirby is the only expert for the Plaintiff who offered a life expectancy opinion, projecting his future care costs over a total of 19.1 total years based upon a vague citation to "2021 data." Id.

Notably, there is no indication anywhere in Ms, Kirby's report that Mr. Smith's current medical condition was factored into her durational analysis, a factor Dr. Suite found significant enough to completely preclude him from being able to offer *any* life expectancy opinion altogether. This flawed methodology is analogous to a similar approach that was scrutinized by Honorable Judge Patricia Seitz in Rinker v. Carnival Corporation, 2012 WL 37381 (S.D. Fla. Jan. 6, 2012). In Rinker, the plaintiff's expert attempted to offer a life care plan that set out costs for future medical care and needs based upon an average life expectancy of a healthy 62 year old woman. In support of granting Defendant's motion to exclude opinions regarding plaintiff's future medical

---

[7] Defendant moves to strike Dr. Kirby's Supplemental Expert Damage Report as untimely. Given its disclosure nearly a month after the February 28 deadline and just two weeks before the Court's previously extended discovery cutoff of April 11, Defendant had no reasonable opportunity to depose Ms. Kirby to explore the basis for her life expectancy projection and was therefore unduly prejudiced. The Eleventh Circuit has instructed district courts to review three factors when deciding whether to exclude the testimony of witnesses who are untimely disclosed: (1) the importance of the testimony; (2) the reason for the failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness is allowed to testify. Pete's Towing Co. v. City of Tampa, Fla., 378 F. Appx. 917, 920 (11th Cir. 2010); *See* Mitchell v. Ford Motor Co., 318 Fed. Appx. 821, 825 (11th Cir. 2009); Alvarado v. U.S., Case No. 10-cv-22788, 2011 WL 1769097 (S.D. Fla. 2011) . Warren v. Delvista Towers Condominium Association, Inc., Case No. 13-23074-CIV, 2014 WL 3764126 (S.D. Fla., July 30, 2014); Shire Development LLC v. Watson Pharmaceuticals, Inc., 932 F. Supp. 2d 1349, 1357 (S.D. Fla. 2013) and Brucker v. Lowe's Home Centers, Inc., 2012 WL 2225818 (M.D. Fla., June 15, 2012). There is no justification for the plaintiff to ignore Rule 26(a) and ignore the deadline for expert disclosures by simply serving a disclosure with no motion to enlarge.

expenses, the Court reasoned that the medical evidence in the case (and expert life care planner's report) indicated that the plaintiff was not a healthy 62 year old woman. Thus, the failure to account for recent changes in plaintiff's medical condition when calculating her life expectancy projections rendered conclusions regarding her future care needs unreliable and unhelpful to the jury because they did not "fit with the facts of this case." Id. at *1.

Clearly, Ms. Kirby's 19.1 year life expectancy projection does not "fit with the facts of this case." For starters, her projection vaguely refers to "2021 data" but offers no insight regarding what co-morbidities/medical conditions, if any, were factored into her analysis. Moreover, her projection exceeds Dr. Suite's initial life expectancy opinion of fifteen (15) years authored in November of 2024. Even Dr. Suite now admits that given recent changes in Plaintiff's health his life expectancy is "further and considerably reduced" to a number he can now inexplicably no longer provide. Thus, the only medical expert opinion providing a life expectancy projection comes from Dr. Merkler, who is also the only medical expert to have examined the Plaintiff in 2025.

Plaintiff must be able to prove "the necessity and reasonableness of the charges for medical attendance and treatment" to recover damages for future medical expenses at trial. Shaw v. Puleo, 150 So.2d 641, 644 (Fla. 1964). Florida law is clear that only those future medical expenses "reasonably certain" to be incurred are recoverable as damages in a personal injury action. Loftin v. Wilson, 67 So.2d 185, 188 (Fla. 1953). It is Plaintiff's burden to show that future medical expenses will more probably than not be incurred, a burden that may only be met with competent substantial evidence. Kloster Cruise, Ltd. v. Grubbs, 762 So.2d 552, 556 (Fla. 3d DCA 2000). Therefore, because a recovery of future medical expenses cannot be grounded on the mere possibility that certain treatment might be obtained in the future, any expert opinions or other

evidence couched in terms of "possibilities" cannot be probative of future damages. Kloster Cruise, 762 So. 2d at 556; *see also* Frei v. Alger, 655 So.2d 1215, 1216 (Fla. 4 th DCA 1995).

The Supplement LCP hastily offered by Mr. Ramos and the Preliminary Economic Damage Report provided by Ms. Kirby nearly a month after the disclosure deadline are so fundamentally flawed that they should be excluded in their entirety. If there are no medical experts on behalf of the Plaintiff who can offer any numeric value to his projected life expectancy, then all of Mr. Ramos' future care recommendations are without sufficient evidentiary support. Meanwhile, Ms. Kirby (an economist with no medical background or expertise) is clearly unqualified to determine Plaintiff's life expectancy and therefore applied flawed methodology in vaguely referring to "2021 data" to support her 19.1 year projection. In the alternative, Plaintiff should be precluded from offering any future care and/or cost opinions at trial from any expert that exceeds one (1) year in duration.

**CONCLUSION**

Pursuant to Daubert v. Merrill Dow Pharm., Inc., 509 U.S. 579 (1993) and Federal Rules of Evidence 403 and 702, Defendant, CARNIVAL CORPORATION, respectfully requests the Court enter an Order precluding Drs. Nicholas Suite and Hitesh Raval from rendering causation opinions in the case. Additionally, Defendant would respectfully request entry of an Order striking Paul Ramos' Preliminary and Supplemental Life Care Plan and Kristi Kirby's Preliminary Economic Damage Report, and futher precluding Plaintiff's experts from offering any testimony or opinions at trial concerning Plaintiff's life expectancy and future care needs/costs. Alternatively, Defendant respectfully requests entry of an Order precluding Plaintiff from offering any future care and/or cost opinions from any expert that exceeds one (1) year in duration.

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(A)(3)

In accordance with Local Rule 7.1(A)(3), undersigned counsel hereby certifies that he conferred with Plaintiff's counsel in a good faith effort to resolve the issues raised herein and has been advised that Plaintiff objects to the relief sought in this Motion.

Respectfully submitted,

GrayRobinson, P.A.
515 North Flagler Drive, Ste. 650
West Palm Beach, Florida 33401
Tel: (561) 268-5727
Fax: (561) 268-5747

By: */s/ Michael Drahos*
Michael J. Drahos
Florida Bar No. 0617059
michael.drahos@gray-robinson.com
W. Cooper Jarnagin
Florida Bar No. 117767
cooper.jarnagin@gray-robinson.com
Ashley Genoese
Florida Bar No. 1019357
ashley.genoese@gray-robinson.com

Luis E. Llamas, Esq.
Florida Bar No. 0089822
Lauren Rose, Esq.
Florida Bar No. 115743
L. Etienne Balart, Esq.
Louisiana Bar No. 24951 (Pro Hac)
JONES WALKER, LLP
201 S. Biscayne Blvd., Ste 300
Miami, FL 33131
*llamas@joneswalker.com*
*lrose@joneswalker.com*
*ebalart@joneswalker.com*

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2025, I electronically filed the foregoing document with the Clerk to the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

*/s/ Michael Drahos*

### SERVICE LIST
### CASE NO. 1:24-cv-21213-KMW

Abby Hernandez Ivey, Esq.
Matthias Masayasu Hayashi, Esq.
Spencer Marc Aronfeld, Esq.
Aronfeld Trial Lawyers
One Alhambra Plaza
Penthouse
Coral Gables, FL 33134
305-441-0440
aivey@aronfeld.com
mhayashi@aronfeld.com
aronfeld@aronfeld.com

*Attorneys for Plaintiff*

Lauren Rose, Esq.
Luis E. Llamas, Esq.
Etiene Ballart, Esq.
JONES WALKER, LLP
201 S. Biscayne Blvd., Ste 300
Miami, FL 33131
*llamas@joneswalker.com*
*lrose@joneswalker.com*
*eballart@joneswalker.com*

*Co-counsel for Defendant*