Hitesh Raval DO
April 08, 2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-cv-21213

JAMES SMITH,

          Plaintiff,

          -vs-

CARNIVAL CORPORATION,

          Defendant.
_____/


        VIDEOTAPED DEPOSITION OF HITESH RAVAL, D.O.


                    Tuesday, April 8, 2025
                    10:59 a.m. - 1:07 p.m.

                    3100 South Douglas Road
                    Coral Gables, Florida 33134












                    Stenographically Reported By:
                         LAURIE K. BELLE

Hitesh Raval DO
April 08, 2025

                    APPEARANCES

On Behalf of the Plaintiff:

        ARONFELD TRIAL LAWYERS, P.A.
        1 Alhambra Plaza, Penthouse
        Miami, Florida 33134
        305-441-0440
        Aronfeld@aronfeld.com
        BY:  SPENCER ARONFELD, ESQUIRE


On Behalf of the Defendant:

        GRAY ROBINSON
        515 North Flagler Drive, Suite 650
        West Palm Beach, Florida 33401
        561-268-5727
        Michael.drahos@gray-robinson.com
        BY:  MICHAEL DRAHOS, ESQUIRE


        JONES WALKER LLP
        Citi Center
        201 South Biscayne Boulevard, Suite 3000
        Miami, Florida 33131
        305-679-5700
        Lrose@joneswalker.com
        BY:  LAUREN ROSE, ESQUIRE (via Zoom)


Also Present:

        Danny Holguin, videographer

        Michele Smith (via Zoom)

        James Smith (via Zoom)

Hitesh Raval DO
April 08, 2025

INDEX OF PROCEEDINGS

Deposition of HITESH RAVAL, D.O.                         Page


Direct Examination by Mr. Drahos                            6
Cross-Examination by Mr. Aronfeld                         101
Redirect Examination by Mr. Drahos                        114


Certificate of Oath                                       117
Certificate of Reporter                                   118
Witness Review Letter                                     119
Errata Sheet                                              120

Hitesh Raval DO
April 08, 2025

INDEX TO EXHIBITS

HITESH RAVAL, D.O.

James Smith vs. Carnival Corporation

Tuesday, April 8, 2025

LAURIE K. BELLE, Stenographer

<table>
<tr><td>Marked</td><td>Description</td><td>Page</td></tr>
<tr><td>Exhibit A</td><td>Notice of Taking Deposition</td><td>13</td></tr>
<tr><td>Exhibit B</td><td>February 27th report</td><td>19</td></tr>
<tr><td>Exhibit C</td><td>Third Supplemental Report dated<br>April 4th of 2025</td><td>22</td></tr>
<tr><td>Exhibit D</td><td>File (e-mailed) from Dr. Raval</td><td>101</td></tr>
</table>

Hitesh Raval DO
April 08, 2025

Deposition taken before LAURIE K. BELLE, Stenographer

and Notary Public in and for the State of Florida at

Large, in the above cause.

-------

THE VIDEOGRAPHER:  Good morning.

We are on the record at 10:59 a.m., on

April 8, 2025.  Audio and video recording will

continue to take place unless all parties agree to

go off the record.  Please note that the

microphones are sensitive and may pick up

whispering and private conversations.

This is the video-recorded proceeding of

Hitesh Raval, M.D. [SIC] in the matter of James

Smith versus Carnival Corporation.

This proceeding is being held at Coral Gables

Hospital located at 30- -- sorry, 3100 Douglas Road

in Coral Gables, Florida 33134.

My name is Danny Holguin from TruVid, LLC and

I am the videographer on behalf of U.S. Legal

Support.  I'm not related to any party in this

action, nor am I financially interested in the

outcome.  The court reporter is Laurie Belle on

behalf of U.S. Legal Support.

Counsel will state their appearances for the

record after which the court reporter will swear in

Hitesh Raval DO
April 08, 2025

the witness.

Thank you.

MR. ARONFELD:  Thank you.

May it please the Court, my name is Spencer Aronfeld and I have the privilege of representing Mr. James Smith.

MR. DRAHOS:  And I'm Michael Drahos from the law firm of Gray Robinson on behalf of the defendant, Carnival.

THE COURT REPORTER:  Are you ready, Doctor?

Please raise your right hand.

Do you swear or affirm the testimony you're about to give will be the whole truth and nothing but the truth?

THE WITNESS:  Yes.

THE COURT REPORTER:  Thank you.

DIRECT EXAMINATION

BY MR. DRAHOS:

Q.    Can you state your name for the record.

A.    Hitesh Raval.

Q.    Thank you, Dr. Raval.

In your expert report that we received in this case, you used a particular choice of words that I want to open this deposition with.  I found it interesting, particularly on page 7.

Hitesh Raval DO
April 08, 2025

You write, "A well-trained emergency physician would understand the limitations of their practice environment, and in this case, I believe Dr. Waris failed in providing high-quality medical care that an average and prudent physician would have been able to offer."

Are those your words?

A. Yes, those are my words.

Q. Do you think that also applies to the field of serving as an expert witness?

A. Absolutely.

Q. Do you think that an expert witness certainly will experience limitations in their environment and their ability to serve as an expert?

MR. ARONFELD: Object to form.

THE WITNESS: I'm sorry.

I didn't understand your question.

BY MR. DRAHOS:

Q. Sure. Well, you make your point here by saying that -- I am inferring this to believe or my understanding of what you wrote here is that Dr. Waris should have appreciated the fact that he had limitations in his practice environment. Is that what you were saying?

MR. ARONFELD: Objection to form.

Hitesh Raval DO
April 08, 2025

THE WITNESS:  Correct.

BY MR. DRAHOS:

Q.   Have you formulated that same appreciation as an expert witness in this case?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I'm still a bit unclear.  Are you referring to the practice setting that he was --

BY MR. DRAHOS:

Q.   No.

I'm referring specifically to your ability to testify as an expert in this case.

MR. ARONFELD:  Objection to form.

THE WITNESS:  So -- and the question one more time.

BY MR. DRAHOS:

Q.   Have you appreciated that your ability to serve as an expert has been limited in this case?

MR. ARONFELD:  Form.

THE WITNESS:  I don't see how it was limited in this case.

BY MR. DRAHOS:

Q.   Do you think that you had all the information that you can receive in order to be able to formulate an opinion?

Hitesh Raval DO
April 08, 2025

MR. ARONFELD:  Objection to form.

THE WITNESS:  Absolutely.

BY MR. DRAHOS:

Q.   Okay.  So let's talk a little bit about that then.

I don't think you've done this very often, have you?

MR. ARONFELD:  Objection to form.

THE WITNESS:  Have done what?

BY MR. DRAHOS:

Q.   Served as an expert witness.

A.   I have been; it's been several years now.

Q.   So I've seen one documented case where you served as an expert.  Has there been more than that?

A.   There was one documented case where I served as an expert where it required a deposition --

Q.   Okay.

A.   -- but I have been working as an expert witness for several years.

Q.   So what you're saying is:  This is -- this is your second time sitting in that seat as an expert witness?

A.   Yes.

Q.   All right.  So let's talk about whether or not you sitting in that seat as an expert witness having

Hitesh Raval DO
April 08, 2025

limited -- your environment has been limited in your ability to serve as an expert. Okay?

MR. ARONFELD: Objection to form.

BY MR. DRAHOS:

Q. So, first of all, you would agree, I mean, obviously you are an emergency room physician, right?

A. Yes, I am.

Q. Okay. You are not a neurologist?

A. I'm an emergency room physician.

Q. Which means you're not a neurologist?

A. No.

Q. You're not a neurosurgeon?

A. No.

Q. You're not a radiologist?

A. No.

Q. You're not a neuroradiologist?

A. Those are different specialties in medicine. I'm a specialist in emergency medicine.

Q. And in this particular case you didn't review any diagnostic imaging of Mr. Smith after he left the Carnival vessel; is that correct?

A. I've reviewed imaging when he was on the vessel, on the ship --

Q. Right.

A. -- I reviewed imaging that was supplied to me

Hitesh Raval DO
April 08, 2025

as well when he was in various other facilities as well.

Q.   So you tell me where you put in your expert report that you reviewed diagnostic imaging after Mr. Smith left the Carnival vessel?  Tell me where that is in your report?

A.   So I think it's important to note when I'm reviewing a case to evaluate every single practice environment that he was in, whether he was on the ship or receiving medical care or in Jamaica, as he would have at Montego Bay or in Miami.  I reviewed images to formulate my opinion, all of those things.

Q.   Where is your report?

A.   My -- I imagine my report was sent to you and -- we're referring to that report?

Q.   Do you have it in front of you?

A.   I don't have any documents in front of me.

Q.   Do you have access to it?

A.   I can pull up my laptop, if need be.

Q.   All right.  Wouldn't that then qualify as one example of you being limited in your ability to testify as an expert?  You showed up without your report?

MR. ARONFELD:  Objection to form.

Mischaracterization of his testimony.

THE WITNESS:  So, yeah, I do have my report.

It's available on my laptop once again, but --

Hitesh Raval DO
April 08, 2025

BY MR. DRAHOS:

Q.    So --

A.    -- I'm not sure why this is a limitation for you.  I'm aware of it.  I have the report --

Q.    Not a limitation for me --

A.    -- in my head --

Q.    -- limitation for you.

MR. ARONFELD:  Wait.  Wait.  He's got to be able to finish his answer, Michael.

I'm sorry.

Are you done, Dr. Raval?

THE WITNESS:  I was not done.

But -- so I'm aware of my report, and if we need to look over it, I have access to it and I believe you have it in front of you.  I can look at the report in many fashions.

BY MR. DRAHOS:

Q.    So tell me where in your report you indicate that you reviewed diagnostic imaging studies after Mr. Smith left the Carnival vessel?

A.    So the report is indicating my opinions, and again, as an emergency physician, I'm giving you my -- as an expert in my field giving you my expert opinion on his medical care and the negligence that was involved.

Q.    I think you're going to need to get that

Hitesh Raval DO
April 08, 2025

report, Doctor.  Why don't you go ahead and pull up the computer that has it so we can ask you questions about it.

MR. ARONFELD:  Why don't we go off the record, Michael, and let him get that.

MR. DRAHOS:  Sure.

THE VIDEOGRAPHER:  Going off of the record.  The time is 11:05 a.m.

(There was a discussion off of the record.)

THE WITNESS:  I have my report up here.

MR. DRAHOS:  Back on.

THE VIDEOGRAPHER:  We're on the record.  The time is 11:06 a.m.

BY MR. DRAHOS:

Q.   All right.  So you've gone ahead and pulled up your report on your computer, Doctor; is that right?

A.   Yes, correct.

Q.   Let me hand you what we've marked as Composite Exhibit A to this deposition.  It's the Notice of Deposition.

Do you see that there?

(Thereupon, Notice of Deposition was marked as Exhibit A for identification.)

THE WITNESS:  Yes.

BY MR. DRAHOS:

Hitesh Raval DO
April 08, 2025

Q.   All right.  And did you look at that notice before you showed up today?

A.   Let me look at it for a second here.

Q.   Sure.

A.   Yes, I did see this e-mail.

Q.   Okay.  So if you saw that notice of deposition, you saw that it specifically asked for you to bring materials today, correct?

A.   Let's see.  Can you show me where it is?

Q.   Sure.  It says, "Schedule A."  You've got a long list there.

A.   Uh-huh.

Q.   I mean, I can ask you each of these things --

A.   Yeah, it's a long list.

Q.   Did you bring any documents, memoranda, notes or other tangible evidence, or empirical data that you used to testify or support -- support your testimony as an expert in this case?

A.   I have my report on my laptop if that counts as the material.

Q.   Did you bring any of your bills or invoices that you generated?

A.   I forwarded that already to -- via e-mail -- via e-mail, I believe.

Q.   I haven't seen anything from you.

Hitesh Raval DO
April 08, 2025

MR. ARONFELD:  We sent you --

THE WITNESS:  That was sent.

MR. ARONFELD:  We sent you a composite of all the documents that are not privileged that are responsive to your subpoena duces tecum.

MR. DRAHOS:  When was that sent to me?

MR. ARONFELD:  Huh?

MR. DRAHOS:  When was that sent?

MR. ARONFELD:  I'll get you time and date.

MR. DRAHOS:  Okay.

MR. ARONFELD:  But prior to the depo.

BY MR. DRAHOS:

     Q.   Where are -- where are those documents now to be able to review and have it in front of you for this deposition?

     A.   On my laptop in front of me.

     Q.   Okay.

MR. DRAHOS:  Can you get for me the date that that was sent --

MR. ARONFELD:  Yeah.

MR. DRAHOS:  -- because I don't believe that that was.

BY MR. DRAHOS:

     Q.   All right.  How much did I pay you, Doctor, to come here today to testify as an expert?

A.   You received my invoice?  It is on there.  I don't have it off the top of my head.

Q.   All right.  So --

A.   I can pull it up.

Q.   Yeah.  Why don't you tell me how much you charged for your deposition today?

A.   You did receive my invoice, though?

Q.   That, I don't know.

A.   Let me see here -- it might be a bit.  I'd have to look at the -- the e-mail.

Okay.  I have it pulled up.  It was $6,000.

Q.   $6,000 for today's deposition?

A.   Correct.

Q.   How much have you charged total in the case?

A.   I don't have that on the top of my head.

Q.   Okay.  That was a specific area of inquiry that's within the Schedule A.  Are you saying that you can't answer that question today?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I don't have the number off the top of my head, but I can look up the documents, the invoices.

BY MR. DRAHOS:

Q.   All right.  Are all of the documents and invoices that you've generated in this case to date

Hitesh Raval DO
April 08, 2025

created, meaning they're in that file that you claim you sent me?

A. Yes.

Q. All right. Because I'm still sitting here looking at my inbox and I don't see any e-mail of any documents that were responsive to the duces tecum. So unless someone can tell me otherwise, as of right now, we don't have anything from you. And we paid you $6,000 to be here, to answer these questions, and specifically bring those documents with you.

A. I'm looking at it here; I have it here as well, if that helps you.

Q. All right. So getting back to the point of my question, we got a little sidetracked with -- with the absence of documents.

Where within your report -- and you can scan through your computer screen all you'd like, where within your report you make mention of the fact that you reviewed diagnostic imaging after Mr. Smith left the Carnival vessel?

A. So when you look at my -- the final section of my report, it's the culmination of review of the entire -- all of the documents that were supplied to me, and that is what allowed me to formulate my opinion, and that's how my opinion was generated. It's looking at

Hitesh Raval DO
April 08, 2025

all of the documents supplied to you, that includes

shipboard and the non-shipboard documents.

Q.   Let's go through it in painstaking detail,

Doctor, now.  Because on page 1 of your expert report

that you generated in this case that was disclosed to

me, you have a section there called "Documents

Reviewed."

Do you see that?

A.   Yes.

Q.   All right.  And other than X-ray reports, a

skull X-ray report by Dr. Gerson, can you tell me where

you make mention specifically of any diagnostic imaging

studies that you've reviewed?

A.   So there was a supplemental to that report as

well --

Q.   Okay.

A.   -- where I reviewed the -- all of the

additional documents, because I initially believe I

failed to include the non-shipboard or some of the

non-shipboard documents.

Do you have that file?

Q.   What date was your initial report completed,

Doctor, in this case?

A.   I'd have to look it up.  Give me a second

here.  The date is on my report, by the way, on the

Hitesh Raval DO
April 08, 2025

top --

Q.   February 27th?

A.   Is that what -- yeah, sounds about right.

Q.   All right.  We're going to mark your February 27th report as Exhibit B to the deposition.

(Thereupon, February 27th report was marked as Exhibit B for identification.)

BY MR. DRAHOS:

Q.   And so what you're telling us is that when you formulated this report summarizing your opinions in this case you didn't specifically put in the Documents Reviewed section that you reviewed any diagnostic imaging studies after Mr. Smith left the ship, but that was what, a scrivener's error on your part?

A.   No, so if you look at the report, there's -- if you -- if we can -- I think it will be easy if we look at the Documents Reviewed on the initial report. It will be easy to clarify your concerns or questions here.

So, for example, line item number four, it states, "Jackson Memorial Hospital records" --

Q.   Uh-huh.

A.   -- "dated January to February of 2024."  They included various imaging reports and that's off the ship and I reviewed all of those documents; that includes a

Hitesh Raval DO
April 08, 2025

lot of imaging.

Q.   You didn't specifically put in here that you reviewed the diagnostic imaging, right?

You put "Jackson Memorial records," but you didn't specifically make the point to say, And I also reviewed the diagnostic imaging studies.  You didn't do that?

A.   I think that when I mentioned that I reviewed the medical records that includes diagnostic imaging, it includes laboratories, it includes consultations.  There is just so many different records that it's -- I think it's all-encompassing when I stated that I reviewed the medical records; that includes diagnostic imaging, including all medical aspects of the patient's care.

Q.   I appreciate that you want to give that answer today, but the jury is not going to see your expert report.  So the point I'm trying to make here is with the benefit of you and I both looking at your expert report, you didn't actually put in here that you reviewed diagnostic imaging studies.  Agreed?

A.   I agree that there's not a single one line item that states that I did not review specific imaging you're referring to --

Q.   Right.

A.   -- however, when I state again, I want to

clarify, when I'm saying that I reviewed medical records, you -- this includes all aspects of the medical care and I reviewed labs as well that were done.  I didn't have to write on a separate line.  I don't think that would be appropriate actually to write that I also included and reviewed laboratories that were performed.

Q.   I disagree with that, but we can talk it over with the judge later.

In your rebuttal report that you generated that's dated March the 23rd of 2025, you didn't make mention of the fact of having reviewed any diagnostic imaging in this report either, correct?

A.   Again, mentioning that I reviewed diagnostic imaging is included when I state that I reviewed all medical records, so it's redundant actually to do that; we try to avoid that especially in a small list of reviewed documents.

Q.   Hopefully by now you've gotten the sense that I'm not going to just stop questions if you don't answer them.  So I'm going to ask the specific question again and I'm going to ask you to give me a specific answer.

In your rebuttal report dated March the 23rd of 2025, you did not specifically make mention of the fact that you hadn't reviewed any diagnostic imaging studies.  Agreed?

A.    I'm going to review the report again.

Q.    Okay.

A.    So to answer your question again, all of my -- my documents do state that I reviewed medical records. Again, that's all-encompassing.  To answer your question, yes, that includes that I've reviewed all medical aspects of the patient.

Q.    I understand that that's your answer today, but my question is very specific.

Did you make mention in your rebuttal report of having reviewed diagnostic imaging studies?  Is that in here at all?

A.    That exact verbiage?

Q.    Yes.

A.    It's not.

Q.    All right.  Thank you.

And then also we got a third supplemental report sent to us over the weekend, and this third supplemental report dated April 4th of 2025, which we will mark as Exhibit D [SIC] to your deposition, makes the specific point to identify supplemental documents that you reviewed in this case.  Agreed?

(Thereupon, Third Supplemental Report dated April 4th of 2025 was marked as Exhibit C for identification.)

Hitesh Raval DO
April 08, 2025

THE WITNESS:  Yes.

BY MR. DRAHOS:

Q.    All right.  And would you agree that in this particular supplemental report it only says -- well, actually, I read it.  It's so specific.

It says here you reviewed the deposition of Dr. Scott with exhibits.  You reviewed Exhibits 1 through 4 of the deposition of Dr. Waris.  You reviewed the neurology report by Dr. James Smith.  I don't know who that is, do you?

A.    Yes, that was a document that was supplied to me and I reviewed it.

Q.    Who is Dr. James Smith?

A.    He's a neurologist.

Q.    Dr. James Smith is a neurologist?

A.    Oh, I'm sorry.  Let me clarify that.

Can you repeat the line again?

Q.    Sure.  Who's Dr. James Smith?

A.    Let me pull up that document, because that may have been a typographical error then.  Yeah, that sounds like a typographical error.

Q.    So who is Dr. James Smith?  Nobody?

A.    Yeah, there was a neurology report; I believe I was referring to that and mistakenly the name was input -- inputted incorrectly.

Hitesh Raval DO
April 08, 2025

Q.   Who's the neurologist report that you reviewed then?

A.   I have to look it up.  There was a neurology report that was supplied to me.

Q.   All right.  A neurology report by some unknown doctor dated 2024, correct?

A.   Unknown doctor?

Q.   Well, you don't know who it is, because you have the name wrong.  Yes?

A.   Right, so it's not an unknown physician.  He's a physician and the name is input incorrectly.  I guess it's a typo.

Q.   And here is the next sentence that I think we should really emphasize.

"All shipboard imaging including X-rays and body cam" -- so what you're saying is it's not important enough for you to identify diagnostic imaging from other entities, but it's very specific for you to be able to make sure that everybody knows you reviewed the shipboard imaging, correct?

MR. ARONFELD:  Objection to form.

THE WITNESS:  So I want to clarify that.  When doctors review cases we are looking at everything that was done for the patient, and I think if we're arguing semantics it would be inappropriate.  Any

physician will review blood work, imaging, consults from other physicians, and really all documents that are clinically appropriate. So it's not that I was leaving anything out or inappropriately documenting and perhaps creating a documents' list, it's -- I've reviewed everything that was relevant clinically to this patient. I think that's clear.

BY MR. DRAHOS:

Q. And then you put "Emory Hospital medical records and exhibits June of 2024," correct?

A. If it's there, yes.

Q. All right. And then it says, "I would like to add the above to the Documents Reviewed section, as they were left out of the original report. My opinion in the case has not changed, because of this addendum."

So, I mean, why did you create this document?

A. When I was reviewing the initial report I realized there were some documents that were missing so I added the documents that I had left out initially.

Q. All right. And so why specifically mention "all shipboard imaging studies," but not all Emory imaging studies or all the Hospiten imaging studies or all Jackson Memorial Hospiten [SIC]?

MR. ARONFELD: Objection to form.

THE WITNESS: It was a decision I made. It

Hitesh Raval DO
April 08, 2025

doesn't mean that I didn't review other imaging at another facility.

BY MR. DRAHOS:

Q. So would you agree that you did not review at any point in time the expert report of Dr. Harold Keyserling?

A. Can you tell me that name one more time?

Q. Sure. Harold Keyserling.

A. And can you tell me who he is?

Q. First, I'd like to know if you reviewed the report?

A. I'm trying to gather my brain in memory to see if you can give me some pertinent information that would help me answer your question.

Q. So in your rebuttal report you make mention of the fact that you reviewed Mr. Talan's report, right?

A. Yes.

Q. Okay. I don't see any report ever mentioning that you reviewed Dr. Harold Keyserling's report.

A. The name is a bit obscured to me right now. Can you let me know who that is? Maybe I can get it from my memory.

Q. Sure. He's the expert neuroradiologist for the defense.

A. I don't believe that was supplied to me.

Q.    All right.  And you didn't review the expert report of Dr. Andrew Zelby, correct?

A.    That name is also not familiar.  Who is this?

Q.    That's the defense neurosurgeon.

A.    No, I have not reviewed that, I believe.

Q.    So first question I asked you in this case had to do with whether or not your opinions in the case were limited by virtue of the environment that you were in. Would you agree with me that as you sit here today you don't have all the information?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I have all of the information -- I disagree with you, so no.  That's very clear.

So I have all of the information that I need to make my opinion from the emergency medicine perspective.  I have every piece of data I needed.

BY MR. DRAHOS:

Q.    What is Mr. Harold Keyserling's impression of the diagnostic imaging studies in this case?

MR. ARONFELD:  Objection to form.

THE WITNESS:  So again, I -- that was not sent over to me.  I have not reviewed that, but another physician's opinion on this case wouldn't be relevant to my opinion that I created from the emergency medicine specialty point of view.

Hitesh Raval DO
April 08, 2025

BY MR. DRAHOS:

Q. But you agree that you're not a neuroradiologist. So someone like Dr. Keyserling will have subspecialty expertise in an area of medicine that you don't have. Agreed?

MR. ARONFELD: Form.

THE WITNESS: We are different specialties; there is a lot of overlap, however, between specialties, but we are different.

BY MR. DRAHOS:

Q. Okay. And so if the expert reports of Dr. Harold Keyserling and Dr. Andrew Zelby, who are both specialists in an area of medicine you don't practice in, contradict what you have say here in this case, wouldn't you agree that you're in no position to rebut what they have to say?

MR. ARONFELD: Objection to form.

THE WITNESS: So what I would say is that I have been -- I'm also a specialist in emergency medicine, it sounds like they are not specialists in emergency medicine, so my opinion and their opinion may differ in some aspects. Again, I haven't read those reports, but I would say that perhaps they can't contradict my opinion as well, given that we are different specialists.

Hitesh Raval DO
April 08, 2025

BY MR. DRAHOS:

Q.   So when you have a patient comes into your emergency room and they have a fractured neck, where do you send them?  Who do they go to next in this hospital?

A.   So when someone has a fractured neck there are lots of subtleties that apply, lots of nuances and complexities that are evaluated by me, the emergency specialist.  These can be minor induced or major induced and these are decisions that I formulate based on my expertise.

Q.   So --

A.   So you asked me in this hospital what I would do, it comes down to all of these different scenarios. It's a bit of a general question.  To answer it better, I think it comes down to the nuances of the type of injury.

Q.   What about a patient who comes in with a spinal cord injury.  Who do you send them to?

A.   A spinal cord specialist.

Q.   Which would be?

A.   Typically, a neurosurgeon.  It can be an orthopedic surgeon with a spine specialty -- specialty as well.

Q.   And when a C.T. or an MRI is created of a patient who suffered a spinal cord injury, would you

Hitesh Raval DO
April 08, 2025

defer to the neuroradiologist in terms of the interpretation of that finding?

A.   This is within the realm of emergency medicine specialists to interpret C.T. scans, MRIs, X-rays. These are actually medical emergencies and this actually is my specialty, so I don't defer to them.  I would absolutely seek their opinion; however, I have no limitations in medicine and I understand there are different specialties.  To not consult another specialist in that specific scenario would be, I think, a shortcoming.  I would absolutely consult a spine specialist, but it's in conjunction with a specialist I do formulate my opinion in that setting typically, but it is within the realm of an emergency medicine specialist to review those images if that is what your question was.

Q.   All right.  Hypothetically, let's say a patient comes in to this hospital and they have a spinal cord injury or suspected spinal cord injury that's on the film and you're standing there with the neuroradiologist, and the two of you differ on what you see there on the film.  Who ultimately is going to have the final say in what that film shows, you or the neuroradiologist?

MR. ARONFELD:  Object to the form.

Hitesh Raval DO
April 08, 2025

THE WITNESS: So the physician who's primarily taking care of this patient, the one who is able to do a physical exam, the one who is managing that patient at bedside is actually the emergency physician. The neuroradiologist is a consultant. So I think both of them will have to come up with a plan. Whether they disagree on some matters or agree on other matters, overall you together as a team make those decisions.

BY MR. DRAHOS:

Q. So let's say --

A. One means -- not more important than the other.

Q. -- you and the neuroradiologist differ, but you have agreed that that person needs to be sent to the neurosurgeon, who ultimately decides the final plan of care in that scenario?

A. It's the physician who is taking care of the patient at that time.

Q. Would be the neurosurgeon?

A. In most practice settings it's an intensivist or a hospitalist who is taking care of that patient. They're the ones that typically consult all the physicians, such as perhaps a neurosurgeon. In most of the facilities that I've worked at in the past, the

Hitesh Raval DO
April 08, 2025

primary team is not the neurosurgeon.  They're not

taking care of the patient; they're consultants.

BY MR. DRAHOS:

Q.    So let's talk about your background a bit.

Where did you go to undergrad?

A.    State University of New York, Binghamton

University.

Q.    And you did not go to medical school --

MR. ARONFELD:  Objection to form.

BY MR. DRAHOS:

Q.    -- correct?

A.    As a physician in the U.S. you have to go to

medical school.  I did go to medical school.

Q.    So you're not a medical doctor, though?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I am a medical doctor.

BY MR. DRAHOS:

Q.    You're a doctor of osteopathic medicine.

There's a difference between the two, isn't there?

A.    There's really no difference at all and I --

osteopathic medicine, you're still a medical doctor.

Q.    Are you an M.D.?

A.    I'm a D.O.

Q.    All right.  So you're not Dr. Raval, M.D.,

you're Dr. Raval, D.O., correct?

Hitesh Raval DO
April 08, 2025

A.    Raval, D.O., yes.

Q.    I'm sorry.  Raval.

A.    No problem.

Q.    Did you apply to medical school?

A.    That's the only way to get into medical school, you have to apply to get into medical school. Absolutely.

Q.    I understand that you're calling osteopathic college medical school, but what I'm wondering is, did you apply to schools that offer M.D.s?

A.    I did not.

Q.    All right.  So you only applied to schools that offer osteopathic degrees?

A.    Absolutely, yeah, I chose the osteopathic route over the M.D. route.

Q.    The expert testimony that you've given in the past, the one particular case that you identified in your report, what was that case about?

A.    I don't recall all the details of that case at this time.

Q.    Galinda Hudson versus Carnival?

A.    Yes.

Q.    Who did you testify for in that case, Ms. Hudson or Carnival?

A.    For Ms. Hudson.

Hitesh Raval DO
April 08, 2025

Q.    And who was the attorney on behalf of Ms. Hudson?

A.    Mr. Spencer Aronfeld.

Q.    How many times have you testified as an expert for Mr. Aronfeld?

A.    I have testified as expert, I believe it was that one time with a deposition.

Q.    And you don't recall what the case was about?

A.    I do not.

Q.    Did you testify at trial or just in deposition?

A.    In deposition.

Q.    Who was the attorney who took your deposition?

A.    I do not recall.

Q.    How many matters are you currently consulting with Mr. Aronfeld about?

A.    Just this case.

Q.    So have you ever testified as an expert for anyone else other than Mr. Aronfeld?

A.    I have not.

Q.    Ever been sued for medical malpractice?

A.    No, I have not.

Q.    So curious to know what you're going to answer to this question:  Can cervical collars be removed in an emergency room setting without imaging studies being

Hitesh Raval DO
April 08, 2025

taken?

A.   Yes, they can.

Q.   What are the circumstances in which you believe -- Dr. Raval believes that cervical collars can be removed without having imaging studies taken?

A.   So this has been a matter that's been studied in medical literature for years to create a standardized pattern -- practice pattern so all physicians without really having to think on their own and to -- so that's streamlined and standardized as several criteria that have been established as the standard of care, one of them being the NEXUS Criteria, the other being the Canadian CT -- C-Spine Rules criteria and using physician judgment, applying one of these criteria we decide when to take the collar off.

Q.   All right.  So does that then mean there is a recognized uniform standard upon which emergency room physicians or cruise ship doctors can make a medical decision that is appropriate to remove this collar based upon my clinical findings on an exam and my interpretation of films?

A.   And -- correct, and using the criteria as well.

Q.   Okay.  So you have removed cervical collars in instances where patients have come in here reporting of

neck pain?

A.   Yes, if they've satisfied all the criteria.

Q.   The point is that you've done it?

A.   Many times I've done it if it has satisfied the criteria, yes.

Q.   So let's talk about the criteria.  You've made mention of the NEXUS Criteria; that is a uniform standard that all doctors at least attempt to follow?

A.   Correct.

Q.   And so would you agree -- well, strike that.

What is the NEXUS Criteria?

A.   So there's a few points that are brought up by the NEXUS Criteria, and really the purpose of this is to identify which patients need adequate imaging and which ones do not.

The NEXUS Criteria identifies that you don't need imaging at all if -- if it's a low-risk or you have low suspicion for a major neck injury.  What does major neck injury mean?  A spinal cord injury or a neck fracture, if there is low suspicion for this, you don't even need to do an X-ray.

Q.   Okay.  And does that then mean that if a patient, let's just say, passes the NEXUS Criteria, the collar can be removed?

A.   Yes.

Q.   Okay.  So I asked what NEXUS Criteria was, and you answered and you told me basically what it is, but what I'm wondering is:  What is the specific criteria?

A.   Absolutely.  So there's I believe five points, and off the top of my head, I hope I don't miss one right now, but number one is the patient has to be awake and alert.

Number two, no neck tenderness specifically to the midline of the neck.  There should be no neurological deficits on this patient.  And the patient cannot be intoxicated.

Q.   Okay.  You have four, missing one.

I prefer you not --

A.   Is it okay if I --

Q.   No.

A.   -- look it up?

Q.   I'd prefer you not to do that.  I'd prefer you tell me based upon your knowledge, training, and experience.

A.   I believe --

MR. ARONFELD:  Objection.  Form.

THE WITNESS:  So I believe that the final one is pain-free movement of the neck on flexion or extension.

BY MR. DRAHOS:

Q.   That's wrong.

A.   It's possible.

Q.   Yeah.  I mean, so what you're telling the members of the jury is Dr. Raval, expert emergency room physician for the plaintiff, cannot rattle off accurately the NEXUS Criteria when asked?

MR. ARONFELD:  Objection to form.

THE WITNESS:  So can you explain to me what was wrong?

BY MR. DRAHOS:

Q.   Sure.  I mean, in a second, but beforehand, I want to make sure we make this point here.

When you came here today prepared to testify as an expert, what did you do to prepare yourself?

A.   I reviewed the documents that were supplied and that was preparation for this.

Q.   Okay.  The documents that were supplied by Plaintiff's counsel?

A.   Correct.

Q.   Okay.  I mean, you had to know I was going to ask you about the NEXUS Criteria?

A.   Absolutely.

Q.   Didn't study -- didn't study up on it beforehand?

A.   You know, this is something I practice on a

Hitesh Raval DO
April 08, 2025

daily basis.  There's times where we have references.  I have this in my ER, in the trauma bay, so this is something that we use on a daily basis.

Q.   Right.  Which I would think it would be all the more reason why you should be able to rattle off all five of these accurately off the top of your head, no problem.

MR. ARONFELD:  Objection to form.

THE WITNESS:  Sometimes we use references.  It helps on a daily basis to use additional protocols that are -- that I have access to on my phone, which is what I would have done now, whenever I need it.  Even though I've done this for 13-plus years, I still refer to references, and these are located on my phone and used at bedside to assist in clinical decisions on a daily basis --

BY MR. DRAHOS:

Q.   Okay.

A.   -- by no means does this mean that I'm not aware of the NEXUS Criteria.  That would be faulty. This is something we do multiple times a day as emergency physicians.

Q.   My point -- what you're telling us then is that you got to look it up in order to be able to get it right here today?

Hitesh Raval DO
April 08, 2025

A.   At this moment, I think, yeah, I'll look it up easily, it takes a few seconds to find it.

To add, I use references on a daily basis throughout the day, during my clinical shifts probably ten times a day.

Q.   All right.  So what I'd like to ask you about is the fifth criteria that you talked about, pain-free movement of the neck on flexion and extension.  Tell me what would be involved in that?

A.   If the patient no longer has pain subjectively, meaning they're not complaining of pain, you can then ask the patient to perhaps flex their head and extend their head, if all of the other criteria were satisfied.

Q.   And in that incident, if the patient says I'm able to flex and extend my head without any pain, can the doctor remove the collar?

A.   If the other criteria was satisfied, I want to make sure that's clear --

Q.   Yes.

A.   -- yes, it's not just about this one criteria that we're talking about right now; everything else needs to be satisfied first prior to removing the cervical collar.

Q.   All right.  So in this particular instance

involving Mr. Smith, when Dr. Waris arrived on scene, being the scene where he fell and initially suffered his injury, can we both agree he did not meet the NEXUS Criteria?

A.   Yes, I believe that he didn't satisfy the rules of the NEXUS Criteria, because of the mechanisms of injuries and some other parameters.

Q.   All right.  And so you're saying mechanisms of injury, but I'm making it so much easier.  Would you agree that he did not meet the NEXUS Criteria when Dr. Waris arrived on scene, because he specifically reported neck pain?

A.   Correct.

Q.   All right.  And so in that circumstance then specifically reporting neck pain, it would be appropriate for Dr. Waris to apply a cervical collar, correct?

A.   Correct.

Q.   And he did that, right?

A.   It's not just about the neck pain, there's other issues as well --

Q.   Right.  But --

A.   -- but yes, he did put a collar on him.

Q.   All right.  For right now to make it as easy as possible, we both can agree that when Dr. Waris

arrived and Mr. Smith reported neck pain, he didn't meet the NEXUS Criteria and therefore it was appropriate for Dr. Waris to apply a cervical collar, which he did?

A.    Correct.

Q.    So as far as you and I are both concerned, when Dr. Waris arrived, he followed the NEXUS Criteria?

A.    Correct.

Q.    All right.  Now, let's talk about Mr. Smith when he finally was transported to the ship's medical center.  Okay.  So would you agree that from the moment in time that he arrived in the medical center until the moment in time that he began reporting right-sided neurologic deficits, he never had an altered level of consciousness?

MR. ARONFELD:  Objection to form.

THE WITNESS:  He did not.

BY MR. DRAHOS:

Q.    All right.  And as a matter of fact, when he was first reviewed by the triage nurse, she noted a Glasgow Coma Score 15 out of 15, right?

A.    Correct.

Q.    And that means he's of normal consciousness?

MR. ARONFELD:  Objection to form.

THE WITNESS:  Correct.

BY MR. DRAHOS:

Q.   Okay.  And we can both agree that when Mr. Smith arrived to the medical center, throughout the entirety of his time there, he was never intoxicated, correct?

A.   Based on my review, correct, I don't suspect that he was intoxicated.

Q.   All right.  And have you found anything in the records to indicate that Mr. Smith would not be a reliable historian?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I have -- no, I have not.

BY MR. DRAHOS:

Q.   Therefore, would it have been reasonable for Dr. Waris to rely upon Mr. Smith in terms of him being able to report how he was feeling and his medical history before the ship?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I want to actually take that back, the initial response.

You asked me -- your previous question was what again?  Was he -- at any point, was he not reliable as a historian?  Is that what you asked me?

BY MR. DRAHOS:

Q.   I had asked you that two or three questions

Hitesh Raval DO
April 08, 2025

ago, yeah.

A.   What was the last question you asked me.

Q.   We can ask the court reporter.

THE COURT REPORTER:  Okay.  Give me one second.

His feeling about his medical history.

(A portion of the record was read by the court reporter.)

THE WITNESS:  And was he not a reliable historian?

THE COURT REPORTER:  The historian was the one before.

THE WITNESS:  So that -- yeah, I'm referring to that one.

BY MR. DRAHOS:

Q.   What is it that you want to change about your answer, Doctor?

A.   There was documentation of him being in pain, and sometimes you can ascertain that the patient was in a lot of pain and may not be the most reliable historian, and I believe that his family members gave some of the history.  So I do want to give Mr. James Smith, the patient, some benefit of the doubt that when you're in pain, sometimes it's not always reliable.

Q.   Okay.  And he had family there to be able to

provide his history to the doctor?

A.   I believe so.

Q.   Okay.  And when you're working in the emergency room and you have a patient come in with family members and they're in pain and they can't report their history, do you, as a matter of practice, get the history from the family members?

A.   It's what -- absolutely.  Whatever data I can get is helpful to help the patient.  Sometimes the patient can't really ascertain everything themselves given the circumstances that they're in.

Q.   Okay.  So in your report on page 5 one of the first opinions that you provided you state -- and confirm for me that these are your words, please?

"An emergency physician's primary concern in this setting is to assess for injury to vascular, bony, or soft tissue structures of the neck."

Are those your words?

A.   Yes.  And this is in -- where exactly did you --

Q.   It's page 5 of your report.

A.   I'm referring to it now.

Yes.

Q.   Okay.  By the way, did you write this whole report?

Hitesh Raval DO
April 08, 2025

A.   This -- my report?

Q.   Yes.  Are these your --

A.   By myself, yes.

Q.   All your words?

A.   Yes.

Q.   Did anybody help you with this?

A.   No.

Q.   Nobody made any edits or changes or anything like that?

A.   No.

Q.   And would the same be true for the supplemental report that you drafted?

A.   Yes.

Q.   And would the same be true for that third report that we talked about that identified documents, did you write that also?

A.   Yes.

Q.   Okay.  So getting back to it.  So when you say that an ER doctor's primary concern in this setting is to assess for injury to vascular, bony, or soft tissue structures, did Dr. Waris do this?

A.   Did he assess for them --

Q.   Yes.

A.   -- I believe so.

Q.   All right.  And you would agree he

specifically took a history, right?

A.   Yes.

Q.   All right.  And he specifically did a physical exam, right?

MR. ARONFELD:  Objection to form.

THE WITNESS:  Yes.

BY MR. DRAHOS:

Q.   All right.  And you read his deposition?

A.   Yes.

Q.   All right.  And did he specifically testify that he palpated C1 through C7 of Mr. Smith's neck?  You saw that part, right?

A.   I reviewed his deposition.  I recall that he mentioned he did a physical exam.  Did he say specifically C1 to C7?

Q.   Yes, sir.

A.   I don't recall that exact detail.

Q.   All right.  Well, as you sit here today, if I was to represent to you that Dr. Waris testified that he specifically palpated C1 through C7 of the cervical spine, would you have any reason to dispute the accuracy?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I would not.

BY MR. DRAHOS:

Hitesh Raval DO
April 08, 2025

Q.    All right.  And where specifically did he elicit tenderness from Mr. Smith when he did this examination of C1 through C5?

MR. ARONFELD:  Form.

THE WITNESS:  So what I recall is he did elicit tenderness to the spine.

And where exactly are you referring, to what segments?  What level of the cervical spine?

BY MR. DRAHOS:

Q.    Yes, sir.

A.    I believe he said the upper neck is where he elicited tenderness.

Q.    He gave a very specific answer.  He specifically said what cervical disc he was able to palpate tenderness.  Do you recall, as you sit here today, which specific cervical disc it was?

MR. ARONFELD:  Objection to form.

THE WITNESS:  So -- so I want to clarify something.  You can't palpate a cervical disc with your hands.  So I think that -- the question you're asking is -- to answer your question, you can't palpate it.

BY MR. DRAHOS:

Q.    All right.

A.    A cervical disc is a deeper structure; it's

Hitesh Raval DO
April 08, 2025

not possible to palpate that.

Q.    When I -- I appreciate that you perhaps are being particularly detailed with semantics, because I attacked you with that in the beginning, so that's fair enough.  But what I'm getting at with my questions, to make sure we're on the same ground here as we talk, is that as a physician when you're examining someone's neck, can you move your fingers or manipulate your fingers down from top to bottom to be able to identify where the C1-C2, C3-C4, C4-5, 5-6, and 6-7 are located?

A.    So I'm not arguing semantics for no reason. When discussing the absolute ability to physically and adequately examine a cervical spine, you want to examine each level, C1, 2 to 7, as you mentioned.

Q.    Okay.

A.    The discs are deeper structures that you cannot physically palpate.

Now, you can palpate a portion of the spine and it's only one portion of the spine, which is the most -- the spine that's most superficial to the skin, if you press your own neck, you feel those bumps, that's only a fraction of actual bony spine and those are spinous processes, but what's important is that you can palpate those portions, yes, and you can palpate each level of cervical from 1 to 7.

Hitesh Raval DO
April 08, 2025

Q.   Okay.  So regardless of how we characterize it here or attempt to try to describe it, what area of the spine did Dr. Waris identify as the location where Mr. Smith was complaining of tenderness --

MR. ARONFELD:  Form.

BY MR. DRAHOS:

Q.   -- on his physical exam?

MR. ARONFELD:  I'm sorry.

Form.

THE WITNESS:  I want to clarify that he was complaining of pain to his neck, and based on my recollection of Dr. Waris' testimony, it was the upper neck where he was eliciting tenderness.

BY MR. DRAHOS:

Q.   Okay.  And when you say "upper neck," what would you classify as upper neck?  If we're going through this C1 through C7 of a category to try and be as specific as we can, when you say "upper neck" or how -- how do you understand that?

A.   My understanding would be from the midway point to the uppermost points of perhaps C5 or C4 and half above or in that range, right.

Q.   Let me see if I can help a little.

A.   Above level of C4 to clarify.

Q.   Okay.  All right.  So if Dr. Waris testified

Hitesh Raval DO
April 08, 2025

in this case that on exam, he was able to palpate or he was able to elicit a tenderness response to Mr. -- from Mr. Smith at the C2-C3 level, is that accurate with your recollection of what you read?

A.   Yes.

Q.   Okay.  And in this particular case, you reviewed the cervical X-rays that were taken?

A.   I did.

Q.   Okay.  And what is your understanding of why the entirety of Mr. Smith's cervical spine was not captured on X-ray?

A.   What is my -- I'm sorry.  Say that one more time.

Q.   Sure.  What is -- well, we can both agree, it's one of your opinions in the case, it's probably the only thing that you and I are going to agree on today, that the entirety from C1 to C7 is not captured on the X-ray onboard the ship.  Agreed?

A.   Yes, it was very poor quality film.

Q.   All right.  I didn't ask about that.  I just asked whether or not C1 through C7 were captured.  We -- you and I are both in agreement it didn't capture from C5 down.  Agreed?

MR. ARONFELD:  Form.

THE WITNESS:  Perhaps even higher.  I think C1

Hitesh Raval DO
April 08, 2025

was very -- not visualized well, but it was the
upper portion of the spine.

BY MR. DRAHOS:

Q.   All right.  Could you see C2-C3?

A.   Vaguely, yes.

Q.   All right.  Do you know why the entirety of
Mr. Smith's spine was not captured on X-ray film?

A.   I do not, but in Dr. Waris' testimony, he said
he had difficulty getting good X-rays.

Q.   Okay.  Dr. Waris specifically talked about the
attempts to make -- the attempts that were made to try
and capture his entire spine?

        MR. ARONFELD:  Objection to form.

        THE WITNESS:  Yes, I recall that.

BY MR. DRAHOS:

Q.   So an effort was made, you would agree?

A.   Yes.

Q.   Okay.  So the X-ray that you did look at, was
there any pathology at C2 and 3?

A.   It's not possible to assess that based on the
quality of the film.

Q.   Okay.  So what you're saying is you can't
determine based upon your review of the film that there
was any pathology at C2-3?

A.   It's because of the angles that it was taken

at; I don't think it sufficient enough to make a sound medical decision.  It's -- the X-rays were really poorly performed.  What does that mean?  I cannot rule out that there was an injury there.

Q.   But you cannot also state here today that there was an injury at C2-3 based upon your review of that film?

A.   Based on just the film, correct.

Q.   Okay.  So you wrote in your report, "I believe that a prudent physician in similar circumstances would not have removed the cervical collar on Mr. Smith based on his clinical presentation with persistent neck pain, neurological deficit, and mechanism of injury."

Those were your words?

A.   Yes.

Q.   All right.  Let me first ask you about your use of the term "similar circumstances."  Okay?

Do you have any experience working as a cruise ship doctor?

A.   I have not worked as a cruise ship doctor.

Q.   Okay.  Have you ever been on a cruise ship medical center?

A.   I visited one previously, leisurely, but not in a professional setting.

Q.   When was that that you visited one leisurely?

Hitesh Raval DO
April 08, 2025

A.    On vacation years ago.

Q.    What cruise line was that?

A.    I don't recall.

Q.    Okay.  So can we both agree you've never been in the Carnival Glory's medical center?

A.    Correct.

Q.    Have you ever been on board a Carnival vessel?

A.    Yes.

Q.    How many times?

A.    Several.

Q.    How many times have you been in a Carnival vessel's medical center?

A.    If the vacation I was on was Carnival, then maximum one.

Q.    And that was, you said, years ago; can you give me some sense?  How many years?

A.    Less than eight.

Q.    Less than eight, more than three?  I mean, how -- what kind of range are we talking about?

A.    More than three.

Q.    More than five?

A.    No, between three and eight years.

Q.    Did you treat any patients while you were in there?

A.    Again, I was on vacation.  I stated I was a

Hitesh Raval DO
April 08, 2025

physician and they gave me a quick tour of it so that was about it.

Q.   Okay.  Have you ever spoken to a cruise ship doctor while -- or consulted with a cruise ship medical doctor concerning medical care that was pending in the ship's medical center?

A.   No.

Q.   Okay.  Do you have any experience whatsoever with the Carnival Health Operations Center?

A.   Do I have experience professionally?

Q.   Yeah.  Have you ever spoken to any of them?

A.   No.

Q.   Have you ever been to Hospiten in Montego Bay?

A.   I have not.

Q.   All right.  So you gave really, I mean, three qualifications here.  You say that a prudent physician in similar circumstances would not have removed the cervical collar based on A, clinical presentation with persistent neck pain; B, neurological deficit; and 3, mechanism of injury.  Right?

A.   Yes.

Q.   Okay.  So I'm curious as to why -- what the basis is for your inclusion that Mr. Smith was complaining of, quote, "persistent neck pain"?

A.   So just reviewing the shipboard documents he

Hitesh Raval DO
April 08, 2025

had an injury, he had fallen, complaining of neck pain, and ultimately, he was treated for this neck pain.

Q.   Okay.

A.   So that's where my mention of persistent neck pain comes from.

As he was disembarked from the boat as well, the -- in this final hour I believe that he was on the shipboard ER, he again complained of neck pain and shoulder pain.  So there is a persistence there when he first entered the ER to when he left.

Q.   So what is your definition of the word "persistent"?

A.   That the neck pain did not completely dissolve.

Q.   No, I wasn't asking you about neck pain.  I was asking about how you would define the word "persistent"?

A.   Persistent in the clinical setting would be pain that doesn't really go away.

Q.   Okay.  Do you have the medical chart for the Carnival Glory in front of you?

A.   I can pull it up here.

Yes, I have it.

Q.   So we agree upon seeing he complained of neck pain.  We agree when he came in and the initial exam was

Hitesh Raval DO
April 08, 2025

done, he had neck pain, right?  We've established that so far.  Agreed?

A.   Yes, and --

Q.   All right.  So what I'd like to do is turn your attention to the medical chart specifically.  It would be at 23:00.

A.   Do you know what page that's on?

Q.   Yeah, I'm going to get that for you right now. So it would be page 25 of 28.

A.   Yes.

Q.   All right.  So do you see the note that is written there by Nurse Christine at 23:00?

A.   So page 25 at 23:00 -- I don't see anything documented -- maybe you're on the wrong page there.

Q.   23:00 on page 25, yeah.

A.   Can we compare?  I'm not seeing here.

Q.   So it's -- you're on the wrong page.

A.   So that's page 25.

Q.   Is it --

A.   No, it's not.

Q.   You got to go to the next page.

A.   So next page is page 26 of 29 at the bottom, I can see that.

Q.   Yours says -- no, you got to go to the next page.

Hitesh Raval DO
April 08, 2025

A. So on page 27 I have at 23:00.

Q. 23:00.

A. "Patient able to move the neck."

Is that the one?

Q. Yes, sir.

A. Yes.

Q. Okay. So specifically at 23:00 you would agree that Mr. Smith still had the cervical collar on?

A. Yes.

Q. All right. And specifically at 23:00 he reported being able to move his neck?

A. Yes.

Q. All right. And did he say that he was able to move his neck without pain?

A. That wasn't documented, no.

Q. Well, do you know as you sit here?

A. I assume that based on NEXUS Criteria that most prudent physicians would have only removed the cervical collar, as it's stated at that time, if he had no pain.

Q. So the next sentence down there, it says, "C-Spine clearance done."

Do you see that?

A. Yes.

Q. Do you know specifically what was done when

it's indicated there as "C-Spine clearance"?

A.   So it's typically applying one of these two criteria, the NEXUS or the Canadian C-Spine Rules, and then you can, what we call, clear a C-Spine and therefore take off the collar safely.

Q.   Okay.  So as you sit here today then, would you agree that Dr. Waris applied the NEXUS Criteria and determined whether or not to remove the collar at 23:00?

A.   So I don't believe that the NEXUS Criteria allows him to remove the collar, given the current pathology and disease that Mr. Smith is dealing with.

Q.   So --

A.   So I think that's incorrectly --

Q.   -- that's different --

A.   -- performed.

Q.   -- than what I'm asking you, though.

What you're saying is you disagree with his use of the NEXUS Criteria, meaning you're saying he didn't use it properly, but as you sit here today, would you agree with me that he used it, whether or not you agree if he did it correctly, that he used it?

A.   I stated earlier, yes, I believe he used one of the correct criteria, which is kind of standard --

Q.   All right.

A.   -- to remove the collar.

Hitesh Raval DO
April 08, 2025

Q.   You agree he had used that criteria at 23:00 when he was deciding whether or not to take it off?

A.   Yes.

Q.   And so who was in a better position today to tell the jury how Mr. Smith responded to specific questions about neck pain, Dr. Waris or yourself as the paid expert?

MR. ARONFELD:  Objection to form.

THE WITNESS:  So when discussing the neck pain, this is just one of the parameters that we use to decide whether this patient should have their collar taken off or not.  So to focus on just the pain would be inappropriate and bad medical care.  There's other points that need to be addressed, and therefore the criteria is more than just one parameter just beyond just pain.

BY MR. DRAHOS:

Q.   I'm going to move to strike; your answer is nonresponsive, because that is not at all what I asked.

What I asked was:  At 23:00 when the NEXUS Criteria was being applied, who was in a better position to ultimately tell the jury how Mr. Smith responded, Dr. Waris or yourself?

MR. ARONFELD:  Objection to form.

THE WITNESS:  Your question was about pain

Hitesh Raval DO
April 08, 2025

specifically in the last time you asked me.  You didn't ask me about this, this time.

So to answer this question, these are objective criteria.  I think that any ER physician reviewing the documents that Dr. Waris applied in his documentation of the case, I think any physician would be in the right position, equal setting, to remove the collar based on the understanding of the documentation.

BY MR. DRAHOS:

Q.    If Dr. Waris were to testify in this case that he asked Mr. Smith, Hey, Mr. Smith, are you able to move your neck without pain?

And Mr. Smith said, Yes, I can move my neck without pain.

Are you in a position to be able to say that Dr. Waris got that wrong?

A.    I think that the documentation doesn't exist, so I can't make up something if you're going to say otherwise.  I'm reading the documentation, what's in it, which is what physicians would typically do is document what their thought process was when removing the collar. This is a critical moment in the person's practice and their health care in the emergency department when they come in with a neck injury.  This is something that

Hitesh Raval DO
April 08, 2025

needs to be documented and based on -- to answer your question, I don't see the documentation, therefore I can't assume anything else beyond that.

Q.   Okay.  So you said you read Dr. Waris' deposition?

A.   Yes.

Q.   How did he answer the question when he was asked that question?  How did Dr. Waris testify about how Mr. Smith responded at 23:00 when he was deciding whether or not to remove the collar?  What did he tell us?

A.   So verbatim, I can't -- it's difficult for me to recite the exact word-for-word response.  He was asked about it in the deposition, and I think his response was a bit vague and unclear and I think it needs further elucidation.

Q.   Okay.  So let me make it as clear for you as I possibly can.

If Dr. Waris is to testify in this case in front of the jury under oath that at 23:00 when he asked Mr. Smith whether or not he was experiencing any neck pain on movement, and Mr. Smith told him, no, I am not. As you sit here today, are you able to rebut Dr. Waris' testimony in any way?

MR. ARONFELD:  Objection to form.

THE WITNESS: If he specifically said only referring to the pain aspect, I would not rebut that and I actually believe him --

BY MR. DRAHOS:

Q. All right.

A. -- that is what most physicians would -- it would be believable if a physician said that.

Q. Sure. And you said that you need to see documentation. So let's look at 1:07 a.m. after the collar had been removed at this point. What does it say about Mr. Smith's neck pain at that point?

A. The same page?

Q. Yes, sir.

A. "Guest has no complaint of neck pain."

This is two hours after it was removed.

Q. All right. And you would agree that at this particular time he's still moving his right side, correct?

A. Correct, I believe that was around 3:00 --

Q. Okay.

A. -- when he -- the neuro- -- the other neurological symptoms started.

Q. All right. So would you also agree while looking through here now just for the sake of completeness at 2:10 a.m., he was resting -- or he was

"sleeping comfortably"?

A.   Yes.

Q.   Meaning no indication that he was complaining of any neck pain at that time either, correct?

A.   Correct, but I want to clarify that it's not just about pain, and let's remember that the criteria to remove a collar requires several parameters to be met and solely pain is not --

Q.   We're going to talk about that.

A.   -- the only indicator to remove the collar.

Q.   Don't worry.  We're going to talk about that.  Right now, I'm just focusing on the pain part of it.

A.   Sure.

Q.   Okay.  So at 2:10 a.m. no indication that he's complaining of any neck pain, correct?

A.   At 6:00 a.m. -- no, I'm sorry.

Q.   2:10.  2:10?

A.   At 0100, it was documented.  At 2:10 is after that he's asleep, I don't know if he has pain or not; it says he's sleeping, that's all --

Q.   It says, "sleeping comfortably," right?

A.   Yes.

Q.   Okay.  And then at 4:10 a.m. it says, "Patient sleeping comfortably."  Correct?

A.   Correct.

Hitesh Raval DO
April 08, 2025

Q.   What has Mr. Smith said in his own words about how he was feeling while in the medical center?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I haven't spoken to Mr. Smith.

BY MR. DRAHOS:

Q.   At no point in time?

A.   No.

Q.   Have you ever spoken to his wife?

A.   I have not.

Q.   Have you spoken to anybody that was in the medical center that day or that evening?

A.   I have not.

Q.   You said that you reviewed records from University of Miami, correct?

A.   Correct.

Q.   And those doctors asked Mr. Smith how he was feeling that night, didn't they?

A.   Perhaps if you could remind me.

Q.   Well, I mean, you didn't make any mention of any of the findings that the UM doctors made during their assessments of Mr. Smith.  Why not?

A.   I'm confused by your question.

Q.   Sure.

A.   My opinion did take into account all the records.

Hitesh Raval DO
April 08, 2025

Q.    So if the medical records from the University of Miami make mention of the fact that Mr. Smith specifically told them that after the fall he felt fine until he woke up and was unable to move his lower -- left lower extremity and his right extremity, do you have any reason to dispute the accuracy of the findings of the UM doctors?

MR. ARONFELD:  Objection to form.

THE WITNESS:  So I'm still a bit confused, if you can help me out.

So he felt fine when he was in the ER up until the point where he had right-sided symptoms; is that --

BY MR. DRAHOS:

Q.    Yes, sir.

A.    So I --

Q.    And left-sided symptoms.

A.    I believe he had neck pain.  That actually is what led him to the ER.  So I don't -- so if the patient said they felt fine, I wonder what they really mean by that, because he was complaining of pain and he did get injured.

Q.    He felt neck pain, but then according to Dr. Waris at 11 o'clock when the collar was removed, he specifically said he wasn't feeling any neck pain,

Hitesh Raval DO
April 08, 2025

correct?

MR. ARONFELD:  Objection to form.

THE WITNESS:  At 11 o'clock he was not --

BY MR. DRAHOS:

Q.  23:00.

A.  Uh-huh.  Correct.

Q.  All right.  And then two hours later at 1 o'clock in the morning he specifically said he didn't have any neck pain, right?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I believe he was sleeping comfortably.  I don't think there is anything else beyond -- so he did not say that he had neck pain.

BY MR. DRAHOS:

Q.  At 1 o'clock in the morning -- we talked about this earlier --

A.  Oh, yes.  He -- yes.  Correct.

Q.  So would you agree that from 11:00 p.m. until 4:00 a.m. there's no report of any new neurological deficits?

MR. ARONFELD:  Objection to form.

THE WITNESS:  That, I disagree with.

BY MR. DRAHOS:

Q.  Tell me where specifically in this chart it indicates that between 11:00 p.m. and 4 o'clock in the

Hitesh Raval DO
April 08, 2025

morning he reported new neurologic deficits?

A.   So I think what's important here is "new neurological deficits."  This patient was unable to move the left side of their body.  Now, if you have a neck injury and a spinal cord injury, as Mr. Smith had, which was debilitating and life-changing, he is in a situation in the ER where he is unable to move the left side of his body at this time.

Now, if he injured his neck and he had a worsened spinal cord injury, perhaps what's an already weakened left side is now damaged further, and it might be difficult for the patient to even assess that, given that he has previous left-sided weakness and maybe sensory changes and loss.  So there could have been even further damage to the spinal cord and the patient is not really himself aware of it.

Q.   All right.

A.   So I cannot rule out further injury or new neurological injuries.

Q.   Let me ask you something about your understanding of what your role is here today.  When a patient comes into this hospital and you are the treating physician, you agree that you are their treating doctor, correct?

A.   Yes.

Q.   All right.  Today you are not Mr. Smith's treating doctor.  Agreed?

A.   Correct.

Q.   Today you are an advocate for Mr. Smith, are you not?

MR. ARONFELD:  Objection to form.

THE WITNESS:  Yes.

BY MR. DRAHOS:

Q.   All right.  And you're serving as an advocate as you sit here today?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I'm sitting as an expert witness to review this objectively.

BY MR. DRAHOS:

Q.   And so the question that I just asked you a few questions ago was:  Tell me what new neurological deficits he complained of between 11 o'clock p.m. and 4 o'clock in the morning?  And so that's what my question is.  It has nothing to do with his ability to determine whether or not he has left-sided deficits or anything.

The question is:  Between 11:00 p.m. and 4:00 o'clock a.m., did he make any report of any new neurologic deficits?

MR. ARONFELD:  Form.

Hitesh Raval DO
April 08, 2025

THE WITNESS:  No, he did not.

BY MR. DRAHOS:

Q.   All right.  Thank you.

So let's talk about the NEXUS Criteria at 11:00 p.m.  Okay?

So you would agree at 11:00 o'clock p.m. when the collar was removed, he was still conscious, right? He had not lost consciousness?

A.   Correct.

Q.   All right.  He was not intoxicated?

A.   Correct.

Q.   Okay.  And according to Dr. Waris he did not report any spinal tenderness at that time, correct?

A.   Correct.

Q.   So using your criteria at that particular time he was specifically asked if he could move his neck without pain and he said, yes, right?

A.   Correct.

Q.   And so judging by the answer you just gave me a minute ago as the advocate for Mr. Smith, it sounds to me like what you're going to tell the members of the jury is that because Mr. Smith had an old neurologic deficit, that collar couldn't be removed.  Is that what you're going to tell them?

MR. ARONFELD:  Objection to form.

Hitesh Raval DO
April 08, 2025

THE WITNESS:  That's partially the issue here.

So now to answer your question, I -- again, I don't think that NEXUS is satisfied whether Mr. Smith was in pain or not; the NEXUS Criteria is only applied to low-risk features.  What does that mean?  That if you have a low-risk of major injury to the neck, only then do you apply the NEXUS Criteria and remove the collar.

Mr. Smith had fallen, he felt a crunch sound in his neck, he had neck pain, he had a previous neurological injury, and with that fall, I believe that this is not a low-risk feature.  And, in fact, the NEXUS Criteria does not ever get satisfied whether he's in pain or not, whether he's comfortable, sleeping or not, you cannot apply NEXUS any further, because I think it's inappropriate to do so.

BY MR. DRAHOS:

Q.  All right.  So did you make that opinion in your first report?

A.  Yes, I did.

Q.  Tell me where you said that this was a high-risk injury and that NEXUS Criteria wouldn't apply in your first report?

A.  In my first report?

Hitesh Raval DO
April 08, 2025

Q.   Yes, sir.

A.   Give me a second.  I'm pulling up the report here.

MR. ARONFELD:  Michael, if he's looking, can we take a two-minute break?

MR. DRAHOS:  Absolutely.

MR. ARONFELD:  Thank you, sir.

MR. DRAHOS:  Let's go off of the record.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:08 p.m.

(There was a discussion off of the record.)

THE VIDEOGRAPHER:  We're on the record.  The time is 12:13 p.m.

BY MR. DRAHOS:

Q.   Okay.  So, Doctor, when we went off, there was a pending question.  The question was:  Whether or not in your first report you made any mention of what you're calling high-risk injury?  Were you able to locate anything in your first report?

A.   Yes, I mentioned the NEXUS Criteria in that first report.

Q.   Yeah, as a matter of fact, I mean, when you mention the NEXUS Criteria you mention it in a way that it should have been used, right?  You say --

A.   Correct.

Hitesh Raval DO
April 08, 2025

Q.    Okay.  So in your first report you're saying the NEXUS Criteria applies.  In your second report you're saying it doesn't?

A.    So the NEXUS Criteria is applicable and should be utilized to assess a patient with a severe neck injury always.  Now, I think that is it satisfied or not is the question?  Is that correct?  Is that what you mean?

Q.    Well, the reason we went down this path is because you started stating that this wasn't the case where the NEXUS Criteria could be applied, but it sounds to me like you're changing your answer.  You're saying that the NEXUS Criteria can be applied?

A.    NEXUS Criteria is always applied.  So if there was confusion previously, I want to clarify.

The NEXUS Criteria, the Canadian C-Spine Rules, these are always applied to anyone with an injury, whether they're satisfied or not is the question, and that's the purpose of these criteria.

Q.    All right.  So tell me how the NEXUS Criteria was not satisfied at 11:00 o'clock p.m. when Mr. Smith had his collar removed?

A.    So when you apply the NEXUS Criteria the first thing that -- the first inclusion criteria is the statistical terminology, and to break that down into

Hitesh Raval DO
April 08, 2025

layman terms, so what that means is does this patient satisfy the criteria?  Number one, is there a trauma and it has to be a blunt trauma.  What does that mean?  A fall, hitting your neck against the ground is considered blunt trauma, so that part is satisfied.

Now, if you were -- one example is if you were slapped very lightly by your own newborn child and you hit your neck, that would be considered a mild injury. If you're hit by a hundred-mile-an-hour train going by to your neck, that would be considered a major injury and I think that's very easy.  Right.

Now, falling from a scooter, falling from the ground level, which is the medical term that we use, ground-level fall, it's considered not a minor risk of so injury.  So the mechanism alone is no longer considered mild.

Q.   All right.

A.   So when you fall --

Q.   Sorry.

A.   -- and you hit your head from the ground level, this is not considered a mild injury, and therefore, I think in my clinical practice and 13 years of being an expert in my field, the NEXUS Criteria will not be satisfied based on that criteria alone.  Now, moving on, even if we're going to continue this, you use

Hitesh Raval DO
April 08, 2025

the other criteria, which is:  Was there a neurological deficit on the patient?

The NEXUS Criteria never looked at previous neurological injury, what is the baseline.  If there is a neurological deficit, this alone should raise your suspicion as an emergency medicine specialist that there's a propensity or a suspicion that there could be a major spinal cord injury; therefore, you cannot clear the collar or the NEXUS Criteria is not satisfied.

Q.    All right.  So let me make sure I understand what you've just said.

What you're telling us is that the mechanism of an injury is a criteria used in the NEXUS analysis --

A.    Correct.

Q.    -- mechanism of injury?

A.    Yes.

Q.    All right.  And secondly, what you're saying, then Dr. Raval's interpretation of the NEXUS Criteria, what you're saying is if a patient has preexisting neurologic deficits, they can never have the collar removed?

A.    I'm not saying that.  I think that if you have a ground-level fall and you heard a crunch sound in your neck and you have neck pain and you have previous neurological injury, that the suspicion of having a

Hitesh Raval DO
April 08, 2025

major injury to the neck, given the criteria that Mr. Smith already clearly objectively had, now goes up.

When the suspicion goes up, you cannot utilize a simple X-ray of the neck to satisfy the criteria and say because the patient has no pain and the X-ray is perhaps deemed okay, you cannot clear the neck.

Q.   So how many times did Mr. Smith ask to have his collar removed while he was in the Carnival medical center?

MR. ARONFELD:  Objection to form.

THE WITNESS:  So based on the documentation Mr. Smith never did -- he never asked for the -- based on the shipboard documentation, he never asked for it.

BY MR. DRAHOS:

Q.   Okay.  So it's not mentioned in the chart, is that -- what you're telling us then is based upon the fact that it is not in the chart, he did not ask ever?

A.   So as an emergency physician, what's important when it comes to critical actions when you're taking care of a patient, in this case someone with a severe neck injury, what would be important, and I think an average physician what they would do is document this very clearly, because this is a high-high-risk maneuver and decision process if you're removing a cervical

Hitesh Raval DO
April 08, 2025

collar, because the consequences of removing a collar

with a spinal cord injury are clear, dramatic, and

serious.  You need to document this.  I think any

physician would document such critical decisions and

conversations --

Q.   Meaning --

A.   -- I don't see that document.

Q.   Documenting that he's not complaining of neck

pain, that's what you're saying?

MR. ARONFELD:  Form.

THE WITNESS:  So one more time.  Neck pain

alone --

BY MR. DRAHOS:

Q.   What -- need -- document --

A.   -- is insufficient.  This is why there's many

criteria as we discussed earlier.  There's five, but

beyond the five criteria, I want to make sure we're

clear on this, the NEXUS Criteria, this -- that we

discussed only applies to what's considered low-risk

injuries.

Q.   So --

A.   Mr. Smith did not have a low-risk injury.

Q.   Are physicians -- you said that the whole

point of this NEXUS Criteria is to grade some sort of

objective standard that everybody can follow

Hitesh Raval DO
April 08, 2025

internationally, right?

Right?

A.  Correct.

Q.  All right.  So does that mean that physicians can differ one from the other as to what they believe is a low-risk versus high-risk?

A.  So this has been studied and this is why we have other criterias as well, which at trauma centers when we're discussing which patients need the -- or demand the highest and -- the highest modalities of care and the most expedited treatment where we suspect they're high-risk, ground-level falls, which is what Mr. Smith incurred, this is actually part of our trauma criteria.

Q.  So --

A.  NEXUS does not apply in those patients.

Q.  You reviewed Dr. Talan's report, correct?

A.  Correct.

Q.  All right.  And Dr. Talan is a professor of medicine, emergency medicine at the University of California Los Angeles; he was the chief of the department of emergency medicine for over 20 years.  He differs from you in terms of his opinions in this case particularly whether this was a low-risk or high-risk. Wouldn't you agree that you didn't bring up this

Hitesh Raval DO
April 08, 2025

low-risk versus high-risk mechanism injury until after

Dr. Talan issued his opinions in this case?

      MR. ARONFELD:  Form.

      THE WITNESS:  I disagree.  I mentioned the

NEXUS Criteria, which already encompasses all of

this data.

BY MR. DRAHOS:

    Q.   We're going to --

    A.   So when you mention "NEXUS," it's already

discussed in the physician's brain, we are already aware

of all the criteria and the inclusion factors, which is

the mechanism of injury for NEXUS.

    Q.   What's ironic to me, Doctor, is that you're

holding Dr. Waris to this standard that he needs to

specifically put everything in his medical chart, yet

you haven't done the same here in this case, have you?

      MR. ARONFELD:  Objection to form.

      THE WITNESS:  I disagree with you.

BY MR. DRAHOS:

    Q.   Tell me where in your expert report -- where

in your expert report did you specifically put -- the

first one, that this was a high-risk mechanism of

injury?  Where are those words in your report?

    A.   The words may not be there in this setting --

    Q.   Where's the concept?

Hitesh Raval DO
April 08, 2025

A.    -- if you read my reports, though, it's located in one of my reports; there's several.

Q.    It's not located until the rebuttal report after Dr. Talan issued an opinion that competes with your opinions, right?  You never made any mention of this being a low- or high-risk --

A.    Discussing semantics, perhaps that specific verbiage was in my second report.  I'm the one that actually mentioned NEXUS prior to any other physician I believe getting involved here.

So when discussing NEXUS, the mechanism of injury, that's the first thing that comes to mind.  If someone gets hit by a train, again, to go back to the example, on their neck, I don't think I need to mention the high-risk nature of the injury, because it's kind of common sense that someone was hit by a train.  In a setting like this where ground-level falls are considered low-energy mechanisms, it's still high-risk, because of the other parameters that are involved.

Q.    All right.  So can you tell me between 11 o'clock and -- 11:00 o'clock p.m. when the collar was removed and 4:40 a.m. when the first signs of neurological deficit were reported, can you tell me during that time period any instances where Mr. Smith moved his neck?

A.   So what I recall is a re-examination of the neck that Dr. Waris had documented, I need to pull up the exact time frame, if it fell within those hours that you're mentioning --

Q.   Sure.  Go ahead.

A.   -- but there is clear documentation of Dr. Waris maneuvering the cervical spine of Mr. Smith.

Q.   Okay.  Why don't you go ahead and tell me when you think that happened?

A.   So I'm going have to look up the report and find it.

Q.   Sure.

A.   I believe it was after he developed the neuro- -- the weakness that was noted.

Q.   Okay.  5 o'clock in the morning?

A.   Approximately.  I don't know.  I'm still looking for it.

Q.   Okay.  If there is a different time, you can let me know.

A.   It looks like 4 o'clock in the morning he's documenting that the neurological symptoms were identified, and at 5 o'clock in the morning is when -- where you're asking?

Q.   Yes, sir.

So let's just be clear for the sake of

Hitesh Raval DO
April 08, 2025

clarity.  My question was:  Any indication between 11:00 and 4:00 that he moved his neck?

You said, Well, I think Dr. Waris might have moved his neck.  You would agree that the moment you're talking about occurred at 5:00 in the morning?

A.    The moment I'm referring to was at 5:00 in the morning.

Q.    So let's go back to my original question then.

Can you, as you sit here, identify for the members of jury any moment where Mr. Smith moved his neck between 11 o'clock p.m. and 4 o'clock a.m.?

A.    That's not documented that I can see.

Q.    So you can't.  Agreed?

A.    Correct.

Q.    So you indicated that following the first reports of paralysis at 4:40, "Dr. Waris moved his neck which worsened his paralysis."

Those are your words, right?

A.    Absolutely.

Q.    All right.  So would you agree that at 4:40 -- well, why don't we go to the 4:40 entry, just kind of make it easier for us.

So would you agree that at 4:40 a.m. when the complaints first arose about deficits, he said that he couldn't feel his right leg, he couldn't move his right

leg, right?

A.   Can you tell me what page you're on?

Q.   Sure.  Well, it's a 4:40 entry.

A.   Different documents.

Q.   Okay.  Well, do you know how to -- is this the first time ever reviewing a medical chart for care rendered at a Carnival medical center?  I don't know how familiar you are with these charts, but if you go to the --

A.   Well, I guess there was some confusion before. You were telling me the wrong page number so I want to clarify --

Q.   Sure.  I'm talking about a 4:40 entry that was written by Dr. Waris.  So you can --

A.   I have a 4:40 entry by Dr. Waris here.  I was asking what page you're on.

Q.   24 on mine.

A.   Okay.  So before you gave me the wrong page number, so I want to make sure we're not doing that again.

Q.   Okay.  Well --

A.   Give me one second here.

So I see the 4:40, but that's in my own record in my report.  If you want to continue your question.

Q.   Sure.  So he indicated that he couldn't feel

or move his right leg, right?

A.    Yes.

Q.    Okay.  And he couldn't move his right hand or his fingers, correct?

A.    Correct.

Q.    Okay.  So what I'm wondering is what is the basis for your opinion that he, quote, "worsened his paralysis"?

A.    So at 4:40 in the morning they noted that there was new neurological deficits.

Q.    Okay.

A.    So essentially in layman terms, he's now getting paralyzed.

So the last thing you want to do is worsen this paralysis.  And what would you -- and how can you worsen it?  By putting and exerting more pressure on the cervical spine; therefore, exerting pressure on the spinal cord.  And I think that any physician with an understanding that there's a spinal cord injury here, the last thing you want to do is now move the neck in any direction or else you will exert pressure on the spinal cord, and that's very soft, and you will injure it and it leads to paralysis.  This is just common sense really for any physician.

MR. ARONFELD:  Is that for me?

MR. DRAHOS: No, no, no.

MR. ARONFELD: Michael, let me see what that noise is next door. I don't know if you --

THE WITNESS: There's another conference room that's -- this is a barricade between the two.

MR. DRAHOS: Yeah, I noticed.

THE WITNESS: There could be a meeting and it goes through the air vents.

MR. ARONFELD: Are you able to hear okay?

THE COURT REPORTER: Yeah, just speak up for me.

BY MR. DRAHOS:

Q. So let me go back to my original question. What is the basis for your opinion that he worsened his paralysis? You're saying he moved his neck and he shouldn't have done that, which we will quarrel over that issue later, which by the way, did Dr. Waris ever state that he moved his neck?

A. I read his -- Dr. Waris' documentation where he said he moved his neck.

Q. No. He was specifically asked about this in deposition. What did he say when asked specifically about what his notes mean?

A. So I believe from the deposition he actually agreed that he did evaluate the neck.

Q.   He evaluated the neck, but did he ever say he actually -- that he moved the neck or that Mr. Smith moved his neck?

A.   So you've mentioned "actively," so the difference between actively and passively, I want to clarify this.  Passively is when the patient themselves, they use their own muscles -- let me rephrase.

Q.   Yeah, you got it wrong.

A.   I don't have it wrong.

So I'm going to clarify.

You mentioned "actively," so actively is when you have a -- and you're telling a patient, I'm going to move your neck for you, which is what Dr. Waris documented.  So what Dr. -- and we can -- I have a line here as well, let me pull it up.

So to answer your question, at 0500 Dr. Waris -- and this is just reading what he wrote. "There's no palpable stiffness on either active or passive flexion and extension of the neck."

So to answer your question, you mentioned active, he mentioned active.  What does "active" mean? That the patient is now been told to move their neck in flexion, extension.  What's flexion, extension mean? Taking your chin touching your chest.  By doing this you're exerting these extra forces on the spinal cord.

By extending the neck, it's going -- you're tilting your head backwards, now you're bending the neck back causing significant pressure on the spinal cord at the neck level.

Now, did -- what did he say in the deposition? My recollection is that he mentioned that there was passive range of motion of the neck is my recollection, but if we can pull up his deposition to clarify.

Q.   It's your job to be prepared here today.  So if you don't recall or if that's what your understanding is, is that's what he said, then that's what your answer is going to be for today.

But let me go back to the point that I think we're debating right now is:  Can you tell me specifically what is the basis is for your opinion that the paralysis worsened?  I know you're disagreeing with his actions and he shouldn't have done this, that, or the other, but tell me where you have any support for the opinion that the paralysis was, quote, "worsened"?

A.   So when you have a spinal cord injury and you move someone's neck and it leads to paralysis --

Q.   Dr. Raval, I don't want --

A.   I'm answering your question, if you'd let me.

Q.   But I don't want a hypothetical.

A.   Fine.

Hitesh Raval DO
April 08, 2025

Am I allowed to answer your question?

Q.   I want Mr. Smith specifically.

A.   Yes, so Mr. Smith specifically.  When you move someone's neck in this manner that was documented by the ER physician taking care of him, and I'm just believing what he documented here, he documented active and passive flexion and extension of the neck after a patient was now exhibiting signs of paralysis.  This paralysis occurs from a spinal cord injury, and Mr. Smith specifically sustained a spinal cord injury, and now the physician is maneuvering the neck in positions that there is no business of moving.  This -- and you're asking me how did he make it worse?  This is literally how he made it worse.

Q.   No, no, no, no.  That's not -- I'm going to move to strike.  Your answer is nonresponsive.

What I want to know is:  Tell me how it was worse?  How did the paralysis get worse?  What evidence can you point to, to say, He was like this and now he's like this, because he was moved that way?

Do you have any indication that you could point to here today?

A.   So, yeah, I think it's very clear actually.

So again, one more time, this is -- someone who comes in and fails the NEXUS Criteria, the cervical

Hitesh Raval DO
April 08, 2025

collar needs to be in place.  Dr. Waris removed the collar, several hours went by where the patient was not documented to be immobilized entirely, in fact, the collar was removed, and then the patient developed neurological symptoms of weakness of the right side.

Now, I think common sense dictates that because of this lack of immobilization of an obvious neck injury, there was movement and force applied to the neck because the collar was then removed.

Then we have documented here that Dr. Waris physically manipulated the neck after he developed these symptoms.  So therefore to answer your question, this is a direct insult to an already -- an injury that already occurred.

Q.   Okay.

A.   In fact, this is the worst thing that a physician can do to cause this.  So this is a direct cause --

Q.   I'm going to -- I'm going to move to strike your answer as nonresponsive, because you're not answering it.  I don't know whether or not you're answering it because you don't understand it or you don't want to.

So let me try and rephrase it a different way.

MR. ARONFELD:  Objection to form.

Hitesh Raval DO
April 08, 2025

BY MR. DRAHOS:

Q.   You're saying that he, quote, "worsened his paralysis," okay, so what I want to know is, let's say on a scale of 1 to 5, 5 is complete paralysis, 1 is partial.  Are you saying that he went from a 1 to a 5 because Dr. Waris moved his neck?

Where -- where are you coming up with the, quote, "worsened" part other than that you just disagree with his actions?

MR. ARONFELD:  Objection to form.

THE WITNESS:  So again, I believe I am answering your question.

So moving someone's neck who has now paralysis will only worsen it; it's not getting better by putting extra force on the spinal cord.  So if we're going to go by the chronology, and I don't know if that's where you're kind of insinuating here, but we have a patient who developed neurological symptoms who did not get better after moving the neck, he -- it only got worse.

BY MR. DRAHOS:

Q.   So here's why I'm asking these questions repeatedly, because there are plenty of other studies that completely disagree with what you're saying.

Are you familiar with studies that were done

by Dr. Mark Haswell [phonetically]?

A.   I don't know who that is.

Q.   Did you -- did you read any of that at all when you came to this opinion that, quote, "Dr. Waris worsened Mr. Smith's paralysis"?

Because according to Dr. Haswell, peer-reviewed studies, subsequent movement post-injury doesn't cause any future damage.  The paralysis has already set in.

Are you familiar with any of those studies?

A.   So there's lots of studies in the neurological emergency literature, to name one study -- I mean, was this supplied to me for review?

Q.   So I'm just asking whether or not you read it.

And actually, yes, there were articles within Dr. Talan's report, where if you read them, you would have seen what I'm talking about.

So you didn't read Dr. Talan's literature?

A.   I read his report.

Q.   But you didn't read the literature specifically quoted in there?

A.   I read his report and quoted literature -- a line from some of the literature that we cited, I did read his report.

Q.   All right.  But you didn't read the

Hitesh Raval DO
April 08, 2025

literature?

A.   I did not read all of the studies, no.

Q.   Okay.  What about the testimony of Dr. Suite, the plaintiff's own neurology expert, who said that once the paralysis occurred at 4:40 a.m., it was irreversible.  Do you agree or disagree with your own team?

A.   So I don't recall those exact details, but now using my expertise, when someone has a spinal cord injury, you need to salvage the spinal cord.  And how do you do that?  There's treatment measurements that can be initiated in the emergency department.  Step one is immobilization to further -- to prevent any further external force on a diseased and injured spine.  So immobilization, step one.

Number two is keeping the blood pressure at a certain threshold to make sure that the injured spinal cord can maintain blood perfusion, get nutrition, and oxygen to heal.

So these are the things that we do in the emergency room to prevent further injury.

So imagine you have a broken bone.  You're saying that if someone moves that broken bone, it doesn't get worse?  No, I think it's common sense to actually prevent any further movement on a broken

segment of the spine including a spinal cord.  It's a standard of practice.

Q.  I'm going to, again, move to strike as nonresponsive.

Do you agree or disagree with the opinions that Dr. Suite has given in this case, that at 4:40 a.m., when the paralysis occurred, it was permanent and irreversible?

A.  I think that we can argue -- I don't have a different answer than that.

Q.  Okay.  And as we already talked about before, when a patient like this, Mr. Smith was brought into a hospital and evaluated, it's ultimately the neurosurgeon that does the surgery to respond to whatever trauma is in the cord, right?  The neurosurgeon --

A.  The neurosurgeon does neurosurgery, yes.

Q.  Okay.  All right.  So let me see if I word it this way if I can maybe get the answer I'm looking for.

Do you have any evidence, specific evidence, of Mr. Smith's paralysis worsening while he was in the ship's medical center?

A.  So I think it's pretty clear that he's presented without any neurological symptoms, and then he had harm done to him by Dr. Waris, which was by removing a cervical collar and then he develops new paralysis.  I

think there's clear evidence here that if you're aware of the nuances of the NEXUS Criteria on what patients to apply to and which patients you cannot apply it to or where you cannot satisfy the NEXUS rules, it's clear that by removing the collar, that's harmful stuff, number one.

And then we have new deficits noted and now this external force is applied to the neck.  All of these decisions, I think, are below the standard of care leading to direct harm and now paralysis --

Q.   Right.

A.   -- that Mr. Smith unfortunately is dealing with.

Q.   I'm trying to be a little patient with you, because you've done this only twice and I don't think you've -- you've never testified in a courtroom?

A.   I have not testified in a courtroom.

Q.   When there is a judge there, the judge will not allow you to do what you're doing.

So let me do it again.

MR. ARONFELD:  Objection to form.

BY MR. DRAHOS:

Q.   Can you tell the members of the jury or the judge whether or not you have any evidence of the right-sided deficits after they arose at 4:40 a.m. of

Hitesh Raval DO
April 08, 2025

them worsening?

A.   If you're only referring to the time frame after 4:40?

Q.   Yes, sir.

A.   Of them worsening?

Q.   Yes, sir.

A.   I need to pull up the report here.

Q.   Okay.

A.   So if you mind, I do need some time to --

Q.   Sure.

A.   -- look at the time frame --

Q.   Please do.

A.   -- the whole chronological order.  There's lots of pages here.

Q.   Sure.

A.   So I'm looking at page 24.

Q.   What's the note entry?  The time of the note entry?

A.   It's at 10:00 a.m., so this is after 4:00 a.m.

Q.   Okay.  Got it.

A.   It states that under physical exam, "He can lift his right arm, but he has no sensation to his right hand.  He cannot grip with his right hand.  He cannot move his right leg.  He has no sensation to his right leg."

Q.   All right.  So let's compare that to the 4:40 findings.

A.   Uh-huh.

Q.   Cannot -- this is Dr. Waris' report.

"Cannot move his right hand and his right leg, loss of sensation in the right leg."

Same symptoms, right?

A.   So I'm looking at the -- so I think there's more at 4:40 where it says, "Right finger shows 1 out of 5 power."

Do you see that?  At the same time frame.

Q.   "Flexion and extension absent," that part?

A.   Yeah, so specifically to answer your question, we have right finger shows 1 out of 5 power.  What does that mean?  That he has some movement ability to the right fingers.

Now, let's go back to the time stamp that I just mentioned was at 10:00 a.m., he can lift his right arm, has no sensation in right hand.  Right?  But specifically he cannot grip with his right hand.

Q.   So you're saying grip --

A.   So power 1 out of 5 is movement.  Now, it says that "He cannot grip with his right hand."

Q.   So you're saying at --

A.   So what I'm saying --

Hitesh Raval DO
April 08, 2025

Q.   -- 4:40 a.m. he was capable of gripping with his right hand, and at 10:00 a.m., he's not, and that's the worsening that you're talking about?

A.   So that is -- yes, that is what I'm talking about.

So you when -- when you evaluate a patient neurologically, what often happens in a clinical setting is that it's not a linear trajectory when you have spinal cord damage -- even stroke patients, which I have treated countless stroke patients in my career, there's a wavering clinical exam where you'll see that there's some changes in their ability to move, and then it can get worse and even improve again with time.  It doesn't mean that the initial insult and the subsequent insults on the spinal cord did not occur.  So I see what you're trying to get at is that there wasn't a clear worsening only of the physical exams that were documented, but here actually we do have some worsening that's documented.

So there -- you cannot objectively state that he didn't get worse only because of a physical exam finding.  We know that there are deficits that have persisted, and on top of that, once the spinal cord was injured, he injured it again by moving it.  So looking at the exam here, it's pretty clear that there's pretty

significant neurological deficits that persist and

there's wavering in the symptoms just consistent with

repetitive spinal cord injury.  It's a clear spinal cord

injury case.

Q.   Okay.  So first of all, stroke and spinal cord

aren't even the same thing.  You would agree, right?

They're totally different mechanisms.  Stroke is a brain

injury, spinal cord is a spinal injury?

A.   I disagree with you.  Stroke can actually --

Q.   We'll just have to disagree on that one.

A.   No, this is just -- this is medicine.

A stroke -- you can have a stroke of the

spinal cord, so maybe you're not familiar with this,

but --

Q.   Of course I am, and when you're talking about

strokes and clots, ischemic or hemorrhagic, that's in

the brain.  If you want to talk about a stroke in the

spinal cord, that's -- is that what you were referencing

when you talked about stroke patients and how their

symptoms wax and wane?

A.   I'm referring when I mentioned stroke

patients, the whole encompassing neurological cases that

lead to weakness of the extremities, so stroke is on

there, spinal cord injuries, and it overlaps --

Q.   Okay.

Hitesh Raval DO
April 08, 2025

A.    -- and that's the point.

Q.    So just so that we're clear, what you're saying then is your evidence of worsening is that he was described by Dr. Waris as having 1 out of 5 power in his right hand, and he's described by a nurse at 10:00 a.m. as not being able to grip things, that's your evidence of worsening paralysis?

A.    Well, it's also he's documented that time that this flexion and extension is completely absent at that same time frame.

Q.    Okay.

A.    So what I'm saying is that he didn't improve at all, in fact, made marginally worse after the movement.

Q.    Well, what I'm trying to get at is whether you have evidence, clinical evidence, of worsening, when the only thing that I heard you say was that he had 1 out of 5 power in his right fingers, but he's described by a nurse at 10:00 a.m. to not being able to grip things. That's your evidence -- that's your clinical evidence of worsening, correct?

A.    This is just one of -- yeah, the features that seem to come -- that are in --

Q.    I want to make sure --

A.    -- documentation at this time.

Q.   I want to make sure there aren't any that you can point to here?

A.   So looking at each line by line, I mean, there's just lots of documentation here, so...

Yeah, so based on the documentation, that's one of the features that shows that there's further neurological --

Q.   Well, when you say "one of," it's the only that you've identified?

A.   Based on looking at this right now, that's the only thing.  I didn't look at every single time stamp in front of you, I'm looking live, you know.

Q.   How much time have you spent on the case in total?  You can total it up now.

A.   I'm sorry.  Can you say that again.

Q.   Yeah.  You said that you have the total amount of time that you've billed in the case to date.  I'd like to know the answer to that question.

A.   I've spent 19 hours or so.

MR. DRAHOS:  Mr. Aronfeld, I never got -- I never got anything in an e-mail from Dr. Raval. Were you able to identify some time that this was apparently sent to me?

MR. ARONFELD:  Yes, and I thought it had been resent to you, so I will find out again.  They told

Hitesh Raval DO
April 08, 2025

me they resent it to you.

MR. DRAHOS:  I still don't have it here in my inbox and never had it.

MR. ARONFELD:  Okay.  If you give me a moment.

MR. DRAHOS:  Okay.  Here is something from Adrian at 11:18.

MR. ARONFELD:  Yeah.

MR. DRAHOS:  Okay.  So 11:18 is my first instance of any file being sent to me from Dr. Raval, and what we'll do is I'm going to attach that as Composite Exhibit -- do you know what I was on by any chance?

THE COURT REPORTER:  The stickers have nine on them so you can do it that way.

MR. DRAHOS:  They have nine on them.

THE COURT REPORTER:  There's nine stickers.

MR. DRAHOS:  It must be D then, because I don't -- so Composite Exhibit D, and with that, I don't have any further questions.

(Thereupon, File (e-mailed) from Dr. Raval was marked as Composite Exhibit D for identification.)

MR. ARONFELD:  Thank you, Michael.

CROSS-EXAMINATION

BY MR. ARONFELD:

Hitesh Raval DO
April 08, 2025

Q.   Let me ask just a couple questions, Dr. Raval.

In case for whatever reason you're unable to join us live in the courtroom, so I'm going to ask you to look into the camera, put all modesty aside and introduce yourself to the ladies and gentlemen of the jury and tell us a bit about your background, your education and training.

A.   Absolutely.  So again, my name is Dr. Hitesh Raval, I'm an emergency physician, I'm board-certified in my field of emergency medicine.  I've been in this practice since 2011, and in that time frame, I've worked in many different emergency medicine clinical settings. I've worked in small hospitals where I'm the only physician covering the entire hospital, including the ICU, the ER, and when there is a medical emergency, I cover the floors, the parking lot, and everything, so -- in a small situation.

I have worked in major trauma centers, tertiary care centers.  What does that mean?  Large, large, large hospitals that have trauma doctors 24 hours in-house with me, where we work in practice together.  I worked with neurosurgeons, orthopedic surgeons to take care of very sick and ill patients and specifically trauma patients.  This is my expertise.

I have subsequently served as the director of

my department, leading my hospital, leading my

department, and have served to even teach the next

generation of doctors, and it's been a very fulfilling

career thus far, and I'm an advocate to ensure that

patients receive the best care that they can get.

Q.   Thank you, Dr. Raval.

Now, right now, we're sitting in Coral Gables

Hospital in the physician's conference room.  Do you see

patients here at Coral Gables Hospital?

A.   Yes, I do.

Q.   And are there other hospitals where you see

patients?

A.   I have worked at the major institutions in the

city Kendall Regional, which is one of the busiest

trauma centers in the city.  I have worked at

Westchester General Hospital, Mercy Hospital, Aventura

Medical Center, currently Coral Gables Hospital.  I've

served the community in various regions of the city.

Q.   And, Dr. Raval, could you tell us what

generally speaking an emergency room physician does?

A.   So my job is to treat patients and make sure

that they don't have life-threatening or

limb-threatening injuries and beyond -- and beyond that.

But my main purpose is to ensure that there's no

devastating injury that can occur to this patient and to

even prevent any further injury that they already have

sustained.  That's the bread and butter of what I do for

a living.

Q.   And you're licensed to practice medicine here

in Florida?

A.   Yes, I'm licensed to practice, I'm

credentialed by the emergency medicine physician body,

and I'm board-certified as well.

Q.   And could you explain to us what does it mean

to be board-certified in emergency medicine?

A.   So each state has a licensing body and this is

kind of like most other professional careers, but

specifically for emergency medicine doctors, such as

myself, there's an accreditation process to ensure that

I'm up to date on the latest literature, that I'm

providing the best modern emergency medicine practice

for my patients, and it's not subjective.  This is a

third-party agency that makes sure that a physician is

up to date with everything and they're at the best of

their ability.  Only then do you get board-certified.

Q.   Thank you, Doctor.

Now, I notice on your doctor jacket, it says,

Raval -- "Dr. Raval, D.O., emergency medicine."

What does it mean, Dr. Raval, D.O.?

A.   D.O. specifically stands for doctor of

Hitesh Raval DO
April 08, 2025

osteopathic medicine.  And in the U.S., each state recognizes the D.O. as an equivalent title to the more recognized M.D. title.  There are two branches of medicine and this goes back historically.  They were a little bit different, but in modern practice, they're exactly the same thing.  And, in fact, I chose the D.O. route over the M.D. route.  And why did I do that? There's a different approach to the training that a D.O. has, it's additional training.  It's not just different, it's additional on top of what an M.D. goes through, and it's really about compassionate care and the holistic approach, meaning I'm looking at the entire patient globally and trying to make sure doing our best to take care of a patient while applying modern medicine to it. That's the basis of a D.O.

     Q.   Now, Dr. Raval, do you hold yourself out as an expert on the standard of care of emergency medicine?

     A.   Yes, absolutely, I am an expert in my field in emergency medicine.

     Q.   Is the standard of care in emergency medicine different here in Coral Gables, in Miami, than it would be in New York, New Hampshire, Hawaii, Dubai, Cayman Islands?  Is the standard of care for emergency medicine different from country to country?

          MR. DRAHOS:  Object to form.

THE WITNESS:  You know, the standard of care does not differ based on your practice location. It can be a small hospital, it could be a large hospital, which I have experienced with that situation, and everything in between as well, with medium-sized hospitals.  And the standard of care, the patient deserves the right care regardless of what kind of clinical situation they're in when treated by an emergency medicine physician.

BY MR. ARONFELD:

Q.   Dr. Raval, did I ask you to review the care that was provided to my client, James Smith, in this case?

A.   Yes.

Q.   And did I provide you the medical records from the Carnival ship?

A.   Yes.

Q.   And did I provide you the X-rays that were taken of Mr. Smith while he was a passenger and a patient in the medical center on the Carnival ship?

A.   Yes, you did.

Q.   And did you render any opinion -- and also, Doctor, did you review the deposition testimony, the sworn deposition testimony of Dr. Waris in this case?

A.   I did.

Hitesh Raval DO
April 08, 2025

Q.   And after reviewing those, the deposition of Dr. Waris, the ship's medical records, and the X-rays that were taken by Dr. Waris of Mr. Smith, did you come to some opinions regarding the care that was provided to Mr. Smith on the ship?

A.   You know, unfortunately, I believe that Mr. Smith did not get optimal care on that ship and there was several mishaps or fallouts, if you will, where I believe that he -- the care that he received was below what a standard emergency medicine physician would provide.  And specifically referring to the X-rays, they were really poorly taken, they didn't show the spine that was even the basic necessity to evaluate Mr. Smith's neck injury, and medical decisions were based on this poor, poor imaging quality and technique, and it led to bad consequences unfortunately.

Q.   Did you see in the records, Dr. Raval, where Dr. Waris and the medical team on board the Carnival ship initially placed Mr. Smith in an immobilization collar?

A.   Yes, he was placed in an immobilizer when he -- when he was first evaluated.

Q.   Can you explain to the jury, please, what is an immobilization collar and why is it used?

A.   So it's fairly basic technology.  It's what --

Hitesh Raval DO
April 08, 2025

what the purpose of a collar is it's a plastic piece that then wraps around the neck to prevent motion of the neck in any direction. And what's the point of this? Is if you have a neck injury, you don't want to move the neck or put any force on it, because imagine a broken bone somewhere, broken bones, you have two segments, if the broken bone segments are separated, you get a bad outcome, it doesn't heal and leads to other injuries to the soft tissue structures around the broken bones. These are sharp segments when you break a bone and it can cut everything around it. So how do you prevent that from happening? Keep them together and stop putting other force so there's no shifting of these damaged segments.

Q. When a patient like Mr. Smith is suspected of having a spinal cord injury, is it important to keep the immobilization collar on?

MR. DRAHOS: Object to the form.

THE WITNESS: It's of utmost importance to prevent any further force from injuring the spinal cord, the bones of the neck, the cervical spine, and keeping this collar on is crucial to maintaining immobilization, no further movement of that damaged spine.

BY MR. ARONFELD:

Hitesh Raval DO
April 08, 2025

Q.   In your opinion and experience as an emergency room doctor, is it enough to review an X-ray of the neck to determine whether or not a patient like Mr. Smith has suffered a spinal cord injury?

A.   An X-ray, even if it was done properly, which it wasn't here, it's still not enough to actually elucidate whether the patient has a severe injury or not.  And really this is why we have better technology these days to perform C.T. scans and MRIs to get more detail in situations such as Mr. Smith where he had a devastating injury to the neck; you can't rely on a little minor X-ray to make those decisions.

Q.   And, Dr. Raval, you said that in your opinion the X-ray here was inadequate.  What does that mean?

A.   So when you do an X-ray, you need multiple views to look at the area of interest.  In this setting, it was the neck.  He had other injuries as well that were missed on the boat.  He had a knee fracture, which was never even addressed or evaluated, which we didn't really get to, but going back to the neck injury, he had X-rays performed of the neck.

Now, good X-rays or accurate X-rays, even of the neck, require a minimum of three different angles, we call it "views" to really look at the neck in three-dimensional form, and there's specific technique

Hitesh Raval DO
April 08, 2025

required to do that.

Based on the X-rays that were done on the boat, none of the views were adequate and, in fact, all three views weren't even taken. So there is a lateral view, which is now from the side. You want a view from the front, we call this an "AP" or "PA," so you can see the bones in different ways. And then you want to actually take an X-ray of the higher portion of the neck, and that's evaluating the first level C1 and that's with an open mouth. So you open the mouth and you take an X-ray through there and that allows us to see the neck and that specific upper neck portion in great detail and unfortunately wasn't done.

Ultimately, when getting these X-rays, you need to see the entire spine, the entire cervical spine in this setting, and that's levels 1 to 7. And I think the X-rays that were done on the boat, it missed over half of the cervical spine. So it was just very poorly done.

Q. When you say "poorly done," do you have an opinion, Dr. Raval, as to whether or not the X-rays that were performed on the ship by Dr. Waris fell below the prevailing standard of care?

MR. DRAHOS: Object to the form.

THE WITNESS: They absolutely fell below the

prevailing standard of care, and I think any reasonable physician would conclude this, that the X-rays that were performed are completely inadequate.

BY MR. ARONFELD:

Q.   Did there come a time in your review of the medical records and the testimony, the sworn testimony of Dr. Waris, that Dr. Waris decided to remove Mr. Smith's immobilization collar?

A.   Yes, it appears that he did decide to remove the collar, unfortunately.

Q.   Why do you say "unfortunately," Doctor?

A.   So we have Mr. Smith here who fell to the ground, he admittedly felt a crunch in his neck, and he felt pain.  When you have this kind of injury, we call it the "mechanism of injury," our suspicion that something bad is happening to the neck, broken bones, spinal cord injury really is very high at this point.

Now, step one is to immobilize the spine and to continue to immobilize the spine until you know and you can make sure or ensure that there was no severe damage done to that area of interest.  How do you do this?  With adequate imaging, with stabilization, and only then, once everything is performed and we are super aware and able to "rule out" is the term, or ensure that

Hitesh Raval DO
April 08, 2025

there was no severe injury, do you take off this simple piece of plastic collar that otherwise is perhaps life or limb saving in the interim.

Q.   Dr. Raval, in your review of the medical records and the sworn testimony of Dr. Waris, did you see any indication in the records that Dr. Waris ever considered that James Smith had actually had a spinal cord injury?

A.   So unfortunately not once do I see in the shipboard medical record that he considered the patient having a spinal cord injury, especially even after taking off the collar.  He did mention stroke and bleeding in the brain and -- and what's called an "ischemic stroke," which is lack of blood flow to the brain perhaps.  He didn't mention the word "spine" in his differential diagnosis, and based on reading the documentation, it appears he actually missed this.  He didn't consider that the spinal cord was the injured segment causing the paralysis.  And it seems from an outside perspective that he was thinking about the brain as the issue here, which clearly was not.

Q.   Dr. Raval, do you have an opinion within a reasonable degree of medical probability as to whether or not Dr. Waris' failure to even consider a spinal cord injury fell below the prevailing standard of care?

Hiteqsh Raval DO
April 08, 2025

MR. DRAHOS: Object to the form.

THE WITNESS: I think this is the most obvious thing where someone falls, they complain of neck pain, hearing a crunch in their neck, and not being able to move parts of their body, I think that not considering a neck injury and cervical spine injury and ultimately a spinal cord injury would be egregious. This is well below the standard of care that any physician practicing in that environment would consider.

BY MR. ARONFELD:

Q. Doctor, did you note in your review of the records and the sworn testimony of Dr. Waris whether or not, when Dr. Waris transported Mr. Smith off the ship and in the facility in Montego Bay, Jamaica, as to whether he placed the cervical collar back on Mr. Smith for that transfer?

MR. DRAHOS: Object to the form.

THE WITNESS: It appears based on the documentation review that the collar never went back on, even after he had hours to reconsider and even during the transportation, it appears that it was not performed before he made that decision to transport the patient off the ship.

BY MR. ARONFELD:

Hitesh Raval DO
April 08, 2025

Q.   Doctor, do you have an opinion within a reasonable degree of medical probability based upon your experience, your education, and your training, your review of the evidence in this case, whether or not it was below the standard of care for Dr. Waris to not reapply the collar to Mr. Smith at any time while he was still on the ship?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I think that this is far below the standard of care to not reapply a collar to prevent further spinal cord injury.

BY MR. ARONFELD:

Q.   All right.  Doctor, have the opinions that you've given us here today been within a reasonable degree of medical probability?

A.   Yes.  Absolutely.

MR. ARONFELD:  Thank you, sir.

I have no further questions.

MR. DRAHOS:  Just a couple of quick ones.  And I'll be real quick.

REDIRECT EXAMINATION

BY MR. DRAHOS:

Q.   So when a cervical collar is placed back on a patient, are you stating to the members of the jury that that patient can no longer move their neck at all?

Hitesh Raval DO
April 08, 2025

A.   I would say that any significant movement of the neck, and specifically forceful flexion and extension, would be a problem, subtle movements probably appropriate and, in fact, we have guidelines on how to move a patient when they have a known cervical spine injury.  We use what's called a log-rolling method, which is -- requires several different people to stabilize the neck, but you can allow small force to the neck.  It's the significant stuff that would be detrimental.

Q.   So do you agree with this statement:  "Collars do reduce movement of the neck, but even if correctly fitted, they still allow over 30 degrees of flexion and extension on rotation"?

A.   That's possible.  Yeah, 30 degrees is not as significant as full flexion and extension, which would be beyond that.

Q.   But the patient is still, under that circumstance, capable of moving their neck at least 30 degrees?

A.   A bit you can still move, yeah, with a cervical spine collar.

Q.   Are you scheduled to be here in Miami in September of 2025?

A.   That's -- it's a bit far in advance for me to

Hitesh Raval DO
April 08, 2025

be aware of that, but typically I'm in Miami, I live here, so I --

Q. Meaning at this point in time, you don't have any plans to be out of the country or out of the area in September of 2025?

A. At this time, no.

MR. DRAHOS: Thank you, Doctor.

That's all I have.

MR. ARONFELD: We'll read.

Thank you.

MR. DRAHOS: No, I don't want the video.

MR. ARONFELD: We'll take it, the video.

THE VIDEOGRAPHER: Synced?

MR. ARONFELD: Yes, I need it synced.

Thank you for asking.

THE VIDEOGRAPHER: Okay. This concludes the recorded deposition of Hitesh Raval, M.D. [SIC]. We're going off the record. The time is 1:07 p.m.

THE COURT REPORTER: Would you like to order?

MR. DRAHOS: Yes, order.

MR. ARONFELD: Copy, yes.

------

(The deposition was concluded at 1:07 p.m.)

(Reading and signing of the deposition was not waived by the witness and all parties.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE


         I, LAURIE K. BELLE, Stenographer and

Notary Public, State of Florida, certify that HITESH

RAVAL, D.O. personally appeared before me on Tuesday,

the 8th day of April 2025, and was duly sworn.

         Signed this 14th day of April 2025.

_____
LAURIE K. BELLE, Stenographer
Notary Public, State of Florida
Commission No.: HH 446331
Commission Expires: October 19, 2027

LAURIE K. BELLE
Notary Public - State of Florida
Commission # HH 446331
My Comm. Expires Oct 19, 2027
Bonded through National Notary Assn.

Hitesh Raval DO
April 08, 2025

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, LAURIE K. BELLE, Stenographer, certify that I was authorized to and did stenographically report the deposition of HITESH RAVAL, D.O., pages 1 through 116; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 14th day of April 2025.

_____
LAURIE K. BELLE, Stenographer

Hitesh Raval DO
April 08, 2025

WITNESS NOTIFICATION LETTER

Monday, April 14, 2025

HITESH RAVAL, D.O.
c/o ARONFELD TRIAL LAWYERS, P.A.
1 Alhambra Plaza, Penthouse
Miami, Florida 33134
305-441-0440
BY:  SPENCER ARONFELD, ESQUIRE

       E-mail: Aronfeld@aronfeld.com

In Re: James Smith v. Carnival Corporation
        Deposition of HITESH RAVAL, D.O.
         Taken on 04/08/2025
        U.S. Legal Support Job No. 6840262-001


        The transcript of the above proceeding is now available for your review.

        Please call 305-373-8404 to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a U.S. Legal Support office located nearest you.

        Please complete your review within a reasonable amount of time.


                Very truly yours,




                LAURIE K. BELLE, Stenographer
                U.S. Legal Support
                16825 Northchase Drive
                Suite 800
                Houston, Texas 77060
                (305) 373-8404
                SouthEastProduction@USLegalSupport.com


CC: Via Transcript