Paul M. Ramos, PT
April 11, 2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24-cv-21213

JAMES SMITH,

     Plaintiff,

       -vs-

CARNIVAL CORPORATION,

     Defendant.
_____/

VIDEOTAPED DEPOSITION OF PAUL M. RAMOS, PT

Friday, April 11, 2025
10:15 a.m. - 11:58 a.m.

333 Southeast 2nd Avenue, Suite 3200
Miami, Florida 33131

Stenographically Reported By:
LAURIE K. BELLE

Paul M. Ramos, PT
April 11, 2025

                              APPEARANCES

On Behalf of the Plaintiff:

        ARONFELD TRIAL LAWYERS, P.A.
        1 Alhambra Plaza, Penthouse
        Miami, Florida 33134
        305-441-0440
        Aronfeld@aronfeld.com
        BY:  SPENCER ARONFELD, ESQUIRE


On Behalf of the Defendant:

        GRAY ROBINSON
        515 North Flagler Drive, Suite 650
        West Palm Beach, Florida 33401
        561-268-5727
        Michael.drahos@gray-robinson.com
        BY:  MICHAEL DRAHOS, ESQUIRE


        JONES WALKER LLP
        Citi Center
        201 South Biscayne Boulevard, Suite 3000
        Miami, Florida 33131
        305-679-5700
        Llamas@joneswalker.com
        BY:  LUIS LLAMAS, ESQUIRE (via Zoom)

Also Present:

        Paul Smith, videographer

        Michele Smith (via Zoom)

        James Smith (via Zoom)

Paul M. Ramos, PT
April 11, 2025

INDEX OF PROCEEDINGS

Deposition of PAUL M. RAMOS, PT                          Page

Direct Examination by Mr. Drahos                              6
Cross-Examination by Mr. Aronfeld                            75


Certificate of Oath                                         88
Certificate of Reporter                                     89
Witness Review Letter                                       90
Errata Sheet                                                91

Paul M. Ramos, PT
April 11, 2025

INDEX TO EXHIBITS

PAUL M. RAMOS, PT

James Smith vs. Carnival Corporation

Friday, April 11, 2025

LAURIE K. BELLE, Stenographer

| Marked | Description | Page |
|--------|-------------|------|
| Exhibit A | Notice of Taking Deposition duces tecum | 7 |
| Exhibit B | E-mail, February 28th at 8:12 p.m. | 32 |
| Exhibit C | E-mail, Sunday, March the 2nd at 6:59 p.m. | 39 |
| Exhibit D | Letter March 2, 2025 | 48 |
| Exhibit E | Composite record, e-mail, Monday, March the 3rd at 2025 at 9:53 a.m. | 50 |
| Exhibit F | E-mail with another disclosure dated March 4, 2025, at 1:46 p.m. | 51 |
| Exhibit G | Dr. Merkler, letter, February 18, 2025 | 70 |

Deposition taken before LAURIE K. BELLE, Stenographer

and Notary Public in and for the State of Florida at

Large, in the above cause.

-------

        THE VIDEOGRAPHER:  We are on the record at

    10:15 a.m. on April 11, 2025.  The audio and video

    recording will continue to take place unless all

    parties agree to go off of the record.

        Please note microphones are sensitive and may

    pick up whispering and private conversations.

        This is the video-recorded proceeding of Paul

    Ramos taken for counsel -- taken in the matter of

    James Smith versus Carnival Corporation.  This

    proceeding is being held at Gray Robinson located

    at 333 Southeast Second Avenue, Suite 3200, Miami,

    Florida.

        My name is Paul Smith.  I'm the videographer

    on behalf of U.S. Legal Support located at 16825

    North Chase Drive, Houston, Texas.  I'm not related

    to any party in this action; I am not financially

    interested in the outcome.  The court reporter is

    Laurie Belle on behalf of U.S. Legal Services.

        Counsel will now state their appearances on

    the record.

        MR. ARONFELD:  Thank you very much.

Paul M. Ramos, PT
April 11, 2025

May it please the Court.  My name is Spencer Aronfeld and I have the privilege of representing Mr. Jim or James Smith.

MR. DRAHOS:  Michael Drahos from the law firm of Gray Robinson on behalf of the defendant.

THE VIDEOGRAPHER:  Would the court reporter please swear in the witness.

THE COURT REPORTER:  Please raise your right hand.

Do you swear or affirm the testimony you're about to give will be the whole truth and nothing but the truth?

THE WITNESS:  I do.

DIRECT EXAMINATION

BY MR. DRAHOS:

Q.   Good morning.  Can you please state your name for the record?

A.   Yes.  My name is Paul Mario Ramos.

Q.   Ramos.  I've been calling you Ramos in my head, so --

A.   Either/or.

Q.   -- if I call you by the wrong name, it's certainly not intentional.  It's just that I've formed the habit here getting ready for the deposition.

A.   They're synonymous.

Paul M. Ramos, PT
April 11, 2025

Q.   Okay.  So Mr. Ramos, you are here today as an expert on behalf of the plaintiff in the case of James Smith versus Carnival Corporation; is that right?

A.   Yes.

Q.   And my office issued a subpoena to you, which we're going to attach as Exhibit A to the deposition. This is a Notice of Deposition Duces Tecum; I assume you've seen these before?

(Thereupon, Notice of Deposition Duces Tecum was marked as Exhibit A for identification.)

THE WITNESS:  Yes, I have.

BY MR. DRAHOS:

Q.   And in particular were you served with a copy of Defendant's Composite Exhibit A, which requires you to bring with you certain documents?

A.   Yes.

Q.   And did you have an opportunity to look at that duces tecum before today's deposition?

A.   I did.

Q.   All right.  And I received an e-mail link about two days ago that purportedly is a compilation of everything that is in your possession that is responsive to Schedule A in Defendant's Composite Exhibit A.  Is that indeed accurate?  Did you produce everything?

MR. ARONFELD:  Let me just interject for a

Paul M. Ramos, PT
April 11, 2025

second, Michael.  I sent you a text.  Maybe you didn't see it, just saying that he updated it.  So you have some additional stuff that's in the response to your duces tecum.

MR. DRAHOS:  You sent me a text when?

MR. ARONFELD:  This morning.

MR. DRAHOS:  This morning at 9:41 a.m.?

MR. ARONFELD:  Yes.

MR. DRAHOS:  "Check link for update stuff on Ramos"?

MR. ARONFELD:  Yes.

MR. DRAHOS:  All right.  Well, clearly, we're going to object.  That's not a proper notice.  I haven't had an opportunity to look at that.

MR. ARONFELD:  And I don't even know exactly what the updated stuff is that we added; he can tell you, but I wanted you to have the benefit of everything we have.

MR. DRAHOS:  Well, why don't we talk specifically about what is at issue before we proceed further.

BY MR. DRAHOS:

    Q.   So, Mr. Ramos, what did you update in your file in response to Schedule A of Defendant's Composite Exhibit A since the time of Wednesday?

A.   There were some records that were sent to me yesterday.  So in order to be complete with the duces tecum, I added those records to my file.

Q.   What records are those in particular?

A.   Those -- give me one moment.

I received a report by Dr. Merkler.  There was a report by Dr. Keyserling.  A report from Dr. Talan, if I'm pronouncing that correctly.  And a report from Dr. Andrew Zelby.

Q.   Okay.

A.   And also I added a few other documents.

Q.   What are the other few documents you're speaking of?

A.   There was e-mail correspondence as recent as yesterday that I added.

Q.   E-mail correspondence with who?

A.   Between myself and Mr. Aronfeld's law firm, my office and his law firm.

Q.   And what did those e-mails concern?

A.   I believe the contents are requesting records and stuff of that nature.

Q.   Who is requesting records, you or the Aronfeld law firm?

A.   I requested a record.

Q.   What specifically were you requesting?

Paul M. Ramos, PT
April 11, 2025

A.    I requested Dr. Merkler's record.

Q.    Why was that something that you were seeking?

A.    In review of the life-care plan prepared by Cathlin Mitchell, she made reference to that record, and I do not recall reading it.

Q.    Okay.  Since I haven't seen this correspondence and since I'm trying to gauge to what degree, if any, I am prejudiced by the late disclosure, is there anything else beyond what you just told me that's been supplemented in your file?

A.    There was a depo prepaid invoice that was also sent subsequent to my initial submission of the file.

Q.    Anything else?

A.    And the expert life-care plan of Cathlin Mitchell had not been included in the original submission, so I wanted to make sure that it was complete for today.

Q.    What do you mean by that, sir?  Are you saying that you just recently received Ms. Mitchell's or you didn't include it within your case file?

A.    I didn't include it in the case file, because it was -- it was worded differently in my file.

Q.    Okay.  And anything else?

A.    No, that's it.

Q.    All right.  Going back to the e-mail

Paul M. Ramos, PT
April 11, 2025

correspondence part of the supplemental disclosure, beyond you sending an e-mail to the Aronfeld firm requesting specifically Dr. Merkler's records, were there any other correspondences between your office and the Aronfeld office?

A.   I can pull that up, if you give me one moment.

It was requesting the report from Dr. Merkler and I believe that was it.

Q.   Okay.  Thank you.

Let me -- let me move on.

So this is the first time I've met you actually.  I was looking over your testimonial history. You've worked with a lot of lawyers that I've had cases against, it's just ironic that we haven't crossed paths until today, but there's a few things I want to clarify to make sure that I'm clear on about who you are, and more importantly, that the jury is.  Okay?

A.   Yes.

Q.   So you would agree you are not a medical doctor?

A.   That's correct.

Q.   And you are not a doctor of osteopathic medicine either?

A.   That's correct.

Q.   Okay.  You don't hold a Ph.D. in any

Paul M. Ramos, PT
April 11, 2025

particular field of study?

A. Correct.

Q. And your highest formal education that I'm aware of is a bachelor of science in physical therapy?

A. Yes.

Q. All right. So you became a certified life-care planner in 2013?

A. Correct.

Q. All right. But you would agree that because you're not a doctor, you have to confer with physicians about particular recommendations before you finalize life-care plans?

A. Yes, I do, and even physician life-care planners should confer with treating physicians.

Q. Okay. So in particular, the report that you generated in this case, you do not have the expertise to author solely on your own; you must confer with others, particularly doctors, before you can finalize it?

MR. ARONFELD: Objection to form.

THE WITNESS: Within my scope of practice I can make recommendations. Items that require physician input, yes, I need to confer with the physician.

BY MR. DRAHOS:

Q. So what particularly would be a recommendation

Paul M. Ramos, PT
April 11, 2025

that you can make without conferring with a doctor versus one that would require a doctor's blessing, so to speak?

A.   Therapy recommendations, equipment for activities of daily living, mobility recommendations, home modifications, nonskilled support care recommendations, medical evaluations, leisure and exercise, equipment, personal supplies, counseling. There may be more.

Q.   Any others that you can think of?

A.   Off the top of my head, no.

Q.   All right.  So a lot of what you mentioned, therapy recommendations, you're talking about physical therapy, occupational therapy, your field of study that you have a formal education and training in?

A.   Yes.

Q.   All right.  And when you talk about ADL equipment you're talking about things that would be associated with occupational therapy, things of that nature?

A.   It could be associated with occupational therapy.

Q.   Is there any type of ADL equipment that you need to confer with a physician about before you can certify it in a life-care plan?

Paul M. Ramos, PT
April 11, 2025

A.    If it's something that would require a prescription, then yes, but nothing really comes to mind as far as ADL equipment.

Q.    You made mention of medical evaluations.  What type of medical evaluation can you recommend without conferring with a physician about?

A.    As a physical therapist we have direct access so I'm able to see a patient without a physician's prescription.  Upon evaluating that patient -- I'll give you an example.  For instance, during the course of my evaluation I pick up on -- on symptoms that lead to a neurology evaluation, for instance, I can make that recommendation.

Q.    But you would not be qualified or trained for that matter to make any type of surgical evaluation, would you?

A.    No.

Q.    Or surgical recommendation?

A.    No, I would -- as far as I would be able to go is:  You should see a surgeon.

Q.    All right.  So in particular as it relates to James Smith any surgical recommendation that you made in your life-care plan would require the input of a physician?

A.    Yes.

Q.   Okay.  Let me switch gears a little bit and talk about your methodology and how you reached these life-care plan recommendations, in particular as it relates to Mr. Smith.

What medical records, if any, do you review during this process?

A.   I reviewed all the medical records that were made available to me.

Q.   So I looked over your report, and to be frank, Mr. Ramos, it's rather vague.  It's difficult for somebody like me to go through this report and identify specifically what it is that you're talking about.

And --

MR. ARONFELD:  I'm sorry.

BY MR. DRAHOS:

Q.   -- I want to turn your attention to the last page of your report.

MR. ARONFELD:  I'm going to object to the form.

BY MR. DRAHOS:

Q.   You have what appears to be a list of records and/or depositions that you reviewed, but it doesn't specify by date.  So, for example, when you say that you reviewed the Emory health care record, what specifically are you talking about?

Paul M. Ramos, PT
April 11, 2025

A.   Records from Emory health care.

Q.   But in looking at this today, can you tell me specifically which ones you would have reviewed?

A.   From this page, no.

Q.   All right.  How about as it relates to Jackson Health System records, what specifically would you have reviewed?

A.   I reviewed all of them that were made available to me.

Q.   But how do I know what was made available to you, particularly since the records that you provided to me in response to the duces tecum don't include any medical records whatsoever.

A.   The records were attached in my file that I submitted.

Q.   All right.  I didn't see those.  You're saying whatever you reviewed you've provided to me?

A.   That's my understanding, yes.

Q.   What are you looking for when you look at the records?

A.   I'm looking for a diagnosis, treatment, symptoms, recommendations for future care, pretty much everything.

Q.   So why doesn't your report provide an itemized list of what specifically you've reviewed so somebody

like me can question you about a particular record or a particular entry by a physician?

MR. ARONFELD:  Objection to form.

THE WITNESS:  The records listed are listed by provider or by facility.  I did not include the date range on this -- on my report.

BY MR. DRAHOS:

Q.  Why not?

A.  I customarily don't do that.  It's not something that has come up before.

Q.  So how about Wellstar Health System records, what would have been the last record that you reviewed, last record in time?

A.  The last record I believe was from the 24th of March 2025.

Q.  How is it that you are able to identify that date like that?

A.  In preparation for deposition I reviewed my file.

Q.  What else did you do to prepare for today?

A.  I reviewed my report.  I reviewed my intake document.  I reviewed the contact document with Mr. Nicholas Suite.  I basically reviewed my file and some medical records as well.

Q.  Did you speak with anyone in preparation for

Paul M. Ramos, PT
April 11, 2025

today's deposition?

    A.    Other than Mr. Aronfeld just before the deposition.

    Q.    In other words, did you speak to Dr. Suite specifically about this deposition today?

    A.    No.

            MR. ARONFELD:  Object to form.

            THE WITNESS:  No, I have not spoken to Dr. Suite today.

BY MR. DRAHOS:

    Q.    Are you familiar with Dr. Suite's testimony in this case?

    A.    I have not seen the transcript.  I know he was deposed.

    Q.    Other than the fact that he was deposed, do you know anything that he had to say about this case?

    A.    I mean, we've spoken about the case in-depth and we've had several conversations about Mr. Smith.

    Q.    Yeah, but that's not the question I was wondering.

            What I'm wondering is:  Do you know specifically what Dr. Suite has testified to already in this case?

    A.    I don't know specifically --

            MR. ARONFELD:  Objection to form.

Paul M. Ramos, PT
April 11, 2025

THE WITNESS:  -- what he testified to.

BY MR. DRAHOS:

Q.  So I saw some correspondence between yourself and the Aronfeld office wherein you were requesting Dr. Suite to testify before you, and in particular, you said it would be easier if Dr. Suite testifies before you.

Why is it that you are of that impression?

A.  I find it helpful when the doctor testifies first and lays the medical foundation for the needs of the individual.

Q.  Why is that something that is particularly helpful for somebody like you?

A.  Because as I testified earlier, there's aspects of the life-care plan that require a medical foundation and the input of a physician.

Q.  And so wouldn't you agree that without that medical foundation, your opinions are not reliable?

A.  The medical foundation is necessary for the life-care plan to be -- to be reliable, yes.

Q.  Okay.  And so absent the medical foundation then, your opinions are not reliable?

A.  Can you repeat the question?

Q.  I'm going to move on.

So have you ever actually examined Mr. Smith?

Paul M. Ramos, PT
April 11, 2025

A. I had a video evaluation of Mr. Smith.

Q. When was that video?

A. That was on the 26th of February 2025.

Q. And that's the first and only time you've ever seen him?

A. That was the only time I've seen him. I've spoken to his wife, Michele, subsequently.

Q. So you've never actually seen him in person?

A. I have not.

Q. Why did you do an evaluation by video?

A. He is an inpatient at a long-term care facility in Atlanta and I was in Miami, Florida, so the video was the best option we had at the moment.

Q. So at the time that you saw Mr. Smith on February 26, 2025, he was in that long-care facility --

A. Yes.

Q. -- long-term care facility?

A. Yes.

Q. Was that Wellstar?

A. It was.

Q. Was he in the ICU?

A. I believe so.

Q. He was capable of speaking?

A. He was capable of responding.

Q. What does that mean?

Paul M. Ramos, PT
April 11, 2025

A.    He was nodding and communicating to his wife, who was communicating to me.

Q.    Other than his wife, was anyone else present during this particular communication?

A.    No.

Q.    Did he speak any words to you?

A.    I don't recall him gesturing with his head and face.

Q.    All right.  You don't recall him actually communicating any words specifically to you?

A.    Directly to me, no, to his wife, and then she communicated to me.

Q.    How long was this evaluation in total?

A.    I'd say approximately one hour and 20 minutes.

Q.    And did Mr. Smith remain in the hospital bed throughout the entirety of that hour and 20 minutes?

A.    Yes.

Q.    I didn't see this listed anywhere in your report; did I miss it somewhere?

A.    What specifically?

Q.    That you had an encounter with Mr. Smith.

A.    It would be part of my file, it would be my intake document.

Q.    The intake document that I saw indicated that you had a conversation with Mrs. Smith, didn't make any

mention of you actually speaking to Mr. Smith.  Did I misread it or is there a separate intake form?

A.    No, it should be the same intake form.

Q.    So the intake form that you've produced in this case is the only one that exists, correct?

A.    That's correct.

Q.    All right.  So if Mr. Smith wasn't capable of speaking to you, what did you do for an hour and 20 minutes on the phone with him?

A.    He went over the treatment he has been receiving, his condition at that present moment; we went over past medical history, we went over what Mrs. Smith's understanding was for discharge planning for Mr. Smith.  We went over his pain level, whether or not he was having spasm, the nature of his wounds.  We went over the different hospitalizations he has had since moving from Jackson Hospital back home to Atlanta, the different hospitalizations he has had.  We went over general systems of -- of his body.

Q.    When you say "we," you're talking about you and Mrs. Smith, correct?

A.    With input from Mr. Smith.

Q.    Input that he, you're telling me, he said to Mrs. Smith, who then relayed to you?

A.    Yes.  Mr. Smith was laying in the bed,

Paul M. Ramos, PT
April 11, 2025

Mrs. Smith was to his side, and that is how we conducted the evaluation.

Q. All right. But when you talk about -- you talked about treatment he was receiving, how much, if any, did Mr. Smith specifically provide?

A. Most of it was provided by Mrs. Smith.

Q. All right. And when you say his condition at the moment, how much of the information you received came exclusively from Mr. Smith versus Mrs. Smith telling you this stuff?

A. Predominantly Mrs. Smith.

Q. All right. And how about past medical history?

A. As far as what was provided at the time of the evaluation, it was Mrs. Smith.

Q. Okay. And how about for discharge planning?

A. Also Mrs. Smith.

Q. Nature of his wounds?

A. Also Mrs. Smith.

Q. And his subsequent hospitalizations after Jackson Memorial?

A. Also Mrs. Smith.

Q. When you say "general systems of his body," what are you talking about?

A. We reviewed if he had any movement in the

upper extremities. You know, this being a quadriplegic spinal cord patient, you know, we went over spasticity; general things like vision, hearing, sense of smell, sense of taste, teeth and gums. We reviewed the respiratory status after, you know, gleaning what was in the medical records. And we discussed the plans to wean him off the ventilator. We discussed that he had a colostomy at the moment and that he wanted to have it reversed, if that was an option. Mr. Smith did voice that or indicated that. We discussed neurogenic bladder, neurogenic bowel, the condition of his skin, the stages of the different wounds. As I mentioned before, we discussed the spasms and his pain levels at the time.

Q. So are you reviewing something there on your computer screen when you're answering these questions?

A. The intake document that we're referring to.

Q. So you're not rattling this off of memory, you're reading it from the form?

A. Yes, I'm referring to my intake document.

Q. And when you said "respiratory status," he was still on the ventilator at the time of this encounter?

A. He was -- they were weaning him off.

Q. But I just want to make sure we're clear, that was not happening as you were on the call; he was still

on the ventilator during the duration of your

evaluation?

A.    Yes.  Yes.

Q.    So did you speak to any of his treating

physicians?

A.    I spoke to a PA at the facility.

Q.    What's the PA's name?

A.    Give me a moment.  I spoke with Leena Shah,

PA, at Wellstar Windy Hill.

Q.    When did you speak to Leena Shah?

A.    On March 4, 2025.

Q.    I didn't see that referenced anywhere in the

report either, a conversation with Leena Shah?

A.    No, that may not have made it into the report;

that was in my intake document.

Q.    Did Leena Shah provide any opinions

specifically for or against or of any degree in response

to any of these recommendations you've made?

A.    She -- she said that it was probable that

Mr. Smith would remain at the LTAC for an additional 4

to 12 weeks before being discharged.

Q.    Anything else beyond that?

A.    That was it.

Q.    Why isn't Leena Shah's name anywhere in this

life-care plan?

Paul M. Ramos, PT
April 11, 2025

A.   That was the only input she gave me in a brief conversation --

Q.   All right.

A.   -- it just corroborated a recommendation made by Dr. Suite.

Q.   Where is Mr. Smith today?

A.   He remains at the facility.

Q.   Same facility?

A.   Yes, Windy Hill.

Q.   Have you received any additional updated information about Mr. Smith's condition subsequent to March 4th of 2025?

A.   Yes, I received medical records after that date and I spoke to Mrs. Smith yesterday.

Q.   What did you speak to Mrs. Smith about yesterday?

A.   I spoke to her as to what -- what was his condition at the moment, that he had gone back on the ventilator as of the 22nd of March 2025.  He had been weaned off of the ventilator for the most part prior to that and had been eating mechanical soft food without aspiration or incident, that they are currently working to get him back on the trach collar, but he had developed two new wounds, small wounds on his back at the facility, and they were addressing that.  And we

discussed that in Miami he was able to use a hand control for the power wheelchair, but then at the moment with the contractures in the hand, he may no longer be able to use a hand controller.

Q.   When you say "in Miami," you're talking about immediately following the cruise?

A.   Yes, at the Lynn Center for rehabilitation.

Q.   Okay.  So he was able to do that in Miami, but he has not been able to do that since?

A.   He's been in and out of the hospital and she felt that his hand function had deteriorated.

Q.   All right.  So going back to it, I don't know if I understood your answer, so let me seek clarity on that.

You said that he went back on the ventilator on March the 2nd?

A.   March the 22nd is my understanding.

Q.   When did he come off of it?

A.   I'd have to go into the records --

Q.   So --

A.   -- but between -- I'm sorry, between my last conversation with Mrs. Smith and -- and the 22nd of March, he had come off the ventilator to some extent.

Q.   How long?  How many days?  How many hours?

A.   I'm not certain.  I would have to refer to the

Paul M. Ramos, PT
April 11, 2025

records.  I don't know from memory.

Q.   All right.  But at least as of yesterday he was still back on the ventilator?

A.   That's my understanding.

Q.   So before I move on, let me ask you this broad-based question and let's see how far we have to dive into it.

You've looked at Dr. Merkler's report, right?

A.   I did.

Q.   So is there anything that you have learned about Mr. Smith throughout either your review of records or your discussion with Mrs. Smith that contradicts or in any way causes you to disagree with any of Dr. Merkler's findings?

A.   Dr. Merkler's findings on life expectancy are outside of my area of experience.

Q.   Well, that's not -- and I appreciate your answer, but what I'm looking specifically for are any of his findings on exam.  So any of his findings on exam are you today challenging based upon any new information you've either reviewed from medical records or from learning through Mrs. Smith?

A.   I don't recall his findings from the exam by memory.

Q.   Okay.  So that means as of today you can't

identify anything specifically?

A.   On his report, no, I don't recall it specifically; I'd have to refer to it.

Q.   So when you talk about your role, in particular, when you first came on this case, can you tell us based upon your review of the file, when specifically you were retained to serve as an expert for the plaintiff?

A.   I was initially contacted on the 20th of January 2025 and I believe officially retained on February 20, 2025.

Q.   Okay.  When you say "officially retained," does that mean a retainer fee was paid to you?

A.   I believe so and the documents were -- all the documents were received.

Q.   So had you started any work at all in this case prior to February 20th of 2025?

A.   I don't think so.

Q.   Okay.  And so at the time you were retained, were you advised of the fact that your report would be due in eight days on February 28th?

A.   I was.

Q.   All right.  Is that a rather expedited time frame in the grand scheme of what you do?

A.   It is.

Paul M. Ramos, PT
April 11, 2025

Q.   All right.  So you were asked to work rather quickly in this case?

A.   I had to work quickly.

Q.   Much quicker than you're used to?

A.   I do this on occasion, yes, but I had to work quickly.

Q.   All right.  When you say, "I do this on occasion," that would mean that having to review a case of this nature and prepare a report within eight days would be unusual for you?

A.   It's not the norm.

Q.   Okay.  Which means it's unusual?

A.   Yes.

Q.   All right.  So let's talk about the evolution of that and what came of it after your retention of February 20th.

Are you able to identify as you sit there today what records you received on February -- I'm assuming you received records on February 20th?

A.   I will see.

I received records actually before -- before that date.

Q.   But you had not yet reviewed them is what you're saying?

A.   I can't be certain when I started reviewing.

Paul M. Ramos, PT
April 11, 2025

Q.   All right.  Point being is that -- well, why can't you be certain?

A.   I can't be certain of the date that I started to review the records.

Q.   Would you have reviewed the records before you were paid to do so?

A.   I may have.

Q.   Do you know for sure as you sit here today whether you did that?

A.   I can't be certain.

Q.   All right.  So what we do know for certain is that you were officially retained on the 20th, and between the time period of the 20th, you would have reviewed all the records that you needed to review, you would have done an evaluation on Mr. Smith, and you would have prepared a report by February 28th?

A.   I prepared a preliminary report.

Q.   All right.  And so let me hand you what we're going to mark as Composite Exhibit B to this deposition.

MR. ARONFELD:  Hey, Mike, when you have a break, can I take 90 seconds?

MR. DRAHOS:  Yeah, I mean -- to talk to him or to --

MR. ARONFELD:  To go to the bathroom.

MR. DRAHOS:  I didn't mean to put that on the

Paul M. Ramos, PT
April 11, 2025

        record.

                MR. ARONFELD:  You asked.

                MR. DRAHOS:  Let's go ahead --

                THE VIDEOGRAPHER:  Going off record at 10:46

        a.m.

           (There was a discussion off of the record.)

                THE VIDEOGRAPHER:  Back on record at

        10:48 a.m.

BY MR. DRAHOS:

     Q.   So, Mr. Ramos, we're back on the record.

           Let me hand you what we've marked as Composite

Exhibit B.  Other than being for purposes of

identification is Plaintiff's Expert Disclosure sent via

e-mail to the parties on February 28th at 8:12 p.m.

           Do you see that there, sir?

        (Thereupon, E-mail, February 28th at 8:12 p.m.

         was marked as Composite Exhibit B for

         identification.)

                THE WITNESS:  I do.

BY MR. DRAHOS:

     Q.   And included within Composite Exhibit B is

specifically your report that is dated February 28,

2025.

           Do you see that there?

     A.   I do.

Paul M. Ramos, PT
April 11, 2025

Q.   All right.  And so, I mean, you've said it yourself, but I'm -- we're just going to read it from this report.  It states, "This preliminary report was prepared based on an evaluation of James Smith and on review of all records received to date.  The report is pending physician input and reviewed; therefore, it is subject to change and I reserve the right to amend and supplement the report."

Those are your words?

A.   Yes.

Q.   All right.  And so would you agree at the time this report was disclosed in the case, you had not conferred with any of Mr. Smith's treating physicians?

A.   That's correct.

Q.   You hadn't called anybody at Wellstar Hospital?

A.   I had not spoken to anyone.

Q.   Who is his primary care physician?

A.   He sees Wendy Swain, nurse practitioner.

Q.   Why didn't you call Wendy Swain?

A.   I -- I didn't call her.  I didn't feel that that would be the appropriate person to provide the input that I needed to prepare the life-care plan.

Q.   Well, what is a primary care physician?

A.   Primary care physician is a gatekeeper for

Paul M. Ramos, PT
April 11, 2025

one's health care needs, does not necessarily specialize in spinal cord injury.

Q.   So as the gatekeeper of one's health care needs, would you agree that that's the person that typically is the one to refer patients to outside specialists to the extent they need it?

A.   They do, do that.

Q.   All right.  Was there anything stopping you from calling Wendy Swain?

A.   No, nothing stopped me from doing so.

Q.   All right.  You didn't call his cardiologist or his neurologist either?

A.   I did not.

Q.   Why not?

A.   I was -- I had a call scheduled with Dr. Suite who was going to help provide the recommendations that -- for Mr. Smith's life-care plan.

Q.   To be clear, Dr. Suite is the retained expert for the plaintiff in this case; he is not Mr. Smith's treating physician.

Agreed?

A.   Agreed.

Q.   So rather than call anyone or any number of treatment physicians who are actually in the process of currently treating this man, your preference was to call

Paul M. Ramos, PT
April 11, 2025

the retained expert?

A.   Mr. Smith had been in and out of the hospital and had spent more days in different facilities than he had at home or seen his usual providers.  So there were, I would venture to guess, dozens of physicians that were treating him over the course of time through the different facilities, so I felt Dr. Suite, having reviewed the medical records and had seen Mr. Smith on more than one occasion, was the appropriate physician to provide input in this case.

Q.   All right.  But you hadn't even talked to Dr. Suite either at the time that you disclosed this report, correct?

A.   I had not.  I had read his report.

Q.   You had read his report?

A.   Yes.

Q.   Okay.  We're going to talk about his report in just a second, but I'd like to talk about Dr. Suite for a little bit now.

So when did you actually speak to him?

A.   We spoke on March 1, 2025.

Q.   Okay.  So you had to look at your notepad when you answered that question, why is that?

A.   I had taken some notes of dates that I imagined would come up in the deposition.

Q.   So first let me ask you this question:  Have you ever turned in a life-care plan in a litigated case as an expert without having conferred with any treating physicians?

A.   Final life-care plan, I have not, I don't believe so.

Q.   Have you ever turned in a preliminary life-care plan without conferring with any physician?

A.   I can't be certain if I have done that before.

Q.   So as you sit here today, this is the first instance that you can recall, the only instance that you can recall where you've submitted a life-care plan of a, quote, "preliminary nature" without having conferred with any physicians?

A.   I believe so, but I can't be certain.

Q.   All right.  And wouldn't you agree that that practice would be contrary to whatever guidelines, whatever rules, whatever entitles you to call yourself a certified life-care planner?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I wouldn't necessarily agree, because it's preliminary, and as I indicated there, it is preliminary and a physician review and input was pending.

BY MR. DRAHOS:

Paul M. Ramos, PT
April 11, 2025

Q.    All right.  But all of the recommendations that you put in this preliminary report were derived through your mind?

MR. ARONFELD:  Objection to form.

THE WITNESS:  In my review of medical records, my education, experience, and training.

BY MR. DRAHOS:

Q.    Right.  So what we're saying is Paul Ramos, physical therapist, had to come up with recommendations on what type of future care needs Mr. Smith was going to require?

A.    Preliminary.

Q.    And you were put in that position because you had eight days to prepare this report and you didn't have an opportunity to confer with any physicians, correct?

A.    My understanding was that there was a deadline.

Q.    So Dr. Suite was the guy that you were preferring to speak to and it's your contention here today under oath that you spoke to him on March the 1st?

A.    If I could just verify that?

Q.    Sure.

A.    Yes, we spoke on March the 1st.

Q.    All right.  Do you have an independent

Paul M. Ramos, PT
April 11, 2025

recollection of this phone call?

A.   I do.

Q.   So as you sit here today under oath, you're telling the members of the jury and the judge that you recall specifically speaking to Dr. Suite?

A.   Yes.

Q.   On March the 1st?

A.   Unless I made a typo on the date, it was on March the 1st.

Q.   You're 100 percent certain of it?

A.   I'm 100 percent certain I spoke to Dr. Suite, yes.

Q.   Okay.  How long was the phone call?

A.   I want to say between 45 minutes and an hour, likely an hour.

Q.   Did you call him or did he call you?

A.   I don't recall.

Q.   Did you call on his personal cell phone or on his office line?

A.   I don't recall who called who.

Q.   Was the phone call made from your personal cell phone or your office line?

A.   It would have been through my office line.

Q.   And do you know whether or not Dr. Suite was calling you from a cell phone or an office line?

Paul M. Ramos, PT
April 11, 2025

A.   I can't be certain.

Q.   All right.  Do you happen to know what day March the 1st, 2025, lands on, on the calendar?

A.   I want to say it was over a weekend.

Q.   It was a Saturday?

A.   Yes.

Q.   All right.  And so it's your contention that you and Dr. Suite spoke for an hour on a Saturday about Mr. Smith?

A.   Yes.

Q.   And we received what we will mark as Composite Exhibit C, an e-mail from Mr. Smith's attorney dated Sunday, March the 2nd at 6:59 p.m., and I'm going to hand you this, if you will, please.

       (Thereupon, E-mail, Sunday, March the 2nd at 6:59 p.m. was marked as Composite Exhibit C for identification.)

       MR. ARONFELD:  It's okay, Mike.

BY MR. DRAHOS:

Q.   If you'll turn please to page 2.

A.   Yes.

Q.   That says "PMR Med Legal" along the top, correct?

A.   Yes.

Q.   So is this a document that your office

Paul M. Ramos, PT
April 11, 2025

generated?

A.   I prepared it.

Q.   You wrote this document?

A.   I did.

Q.   Okay.  Did Dr. Suite ever see it?

A.   It was sent to him, yes.

Q.   Do you know whether or not he has ever read this?

A.   I can't say if he read it; it was sent to his office and it was received.

Q.   Okay.  Did Dr. Suite specifically ever acknowledge this document?

A.   This document, no, the contents of it were put in a life-care plan that he reviewed and signed.

Q.   We're going to talk about it in a minute, but I'm talking specifically about this document.

Did Dr. Suite ever acknowledge to you personally that he has read this?

A.   No.

Q.   Did he ever acknowledge to you personally that he had approved anything that's contained in this document?

A.   No, other than his review of the life-care plan.

Q.   So Dr. Suite is the guy that you want to talk

Paul M. Ramos, PT
April 11, 2025

to.  He's the guy that you waited on.  He's the one that ultimately you're planning to have certify this is your recommendations, correct?

A.   Yes, to review the life-care plan -- to provide recollections and review it.

Q.   But you would agree that when you approached Dr. Suite, your goal was to get him to review the preliminary report that you had generated and sign off on your recommendations?

A.   No.

Q.   Well, you would agree that the recommendations that you made in that life-care plan, the preliminary life-care plan, are not reliable unless they are certified by a treating physician or a physician.

A.   They need medical foundation, yes.

Q.   Okay.  Clearly then when you spoke to Dr. Suite, it was your hope that he was going to certify or sign off on all of your recommendations?

A.   I don't feel it was my hope.  It was Dr. Suite and I had a conversation, he provided recommendations, those were memorialized in this contact document, they were incorporated in the life-care plan.  The life-care plan was sent to him for his review, to edit as needed, and he agreed and signed it and sent it back.

Q.   All right.  Let's talk about why Dr. Suite was

Paul M. Ramos, PT
April 11, 2025

the preferred guy.

At the time that you purportedly spoke to him on March the 1st, when was the last time Dr. Suite had evaluated Mr. Smith?

A.   According to his report, I believe it was October 31, 2024.

Q.   Actually, sir, when you take a look at his report, if you would like, on October the 31st of 2024, he had a half hour phone call with Mrs. Smith.

So my question is much more specific.  When is the last time Dr. Suite had ever actually evaluated Mr. Smith?

A.   I believe it would be March 19, 2024.

Q.   All right.  So that would mean that at the time you had this phone call with Dr. Suite on March the 1st of 2025, the last time he had ever personally evaluated Mr. Smith would have been almost a year prior?

A.   That he physically evaluated him, yes.

Q.   And that also was the last time he would have seen him?

A.   I -- I think so.

Q.   And also the last time he would have ever spoken to him?

A.   I'm not certain on the October 31, 2024, if he spoke to Mr. Smith at all.

Paul M. Ramos, PT
April 11, 2025

Q.   Regardless of whether he spoke to Mr. Smith or he spoke exclusively to Mrs. Smith on October 31st, would you agree that that was the last date he had any knowledge about Mr. Smith whatsoever?

A.   Other than review of records, which I can't say that he did not review.

Q.   Can you say what he reviewed or didn't review?

A.   I would defer to Dr. -- to Dr. Suite.

Q.   Okay.  So for purposes of our deposition today and the questions that I'm asking you with regard to your understanding of what Dr. Smith knew -- or Dr. Suite knew, we can safely conclude here that we know of one evaluation that had been done a year prior and one phone call that had been had for about 30 minutes almost six months ago?

A.   I'm not certain how long he spoke on -- on October 31st, but yes.

Q.   Okay.  So these bullet points that are contained within this document that you generated on March the 1st, can you tell me which one of those specifically were recommendations that Dr. Suite purportedly made?

A.   They were all recommendations that Dr. Suite made.

Q.   So let's make sure that we are crystal clear

Paul M. Ramos, PT
April 11, 2025

about that. You're saying that this March 1, 2025, document is exclusively information that Dr. Suite provided to you during the call?

A. Yes.

Q. Not a single one of these are any ideas or thoughts of yours?

A. It's collaborative. Dr. Suite and I -- or whatever physician it is that I'm consulting with, it's a collaborative conversation where we go back and forth as to what the needs of the individual are.

Q. Yeah, so I get that it's collaborative, but my question was: Which of these are specifically or exclusively ideas of Dr. Suite's, and you're telling me all of these; now you're telling me it's collaborative. So I want to be clear before I walk out of here today, which one of these you're claiming were exclusively his versus collaborative with you?

MR. ARONFELD: Object to form.

THE WITNESS: If I could clarify that. It's a collaborative process; ultimately, the recommendation, if it's a medical recommendation, falls on -- on the physician, in this case, Dr. Suite.

So if we go bullet by bullet, they would all be recommendations that were made by Dr. Suite and

Paul M. Ramos, PT
April 11, 2025

they were discussed in that March 1, 2025, phone call.

BY MR. DRAHOS:

Q.   All right.  So let's -- let's not go bullet for bullet, but let's just pick one in particular.

So it says here, "It is probable that at least one of Mr. Smith's chronic wounds will not fully close and he will require palliative wound care for life."

Do you see that one there?

A.   I do.

Q.   You would agree that at the time this conversation was allegedly had, Dr. Suite hadn't seen any wounds?

A.   I don't understand the question.

Q.   Sure.  Did Mr. Smith have wounds at the time of his initial evaluation a year prior?

A.   He may have -- he had a healed wound while at Jackson.

Q.   Okay.  So the wounds that you're speaking of here on March the 1st, would you agree Dr. Suite hadn't seen those wounds for at least a year?

A.   He's not seen them physically, but they're clearly identified in the medical records as Stage III, Stage IV, and unstageable wounds.

Q.   But again, you don't know what the medical

records, if any, Dr. Suite had reviewed?

A.   I don't know what he reviewed.

Q.   All right.  And so, in particular, there's a recommendation about a power wheelchair.  "Mr. Smith will need a power and manual wheelchair; specific functionality was discussed in detail."

Yet wouldn't you agree that that recommendation is directly contrary to what Mrs. Smith advised that he hasn't been able to use a power wheelchair since he was in Miami?

A.   Because he's been in the hospital.

Q.   Okay.  So --

A.   And he was not provided a power wheelchair when he was home briefly and for possibly weeks at a time between admissions.

Q.   That may be your explanation now, but my point is during this purported conversation with Dr. Suite there's a recommendation for a power wheelchair, yet he hasn't actually used one in at least a year, correct?

A.   This is the recommendation of what Mr. Smith will need once he gets out of the hospital and for the remainder of his life.

Q.   All right.  So here's what I'm having trouble with and let me just ask you the question directly, because I'm looking forward to your answer.

Paul M. Ramos, PT
April 11, 2025

Are you aware of the fact that Dr. Suite testified four days ago that he hasn't spoken to you about this case?

A.   No, we -- well, I'm not aware of what he said, but we have spoken in-depth about this case.

Q.   So even though Dr. Suite has testified under oath that he hasn't spoken to you about this case, and in particular he hasn't reviewed any of your life-care recommendations, you're willing to state here under oath that that conversation actually did happen?

MR. ARONFELD:  Objection to form.

THE WITNESS:  I am.

MR. ARONFELD:  And, Mike --

MR. DRAHOS:  Let's just form.  If you have an issue with it later we will talk about it.

MR. ARONFELD:  I just want to give you some clarification, but go ahead.

MR. DRAHOS:  I don't want the clarification right now.

THE WITNESS:  Please ask the question so I can answer.

BY MR. DRAHOS:

Q.   Sure.  I'm just giving you a last out here --

A.   Okay.

Q.   -- so Dr. Suite has testified that he did not

Paul M. Ramos, PT
April 11, 2025

review life-care plans of yours, yet you're telling us here today under oath that you actually did have a conversation with him and he did review your life-care recommendations, that's what you're saying?

A.   That is what I'm saying.

Q.   All right.  This conversation with Dr. Suite allegedly happened on March the 1st; did he know who you were during that conversation?

A.   Yes.

Q.   And did you know who he was?

A.   Yes.

Q.   Let me hand you what we will mark as Composite Exhibit D.

(Thereupon, Letter March 2, 2025, was marked as Composite Exhibit D for identification.)

MR. ARONFELD:  Thank you.

BY MR. DRAHOS:

Q.   Composite Exhibit D is a letter dated March 2, 2025, correct?

A.   Yes.

Q.   All right.  And it has a label on the top there, it says, "PMR MedLegal Consultants," correct?

A.   Correct.

Q.   And this letter, if this date is accurate, would have been written the day after you had this

Paul M. Ramos, PT
April 11, 2025

conversation with Dr. Suite, correct?

     A.    Correct.

     Q.    All right.  Can you read the first sentence of that letter, please?

     A.    "We are a private rehabilitation consulting firm representing James Smith, at the request of his attorney."

     Q.    And the second sentence, sir?

     A.    "Your review of our recommendations is essential.  Enclosed is a copy of our draft report dated 3/2/2025."

     Q.    So let me first ask the obvious question:  If you had a conversation with Mr. -- or with Dr. Suite the day before on March the 1st and you identified who you were and he identified who he was, why are you writing a letter identifying yourself in the first sentence of this?

     A.    It's a form letter that goes with the review page; it's just part of my practice pattern.

     Q.    Would you agree that this letter makes no reference to the fact that you guys had purportedly spoken the day prior?

          MR. ARONFELD:  Objection to form.

          THE WITNESS:  If I may have, let me read it.

          No, it doesn't make specific mention to our

Paul M. Ramos, PT
April 11, 2025

conversation.

BY MR. DRAHOS:

Q.   So -- hold on one second.

MR. DRAHOS:  Mr. Aronfeld.

MR. ARONFELD:  Oh, I'm sorry.

MR. DRAHOS:  No problem.

(Thereupon, Composite record, e-mail, Monday, March the 3rd at 2025 at 9:53 a.m. was marked as Exhibit E for identification.)

BY MR. DRAHOS:

Q.   So Exhibit E is a composite record; it's an e-mail provided to my office from the Aronfeld office dated Monday, March the 3rd at 2025 at 9:53 a.m.

Do you see that there?

A.   Yes.

Q.   And it states, "Good morning.  We inadvertently left this out of this disclosure.  Please see attached."  And attached is your March the 1st of 2025 summary record, correct?

A.   Yes.

Q.   All right.  You would agree that on February the 28th when your preliminary report was disclosed, this March 1, 2025, document didn't exist?

A.   Correct.

Q.   So it wasn't inadvertently omitted from the

Paul M. Ramos, PT
April 11, 2025

initial disclosure; it didn't exist at the time of your disclosure?

A.   My disclosure, you mean, the 28th?

Q.   February 28th.

A.   Yes.  Yes.

Q.   Okay.

MR. DRAHOS:  Do you want me to keep handing these over to you --

MR. ARONFELD:  Oh, I'm sorry.

MR. DRAHOS:  -- or do you want me to just give them to him?  I mean, I'm doing it as a courtesy, but I'm happy to just give them to him.

MR. ARONFELD:  No, I really apologize.  I didn't realize it was so document intensive.

Excuse me.  Forgive me.

THE WITNESS:  Thanks.

BY MR. DRAHOS:

Q.   All right.  So, Mr. Ramos, I've handed you what we've marked as Defendant's Composite Exhibit -- what am I on?  F --

A.   F.

Q.   -- and this is an e-mail with another disclosure dated March 4, 2025, at 1:46 p.m.

Do you see that there?

(Thereupon, E-mail with another disclosure dated

March 4, 2025, at 1:46 p.m. was marked as

Exhibit F for identification.)

THE WITNESS:  Yes.

BY MR. DRAHOS:

Q.   All right.  Any reason to dispute that this was sent out on March the 4th at 1:46 p.m.?

A.   I'm trying to find the date.

Yes, I see it there.

No reason to dispute it.

Q.   All right.  And you're welcome to confirm, but would you agree that this report is not labeled a final report?

A.   I don't believe it's labeled a final, but yes, it's a final.

Q.   Okay.  So this report differs from the other in the sense that it doesn't call itself preliminary or draft or anything, right?  So this is the final report?

A.   This is.

Q.   All right.  And the only doctor that's referenced in this report, as we talked about previously, was Dr. Suite, correct?

A.   That's correct.

Q.   All right.  So am I to understand in reviewing this report that this must mean that Dr. Suite has signed off on this report by this point?

Paul M. Ramos, PT
April 11, 2025

A.   Dr. Suite signed off on the report; he signed off on the 4th.

Q.   So are you sure about that?

A.   I'll pull it up.

Yes.

Q.   Would you have provided this final report without first securing Dr. Suite's signature?

A.   It was sent to him on the 2nd and then the report was dated the 3rd and then once his review -- since there were no changes in his review was received on the 4th, the date was kept on the 3rd.

Q.   So what is your official position here?  Just to be crystal clear, is it your testimony before the jury that when this report was submitted to the defendants on Tuesday, March 4, 2025, at 1:46 p.m. that Dr. Suite had signed off on it, officially signed off on it?

A.   I believe so.

Q.   And if the evidence in this case proves to be different, that when this report was submitted to us on March 4th of 2025 at 1:46 p.m., Dr. Suite had not signed off of it, wouldn't you agree that therefore it's unreliable?

MR. ARONFELD:  Objection to form.

THE WITNESS:  Dr. Suite made no changes to the

Paul M. Ramos, PT
April 11, 2025

report.

BY MR. DRAHOS:

Q.   Not the question I asked.

A.   I feel that the report would still be final.

Q.   Would it be improper for you to submit a final report indicating that a physician has signed off on it and otherwise certified it if that had not actually taken place?

MR. ARONFELD:  Objection to form.

THE WITNESS:  If the report was submitted with the date of the 3rd and there were no changes to the report by the time I got his review then the report has medical foundation.

BY MR. DRAHOS:

Q.   Okay.  But you don't have a crystal ball, just as much as I don't, right?

A.   I don't have a crystal ball.

Q.   Okay.  So what we're getting at, though, is when you submit a final report as a certified life-care planner indicating that a physician had signed off on your recommendations, that must mean that at the time you made that representation, that act has actually occurred, the doctor has actually signed off on the report, right --

MR. ARONFELD:  Objection to form.

Paul M. Ramos, PT
April 11, 2025

BY MR. DRAHOS:

Q.   -- otherwise you got to keep calling it preliminary?

A.   Or I can update the report if he had made changes.

Q.   That may be so, but at the moment in time on March the 4th of 2025 at 1:46 p.m., in order for you to call this an officially certified final report, you must have a doctor having signed it by that point?

MR. ARONFELD:  Objection to form.

THE WITNESS:  A physician's signature is not a requirement of a life-care plan; it is part of my methodology to ensure that the recommendations were properly included in the life-care plan, but nowhere in the standards of practice or in the consensus of majority statements of life-care planning is a physician's signature a requirement.

BY MR. DRAHOS:

Q.   So why bother to get it then?

A.   Because I'm thorough and good at what I do.

Q.   All right.  So what you're saying is that if you turned in this report on March the 4th of 2025 at 1:46 p.m. without having gotten Dr. Suite's signature, you violated your own policies and procedures?

MR. ARONFELD:  Objection to form.

Paul M. Ramos, PT
April 11, 2025

THE WITNESS:  No, I don't have a written policy or procedure that I'm violating.  It's within the standards of practice and -- and it's sound practice in life-care planning.

BY MR. DRAHOS:

Q.  What is the entity that gives you the certification, meaning the entity that allows you to call yourself a certified life-care planner?

A.  I'm certified through the International Commission of health care Certification and I'm a fellow of the International Academy of life-care planners through the International Association of Rehab Professionals, so I'm dual certified.

Q.  Okay.  And let me make sure I understood your answers in this deposition.

So are you telling me that you are not required to get a physician to certify your recommendations under either of these two governing bodies?

A.  That's correct.

Q.  All right.

A.  I do it out of thoroughness.

Q.  So you're saying that Dr. Smith -- Suite did not make any additions or deletions or modifications between your preliminary report that you issued on

Paul M. Ramos, PT
April 11, 2025

February 28th and your final report that you issued on March the 4th?

A.   No, I didn't say that.

Q.   All right.  So can you tell me in your review of your final report versus your preliminary report specifically what changes Dr. Suite made?

A.   I would have to go line item by line item.

Q.   I'm happy to take all the time you need to do that.

A.   We can do that.

Q.   All right.

A.   If you can provide both reports in writing, we can go --

Q.   Sure.  We've done that already.

MR. ARONFELD:  Michael, do you want to go off the record while he --

MR. DRAHOS:  We can do that.  Sure.

THE VIDEOGRAPHER:  Going off record at 11:15 a.m.

(There was a discussion off of the record.)

THE VIDEOGRAPHER:  Back on the record at 11:20 a.m.

BY MR. DRAHOS:

Q.   All right.  So, Mr. Ramos, when we left off, we were waiting -- you were going through to see what

changes Mr. -- I'm sorry, Dr. Suite specifically made from the initial draft on the 28th until this final draft. So have you --

A. Yes.

Q. -- gone ahead and done that exercise?

A. Yes.

Q. Okay. And can you tell me where those changes are, please?

A. Okay. Going to line by line, "Internal medicine, primary care," the preliminary draft was one to two times a year; Dr. Suite's recommendation was one time a year.

"Neurological care," the preliminary was as needed; Dr. Suite's recommendation was if needed.

"General surgery care," Dr. Suite's recommendation was two to three times, if able; the preliminary was one time, if able.

"Plastic surgery wound care specialist," Dr. Suite was more specific in four to twelve weeks for six months, three to five times, then life one time a year; the preliminary report simply said prior to each reconstructive surgery one time and one time a week for three to six months, two to three times.

"Neurosurgery," Dr. Suite indicated if needed; the preliminary report had it as needed.

Paul M. Ramos, PT
April 11, 2025

Q.   I'm sorry.  Hold on a sec.  Which page is that one on?

A.   We're still on the first page.

Q.   Okay.

A.   Page 1.

"Infectious disease," the preliminary report had every one to two years; Dr. Suite's recommendation was one to three times a year and as needed.

"Pain management," unchanged.

"Podiatric care," the preliminary report had one to -- every one to three months; Dr. Suite's recommendation was one to two times a year.

"Orthopedic surgery," unchanged.

"Orthopedic surgery care," unchanged.

Preliminary report had cardiology care; Dr. Suite did not make that recommendation.  It was taken out.

Moving onto diagnostics.  "MRI of the cervical spine" was included in the preliminary and not -- and not one of Dr. Suite's recommendations.

"Physical therapy," preliminary report had 50 visits a year.

Q.   Which page are you on?

A.   I'm sorry.  I'm on page 4.

Dr. Suite's recommendation was 48.

Paul M. Ramos, PT
April 11, 2025

Same goes for "Occupational therapy," preliminary report had 50 visits a year; Dr. Suite's recommendation was 48.

"Speech therapy," Dr. Suite's recommendations -- no, it's the same.

Preliminary report included activity-based therapy; Dr. Suite did not make that recommendation.  It was -- it was taken out.

Moving onto page 6.

Preliminary report -- one minute.

"Home infusion therapy" --

Q.   Which page?

A.   I'm sorry.  Page 8.

"Home infusion therapy," the preliminary report has one to seven weeks every two to three years; Dr. Suite's recommendation in four to twelve weeks for twelve months, daily one to seven weeks, one to two times over that span of time, and then Dr. Suite's recommendation, and then life daily for one to seven weeks every one to two years.

Preliminary report had "wound care biologics" on the support care page, 9 to 15 applications; Dr. Suite -- I'm sorry, that may be included somewhere else in the report.

It's the same.

Q.   Okay.  So you moved that --

A.   Yes, I moved it from the support care page to -- to more of an equipment page, supply page.

Preliminary report had housekeeper --

Q.   Which page?

A.   Still on page 8.

Q.   Okay.

A.   -- that was taken out.

Q.   Taken out by Dr. Suite?

A.   It was not included in Dr. Suite's recommendations, yes.

Page 18, "Wound care biologics," preliminary report had two to three times over life; Dr. Suite's recommendation is in four to twelve weeks for six to twelve months, nine to fifteen applications, then over life three to five applications two to three times.

Dr. Suite's recommendation regarding negative pressure wound therapy pump and care, four to twelve weeks for two to four months monthly, then life one to three months two to three times.

Dr. Suite's recommendations include an oxygen -- I'm sorry.

Page 19.

Q.   Thank you.

A.   -- oxygen -- include an oxygen concentrator,

portable liquid oxygen, oxygen tubing, suction machine, suction tubing, Yankauer suction tips.  Those were not included in the preliminary.

I believe the medications are the same.  And I believe that's it.

Q.   All right.  Thank you, Mr. Ramos.

A.   You're welcome.

Q.   So let me go back a bit.

Have you ever worked with Dr. Suite before?

A.   I have.

Q.   How many times?

A.   I'd be guessing, but eight times, somewhere in that neighborhood.

Q.   And in all eight of those times, was Dr. Suite -- strike that.

In all eight of those times, were you retained by the plaintiff?

A.   Yes.

Q.   Okay.  So --

A.   I have had on one occasion Dr. Suite was retained by defense.

Q.   So seven times for the plaintiff, one time for the defense?

A.   My best guess is eight, but yes, somewhere --

Q.   What was the name of the case where Dr. Suite

Paul M. Ramos, PT
April 11, 2025

had been retained by the defense?

A.   I might -- no, I didn't testify.

I can get the name for you.  I can't bring it up on the top of my head.

Q.   So having worked with him on eight different occasions in the past, you're aware of what his background is?

A.   He's a neurologist, yes, and trained at Johns Hopkins.

Q.   By the way, in those eight instances, how many times had it involved cases wherein Mr. Aronfeld was the attorney?

A.   None.

Q.   This is the first time that you, Dr. Suite, and Mr. Aronfeld have all worked together?

A.   Yes.

Q.   Is this the first time you've worked with Mr. Aronfeld?

A.   It is.

Q.   Okay.  So Dr. Suite is a neurologist, you said?

A.   Yes.

Q.   Okay.  So I want to ask:  Do you, when you're speaking to him, ever ask him whether or not he has any knowledge, training, or experience in a particular area

Paul M. Ramos, PT
April 11, 2025

of medicine that you're inquiring about?

A.   I mean, I know that he has education, experience, and training in spinal cord injury.

Q.   So to what extent does Dr. Suite have any knowledge, training, or experience in determining whether or not a patient can have a colostomy reversed?

A.   As a medical doctor, my understanding is he can.

Q.   Do you know if he has any experience in making that type of a decision?

A.   I would defer to him.

Q.   You would actually defer to a gastroenterologist, wouldn't you?

MR. ARONFELD:  Objection to form.

THE WITNESS:  A gastroenterologist would be the specialist that would be responsible for that ultimately, but a medical doctor can make a recommendation, I believe.

BY MR. DRAHOS:

Q.   So how about a knee amputation?  Is that something that Dr. Suite has any knowledge, training, or experience in?

MR. ARONFELD:  Objection to form.

THE WITNESS:  As a medical doctor, I believe so, yes.

BY MR. DRAHOS:

Q.   Is he a surgeon to your knowledge?

A.   Not to my knowledge.

Q.   Has he ever performed a knee amputation in his career to your knowledge?

A.   That he's performed one, no.

Q.   On page 7 of your life-care plan, you indicate that -- let me turn there too.

You indicate that Mr. Smith may be a candidate for penile implant surgery.  Where is that coming from?

A.   In spinal cord injury, sexual health, reproductive health, et cetera, is a topic in an area that is covered in the holistic treatment of individuals with spinal cord injury.

Q.   So the recommendation in your report in particular says, "Per Dr. Suite, if recommended by urologist."

Do you see that there?

A.   Yes, it's included in the report on an if-needed basis, if it were to be recommended by a urologist.

Q.   So what does that mean?  A urologist hasn't made that specific recommendation in this case, correct?

A.   They have not.  It's why it's in there -- it's in the report for informational purposes as a

Paul M. Ramos, PT
April 11, 2025

possibility.

Q.   Right.  But as you sit here today, do you have a qualified urologist making a recommendation that Mr. Smith should receive a penile implant surgery?

A.   No, that's why it's qualified as if recommended by a urologist if needed.

Q.   So your comment section says, "Per Dr. Suite, if recommended."

So is Dr. Suite saying, Look, if a urologist makes this recommendation, or are you saying, per Dr. Suite, but also if recommended by a urologist?

A.   If I understood the question correctly, Dr. Suite is saying if this is recommended by a urologist, it would be indicated.

Q.   Okay.  So this would be an acknowledgement. The way that this is written and the way I'm understanding your report, this would be an acknowledgment that Dr. Suite cannot make that recommendation on his own, he would require the input of a urologist?

A.   Dr. Suite is saying that this is a possibility for this individual should it be recommended by a urologist specifically.

Q.   Okay.  I'm trying to drill down on that in particular so that I know what is going to be admissible

Paul M. Ramos, PT
April 11, 2025

at trial or what we are going to seek to potentially have removed from consideration.

So I'm trying to understand what your terminology means.  So this page 7 in particular, I mean, I keyed in on penile implant, but you've made that same type of qualification for the colostomy reversal and the knee amputation.

It says, "Per Dr. Suite, if the sacral wound closes."

"Per Dr. Suite, if Stage IV left lower extremity wound worsens."

Does that mean Dr. Suite cannot make -- or he did not make that recommendation today on his own.  Certain things need to occur or certain specialists need to be consulted?

A.   If I understand the question correctly, Dr. Suite is saying -- making the recommendation should certain criteria be met, he feels that this is recommended, but it would need to be recommended further by the urologist --

Q.   Okay.

A.   -- that's why it's included in the report on an if-needed basis and not calculated by the economist.

Q.   All right.  So let me just make sure I got that.  I think I do, but let me just make sure.

Paul M. Ramos, PT
April 11, 2025

So what you're saying is today there is not an opinion either from Dr. Suite or yourself that Mr. Smith is a penile implant surgery candidate?

A.   That it is not a probability.

Q.   All right.  And then today, he is not a left, below-knee amputation candidate?

A.   It's not as -- referred to in the medical record as a possibility.

Q.   All right.  And that would mean that also today, he is not a colostomy reversal candidate?

A.   We do not know if he is going to be a candidate for that.

Q.   All right.  And so can I hold that same interpretation of your report true each and every time you put a "if needed" qualification in your description box?

A.   If it's if needed, by definition it doesn't reach the threshold of probability.

Q.   Okay.  Thank you.

On page 5 --

A.   Yes.

Q.   -- of the BOTOX section.

A.   Yes.

Q.   You would agree that Dr. Suite has not measured Mr. Smith's spasticity in at least a year?

Paul M. Ramos, PT
April 11, 2025

A.    I believe it was about a year, yeah.

Q.    Okay.  So as you sit here today, do you know what his spasticity is?

A.    Just from the medical records.  He has contractures in his upper extremities and he has hypertonicity in the upper extremities and hypotonicity in the lower extremities.

Q.    But each one of these BOTOX recommendations that are made also have this same type of qualification: Per Dr. Suite, if recommended by physiatry or neurology; per Dr. Suite if recommended by a urologist.  So this again would be another example where he does not meet the criteria today for this, certain things must occur or be recommended by other specialists?

A.    Right, it's included in the report on an if-needed basis, because it is a possibility that Mr. Smith would benefit from it.

Q.    Okay.  So your report does not contain a specific duration period.  Like many times there's references in here to him needing certain things for life or him needing certain things for 9 to 12 years, but nowhere within this report do I see you making a life expectancy recommendation or opinion.  Agreed?

A.    Yes, that's correct.

Q.    Okay.  Do you agree as you sit here today that

Paul M. Ramos, PT
April 11, 2025

you are not qualified to provide a life expectancy opinion for Mr. Smith?

A.    That's correct.

Q.    And would you agree that your report does not give a specific life expectancy opinion by Dr. Suite either?

A.    My report does not contain that.

Q.    Okay.  So as we sit here today, you've generated a report, but we don't know for how long of a period of time these things may be needed?

A.    No, just through life expectancy, whenever that may be.

Q.    And are you aware of any life expectancy opinion authored by any plaintiff expert in this case?

A.    I don't recall seeing it, no.

Q.    Okay.  So if you read Dr. Merkler's report, surely you're aware of the fact that he did an evaluation of Mr. Smith on January 27th of 2025, right?

A.    Yes.

Q.    Okay.  We're going to hand that to you as a Composite Exhibit.

        (Thereupon, Dr. Merkler, letter, February 18,

         2025 was marked as Composite Exhibit G for

         identification.)

            MR. ARONFELD:  Thanks.

Paul M. Ramos, PT
April 11, 2025

MR. DRAHOS:  I thought you've seen that one before.

MR. ARONFELD:  You're right, I have.

THE WITNESS:  Thanks.

BY MR. DRAHOS:

Q.  All right.  And I've handed you what we marked as Composite Exhibit G, this is Dr. Merkler's expert report date February 18, 2025.

Do you see that there?

A.  I do.

Q.  All right.  And this makes reference to the fact that Dr. Merkler had gone to Wellstar Hospital and personally done an evaluation on Mr. Smith on January the 27th of 2025, correct?

A.  Yes.

Q.  All right.  And in that report, if you turn your attention to the second to last page.

A.  Yes.

Q.  It's Dr. Merkler's opinion within a reasonable degree of medical probability that Mr. Smith has a short life expectancy and will die within a year of his evaluation.

Do you see that?

A.  I do.

Q.  All right.  So as you sit here today, do you

Paul M. Ramos, PT
April 11, 2025

have any competing life expectancy opinions?

A.    I don't opine on life expectancy.

Q.    All right.  So as far as you're aware, if the jury were to apply Dr. Merkler's conclusion to your report, that would mean that all of the recommendations that you made will be needed for one year or less?

A.    Yes, if the life expectancy that the trier of fact takes into consideration is Dr. Merkler's, that would be correct.

Q.    Okay.  Let me wrap up with just some simple housekeeping stuff.

A.    Yes.

Q.    Have you provided all of your billing invoices to date in this case?

A.    To date, yeah.

Q.    Okay.  And do you know in total how much you've charged the plaintiff for your services in this case?

A.    I'm not sure of the exact amount, because work was done this month.

Q.    So does that mean that there has been work done that has not been billed yet?

A.    Yes.

Q.    How many hours additionally have you put in the case that has not been billed?

A.    I'd be guessing, but four, maybe six.

Q.    Four to six hours?

A.    That would be my best guess.

Q.    And that would be at your hourly rate of $300 an hour?

A.    Yes.

Q.    Looking at your testimonial history -- what happened to it?

Give me a second.  I lost it.  I had it here.

A.    It's here as an attachment, I think.

Q.    Oh, that's probably where I had it.

I had all this stuff organized neatly until the end.

MR. ARONFELD:  You were doing so good, Michael.

THE WITNESS:  Here we go.

BY MR. DRAHOS:

Q.    Thank you.

A.    You're welcome.

Q.    Do you need to look at this?

Well, you know what, I don't need to look at it.  Let me just hand it back to you.

The question that I have for you is in looking at that, can you tell me what percentage of the time that you've been retained as an expert have you served

Paul M. Ramos, PT
April 11, 2025

on behalf of the plaintiff versus the defendant?

A.   In testimony it would be 100 percent plaintiff.

Q.   And have any of your opinions ever been stricken or limited by any Court for any reason?

A.   No.

Q.   Do you know what a Daubert challenge is?

A.   I do.

Q.   Have you ever had a Daubert challenge filed against you?

A.   I have.

Q.   And have any of them been successful?

A.   No.

Q.   And I think you told me this is the first time you've worked with Mr. Aronfeld?

A.   Yes.

Q.   Do you have any other cases pending with him at the moment?

A.   I have one.

MR. DRAHOS:  Okay.  Mr. Ramos, those are all the questions that I have.

Thank you for your time.

THE WITNESS:  Thank you.

MR. ARONFELD:  I have just a few.

CROSS-EXAMINATION

BY MR. ARONFELD:

Q.   In the unfortunate event that you're unable to join us in the courtroom with the judge and the jury, could you take a moment and maybe move your little laptop aside so the jury can really see you?

MR. ARONFELD:  Can you zoom in a little bit on him?

THE VIDEOGRAPHER:  That's not the --

MR. ARONFELD:  Oh, that's not -- you got a good video of him?  Let me sit back here.

BY MR. ARONFELD:

Q.   Mr. Ramos, would you introduce yourself to the ladies and gentlemen of the jury.

A.   Yes, my name is Paul Mario Ramos.

Q.   Okay.  And what do you do for a living, sir?

A.   I'm a physical therapist, certified life-care planner, and I hold several other certifications.

Q.   Let's break that down one by one.

What does a physical therapist do?

A.   A physical therapist is a rehabilitation professional that works rehabilitating individuals that have suffered injury or illness; be it orthopedic; neurological; congenital, meaning that they were born that way.  Physical therapists work with all age groups

from neonates or premature babies all the way to centenarians, 100-year-old patients.  I, myself, am board-certified in geriatric therapy.  Physical therapists work in a number of settings.  They can work in the home health setting, acute hospital setting, rehabilitation hospitals, pediatric clinics, outpatient. So it's a pretty broad field.

As a certified life-care planner --

Q.   Well, hold up.  Let's stop.  Let's explore physical therapy just a little bit longer.

A.   Yes.

Q.   Are you licensed in the state of Florida as a physical therapist?

A.   I am.

Q.   And how long have you had that license?

A.   Since 1994.

Q.   Now, let's shift to your career as a life-care planner.  What is a life-care planner?  What do they do?

A.   A life-care planner is generally a medical professional that produces a report, a life-care plan, which is a comprehensive report that takes into account the needs of an individual that has suffered a chronic -- catastrophic injury or illness and maps out what services that individual will need throughout the course of their life, be it medical evaluations and

care, therapy, equipment, support care, modifications to the home, everything down really to the last BAND-AID, and then what that is going to cost and when during their life they're going to need it.

Q.    And so how does -- and are you -- you said that you're certified as a life-care planner?

A.    Yes, I'm a certified life-care planner and I am also a fellow of the International Academy of Life Care Planners.

Q.    And how long have you practiced life-care planning?

A.    Since 2013, I've been certified.

Q.    And where are you from?

A.    I'm from Miami, Florida.

Q.    And have you testified in cases other than Mr. Smith's case involving catastrophic injuries?

A.    Yes.

Q.    Would you agree Mr. Smith has sustained a catastrophic injury?

A.    Yes, he has.

Q.    And what is your general understanding of what his injury is?

A.    Mr. Smith has suffered a C4 ASIA A spinal cord injury, which what that means is it's a complete injury from the C4 cervical level in the neck down.  So he's

Paul M. Ramos, PT
April 11, 2025

unable to have sensation or any type of motor function or movement of significance below the level of injury. Accompanied with that, his other comorbidities or other conditions related to spinal cord injury, such as neurogenic bladder, meaning that he is unable to -- to control urination and retains urine, that needs to be catheterized several times during the day or have an indwelling catheter to be able to control the bladder. Also has neurogenic bowel, meaning that to have a bowel movement, there is a process that has to happen and it also needs to be monitored closely.  There's issues with skin integrity or the development of pressure ulcers cubiti that accompany spinal cord injury.  Bone density loss is ubiquitous or very common in -- or always happens in spinal cord injury.  There's a number of different comorbidities and risk factors that accompany spinal cord injury.

     Q.   Is he in a condition that's commonly referred to as a quadriplegic?

     A.   Yes.

          MR. DRAHOS:  Object to the form.

          MR. ARONFELD:  What's wrong with that?

          MR. DRAHOS:  I think that is outside his area of expertise.  He's not a medical doctor.

BY MR. ARONFELD:

Paul M. Ramos, PT
April 11, 2025

Q.   Well, is it your understanding that Mr. Smith is able to move his arms and legs?

A.   He cannot.

Q.   He is able to speak?

A.   At the moment, no.

Q.   Is he able to breathe on his own?

A.   At the no moment, no, he's on a ventilator.

Q.   Right.  And if no one was taking care of Mr. Smith, is there anything that Mr. Smith could do on his own to survive?

A.   No.

Q.   So have you done life-care plans before that involve patients that are in the same or a similar situation that we find Mr. Smith in?

A.   I've done many life-care plans for patients suffering from quadriplegia.

Q.   And I understand that you're not a medical doctor, is that -- that's true?

A.   It's true.

Q.   So how are you, not as a medical doctor, able to formulate opinions regarding what a particular patient, like Mr. Smith, will need for the rest of his life?

A.   As a physical therapist, I've worked with spinal cord-injured individuals for three decades.  As a

Paul M. Ramos, PT
April 11, 2025

physical therapist, we actually put our hands on the patient and are integral parts of the rehabilitation process.  So I'm very familiar with and very comfortable working with spinal cord-injured patients.

In addition to that as a life-care planner, unfortunately the catastrophic injuries that often we encounter are spinal cord injuries and I have extensive training in that.

Q.  Did I -- did I send you medical records regarding Mr. Smith?

A.  You did.

Q.  And did you review the medical records?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I did.

MR. ARONFELD:  What's wrong with that one?

MR. DRAHOS:  Vague.  I mean, what medical records?  You sent him something.  We don't know what specifically.

MR. ARONFELD:  Okay.

BY MR. ARONFELD:

Q.  Let me just say, what medical records have you reviewed of Mr. Smith generally?

A.  The extensive medical records.

Q.  I don't need detail, but generally what records?

Paul M. Ramos, PT
April 11, 2025

A.    Generally from -- from the ship, from the ship clinic; from a hospital in Jamaica, I believe Hospiten; from Jackson Health Systems, both acute and the rehab hospital; the Lynn Rehab Hospital; several hospitals in the Atlanta area; and currently he's at Windy Hill LTAC, which is a long-term care hospital.

Q.    Did I ask you to do a FaceTime call with Mrs. Smith and Mr. Smith?

A.    Yes, I did.

Q.    And could you tell us a little bit about that FaceTime call?

A.    Yes, it was Mr. Smith, as I just mentioned, was hospitalized, he was at LTAC.  Mrs. Smith was with him at bedside and we were able to go through an intake evaluation and ask the appropriate questions to get an idea of his current situation.

Q.    Were you able to obtain the information that you needed by FaceTime to formulate your opinions?

A.    My review of the medical records, my evaluation of Mr. Smith with Mrs. Smith, yes, that was -- that was helpful in formulating the life-care plan.

Q.    Did you also speak to Dr. Suite?

A.    I spoke extensively to Dr. Nicholas Suite.

Q.    And was that of use to you in formulating your

Paul M. Ramos, PT
April 11, 2025

opinions?

A. Very much so.

Q. All right. And you spoke to Mrs. Smith?

A. I did on a number of occasions.

Q. So do you have an opinion then, Mr. Ramos, based on your experience, your education, your training, having spoken to Mrs. Smith, having observed Mr. Smith on a FaceTime call, having spoken to Dr. Suite, having reviewed numerous medical records as to what needs Mr. Smith will have from your perspective for the rest of his life?

MR. DRAHOS: Form.

THE WITNESS: Yes, and those opinions are contained within the life-care plan.

BY MR. ARONFELD:

Q. Okay. Could you share with us what those opinions are?

MR. DRAHOS: Form.

THE WITNESS: Yes, Mr. Smith is going to need to be followed by a number of different medical specialties, be that physiatry, which is physical medicine and rehabilitation. That is very important. Urology, preferably with a urologist that has experience in spinal cord injury. Gastroenterology going back to when I testified

Paul M. Ramos, PT
April 11, 2025

earlier, being neurogenic bladder, neurogenic bowel.  He may need to be followed by neurosurgery.  He needs to be followed by a plastic surgeon or wound care specialist, because he currently has, I believe eight, if not ten, pressure ulcers.  He will need to be followed by a registered dietitian for nutritional concerns.  Podiatry.  And will have to see an internal medicine or primary care with an increased frequency.  He will need to see a pulmonologist on a regular basis.  In addition to that, he will need extensive therapy, be that physical therapy, occupational therapy, speech therapy.  He's going to need counseling to some extent, as well.  He will need extensive equipment and supplies to help him maximize what independence he can have.  That will be power mobility in the form of a wheelchair.  He will need a manual wheelchair.  He will need a specialized fluidized bed, because of the extensive wounds that he has.  He will need a cough assist machine.  He will need a nebulizer.

BY MR. ARONFELD:

Q.   What is a cough assist machine?

A.   It helps to bring out secretions from his respiratory system.  He will need quite a number of

Paul M. Ramos, PT
April 11, 2025

orthopedic pieces of equipment.  He would benefit from a standing table or a tilt table, braces or splints for his hands, because he has, unfortunately, formed contractures.  He will need what's called multi podus boots to protect his heels.

Q.   Could you show the jury what a contracture is?

A.   Yes, a contracture is where there is a shortening of the muscle of -- from disuse or from spasticity or what we call hypertonicity, basically spasticity, where the joints become contracted.  We see it often in stroke patients, patients that have suffered a CVA where the arm will contract and flexion. Unfortunately, Mr. Smith has contractures of bilateral upper extremities at the moment and that's something that's not uncommon in spinal cord injury and neurological injuries in general.  So he's going to need quite a bit of medication, as prescribed by his physicians and he's going to need 24/7 skilled nursing care once he leaves the hospital.

Q.   For the rest of his life?

A.   For the rest of his life in order to -- to manage him appropriately.

Q.   Now, no one knows how long he's going to live?

MR. DRAHOS:  Object to form.

THE WITNESS:  No one knows how long any of us

Paul M. Ramos, PT
April 11, 2025

are going to live.

BY MR. ARONFELD:

Q.   Right.  You don't know how long Mr. Smith is going to live?

A.   I do not.

Q.   So are you able to within a reasonable degree of probability tell us approximately how much money will be needed by Mr. Smith per year for the rest of his life, whatever the rest of his life is?

MR. DRAHOS:  Object to form.

THE WITNESS:  I really don't know.  I was not asked to quantify the items within the life-care plan.  It -- in my experience, it's going to be in the many, many millions of dollars.

BY MR. ARONFELD:

Q.   Per year?

MR. DRAHOS:  Object to form.

THE WITNESS:  Oh, per year -- per year, my educated guess would be in the neighborhood of a million dollars.

BY MR. ARONFELD:

Q.   Is that your phone?

A.   Yes.  I'm sorry.

Q.   It's okay.  Is it something important you need to --

Paul M. Ramos, PT
April 11, 2025

A.   No.

Q.   Just so that we're clear, based on your experience, education, and training, what would the approximate cost per year be for Mr. Smith for the type of care that your life-care plan suggests he needs?

MR. DRAHOS:  Object to the form.

THE WITNESS:  I would say approximately a million dollars a year.

MR. ARONFELD:  All right.  I appreciate your time, Mr. Ramos.

I have no further questions.

THE WITNESS:  Thank you.

MR. DRAHOS:  I don't have anything further.

So you have the right to read or waive the transcript.

THE WITNESS:  I'll read.

THE VIDEOGRAPHER:  Are there video orders for this?

MR. ARONFELD:  I'll take it.

THE VIDEOGRAPHER:  We're going off record at 11:58 a.m.

THE COURT REPORTER:  Are you ordering?

MR. DRAHOS:  Yes, I am.

MR. ARONFELD:  I'll take a copy, Ms. Belle.

MR. DRAHOS:  I would like to expedite the two

Paul M. Ramos, PT
April 11, 2025

transcripts, this one and the one of Dr. Raval

earlier.

        THE COURT REPORTER:  Yes.  When?

        MR. DRAHOS:  Could you possibly give it to us

by Monday?

        THE COURT REPORTER:  Yes.

        MR. DRAHOS:  Okay.  Thank you.

                        ------

(The deposition was concluded at 11:58 a.m.)

(Reading and signing of the deposition was not

waived by the witness and all parties.)

Paul M. Ramos, PT
April 11, 2025

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF MIAMI-DADE


I, LAURIE K. BELLE, Stenographer and Notary Public, State of Florida, certify that PAUL M. RAMOS, PT personally appeared before me on Friday, the 11th day of April 2025, and was duly sworn.

Signed this 14th day of April 2025.

_____
LAURIE K. BELLE, Stenographer
Notary Public, State of Florida
Commission No.: HH 446331
Commission Expires: October 19, 2027

LAURIE K. BELLE
Notary Public - State of Florida
Commission # HH 446331
My Comm. Expires Oct 19, 2027
Bonded through National Notary Assn.

Paul M. Ramos, PT
April 11, 2025

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF MIAMI-DADE

I, LAURIE K. BELLE, Stenographer, certify that I was authorized to and did stenographically report the deposition of PAUL M. RAMOS, PT, pages 1 through 87; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 14th day of April 2025.

_____
LAURIE K. BELLE, Stenographer

Paul M. Ramos, PT
April 11, 2025

WITNESS NOTIFICATION LETTER

Monday, April 14, 2025

PAUL M. RAMOS, PT
c/o ARONFELD TRIAL LAWYERS, P.A.
1 Alhambra Plaza, Penthouse
Miami, Florida 33134
305-441-0440
BY:  SPENCER ARONFELD, ESQUIRE

     E-mail: Aronfeld@aronfeld.com

In Re: James Smith v. Carnival Corporation
       Deposition of PAUL M. RAMOS, PT
       Taken on 04/11/2025
       U.S. Legal Support Job No. 6840265-001


     The transcript of the above proceeding is now available for your review.

     Please call 305-373-8404 to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a U.S. Legal Support office located nearest you.

     Please complete your review within a reasonable amount of time.


               Very truly yours,




               LAURIE K. BELLE, Stenographer
               U.S. Legal Support
               16825 Northchase Drive
               Suite 800
               Houston, Texas 77060
               (305) 373-8404
               SouthEastProduction@USLegalSupport.com


CC: Via Transcript