1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:24-cv-21213-KMW

JAMES SMITH,                          Miami, Florida

        Plaintiff,                    June 9, 2025

     vs.                              9:06 a.m. - 3:16 p.m.

CARNIVAL CORPORATION, et al.,    Pages 1 to 210

        Defendants.

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JONATHAN GOODMAN
UNITED STATES CHIEF MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:           SPENCER MARC ARONFELD, ESQ.
                             MATTHIAS MASAYASU HAYASHI, ESQ.
                             ARONFELD TRIAL LAWYERS
                             One Alhambra Plaza
                             Penthouse
                             Coral Gables, Florida 33134

FOR THE DEFENDANTS:          LUIS EMILIO LLAMAS,  ESQ.
                             LAUREN SARAH ROSE, ESQ.
                             JONES WALKER LLP
                             201 South Biscayne Boulevard
                             Suite 3000
                             Miami, Florida 33131

                             MICHAEL J. DRAHOS, ESQ.
                             GRAY ROBINSON, P.A.
                             515 North Flagler Drive
                             Suite 1425
                             West Palm Beach, Florida 33401


*STENOGRAPHICALLY REPORTED BY:*
*MARY ANN CASALE, RDR, FPR-C, CLR, CSR-IL*
*Official Court Reporter*
*United States District Court*
*Southern District of Florida*
*400 North Miami Avenue*
*Miami, Florida 33128*
*MaryAnn_Casale@flsd.uscourts.gov*

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

2

I N D E X

**WITNESS**                                                    **PAGE**

NICHOLAS DAVID ALEXANDER SUITE
 Direct Examination by Mr. Aronfeld                             10
 Cross-Examination by Mr. Drahos                                59
 Redirect Examination by Mr. Aronfeld                          84


HITESH RAVAL
 Direct Examination by Mr. Aronfeld                            111
 Cross-Examination by Mr. Drahos                               119
 Redirect Examination by Mr. Aronfeld                         140


PAUL MARIO RAMOS
 Direct Examination by Mr. Aronfeld                            150
 Cross-Examination by Mr. Drahos                               164
 Redirect Examination by Mr. Aronfeld                     175,180
 Recross-Examination by Mr. Drahos                            179

E X H I B I T S

NO EXHIBITS IDENTIFIED OR ADMITTED INTO EVIDENCE

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

(Call to the Order of the Court.)

COURTROOM DEPUTY:  Calling *Smith versus Carnival Corporation,* Case No. 24-21213, civil, Williams.

THE COURT:  Hi.  Good morning, Folks.  Please be seated.  Make yourself comfortable.

THE STENOGRAPHER:  Excuse me, Your Honor.  The audio system just stopped working.

THE COURT:  Are you able to hear me now?

THE STENOGRAPHER:  No, Your Honor.

THE COURT:  Any luck now?

THE STENOGRAPHER:  No, Your Honor.

COURTROOM DEPUTY:  Please take down what I'm saying, if you can.

I'm not a professional court reporter.  I don't know what equipment will be adequate for you or not.  If the audio system is not working, then I'm nervous that whatever other alternatives you're going to use won't be adequate, and we need, obviously, to have an accurate transcript.

Are you able to do any additional probing in an effort to find out what the problem is?

THE STENOGRAPHER:  I can, Judge.

(Pause in proceedings.)

THE COURT:  Are you able to take down what I'm saying now just because I'm speaking loud enough for you to hear with your own ears?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

**4**

THE STENOGRAPHER:  Yes, Judge.

THE COURT:  For the time being, let's just have for notices of appearance, please, starting first with the plaintiff.

MR. ARONFELD:  Good morning, Your Honor.  May it please the Court.  My name is Spencer Aronfeld.  Joining me today is Matthias Hayashi, and together we have the privilege of representing Mr. James Smith.

THE COURT:  For the defense?

MR. DRAHOS:  Yes.  Good morning, Your Honor.  Michael Drahos from the law firm of Gray Robinson on behalf of the defendant Carnival Corporation.

MR. LLAMAS:  Louis Llamas with Jones Walker on behalf of Carnival Corporation.

MS. ROSE:  Good morning, Your Honor.  Lauren Rose, also with Jones Walker, on behalf of Carnival.

THE COURT:  Thank you.

As you can obviously tell, we're having technical difficulties, and the court reporter's headphones are not working.  And we're having our technical person from computer services come over now.  But he's in a different building.  He's in the Ferguson Building.  We're in the King Building.  It's going to take him some minutes just to get here and then some additional minutes hopefully to repair whatever needs to be repaired.  We can't start until that is completed.

To make matters even more problematic, let me just tell you, we need to take a break today from 2:45 to 3:15 because of an unexpected criminal matter that has come up where I need to meet with, suffice it to say, some representatives from federal law enforcement agencies.  So that will generate some additional delay.

I'm going to step off of the bench and go in the back and try to do some more work until I get word that the system has been corrected.  My apologies to the witnesses who are here.  Doctor Suite, good to see you again.  And I know you're a busy professional, a busy doctor.  You may have heard me say in a trial or two, I'm a big believer in Murphy's law.  So it looks like Mr. Murphy is visiting us today.

We'll keep our fingers crossed.  Do our best.  And, hopefully, I'll be back with you in just a few minutes.

Thank you so much.  We'll be in recess.

(The proceedings recessed 9:16 a.m.)

(The following proceedings resumed at 9:21 a.m.)

(Call to the Order of the Court.)

COURTROOM DEPUTY:  Please be seated.  My goodness, that was a lot quicker than I anticipated.

All right, folks.  So as you know from one of the earlier scheduling orders, I have established certain time frames for each side, for each witness.  So for Doctor Suite, each side has an hour and a half for doing direct and

redirect -- or for the defense cross-examination.

So let's call your first witness, please.

MR. ARONFELD:  Judge, if I may, there is an issue that may become important during Doctor Suite's testimony.  I have asked opposing counsel -- and, I'm sorry, Mr. Hayashi has taken ill.  But I have asked opposing counsel for a copy of the films that were taken of Mr. Smith while he was in the hospital in Montego Bay, Jamaica.  My understanding is their expert radiologist had those films, reviewed them, and opined on them.  I'd ask them to provide a copy to us, and I believe that, for whatever reason, they're unable to do that for us this morning, but I would like to have a copy of those films.

THE COURT:  Well, let's just take it a step at a time, sir.

When did you make the request?

MR. ARONFELD:  So that's something, unfortunately, Mr. Hayashi would be far better suited.  I can assure the Court this:  It's been not today.  It has been in process over several days, maybe weeks, before today's hearing that we asked for this.  I don't want to misrepresent something to you.  Mr. Hayashi was prepared to argue this, but he's not feeling well.  So all I know is, A, do they have it and, B, can they kindly provide it to us.   And that would be the extent of my --

THE COURT:  Well, when this request was made, was the

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

request to bring the films to the courtroom?

MR. ARONFELD:  I don't believe it was specifically to bring to this hearing, but it was a request for copies of documents and films and images that were obtained by Carnival. And I have an excellent working relationship with Mr. Drahos, but, for some reason, between the two firms, I'm not getting what were asking for.  And I'm simply asking the Court to inquire.  If they have it, can they please provide it to us.

THE COURT:  And are these films that you would need today to examine Doctor Suite about?

MR. ARONFELD:  It would be very helpful, sir.

THE COURT:  Mr. Drahos?

MR. DRAHOS:  Yes, Your Honor.  Thank you.

THE COURT:  Thank you.

THE STENOGRAPHER:  Counsel, you need to move the microphone closer to you.

THE COURT:  You can either remain standing or you can have a seat.  The microphone is moveable.  The wand is flexible.

MR. DRAHOS:  Can you hear me?

THE STENOGRAPHER:  Yes.  Thank you.

MR. DRAHOS:  Thank you.

So to address the Court's first point, the very first mention of this came this morning.  As a matter of fact, Mr. Hayashi came over and represented that they didn't have it

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

**8**

yet, moments before Your Honor walked in before the technical difficulties, I told Mr. Hayashi, Let me look into this. It's the first time hearing of it. If there is a film that you don't have, we'll get it to you.

Now, what's also, I think, particularly noteworthy here is that Doctor Suite has already testified in deposition that he didn't review films. He doesn't review films as part of his practice. He's not trained to do it. He's not certified. It has nothing to do with any of his opinions in the case.

Thirdly, I'll say that our expert has looked at that film, Doctor Harold Keyserling, who is a neuroradiologist. He put screenshots in his report of images with that film that he had been looking that. Plaintiff knew about that as far back as February 28th. And, again, the first we're hearing of it, that they don't have this film, is today. I don't even know if that's accurate. I have to go back and check and see the history of this film.

And I told Mr. Aronfeld I will go back and solve the mystery of why you don't have this film as soon as the hearing is over. But certainly, I think bringing it up right now today is a smokescreen. It's not been an issue until moments before Your Honor came in.

THE COURT: Mr. Aronfeld, where is Mr. Hayashi now?

MR. ARONFELD: Unfortunately, he is in the men's room

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

as last I checked having some issues.

THE COURT:  All right.  Well, hopefully at some point he'll return.

MR. ARONFELD:  Yes, sir.

THE COURT:  And when he does return, I'll quickly probe with a question or two --

MR. ARONFELD:  Thank you.

THE COURT:  -- whether or not this request for the film was made any earlier than today.  If it was made today in the courtroom, obviously you can't expect Mr. Drahos and his team to have it hear on 30-seconds notice.  That would be crazy.

On the other hand, if there was a specific request made months ago or weeks ago, and there was a follow-up such as we never received it, then we'll be in a different situation.  But in any event, you flagged an issue, which may or may not be an issue, we shall see.

MR. ARONFELD:  We appreciate it.

THE COURT:  Do you have any other preliminary matters before we call Doctor Suite?

MR. ARONFELD:  That's all we have.  Thank you, sir.

THE COURT:  Okay.  Doctor Suite, come on up to the witness stand, please.

MR. ARONFELD:  (Indiscernible.)

THE COURT:  Sir, your have been a trial lawyer long

enough to know, wait until you get to the microphone because the court reporter doesn't hear you in the headphones.

MR. ARONFELD:  (Indiscernible.)

THE COURT:  Whispering doesn't make it any better. It makes it worse.

MR. ARONFELD:  May I move these, sir?

THE COURT:  Yes.

MR. ARONFELD:  Thank you.

THE COURT:  So let's swear the witness in, please.

(Witness duly sworn at 9:27 a.m.)

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please state your full name, your title, and spell your last name for the record, please.

THE WITNESS:  My name is Nicholas David Alexander Suite, S-U-I-T-E.  I'm a medical doctor.

And what else?  I think that's it.

THE COURT:  All right.  It is 9:27, Mr. Aronfeld.

MR. ARONFELD:  Thank you, Judge.

NICHOLAS DAVID ALEXANDER SUITE,

called as a witness herein on behalf of the Plaintiff, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ARONFELD:

Q.   Good morning, sir.

A.   Good morning, Mr. Aronfeld.

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   11

Q.   Could you please tell the Court what your current occupation is?

A.   Yes.  I'm a practicing physician in field of neurology and neurorehabilitation, focusing on trauma to the brain and spinal cord and nerves, for the most part, but also general neurology as well.

Q.   Thank you, sir.

Can you briefly describe your current -- Excuse me.

Can you briefly describe your education, background, and training in neurology?  And please put all modesty aside and go into as much detail as possible.

A.   I was educated at the Johns Hopkins University in Baltimore, Maryland.  I received a medical degree there in 1986.  I then went up to New York City and I did an internship and a residency, a full residency in internal medicine.  I became an internist.  And the program is the Cornell Aid Program which is the New York Hospital Weill Cornell -- that's W-E-I-L-L, Cornell -- Medical Center, Memorial Sloan Kettering Cancer Center and the Hospital For Special Surgery.

After completing my training as an internist, I then fell in love with neurology at that point.  I applied to and was accepted at the same institution, the Cornell Aid Program in Manhattan in the department of neurology where I began and had completed my residency in neurology and my chief residency.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

Upon completing my chief residency at Cornell, I then came down to the University of Miami School of Medicine, and I did an additional year of teaching and training with Professor Walter Bradley, the chairman of the department.  I maintained a professional relationship, teaching relationship, with the University of Miami for probably 15 more years after that. And I have been in continuous clinical practice since 1992.

Q.   And are you board certified in neurology?

A.   I am.

Q.   And how long have you been board certified in neurology?

A.   I believe it's about 32 years now.

Q.   And you have been licensed to practice neurology in the state of Florida for how many years?

A.   About 34 years.

Q.   Can you just explain to the Court briefly what it means to be board certified in neurology?

A.   Yes.

In the field of neurology, to be board certified means to have attained the highest degree of professional recognition as a neurologist.  It means that you have completed an accredited residency training program, which certainly Cornell was, and University of Miami.

You then passed successfully an examination that's written and then be invited back to do an oral examination in front of about 12 professors from around the country, and you

are grilled for the whole day.  And then if you satisfy them as to your knowledge, they bless you and pass you on and say Okay, you're board certified at that point.

Q.   And, Doctor Suite, how long have you been board certified --

THE STENOGRAPHER:  Counsel, you have to use the microphone.

MR. ARONFELD:  Do you have a lavalier mic?

THE COURT:  We have a handheld microphone, sir.

MR. ARONFELD:  May I use that?

THE COURT:  You may.

MR. ARONFELD:  Thank you.

BY MR. ARONFELD:

Q.   How long have you been board certified in neurology, Doctor?

A.   About 32 years.

Q.   Doctor, as a board certified neurologist, do you have any experience in diagnosing cervical spine injuries?

A.   Yes, absolutely.

Q.   Turning to this case, Doctor, what materials did you review in forming your opinions?

A.   I reviewed the medical records from onboard the cruise ship, the Carnival cruise ship, that would include some video taken of the patient after he fell off his scooter.

Additionally, I have reviewed medical records from

the Hospiten facility, which is a free-standing hospital in Montego Bay, Jamaica.  I have also reviewed all the medical records from the Jackson Memorial Hospital, University of Miami, here in Miami, where Mr. Smith was taken on the 26th of January.  I have also reviewed subsequent records from the University of Miami Hospital and also from various hospitals and facilities in the greater Atlanta area in Georgia.

And those are the records that I have reviewed.

I have also, you know, spoken to Mrs. Smith, and I have also examined Mr. Smith as well.

So I think that's a summary of everything.

I have also had the opportunity of reviewing defense medical expert records from Doctor Harold Keyserling, who is an associate professor at Stanford University, but he's a VA doctor in Palo Alto mostly.  And I have also seen records from Doctor Andrew Zelby who is a neurosurgeon in practice in Chicago.  I have had a look at those as well in preparation for today's hearing.

MR. DRAHOS:  Your Honor, can I assert an objection, please?

THE COURT:  Yes.

MR. DRAHOS:  So it's my that understanding this is an evidentiary hearing based on our pending Daubert motion.

THE COURT:  Right.

MR. DRAHOS:  At the time that I examined Doctor Suite

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   15

and I asked him to identify, as Mr. Aronfeld just did, all the materials that he reviewed in support the case, he specifically told me that he had not reviewed Harold Keyserling's report or Doctor Zelby's.  So, again, I would think that anatomy of Doctor Suite's opinion needs to be confined to what he's reviewed and what he relied upon at the time of his deposition and at the time, of course, that we filed our motion based upon that testimony.

MR. ARONFELD:  I'm aware of no law or rule that requires a witness who is being subjected to a Daubert hearing to be limited to only what he had reviewed at the time of his deposition.  The question here is whether or not Doctor Suite can render opinions that meet the Daubert criteria for the jury.  And since the time of his deposition, if he has reviewed additional documents or has substantiated his opinions further, I don't believe there's anything that prevents him from doing that.

THE COURT:  So, Mr. Drahos, your objection is overruled.  You will be able to bring out those points on cross-examination.  That may or may not inform my decision on the Daubert motion.  If Doctor Suite is permitted to provide expert trial testimony -- naturally, I don't know now whether he will or won't, but if he is, obviously, you'd be able to bring that point, namely, that his initial opinion was not based on a review of these additional doctors' records.  You

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   16

can bring that out on cross as well.

So for now, your objection is overruled.  Thank you.

BY MR. ARONFELD:

Q.   Doctor, before we get into the substance of your opinions, I'd like to draw your attention and the Court's attention to the methodology that you employed to render those opinions.

Please tell the Court, Doctor Suite, what methodology you employed to render the opinions that you have in Mr. Smith's case.

A.   I utilized, as I always do, the scientific method.  And I can explain what that is.

Q.   Yes, please.

A.   The scientific method is a rigorous assessment of all of the data that are available, including the history and the physical examination regarding a given matter.  In the field of medicine, it would be a patient.  We look at the history: We look at the physical exam.  We look at the past records of the patient as well, understanding the comorbidities or confounders that may exist in a patient's history.  We then consider that in the context of what actually occurred in this matter, and we focus all of that through the lens of our education, training, and experience, which I have as a board certified neurologist, with over 30 years of experience in clinical cases, specifically to do with spinal cord injury.

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   17

And then diagnosis and management of such patients.

Once you formulate that kind of an assessment -- which is based on the scientific method, which was utilized here based on the available records -- you then come up or deduce a set of likely diagnoses.  We call that a differential diagnosis.  The differential diagnosis is comprised of all of the possible entities that could arise that could be caused -- or causing the patient's current problem.

And then systematically, again, with the scientific method in mind, the least likely contributors are then excluded in favor of the one that is most medically probable, again, within reasonable medical certainty.  And that is the goal of the scientific method as it is applied to medicine.  It's a method that I use everyday in my own practice.  It's a methodology that I teach to students from high school all the way through practicing emergency room physicians, and I have done so regularly over the last 32 years.

Q.    Thank you, Doctor.

So that the record is clear, is this methodology, the differential diagnosis, a methodology that is generally accepted in the profession of neurology?

A.    Yes, it absolutely is.

Q.    Is it a methodology that is accepted in the diagnosis of spinal cord injuries?

A.    It absolutely is.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

Q.   And so the record is clear, is that the methodology you utilized in forming the basis of your opinions in Mr. Smith's case?

A.   Yes, it is.

Q.   Doctor, are there any peer reviewed publications or guidelines that you've utilized to support your approach?

A.   Yes.

Q.   Could you please tell the Court what peer reviewed guidelines you utilized to support your approach?

A.   Yes, of course.  I have four among several, but I have selected four that are reasonable and helpful in my approach.

The first one -- and I can read this into the record as the reference -- it's entitled:  Cervical Spine Fractures Overview, and it's authored by Joseph H. McMordie, Vibhu, V-I-B-H-U, Krishnan Viswanathan, V-I-S-W-A-N-A-T-H-A-N, and Christopher Gillis.  And this is published as part of a book put forth by the National Institutes of Health.

The second is by Beeharry, B-E-H-A-R-R-Y [sic].  First initial is M as in Mary.  And this is an (indiscernible).  It's published in 2021, and it is entitled Management of Cervical Spine Fractures:  A Literature Review.  And it's published in the journal Cureus, C-U-R-E-U-S, or Cureus 13, Volume 4.

Then the third one by Nemani, N-E-M-A-N-I, and Kim from the Cornell program I trained at, which is the Hospital

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   19

For Special Surgery.  It's entitled The Management of Unstable Cervical Spine Injuries, Clinical Medicine Insights:  Trauma and Intensive Medicine.  And it's from 2014.

And, finally, I have a textbook here by -- it's entitled Diagnosis and Management of Disorders of the Spinal Cord, and it is by Robert Young, who is the professor of neurology at the University of California Irvine in Irvine, California, and also Robert Woolsey, W-O-O-L-S-E-Y, a professor of neurology at St. Louis University School of Medicine, chief of the spinal cord injury service in St. Louis, Missouri.  And I have excerpted the chapter on spinal cord injury, which goes into great detail about unstable cervical spine fractures, and it informs us considerably as to what is standard.

THE COURT:  Doctor Suite, the third reference that you mentioned, the Management of Unstable Spine Injuries --

THE WITNESS:  Yes.

THE COURT:  -- colon, and would you read what followed the rest of the title but read it slowly, please.

THE WITNESS:  Yes.  It's Trauma and Intensive Medicine.  That is the journal.  The journal is Clinical Medicine Insights.  And I have a copy of the article here if it's easier.

THE COURT:  No.  I'm just trying to get the title of the article.  Is the title:  The Management of Unstable

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   20

Surgical Spine Injuries or --

THE WITNESS:  Cervical.

THE COURT:  -- of unstable surgical spine injuries?

THE WITNESS:  Cervical, in the neck.

THE COURT:  Unstable cervical spine injuries.

THE WITNESS:  Yes.

THE COURT:  And is that the title or is the title also Trauma and Intensive Medicine.

THE WITNESS:  Okay.  So following that title, which is The Management of Unstable Cervical Spine Injuries, we have the name of the journal, which is clinical medical -- or Clinical Medicine Insights, colon, Trauma and Intensive Medicine.

THE COURT:  I understand that.  Thank you.

THE WITNESS:  Sure.

THE COURT:  All right.  Mr. Drahos, you --

MR. DRAHOS:  Yes, sir.

The defense objects.  None of those four articles were identified either in Doctor Suite's report or at any time there in his deposition or at any time thereafter.

So we have absolutely no notice of his reliance on any of this authority.  I have had no ability to confirm with my experts to see how he's planning to use it and what it says.  And I have no preparation or ability to cross him on any material he's planning to rely upon.  So at this point, I

we're completely ambushed by this.  We would ask the Court to strike any new material that Doctor Suite's planning to rely upon today, same objection that I previously asserted as it relates to the new information that he is planning to talk about.

THE COURT:  Mr. Aronfeld.

MR. ARONFELD:  Thank you, Your Honor.

Same position we took earlier.  This is a Daubert hearing where his methodology is specifically being challenged.  We have the burden of proof.  There is no rule, there's no law, there's no case law that prohibits a witness from substantiating his opinion with expert treatises and peer reviewed research.  The standard here is quite different than if we were at the trial in front of the jury.  And I think that Doctor Suite should be permitted to rely upon these things that substantiate his methodology.

MR. DRAHOS:  There is a rule, Rule 26.  He's required to give this to me before today's testimony.  I would argue he was required to put this in his expert report, but in the very least, give it to me before today so I have an opportunity to review it.  I have no idea what any of those four articles say.

THE COURT:  So, Mr. Aronfeld, how do we eliminate the sandbagging that would be going on, and how do I eliminate or ameliorate the prejudice that would affect the defense by

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   22

virtue of learning of these four articles right now in court for the first time when they were not mentioned in Doctor Suite's report and not mentioned in his deposition?

MR. ARONFELD:  I think that we can provide copies of them to the defense.  I don't anticipate the Court's going to issue a ruling today from the bench, and they would have an opportunity to review these, if there is any prejudice.  These are peer reviewed articles that are commonly utilized in the practice of neurology in terms of the diagnosis of an unstable spinal injury, and I don't believe that there would be any prejudice to the defense.  I'm happy to provide them copies.

THE COURT:  Bear with me for just a minute, please.

So I'm going to reserve ruling on that objection. I'm also going to slightly modify my ruling on the earlier objection having to do with the records that Doctor Suite is now saying he reviewed.  I think that was Doctor Keyserling and Doctor Zelby.  I'm going to reserve ruling on that objection as well.

And then following this hearing, I'm going to give both sides the opportunity to brief the issue as to what are the consequences in a Daubert hearing when the expert witness being challenged provides for the first time new information, new medical records, new treatises or authorities to rely on, when those items were never mentioned in the report or in a deposition.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

And, by the way, also, I'm going to give you a deadline.  Within three days of today's hearing, you're going to provide to the defense copies of all the new material that Doctor Suite has relied on.  So far we have the medical records from Doctor Keyserling and Doctor Zelby.  We have the four articles or medical textbooks mentioned today.  And maybe during Doctor Suite's testimony we'll hear of additional records or references.  And that will be produced within three days as well.  And then your legal memoranda on that issue will be at some point after that, and we'll talk about the deadline for that later.

Next question.

MR. ARONFELD:  Thank you.  Let's do a little housekeeping.

What I'd like to do, Your Honor, is identify the documents that Doctor Suite is referencing and then move those in as evidence in support -- or in opposition to the defendants' motion to strike Doctor Suite.  So we have those identified and as attached to the proceeding.

THE COURT:  Well, Mr. Drahos, your position?

MR. DRAHOS:  We would object to them being entered into evidence in the light of the fact that the Court's reserving ruling as to whether he can even rely upon them.

THE COURT:  So we're going to mark them as exhibits -- actually, that's not what we're going to do

because I even don't think the doctor has with him the medical records that you referenced.

Do you, sir, the medical records that you reviewed from Doctor Keyserling and Doctor Zelby?

THE WITNESS:  I have them online, but that's all we have.

THE COURT:  Right.  But we can't physically mark them today.

So instead, Mr. Aronfeld, what we're going to is we're not going to introduce them into evidence.  Instead following the hearing in addition to producing copies to Mr. Drahos, you will file them on CM/ECF, just as attachments to a notice of filing, not necessarily to be substantively admitted as actual evidence.  They'll simply be in the record, and that will give Mr. Drahos the opportunity to respond to it and also to give you an opportunity to make whatever arguments you want about these records and references.

Please, continue.

MR. ARONFELD:  Thank you.

BY MR. ARONFELD:

And before we move on to the next subject, Doctor Suite, the documents and treatises and medical journals that you have testified to today -- about today, did they in any way alter, change your opinions that you had when you were --

THE COURT:  Mr. Aronfeld, for some reason the audio

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

quality is not good, probably because you're moving away and also probably because you have the microphone on when you're only three inches away from the actual microphone that's in the lectern.  So I can understand why you'd want to use the handheld mic if you're roving around the courtroom, but when you're right there in front of the actual microphone, why don't you turn off the handheld mic and then just speak into the regular microphone that's embedded into the lectern.

MR. ARONFELD:  Yes, sir.

THE COURT:  Thank you.

MR. ARONFELD:  May I ask the question again?

THE COURT:  Yes.

BY MR. ARONFELD:

Q.   Doctor Suite, the documents, the medical documents, medical -- Excuse me.  Let me strike that.

The medical journals and literature that you testified to a moment ago that will be marked as -- for identification in this proceeding, did they in any way alter or change the opinions that you've rendered in this case, both in deposition and in your report?

A.   They did not.  And my reason for saying that is that my first reason for seeking any kind of literature to maybe support my position or just to be instructive to the Court rather than to rely upon.  I relied upon my own education, training, and experience, plus my evaluation of this patient.

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   26

The only reason that I sought these documents was because when I read through Mr. Drahos's motion, I saw for the first time that his experts had come up with a theory that was flawed, and I wish to provide evidence as to why it was flawed because it's something that it was not able to be considered based upon the history of what happened to this patient.  So I wanted to be able to produce records, produce evidence, that would essentially correct his -- the basis for his motion which is a Daubert motion against me.

And, for example, his bringing up of an epidural hematoma --

MR. DRAHOS:  Your Honor, I wanted to give deference to the doctor out of respect, but he knows I'm going to object, and I think he's intentionally carrying on here.

The basis of my objection is that that is not the point of today's hearing.  It is not the point of Doctor Suite to rebut my experts.  He had an opportunity to do that previously.  So any rebuttal opinions he has relative to Doctor Keyserling or Doctor Zelby are too little too late. The point today is only:  Did he employ proper methodology and are his opinions reliable and helpful to the jury?  That's the only point of his testimony today.

THE WITNESS:  Your Honor, can I continue my answer?

THE COURT:  No, not yet, sir, because there's an objection.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   27

THE WITNESS:  But he interrupted me.

THE COURT:  I'm going to hear from Mr. Aronfeld.

Your response, sir.

MR. ARONFELD:  I think that Doctor Suite is entitled to, in an effort to establish what his methodology is as well as the helpfulness of his opinions at trial to complete his answer and explain why, A, it's important for us to understand how, if, or at all, this affected his methodology and, B, and probably more importantly, how this can be helpful to the jury.

THE COURT:  Well, Mr. Aronfeld here's the ruling.

Doctor Suite and every other expert in this case will not, N-O-T, not, able to provide trial testimony with any opinions which are not already part of the record, in other words not already in the written report and in a deposition. No further opinions.

I appreciate the fact that Doctor Suite may now, after you've reviewed the defense motion, want to rebut the defense experts.  Too late for that, sir.

And I'm not going to hear testimony about your opinion rebutting the defense experts.  We're here today to deal with the defense challenge to you and your opinions, your preexisting opinions, not any new opinions that you have come up with, including any rebuttal of the defense experts.

Are we clear?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

THE WITNESS:  Yes.

THE COURT:  Okay.  That's the framework.

MR. ARONFELD:  And so the record is clear, Judge, that would also apply to their experts?

THE COURT:  Of course.

MR. ARONFELD:  Okay.  Thank you.

THE COURT:  What's sauce for the goose is sauce for the gander.  I'm not aware of any defense experts who are seeking to come up with new opinions.  I don't think you filed the Daubert motion against the defense experts; have you?

MR. ARONFELD:  No.  We'll wait for trial.

THE COURT:  All right.  Terrific.  But I'm not making a ruling that's going to allow one side's experts to come up with new opinions and not the other.  Both sides are boxed in by the existing opinions of their experts.  No surprise new opinions at trial.

Next question.

MR. ARONFELD:  Thank you, sir.

BY MR. ARONFELD:

Q.   Doctor Suite --

THE COURT:  And, by the way, Mr. Aronfeld, I'm going to repeat a comment that Judge Nesbitt used to make all the time.  I don't know if you're old enough --

MR. ARONFELD:  Of course.

THE COURT:  -- to remember Judge Nesbitt.

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   29

MR. ARONFELD:  Unfortunately, I am old enough.

THE COURT:  Well, I would say fortunately, you're old enough.

In any event --

MR. ARONFELD:  That's -- you're right.  I take that back.  And, thank God, I'm old enough to remember her.

THE COURT:  So Judge Nesbitt used to say, Don't thank me for legal rulings.  And she would normally say that in front of a jury because sometimes what lawyers would do is, there is an issue that comes up; the Judge rules against the lawyer; Judge Nesbitt would rule against the lawyer.  And then the lawyer, somebody like you, would say, Thank you, Judge.  And the risk is that the jury would think that the Judge ruled for you; that's why you're thanking the Judge.  Even though there's no jury here, both sides, don't thank me for legal rulings.  That's my job, to make legal rulings.  Please don't do that anymore.

Please, continue.

BY MR. ARONFELD:

Q.   Doctor, could you briefly explain the facts of what you understand transpired to Mr. Smith while he was on board the Carnival ship?

A.   Yes.  My understanding of the facts are as follows: There is a timeline where the patient falls from the scooter shortly before 9:00 p.m.  The second thing is a response team

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   30

is dispatched and plaintiff's neck is immobilized with a neck collar.  Third, he is placed on a stretcher and brought to the medical center.  Four, plaintiff reports to the medical center at 9:12 p.m.  Five, spinal clearance is completed, and the collar is removed at 11:00 p.m. while plaintiff still had feeling and movement in the right side of his body.  The sixth, nurse noted plaintiff's movement of the right side at 12:20 a.m. on February 24, 2024.  Seventh, nurse noted plaintiff not complaining of neck pain at 1:07 a.m.  Eight, nurse noted plaintiff was sleeping comfortably and still moving his right arm at 2:10 a.m.  Nine, nurse noted plaintiff was sleeping comfortably at 4:10 a.m.  And ten, the plaintiff first reports loss of sensation in the right side at 4:40 a.m.

Q.   Hold on one second.  Let me just get the major point here.

When was the first time the patient was noted to have a loss of sensation?

A.   On the right side, that would be at 4:40 a.m.

Q.   And when did Mr. Smith's incident occur with the scooter?

A.   The incident with the scooter was shortly before 9:00 p.m.

Q.   And, Doctor Suite, did anything happen to Mr. Smith between 9:00 p.m. and 4:00 a.m. that has formed the basis of your opinions in this case?

A.   Yes.

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   31

Q.   Please tell the Court.

A.   At -- at 11:00 p.m. the collar was removed after there was less than definitive diagnostic imaging study done for removing that collar.  And that's in my deposition.

Q.   Doctor Suite, so that the Court understands, when you say removing the collar, do you have a collar with you you can show the Court?

A.   Yes, I do.

Q.   Would you please show the Court?

MR. DRAHOS:  Before we do that, Your Honor, the witness is referring to a document he's looking at as he's testifying.  And I'm not sure what it is.  It hasn't been identified.  So I just wanted to know if we can identify that so that I can confirm that's, indeed, his report or something else.

THE COURT:  What were you reading from, Doctor?

THE WITNESS:  These are my notes for today's Daubert hearing.  And I have made them privately, but anyone is welcome to look at them.  They are based on the Daubert formats.

THE COURT:  Sure.

THE WITNESS:  -- that was all made by Mr. Drahos in his Daubert motion, that I am reacting to by being here today.  This is nothing to do with my clinical report.  The first ten things I just read are taken straight from his motion

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   32

verbatim, and I have just added, I guess, you know, counters to the various assertions that Mr. Drahos has made in the motion in limine.  And so that's what I have here.

MR. DRAHOS:  Your Honor, we would just like a copy of that when Doctor Suite's done testifying.

Thank you.

THE COURT:  That request is granted.

Please, continue.

By the way, Doctor, do you have an extra copy of that with you?

THE WITNESS:  Yes.  I anticipated his keen interest in this, so I have it prepared.

THE COURT:  Okay.  Well, good.  Why don't we give a copy to the defense now so that they can start reviewing it before cross-examination.

THE WITNESS:  And Mr. Aronfeld can have a copy as well.

MR. ARONFELD:  Thank you.

Your Honor, so that the record is clear we should probably mark this for identification.

MR. DRAHOS:  Marking it for identification is one thing, but if they are seeking to admit that into evidence, we would object to the extent there may be opinions in here, which are, again, new opinions that we had no notice of.

THE COURT:  Right.  This is not substantive evidence.

This is a document that the doctor prepared in order to assist in his testimony, just like a police officer might bring a copy of his or her police report to a trial because we can't expect human beings to be like computers and memorizing every single detail and every single fact.

So following the hearing, we will have the plaintiff file this on CM/ECF under a notice of filing.  And it will simply be listed as Doctor Suite's notes for trial preparation.  And then in parentheses it will say, not substantively admitted as evidence.  And you'll file that, Mr. Aronfeld, within three days.

Please.  Continue.

MR. ARONFELD:  Your Honor, may I approach the witness?

THE COURT:  Yes.

BY MR. ARONFELD:

Q.   First let me give you some water, Doctor Suite.

Do you have a cervical collar with you that you can show the Court?

A.   I do.

Q.   Let's bring that out, please.

And what are those collars called?

A.   The typical name here in Miami is the Miami J collar.  If you're elsewhere New York, Connecticut, you might have one called an Aspen collar.  And these are hard collars aimed at

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE  34

immobilizing the cervical spine when a fracture is suspected.

Q.    And is that collar the same or substantially similar to the collar that was placed on Mr. Smith while he was a passenger on board the Carnival ship?

A.    Yes, it is.

Q.    Could you show the Court how to put the collar on?

A.    Of course.

Q.    Was a collar placed on Mr. Smith?

A.    Yes.

Q.    And what time was the collar placed on him?

A.    I believe it was around 9:05, whenever the rescue team arrived.

Q.    And why was a collar placed on him?

A.    I presume that they suspected that he had a cervical spine injury.

Q.    Is it appropriate to put an immobilization collar like this on a patient that has a suspected cervical spinal injury?

A.    Not only is it appropriate, it's required, especially when you are concerned about the patient who has potentially been on blood thinner and you really don't know what is going on.  You have to try to find out the cause of the problem and what the problem actually is.

So, yes, it's appropriate and indicated in every instance where cervical spine injury is suspected to place a rigid collar on the patient.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   35

Q.   What is the purpose?  Why is it rigid?  What is the purpose of this?

A.   The purpose of the rigidity is to maintain alignment of the spinal column.  And I have a model here that shows that as well.

MR. ARONFELD:  Could the witness come down, Judge?

THE COURT:  Yes.

MR. ARONFELD:  Come on down, sir.

THE WITNESS:  I have here a cervical spine and skull together.  I am holding the cervical spine in my left hand. And I wanted to point out that there are bones in the cervical spine that articulate or move, and they're supported by disks in each level.  And there are seven bones in the cervical spine.

Within the cervical canal, there is a spinal cord, which is a very soft, but extremely important structure that allows the brain to communicate with the rest of the body. The spine is basically able to maintain its integrity because there are ligaments in front and ligaments in the back.  There are also tightly adhesive disks in between each bone of the cervical segments.

And in the case of Mr. Smith, there was a fracture between C4 and C5.  There was what is called a three-column fracture.  And a three-column fracture is basically when the entire spine is broken all the way across as though he has

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

been internally beheaded, and the only thing that's remaining intact after the spine has been fractured are basically the spinal cord, which is very soft, very delicate, the soft tissues of the neck, and the skin of the neck and the muscles. And that's it. The bony infrastructure is destroyed. It's been transversely cut between C4 and C5 in a fashion which is horizontal and that allows this 10- to 12-pound head to totter back and forth with every movement, including the movement of a ship, including movements in sleep. And it makes this very dangerous.

And this is a highly unstable fracture that requires the placement of a rigid, hard collar. And that is basically information that's contained in my notes as well. But that's basically the point I wanted to make in terms of the anatomy and what we're dealing with here.

The additional problem Mr. Smith had was that the bone, the C4 bone, which is the vertebral body, and the C5 bone translated relative to each other, such that one bone was no longer aligned with the bone below it, and that was documented in the operative note and Jackson record, which I reviewed. And that placed stress on the spinal cord itself. And in the resting position, he had what is called a jumped facet and I have one other little model that I can just show really quickly, and that's right here in the bag.

MR. DRAHOS: Again, defense is objecting to these new

opinions of Doctor Suite.  He did not interpret any films.  He did not provide any detail in his reports as to the degree of the fracture.  These are all new analyses, new opinions that he's coming up with today.

THE COURT:  Doctor, these opinions that you're mentioning here that you have been explaining for the past few minutes, are they in your report?

THE WITNESS:  Yes.  They're not only in my report, but they're in Mr. Drahos' motion in limine where he states that I have come up with these, you know, suggestions based upon my review of the records.  And, again, they're in his records, in my records as well.  I've stated that I was very, very upset to know that they had taken off the collar because of the instability of the fracture.  That was documented in my report in no uncertain terms.  I asked him to take a look at it if he likes.

But what's happened here is that there is a movement, horizontal movement, one backward upon the other that causes compression.  This is a straw in between the two.  And if I do this, all of a sudden, that straw has a problem.  It has a kink in it.  And that is what happened to his spinal cord, which is in between here.  All I'm doing today is demonstrating what I said to Mr. Drahos in the deposition, but which, you know, he didn't want me to show in this fashion.  But because it's a Daubert hearing, I'm just showing it for

the ease of the Court to understand the problem here.  That's it.

MR. DRAHOS:  May I?

THE COURT:  Yes, sir.

MR. DRAHOS:  Okay.  Because this is a Daubert evidentiary hearing with no jury, I am giving deference to Doctor Suite and, Your Honor, to allow him to say some of these things.  I'm not jumping up.  And so I'm putting that on the record so that I wouldn't want there to be any argument that I am waiving objections by raising them after Doctor Suite states them.

But there are nuances to what he's saying, Your Honor, that I am able to appreciate because I have conferred with radiologists.  And he's talking about things like transected spinal cords.  Doctor Suite knows as well as I do that that is a particularly important anatomic finding that he never made in any report, nor stated in his deposition.  So for him to argue that today and to somehow say that is in his report or in his deposition testimony is not entirely accurate.

THE COURT:  So, Mr. Drahos, I'm going to give both sides -- listen, I'm not as familiar with all the nuances of every expert's opinion and what he said in the report, what he said in the deposition, whether his -- whether his hearing testimony is completely different, slightly different, a

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE  39

supplement.  I don't know.  You as the lawyers know.  So when you stand up and object and say it's beyond the record, it's not in his report, he didn't testify to that at the deposition, and the doctor says, Yes, I did, what am I supposed to make of this dichotomy?  I don't know.  I don't have all these medical records.

So I'm going to give both sides after the hearing the opportunity to pinpoint for me whether the doctor has, in fact, today come up with new opinions or new gloss on existing opinions.  Or maybe Mr. Aronfeld will take the opposite approach.  He likely will take the opposite approach of, This is nothing new, it's been there the whole time.  And then I'll get both sides explaining in clear terms what the reality is, and then I'll make an appropriate ruling.

But right now you're not waiving those objections. You're perfectly within your rights to stand up and voice that objection, and then later on we'll hash it.

MR. DRAHOS:  Would Your Honor like me to continue standing and making a record of it now, or would you like me to reserve that until after --

THE COURT:  No.  I think what you can do is, for this type of objection, just say, objection, Your Honor, beyond the doctor's prehearing report and/or testimony.  And then that will be a signal to me that we're getting back to the same argument.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

MR. DRAHOS:  Will do.

THE COURT:  Sure.

Please, continue.

BY MR. ARONFELD:

Q.   Doctor, is it my understanding that the records reflect that the collar was removed at approximately 4:40 in the morning?

A.   No.

Q.   I'm sorry.

A.   The collar was removed at 11:00 p.m., after the order was given at about 10:10 p.m., I believe.

THE COURT:  Mr. Aronfeld, is it still necessary for you to wear that cervical collar?

MR. ARONFELD:  I had a moment.  If you give me one moment, it's going to come off.

BY MR. ARONFELD:

Q.   When was the collar removed?

A.   At 11:00 p.m.

MR. ARONFELD:  Okay.  This is the moment.  I may need your help with the exhibit.

BY MR. ARONFELD:

Q.   Was it appropriate, Doctor, based on your education, your training, your experience as a board certified neurologist for the physician on Carnival's ship to have removed Mr. Smith's cervical immobilization collar at 11:00 p.m.?

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE  41

A.   No, no.

Q.   Could you please tell the Court why that was inappropriate?

A.   Because Mr. Smith had an unstable cervical spine, as I documented in my notes and in the records from the hospital that I reviewed at the time of my deposition.  And to remove a collar in the setting of a three-column fracture, which is the most unstable type of cervical spine fracture one can have, that is absolutely forbidden.  That is something that is not done.  It's not appropriate at all.

        MR. DRAHOS:  Objection; beyond the scope of his report and deposition testimony.

BY MR. ARONFELD:

Q.   And --

        MR. ARONFELD:  I'm sorry, sir.

        Are you going do render a ruling or may I continue.

        THE COURT:  No.  That is the objection I said he can make in shorthand fashion to preserve his argument to avoid a waiver, but I'm not ruling on it now because I don't have an intimate familiarity with every single answer in his deposition and every single line in his report.  The ruling will come later.

BY MR. ARONFELD:

Q.   Doctor, when they removed the collar at 11:00 p.m., did Mr. Smith at the time that they removed the collar -- was he

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   42

paralyzed?

A.   He had preexisting paralysis of his left side due to a stroke.  And at that point when they removed the collar, he had preserved movement on the right side.  That preserved movement on the right side did not disappear until 4:40 a.m.

Q.   Let me ask the question differently.

Could you tell us what a quadriplegic is?

A.   Yes.  The important distinction is between plegia and paresis.  You have quadriplegia and quadriparesis. Quadriplegia means zero movement of the four extremities, typically due to a cervical spine injury.  Quadriparesis is weakness of the four extremities.  So plegia is paralysis. Paresis is weakness.

So he had quadriplegia after 4:40 a.m.  And that was documented further by a Doctor Allan Levi as being what is called an ASIA A, which is a classification of the spinal cord injury system, which means complete cervical spine injury.

Q.   Doctor, was Mr. Smith a quadriplegic before they removed the collar?

A.   No.

Q.   Doctor Suite, do you have an opinion within a reasonable degree of medical probability, based upon your experience, your education, your training, your teaching, as to whether or not the removal of Mr. Smith's immobilization collar caused or contributed to Mr. Smith becoming a quadriplegic?

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   43

A.   Yes, I do have an opinion.

Q.   Could you please share that opinion with the Court?

A.   My opinion, again, based within reasonable medical probability and certainty is that the removal of the cervical spine collar at 11:00 p.m. caused and contributed to Mr. Smith's subsequent quadriplegia by virtue of taking away stability that was external to an extremely unstable and completely fractured and ankylosed spine, A-N-K-Y-L-O-S-E-D.

Q.   Is there an analogy, Doctor Suite, that you can utilize in explaining what the removal of the cervical immobilization collar did to Mr. Smith's spinal cord?

A.   Yes.  I think the best analogy would be is if you have a grenade, and you pull out the pin, it's going to explode.  It may not explode right away.  It may not explode at 11:00 p.m.  But it's going to explode at 4:40 a.m.  And that's the analogy I think is the best that one can use here.

Once you remove that collar, you remove the protection that is there for Mr. Smith's neck, and the fracture is allowed to do what it will.  And when he moves the head or if it is moved forward in an untoward fashion, he becomes paralyzed because it's an unstable fracture.

Q.   At the time that the Carnival cruise ship doctor made the decision to remove Mr. Smith's collar, had he consulted with a neurosurgeon?

A.   There's nothing in the records to support that notion.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   44

He did not.

Q.   Had the doctor on the ship consulted with a neurologist?

A.   Again, there's nothing in the record to state or support that fact that he may have consulted with a neurologist. There's nothing there.

MR. DRAHOS:  Your Honor, I want to object to relevance.  We are not challenging Doctor Suite's opinions on the standard of care.  It's his causation opinion that's at issue today.  So what the doctor should or should not have done is totally irrelevant to today's proceeding.

THE COURT:  Understood.

Please, continue.

BY MR. ARONFELD:

Q.   Doctor Suite, would it have been -- did Mr. Smith undergo a CT scan prior to the decision to remove the cervical immobilization collar?

A.   He did not.

Q.   Is a CT scan an important diagnostic tool to neurologists in determining whether or not there has been spinal cord injury?

A.   Yes, it is.

Q.   Is it important, Doctor, to keep the patient immobilized until a CT scan can be performed to rule out a spinal cord injury?

A.   Yes, it is.

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   45

Q.   Was that done in this case?

A.   It was not.

MR. DRAHOS:  Same objection, Your Honor.

THE COURT:  Noted.  Thank you.

BY MR. ARONFELD:

Q.   Doctor, in formulating your opinion, did you utilize the methodology that you explained to Judge Goodman earlier in terms of a differential diagnosis?

A.   I did.

Q.   And how did you do that in rendering your opinion that the removal of the cervical immobilization collar --

THE COURT:  Do you want to switch to the regular microphone, please.  It's getting very static-y.

BY MR. ARONFELD:

Q.   How did you utilize the differential diagnosis methodology in rendering your opinion that the removal of the collar caused or contributed to Mr. Smith becoming a quadriplegic?

A.   So I considered a differential diagnosis.  I considered the history of the events and the timing of the removal of the collar.  And I entertained various possible causes that I excluded in favor of the one that was most medically reasonable and probable.  And I chose that and put that into my report.

Q.   And what were those causes?

A.    Well, there's a host of other potential causes of why someone may suddenly be paralyzed.  One of them -- and, again, this -- I don't know if I should get into that because I don't think I was asked that by Mr. Drahos, what is my differential diagnosis.  But I can talk about it now, but I don't want that to be a problem.  I mean, there is a differential diagnosis that we always consider, but Mr. Drahos didn't ask me that.

THE COURT:  Well, you're asking for a premature ruling.  There hasn't been a question asked yet.

So ask a question.  We'll see if there's an objection.  And if there is I'll rule on it.

MR. ARONFELD:  Thank you.

BY MR. ARONFELD:

Q.    Doctor, in rendering your opinion that the removal of the cervical immobilization collar caused or contributed to Mr. Smith becoming a quadriplegic, you utilized your methodology or the generally accepted methodology of differential diagnosis?

A.    I did.

Q.    And so I'm just asking you to explain to Judge Goodman what you did in applying that methodology, please.

A.    Yes.

MR. DRAHOS:  Objection; it's vague, and I think we are going to get into new opinions, so...

THE COURT:  Based on the vague objection, that's

overruled.  But if it turns out that it is, in fact, a new opinion -- and I'll define that later -- if I do reach that conclusion, then it won't be permitted.

Next question.

Or you can answer that question.

THE WITNESS:  Yes.

So my answer to that question I considered the possibility of a hemorraghic lesion, what we call an epidural hematoma, that may have occurred with trauma is a patient who's on a blood thinner which is also another indication to get the patient's emergency off the ship and to a facility that can take care of his problem, like University of Miami.

The second could be some kind of occult tumor in the spine that may have caused cord compression.  I considered that.  Excluded it because the patient didn't have this progressive painful weakness that you see with that kind of situation.  I considered the possibility of something called a transverse myelitis, which is an inflammation of the spinal cord that -- it may be viral, but sometimes we just don't know the cause.  I considered that as well.  And I think those are the main concerns.

Another concern I would have would be the presence of an acute, large herniated cervical disk that could be compressing the cord based on trauma.  And, again, there are some other rare causes of spinal cord injury.  There is

something called Naiman syndrome N-A-I-M-A-N which is an acute fibrocartilaginous embolism to the spinal cord caused by injury to one of the arteries and the disk itself going into the spinal cord.

And, finally, a stroke to the spinal cord which could be substantiated if there had been, for example, a lesion, one of the arteries going up supplying the spinal cord -- and we know in retrospect that there was such a lesion, but we don't have evidence for that being worked up further.

That's basically the long list of possible causes.

Q.   Doctor, this methodology that you are utilizing, considering alternative causes for the reason that Mr. Smith has become a quadriplegic, is this the same methodology that you utilized in your professional practice as a neurologist?

A.   Yes, it is.

Q.   Is it the same methodology that doctors worldwide in the field of neurology use in determining the cause of a spinal cord injury?

A.   In my estimation, it is, again, with physicians and they're blessed with similar training and experience, I would say so, yes.

Q.   Did you, when considering these alternative causes, rule any of them in or out?

A.   Yes, I did.

Q.   Which causes did you rule out?

MR. DRAHOS:  Objection; beyond the scope of his report and deposition testimony.

THE COURT:  Duly noted.  Thank you.

THE WITNESS:  I ruled out all of those secondary causes in favor of the one which I put into my report, which was that he had a spinal cord injury because of the cervical collar being removed when it should not have been removed. And it allowed his unstable spinal cord injury, his unstable cervical spine fracture to manifest into quadriplegia.

BY MR. ARONFELD:

Q.   Doctor, could you please explain to the Court what the difference is between a medical certainty and a medical probability?

A.   Yes.

So my understanding of medical certainty is, again, almost 100 percent or, in fact, 100 percent definitively that something is the cause of something else.  But probability is more likely than not.  So greater than 50 percent.

Q.   Doctor is the opinion -- are the opinions that you've rendered in this case, both in your deposition and your expert report and here today in front of Judge Goodman, based upon a reasonable degree of medical probability?

A.   Yes, they are.

Q.   Doctor, is that basis the same basis that's utilized in practice of neurology -- in the practice of neurology here in

our community?

A.   Yes, it is.

Q.   And, Doctor, is that the same approach that you utilized when you treat patients yourself that have had spinal cord injuries?

A.   Yes, it is.

MR. ARONFELD:  Thank you, sir.  I have no further questions.

THE COURT:  All right.  So it is now 10:27, so you have used up one hour.  Before we get to Mr. Drahos's cross-examination, Mr. Hayashi, come to the lectern, please.

MR. HAYASHI:  Yes, Your Honor.

THE COURT:  Mr. Hayashi, it's my understanding that this morning you asked Mr. Drahos for certain films, which I believe may be from a hospital in Jamaica.

Am I describing that correctly?

MR. HAYASHI:  Yes, Montego Bay, Jamaica.

THE COURT:  Montego Bay, all right.

And when did you -- rephrase the comment.

This morning when you made that request to Mr. Drahos, was that your first request to the defense for those films from Montego Bay?

MR. HAYASHI:  Specifically for the films, yes.  But if I can explain, Your Honor, we requested all of the copies they received in response to subpoenas.  I emailed them on

Friday.  They said they would get back to me.  They did not confirm that they've responded to all requests for copies until today.  They advised that they did; however, all we see is a report from Montego Bay.  The treatment, it references a lot of imaging.  We cannot find the imaging in their disclosure.  Perhaps, it was a harmless mistake that they forgot to attach the actual imaging.  It is referenced in their expert's report that he reviewed the actual imaging, so it does appear that they have it.  We would simply like that because it may be relevant to the hearing today, Your Honor.

THE COURT:  So a few follow-up questions.

When you say you emailed the defense on Friday, to whom did you make this email request, and what time on Friday did you make?

MR. HAYASHI:  Yes.  Well, actually a bit of a clarification.  It actually started with a text message.  I got a response to that text message.  So the record's clear -- excuse me.

So, for the record, I texted another attorney at their firm.

THE COURT:  Who?

MR. HAYASHI:  His name was Cooper Jarnagin.  He typically works with Mr. Drahos.  I assumed he was going to be at the hearing today, but apparently, he's not.

THE COURT:  So what time was this text message that

DIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE  52

you sent Mr. Jarnagin?

MR. HAYASHI:  It was 8:43 a.m. on Friday, and it says --

THE COURT:  Meaning Friday, June 6th?

MR. HAYASHI:  Yes, Your Honor.

THE COURT:  Okay.  And what does it say?

MR. HAYASHI:  It says:  Good morning, Cooper.  Could you please have your assistant send copies of anything received from your office, subpoenas on Smith, that hadn't been disclosed -- it says:  Hadn't disclosed if.  I meant to say yet -- so we have it in advance of the Monday hearing, question mark.

THE COURT:  And does that mention -- it doesn't sound like it mentions films.

MR. HAYASHI:  No, it does not, Your Honor.

THE COURT:  And when you say to me that the defense expert report mentions imaging from a particular hospital, which expert's report are you talking about which mentions that imaging?

MR. HAYASHI:  Yes, Your Honor.  It's the report of Doctor Keyserling.

THE COURT:  Slowly and spell it.

MR. HAYASHI:  Yes, Your Honor.  It's K-E-Y- -- Sorry. K, as in, you know, Kenya; E, as in electric; Y, as in yellow; S, as in Sam; E, as in electric; L, as in love; I, as in ice;

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

N, as in Nancy; G, as in Gregory; Doctor Keyserling, if I'm pronouncing that correctly.

THE COURT:  And what type of doctor is Doctor Keyserling?

MR. HAYASHI:  I believe he's a radio neurologist.

THE COURT:  I'm not familiar with that term, a radio neurologist.

MR. HAYASHI:  I believe he's essentially a radiologist, Your Honor, I guess specializing in --

THE COURT:  All right.  And so when did you get Doctor Keyserling's report in which he mentioned the imaging from this hospital?

MR. HAYASHI:  Let's see.  I don't see a date on the report, so give me a second.  I have to scroll back here.

Okay.  I think I found it.  Let me just confirm.  It's loading.

Okay.  I believe it was -- I think it was February 28th, Your Honor, but I'm just scrolling to their expert disclosure to confirm Doctor Keyserling's reports in this initial one, and --

THE COURT:  Can you talk a little louder, please --

MR. HAYASHI:  Yes.

THE COURT:  -- because I can't tell if you're talking to yourself or you're talking to me.

THE WITNESS:  My apologies, Your Honor.  It was a

little bit of both.

But I have found it, and I believe it was February 28 of this year.

THE COURT:  Let me make sure I'm clear.  On February 28th, 2025 you, plaintiff's counsel, receives from the defense Doctor Keyserling's report, and in that report he mentions that he reviewed imaging from Montego Bay, Jamaica, hospital.  And then it wasn't until this last Friday, June 6th, the last business day before the evidentiary hearing, that you followed up and asked the defense to send you a copy of, quote, everything, closed quote; is that right?

MR. HAYASHI:  That was not disclosed yet, Your Honor, correct.

THE COURT:  Now, why didn't you on Friday say to Mr. Jarnagin, listen, specifically we're missing the imaging from the Montego Bay hospital.  We know it exists because Doctor Keyserling mentioned it in his report.  We don't have it, send it.  Why didn't you phrase it that way instead of a vague, open-ended comment like, Please make sure that everything has been sent?

MR. HAYASHI:  In retrospect, Your Honor I should have also included a specific request.  At the time, though, I wasn't sure if that was everything.  In all honesty, Your Honor, I'm kind of getting caught up with a lot of medicine in this case.  I wasn't as involved in this previously.  So I

apologize that I hadn't been more specific. It's my understanding we simply want the films. I'm not trying to say they did anything untoward. We just want the films, Your Honor.

THE COURT: So what response did you get from Mr. Jarnagin concerning your June 6th text message?

THE WITNESS: Yes. He responded by email on June 6th at 9:14 a.m. He said: Matt, I received via text from you this morning a request for, quote, anything received from, bracket, my offices, Subpoenas and Smith, that haven't been disclosed, end quote, so you could have it in advance of Monday's hearing. He said: I'm copying all of defense counsel to notify them of your request and for an appropriate response. Please send any future requests on this case through email to all defense counsel.

That was his response.

And then I responded to him at 9:21 a.m., saying: Sure thing. Please send ASAP. Much appreciated.

And then I sent another follow-up email on Sunday, June 8th at 10:41 a.m. I said: It's Sunday morning and we still don't have this. Please provide ASAP before the hearing on Monday to avoid prejudice to us. And I did not get a response until this morning. Again, Your Honor, we simply want the films.

THE COURT: And who did you send the Sunday

communication to?  And by the way, on Sunday, was it a text or email?

MR. HAYASHI:  That was an email.  Everything was an email after that 8:43, Friday, June 6th text.

THE COURT:  And who was the email addressed to?

MR. HAYASHI:  Also to Cooper Jarnagin, but I also included Mr. Drahos in the "to" line.

THE COURT:  And then what did you hear this morning?

MR. HAYASHI:  I heard that they had -- that they were up to date with all of their responses to our requests for copies.  I'm not sure they believed they were.  But what it appears may have happened is that they provided the report from Montego Bay, but perhaps they inadvertently forgot to send the imaging.

THE COURT:  And so when you sent this communication on Sunday, this email, did you pinpoint what you were concerned about, namely, the film from the Montego Bay hospital, the imaging mentioned in Doctor Keyserling's report?

MR. HAYASHI:  I didn't pinpoint that, Your Honor, no.

THE COURT:  Why not?

MR. HAYASHI:  Again, at the time -- in all honesty, Your Honor, at the time, I had not -- I had not seen that they had enclosed the report even at that time.  I was under the impression that they had not supplemented even more or that they had not provided even more copies.  That was mistaken, of

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

course, this morning.  After they advised they were up to date, I checked again.  And I did see, oh, we do have the report but we don't have the imaging.

The reason why -- at the time I can only tell you what I was thinking, which is that I was concerned that there could be even more than just that.  In retrospect I should have also included a specific request to make it easier for them.  But again, Your Honor, we just want the films.  I see no reason why the films shouldn't be provided.  I'm not saying they did anything untoward.

THE COURT:  Thank you.

Mr. Drahos.

MR. DRAHOS:  So, if, indeed, Mr. Aronfeld --

THE COURT:  You're going to need to either sit down and talk directly in to the mic --

MR. DRAHOS:  Sorry.

THE COURT:  Come to the lectern.  I'm not hearing you well today.

MR. DRAHOS:  Okay.

So if Mr. Aronfeld's office does not have those films, they will have them -- we can instruct our office to send them right now.

But, again, I think the bigger problem is that his is the first we're hearing of it, and they knew those films existed because not only did Doctor Keyserling mention in his

report, he took screenshots of the films back in February.

So I find it -- I'm having a little bit of difficulty with the fact that in February they had screenshots of those films in our own expert's report and that the first specific mention that we've ever had of them not having the report came moments before Your Honor came into the courtroom.

THE COURT:  Right.

Where is your office located?

MR. DRAHOS:  Well, I'm in our Palm Beach office.  We do have a Miami office.  It would be something that we could send digitally.  That would be the easiest way to do it.

MR. HAYASHI:  That would be fine, Your Honor.

THE COURT:  And it can be sent digitally from your -- Well, actually it doesn't matter, physically, what office puts fingers on keyboards.  You can send it digitally from somebody in your Miami office or in your West Palm Beach office, right?

MR. DRAHOS:  Yes.

THE COURT:  Okay.  So why don't you have one of your colleagues, or even you, send either a text message or an email immediately to your liaison at your firm and have them immediately send digitally the imaging, done on Mr. Smith from the Montego Bay hospital and send it immediately to plaintiff's counsel?

MR. HAYASHI:  Thank you, Your Honor.

THE COURT:  And you can explain that you're in the

midst of an evidentiary hearing and the Judge has ordered us to do this ASAP.

MR. HAYASHI: Thank you, Your Honor. May I be seated?

THE COURT: Yes.

MR. HAYASHI: Thank you, Your Honor.

THE COURT: Have you finished typing out that request?

MR. DRAHOS: Yes.

THE COURT: And you're prepared to begin your cross-examination of Doctor Suite?

MR. DRAHOS: I am, Your Honor.

THE COURT: All right. Let's do that, please. It's now 10:43.

MR. DRAHOS: Thank you.

THE COURT: To improve our communication, let's make sure that the handheld mic is turned off unless you're moving around the courtroom.

MR. DRAHOS: Thank you. I don't intend on using it. I don't even know where it is.

May I proceed, Your Honor?

THE COURT: Yes, sir.

CROSS-EXAMINATION

BY MR. DRAHOS:

Q. Good morning, Doctor Suite.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

A.   Good morning Mr. Drahos.

How are you, sir?

Q.   Good to see you again.

A.   Same.

Q.   So I figured it would be easy if we started with some things we agree on.

As you testified a moment ago and also in deposition, you would agree that the cervical collar was removed in this instance at 11:00 p.m., correct?

A.   Yes.

Q.   And by that time, you would agree that two hours had passed since the fall event that occurred at approximately 9:00 p.m.?

A.   Yes.

Q.   And at that time, as you testified a moment ago, there was no reported right-sided deficits by Mr. Smith?

A.   Correct.

Q.   Okay.  And you also would agree that following the removal of the collar, there was a nurse there in the medical center who was doing assessments periodically on Mr. Smith?

A.   Yes.

Q.   And those assessments were done at midnight, 1:07 a.m., 2:10 a.m., and 4:00 a.m., during which there was no indication of any right-sided deficits reported by Mr. Smith?

A.   That is correct.  I think 4:10 a.m. is what your motion

states.

Q.    Okay.  Point being here is I think we all agree that the first indication or the first report of any right-sided deficits arose at 4:40 a.m.

That was your testimony, and that's your opinion in the case?

A.    Agreed.

Q.    And you would also agree that between the hours of 11:00 p.m. and 4:40 a.m., Mr. Smith was resting in a hospital bed in the medical center?

A.    That's my understanding from the records, yes.

Q.    And you would agree that at that time between the hours of 11:00 p.m. and 4:40 a.m. there is no evidence of him having fallen out of the bed?

A.    Correct.

Q.    There's no evidence of any direct trauma to his neck?

A.    That's right.

Q.    There's no evidence he actually moved his neck at all; is there?

A.    That -- I have nothing in the record that said he was moving his own head.  I know that there was a point where I think Doctor Juarez moved his head, but I'm not sure what time that was.

Q.    That movement was after the reported right-sided deficits were -- first arose?

A.   I don't know.

Q.   Have you given an opinion in this case that Doctor Juarez moved Mr. Smith's neck at some point prior to 4:40 a.m. but after 11:00 p.m.?

A.   Let me just check.  Hold on.

What I know is at 11:00, it says:  Patient able to move his neck.  That's what I'm referring to.

Q.   The key point here, Doctor Suite, you would agree is that following the removal of the collar at 11:00 p.m. up to the point of the first report of right-sided deficits at 4:40 a.m., you have no evidence that you can point to that he actually moved his neck?

A.   That's right.

Q.   So as a matter of fact, as you testified to in deposition, it would be speculative on your part to even suggest that he moved his neck?

A.   I didn't say it that way.  I didn't say it would be speculative to even suggest that he moved.  I believe in order to have this kind of a problem there has to be neck movement, whether he moves it or someone else moves it or the ship's rocking moves it.  There had to be some kind of translational movement to cause that to happen.  And that would happen because of the unprotected nature of being without his collar.

MR. DRAHOS:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. DRAHOS:

Q.   Doctor Suite, you remember being deposed in this case on April the 4th of 2025?

A.   Yes.

     MR. DRAHOS:  Your Honor, would you like a copy of the deposition transcript?  We can mark it as an exhibit.

     THE COURT:  Thank you.

BY MR. DRAHOS:

Q.   Doctor Suite, you recall on April 4th of 2025 when I took your deposition, you swore on oath to tell the truth, correct?

A.   Yes.

Q.   Okay.  And during that deposition, we had an exchange for about an hour and a half, two hours or so.

     At no point in time did you have any trouble understanding me?

A.   Correct.

Q.   I'd like to direct your attention to Page 49 of your deposition, Line 5.  And let me know when you get there.

A.   Yes, I see it.

Q.   On April the 4th of 2025, did you testify under oath to the following, Line 5:

     QUESTION:  Okay.  But my question was much more specific.  As you sit here today would you agree that between 11:00 p.m. and 4:40 a.m. you have no evidence that you can point to to indicate that he moved his neck?

There was an objection to the form.

And was your answer:  I have no idea.  That would be speculative?

A.   Yes.  And I just said that to you earlier when you said that he moved his neck or not.  But if you go to the next set of questions, you'll see that I addressed that further.

Q.   Well, let's talk about what you actually know about what went on in the medical center on the night in question.

You would agree that you never read the deposition of Doctor Juarez, the ship's physician?

A.   Correct.

Q.   All right.  And so you have no idea as you sit here today how he's testified to Mr. Smith's clinical condition or his actions while in the medical center that night?

A.   Correct.  I just looked at what he wrote in the medical record.  I relied on the medical record.

Q.   And you have not read any depositions from any ship's nurses who were in there, particularly the shift nurse who was doing those assessments 11:00 until 4:40 a.m. either; did you?

A.   Correct.

Q.   And you told us you that examined Mr. Smith on March 19th of 2024 for what you claim to be 60 minutes, correct?

A.   Is that what I claimed?

Q.   Yes, sir.  It's in your report.

A.   Well, then that's what happened.

Q.   And during your physical examination that you performed, Mr. Smith was fully capable and speaking and answering your questions; wasn't he?

A.   Yes.

Q.   And during that particular exam that you did for 60 minutes, he also specifically told you what happened; didn't he?

A.   I took a history from him and his wife, correct.

Q.   And at no point in time during the history that you took did he ever tell you that he moved his neck between the hours 11:00 p.m. and 4:40 a.m.?

A.   I don't believe he said one way or the other because he was asleep --

Q.   Okay.  And --

A.   -- according to the nurse.

Q.   -- during that same examination, Mrs. Smith was in the room with you as well?

A.   Yes.

Q.   You actually had two different conversations with Mrs. Smith about this case?

A.   Yes.

Q.   And during that particular time, Mrs. Smith never told you that her husband's neck moved between the hours of 11:00 p.m. and 4:40 a.m.

     Agreed?

A.    We didn't talk about that, no.

Q.    You didn't talk to anybody who was in the medical center that night for the Smith family about what went on between 11:00 p.m. and 4:40 a.m.; did you?

A.    Aside from the untimely removal of a valuable medical protective device, namely, the cervical collar, correct.

Q.    Thank you, Doctor.  I would appreciate if you just answer the questions I'm asking.

Did you speak to any of Mr. Smith's treating physicians in this case?

A.    Yes.

Q.    When did you speak to a treating physician?

A.    Yesterday.

Q.    In support of the opinions that you rendered in this case up until the point of your deposition, you would agree you never spoke to any of his treating physicians; did you?

A.    Correct.

Q.    Imaging studies.

You would agree you didn't read or interpret any of them?

A.    That's right.

Q.    And that's because you're not qualified to do so?

A.    No, that's not true.  And if you want to look in my deposition, I explained fully what happens.

You don't go become board certified in neurology

without having a full day of MRI, CT, X-ray testing.  We do that as a part of our practice.  We do what the radiologist asked us to do, which is clinically correlate the clinical findings with what the radiologist finds.  And that's what's part of what we do.  We don't bill as a neuroradiologist.  We don't bill as radiologist.  But we are required to understand and interpret those films.

So I understand what you said earlier in the trial, that I don't do anything to do with x-rays, I never look at patient's films.  That's a falsehood, again, that you're promulgating.  I don't have that in my record.  I absolutely look at films.

Q.   In this --

A.   In this case I did not look at the films.

Q.   Thank you, Doctor Suite.

Is it your opinion in this case that Mr. Smith must have moved his neck after 11:00 p.m. but before 4:40 a.m. as the only explanation for what happened?

A.   My opinion is stated in Line No. 14 on Page 49.  And I can read that into the record again for you, for your memory.

Q.   Well, I'd like to ask whether or not your opinion is that he must have moved his neck after 11:00 p.m. but before 4:40 a.m. because that's the only explanation for how he was rendered a quadriplegic?

A.   The scenario either he moved his neck or his neck was

moved by an external force, but I believe there had to be some movement, when you have a fractured cervical spine that's fractured through and through all three columns.  I have a picture of the three columns here.  That will cause the delicate cervical spinal cord to be damaged permanently.

Q.    So, Doctor Suite, can you turn to Page 49 of your deposition, please sir.

A.    I'm on it.

Q.    Okay.  And I'd like to direct your attention to midway down.  It's Line 18.  It was your statement on April the 4th of 2025 that, quote:

        We know that he became paralyzed.  And there's only one way to become paralyzed when you have a broken neck and it's not stabilized, and that is to move your neck, move your head and to do so in an unprotected fashion.

        QUESTION:  That's the only possible way?

        ANSWER:  In this case, yes.

        That was your testimony?

A.    Yes, absolutely.  I stand by it.  And whether or not he moved it himself or it was passively moved by, let's say, a violent rocking of the ship or him falling asleep and having his head jerk backwards, those are scenarios.  A trauma, a movement would cause that translational movement that Levi found at the time of surgery, including what's called a jumped facet, which is a very dangerous, unstable situation when the

vertebral column is fractured through and through in all three columns.

Q. And in this particular case, you cannot pinpoint any specific movement, correct?

A. There was no video camera there.

Q. There's no -- Sorry.

A. You asked me to finish the --

Q. Yes.

A. I was trying to tell you that I didn't see any video of him sleeping. And, again, all I know is that he had an unstable cervical spine fracture in which he was almost internally beheaded. The spine was broken through and through. And when the people in University of Miami did the scan, they saw what is called a jumped facet, which means that there was a translational movement.

Q. I know you want to continue to use that answer today, but you would agree you never mentioned jump facet or transected spinal cord or anything of that nature in your report or during your deposition?

A. I would say transected spinal cord is not an issue at this point. If you read the documents carefully, you will see that in the medical record that I reviewed, there was a transection -- and I think I have the exact quote. It's not a transected spinal cord. Very careful that you understand the difference there.

A transection, that Doctor Levi and others reported, it says cervical spinal cord injury with transection through the ossified C4-C5 disk space which is an instability of the disk space brought because there is a three-column fracture all the way through.  The disk is no longer adherent to the space itself.

Q.   So --

A.   And that is the problem.  The transection is through the disk space itself.  The cord itself is not transected.

Q.   Why didn't you go into that detail in your report?

A.   Again, it's obvious you had the opportunity to ask me about that detail in my deposition, and you didn't.  So it's in my report.  It's implied in my report.  If you go to my and --

Q.   It's implied in your report.  That's what you are saying.

Is the name Doctor Levi in your report?

A.   I don't know.  I don't remember.

Q.   So let's talk about the doctors that I did ask you about during your deposition.

That was Doctor Harold Keyserling?

A.   Yes.

Q.   And Doctor Andrew Zelby?

A.   Yes --

Q.   Neurora- --

(Simultaneous crosstalk.)

THE WITNESS:  (Indiscernible.)

BY MR. DRAHOS:

Q.    Neuroradiologist?

A.    Yes.

Q.    And a neurosurgeon?

A.    Yes.

Q.    And you would agree that at the time of your deposition, you had not reviewed either of their reports?

A.    Correct.

Q.    As a matter of fact, at the time of your deposition, you didn't even know what they had to say in this case?

A.    You told me what they had to say, and you gave me your interpretation of what they said.  And when I read the report, I saw some differences.

Q.    Actually, that's not true either, Doctor Suite.

      Let's go through and cover --

   (Simultaneous crosstalk.)

      THE WITNESS:  That's your testimony.

BY MR. DRAHOS:

Q.    Let's cover the specifics of what you and I talked about during in your deposition.

      Can you go to Page 21 of your deposition, please, sir.  I'll direct your attention to Line 13 when you get there, please.

      All right.  Let me word it differently.

Are you here today to state that the expert neuroradiologist that's been retained by the defendant --

THE COURT:  Mr. Drahos...

MR. DRAHOS:  Yes, sir.

THE COURT:  ...you're doing what all lawyers do.

MR. DRAHOS:  I'm going too fast.

THE COURT:  When it comes time to read -- I'm sorry?

MR. DRAHOS:  I'm going too fast.  I'll slow down.

THE COURT:  You are going too fast.

MR. DRAHOS:  Okay.  Let me start again.  My apologies to the Court reporter.

BY MR. DRAHOS:

Q.   Page 21, Line 13:

QUESTION:  All right.  Let me word it differently then.  Are you here today to say that the expert neuroradiologist that's been retained by the defendant read the films incorrectly in this case?

ANSWER:  I don't know that I read that opinion.  If you'd like to share that record with me, I'll do that.  So I don't know what they've said.

That was your testimony, correct?

A.   Yes.  And you did not show me anything from your expert, even though you asked me about it.  So that was a setup.  Yes, I saw it.

Q.   And then Page 21, Line 24:

QUESTION:  And so same question for the neurosurgeon. Would you agree that you are not here today to rebut the opinions of the expert neurosurgeon retained by the defendant?

ANSWER:  I have no idea what those opinions are.  I can agree with them.  I can rebut them.  I have no idea what they say.  If you care to share it with me in the presence of the Court, I'd be open to that.

That was your testimony, correct?

A.   Yes.  And your action was to not show me anything.

THE COURT:  Mr. Drahos, just so I can keep up, when you're talking about Doctor Suite not having read the reports of two doctors at the time of his report and at the time of your deposition of Doctor Suite, tell me the names of the two doctors at issue.

MR. DRAHOS:  Doctor Harold Keyserling --

THE COURT:  Yes.

MR. DRAHOS:  -- neuroradiologist.

THE COURT:  Right.

MR. DRAHOS:  Doctor Andrew Zelby, neurosurgeon.

THE COURT:  Thank you.

Please, continue.

MR. ARONFELD:  Your Honor, those two doctors are the defense's consultants.  They're not treaters.

THE COURT:  I'm aware.

MR. ARONFELD:  Thank you, sir.

BY MR. DRAHOS:

Q.    I'd like to ask you some medical concepts, Doctor Suite.

Would you agree that a spinal epidural hematoma is bleeding into the spinal canal?

A.    Okay.  Which spinal canal are you talking about?

Q.    So would you agree that a spinal epidural hematoma is bleeding into the spinal canal that accumulates over time?

A.    Let me clarify terminology because if I answer yes or no, I'll be disrespectful to my knowledge of anatomy.

There is a central spinal canal within the spinal cord.  That's not what we are a talking about here.  We're talking about the vertebral canal, in which the spinal cord sits.

You're asking me about the epidural space which overlies the spinal cord in that spinal canal, and that hematoma that's going to accumulate, will do so over a period of time and cause very, very severe pain over that period of time as it continues to press on the cord.  So yes, with that clarification, it will accumulate over time, correct.

Q.    And as it accumulates over time it will compress upon the spinal cord and cause paralysis?

A.    It will cause first very severe pain, agonizing pain, and then ultimately paralysis.

Q.    I didn't ask you about the pain.

I asked whether or not anatomically a spinal epidural

hematoma can accumulate over time to such an extent that it can cause paralysis?

A.   Yes.  But it's also important to state that the pain is important because he had no pain.  I mean, you and I talked about that in deposition.

Q.   What is spinal ankylosis?

A.   Ankylosis is a fusing together of bones in the vertebral column.  For example, normally, with the disk the disks allow for the vertebral bodies to articulate and bend.  But when you have ankylosis, it's a fusion externally, something that's sometimes termed DISH or diffuse skeletal hyperostosis.  He did have hyperostosis, which is an overgrowth of bone that gives the spine a bamboo-like appearance and makes it brittle.

Q.   It makes it susceptible to injury?

A.   Much more susceptible.  I agree with what Doctor Keyserling said, yes.

Q.   I'm not asking about Doctor Keyserling.  I'm asking about anatomy right now.

A.   He used those -- the sentence that he used in his report. Yes, I agree with him.

Q.   I'll ask you if I want you to comment on Doctor Keyserling.  Right now I'm just talk about anatomy.

So you would agree that Mr. Smith was also on anticoagulants?

A.   Yes, Warfarin.

CROSS-EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE    76

Q.    And that renders him susceptible to bleeding as well; doesn't it?

A.    Yes.

Q.    Okay.  And the fracture that was at C4-5 of his spine.

You never actually saw that image itself, agreed?

A.    Until I read Doctor Keyserling's report, that is correct.

Q.    Okay.  So as you sit here today, you cannot comment on how severe that fracture was or at least you weren't able to comment on how severe that fracture was at the time of your deposition because you hadn't actually seen it?

A.    That's incorrect.  I was able to read Doctor Levi and also all of the University of Miami records, and they described the severity of that fracture; that it was a three-column fracture, that it went all the way through, it was extremely unstable in Doctor Levi's own words.

Q.    And?

A.    On top of that, the area that involved this alleged hematoma was at C2, but not at C- --

Q.    I'm not asking you about the hematoma, Doctor, at all. And, actually, I didn't ask you anything about Doctor Levi because you told me he's not even listed in your report, or at least he wasn't according to the report I read in this case.

A.    So I don't recall if I mentioned Doctor Levi's name. Again, I'd have to look at my report.  But I have no reason not to mention his name.  I looked at all his records.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

Q.   So I did ask you about a cervical epidural hematoma during your deposition.

Do you recall that?

A.   If you take me to the page we can go to that --

Q.   Sure, sure.  It's Page 50, Line 1 through 20.  I'm going to read it.

Same question I just asked a moment ago.  I asked you whether or not you had actually seen the image.  You said, Line 12 -- Here, I'll ask the question beforehand.  So Page 10:

Correct.  And you're saying that without having actually seen the anatomy of his body?

THE COURT:  Slowly, please.

MR. DRAHOS:  Thank you.  I will slow down.

BY MR. DRAHOS:

Q.   ANSWER, that's correct.  I've seen the reports, and that's sufficient to make that diagnosis.  When I saw the reports, particularly the MRI of the cervical spine that was done later, I didn't see any evidence of hemorrhage in the collar or anything like that.

QUESTION:  So the report, not the image.

ANSWER:  Correct.

In your deposition, you would agree that when I asked you whether or not there was a cervical epidural hematoma, you told me there was not one because it wasn't listed in a

cervical MRI, correct?

A.    It does say MRI.

Q.    Okay.

A.    But it was a CT scan.  We know that.  But there was an MRI of the cervical spine done later.

Q.    The cervical MRI is what you relied upon to rebut the suggestion that he did not have a cervical epidural hematoma at the time of your deposition, as we can see at Page 50?

A.    No, no, not so.

Q.    All right.  Well, the record will speak for itself, Doctor.

A.    The reports.  Look at the deposition.

Q.    The reports.  I would agree with that.

The cervical MRI report is what you were relying upon in your deposition to rebut the possibility that a cervical epidural hematoma was present in Mr. Smith's spine, correct?

A.    I think you're putting words in my mouth.  The reports encompassed not only the radiology reports but the reports that the actual surgeon that carried out the surgery to fix the cervical spine fracture, that's Doctor Allan Levi --

Q.    That's not what that says here, Doctor.  It says:  When I saw the reports, particularly the MRI of the cervical spine.

That's what you specifically mentioned in your deposition, agreed?

A.    I think we're in semantics here.  101, reports, means all

reports and particularly one report.

Q.   Let's talk about the one that you --

(Simultaneous crosstalk.)

THE COURT:  The court reporter can't take down what two people are saying at the same time.  So I can't tell myself who was interrupting who, but somebody was interrupting somebody else.

So let's roll the script back, ask your question again, and let me remind the witnesses not to interrupt each other.

BY MR. DRAHOS:

Q.   Okay.  So we both agree that you did not actually see the cervical MRI film.

It's the cervical MRI report that you are referring to here in this exchange that I read in your deposition, correct?

A.   The cervical MRI is mentioned in the deposition, but it was a cervical CT scan.  And I didn't look at that film.  I saw the report.

Q.   Let's go back.

A.   If MRI is there, it probably should be CT.

Q.   All right.

A.   There was no MRI done.  He has a defibrillator in place. And at that time it was thought that the defibrillator may have prevented him from getting an MRI.

So I may have said MRI inadvertently.  There a few other typos in here, there could be something like that going on.  But he had a CT scan that I did not review.  I saw the report of CT can.

Q.   So what's interesting about your position today is that you and I had a particularly animated discussion about the cervical MRI wherein you said you had reviewed one.  I questioned whether or not that was possible.  You said I was making things up or I was creating issues that didn't actually occur and that you had seen one.

Do you remember that exchange that we had?

A.   Was that on the record?

Q.   It was the last question I asked you during your deposition where I asked you to specifically tell me what cervical MRI were you talking about, and you gave me a date and time.

A.   I believe there was done in Atlanta eventually.

Q.   Okay.  So there is a cervical MRI report that you specifically relied upon in deposition to rebut the possibility of a cervical epidural hematoma, correct?

A.   No, no.

Q.   Tell me what that means then in your deposition when I ask and you say:  When I saw the reports, particularly the MRI of the cervical spine?  What did you mean when you used the words:  Particularly the cervical MRI?

A.   In that report he did have an MRI eventually, but the CT scan is what was being talked about because that was what was done at the time.  And in the report of that acute time period when he had the fracture and needed the surgery, he did not have an MRI of the cervical spine.  And I did look at the CT scan of the head.

Q.   So you agree that you did not say anything about CT report.  You specifically said cervical MRI report?

A.   Yes.

Q.   Okay.

A.   But he didn't have that until later, as I said.

MR. DRAHOS:  May I have a moment, Your Honor?

THE COURT:  Yes.

BY MR. DRAHOS:

Q.   Whether it's today a CT film or in your deposition a cervical MRI, you would agree at no point in time during your scientific analysis or your scientific method did you ever talk to any of the interpreting radiologists about what those images showed?

A.   Prior to the deposition?

Q.   Yes, sir.

A.   Is that what you're asking?

Q.   Yes.

A.   I just relied on the medical record, and that was it.

Q.   Would you agree that under your theory Mr. Smith had to

move his neck in order to have become a quadriplegic?

A.    His neck had to move.  I would rather say it that way. Whether he did it actively or it was done to him by violent rocking motion on a ship or him falling asleep and jerking his head back, as I have said in my deposition a few times now, that is the mechanism by which he would get this abnormal translational motion with a completely fractured cervical spine to disrupt the delicate spinal cord that passes through the cervical spine.

Q.    In other words, you you're not suggesting that it was the removal of the collar that caused the quadriplegia; you're saying it was movement of his neck after the -- at some point in time after that collar had been removed?

A.    Like I said, the analogy was the pulling of the pin out of the grenade, it's not going to explode right away.  The moment you let time pass and something happens, you will get that explosion.  And this is what happened in this case. Taking off the collar itself did not produce his sudden paralysis, as we know from what the nurses wrote.  They documented clearly, I think, two separate intervals that he was okay.  2:10 a.m. was the last time they had said he was moving the right side.  And then after 4:40 a.m. is when he lost that movement.  So something happened, more likely than not, untoward unexpected movement of his neck, whether he did it or someone else did it, and it caused the jumped facet and

CROSS-EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE   83

the instability and the damage to the spinal cord that caused his quadriplegia.

Q.   So let me switch gears.

Would you agree that, as you sit here today, you cannot provide a numeric value for Mr. Smith's life expectancy?

A.   That is correct.  I cannot.  And I know that he's alive today.  I saw him yesterday, and he's doing better.

Q.   Did you consult with Paul Ramos --

A.   Yes.

Q.   -- regarding his life care plan?

A.   I did.

Q.   Can you turn to Page 83 of your deposition testimony, please, Doctor Suite?

A.   Yes.

Q.   Starting on Page 6, sir.

Are you there?

A.   Yes.

Q.   Was it your testimony under oath on April 4th of 2025:

QUESTION:  Did you talk to Paul Ramos, the retained life care planner, from the plaintiff?

ANSWER:  No.

QUESTION:  You've never consulted with him at all?

ANSWER:  Not in this case.  I haven't seen his report yet.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 84

Was that your deposition testimony, sir?

A.   That's what I said, and I made a mistake.  I found text messages with him.  We spoke on a Saturday morning or a Sunday morning in March.  And I have the text messages that show that I did consult with him.  And that was an error.

Q.   That's your testimony here today, but that was not your testimony on April 4th, agree?

A.   I did not recall speaking with him on a Sunday morning.  It was early, and I just didn't remember.

Q.   Thank you, sir.

     MR. DRAHOS:  No further questions.

     THE COURT:  All right.  So the record will show that it is now 11:15.  So bear with me just a minute, please.

     Okay.  Mr. Aronfeld, do you have some additional questions?

     MR. ARONFELD:  Thank you, sir.  I do.

     THE COURT:  All right.  11:15.

     Go ahead, sir.

                    REDIRECT EXAMINATION

BY MR. ARONFELD:

Q.   Doctor Suite, how realistic is it to imagine that a patient lying on a hospital bed on a cruise ship in the middle of the ocean would not have any head or neck movement for hours?

A.   It's --

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 85

MR. DRAHOS:  Objection.

THE COURT:  Wait, wait, wait, Doctor Suite.  I'm so sorry.

There's an objection?

MR. DRAHOS:  Yeah.

THE COURT:  Basis of the objection?

MR. DRAHOS:  Calls for speculation.  He's asking how realistic it would be that somebody doesn't move in a bed. He's not an expert on biomechanics or movements on ships. Lack of predicate as well.

THE COURT:  Sustained.

Next question.

BY MR. ARONFELD:

Q.   Doctor Suite, have you had patients before in hospital beds?

A.   Yes.

Q.   How many patients, approximately, in your 30-something years as a board certified neurologist have you observed in hospital beds?

A.   More than 20,000.

Q.   Doctor Suite, have you ever been on a cruise ship?

A.   Yes.

Q.   Approximately, how many cruises have you been on?

A.   I'd say maybe four or five.

Q.   Doctor Suite, in your experience on four or five cruise

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 86

ships, does the ship move?

A.   Yes.

Q.   Doctor Suite, how realistic is it, based on your experience of having hundreds of patients over 35 years as a board certified neurologist lay in on a hospital bed on a cruise ship, that that patient's head would not move?

MR. DRAHOS:  Same objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  It's highly unrealistic to expect a patient in a hospital bed on a moving vessel, especially one that is rolling around, would not have any kind of head or limb movement as a result of that external force.  That goes back to Newton's laws of motion.

Q.   Could something as simple as a sneeze cause a patient to move their head or neck?

MR. DRAHOS:  Objection.

THE COURT:  Basis?

MR. DRAHOS:  An opinion that's not been disclosed either in his report or in deposition testimony.

THE COURT:  Sustained.

BY MR. ARONFELD:

Q.   What kind of things can cause some patient to move their head or neck?

MR. DRAHOS:  Same objection.

MR. ARONFELD:  I believe he opened the door, Your

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 87

Honor.

THE COURT:  How?

MR. ARONFELD:  By asking him these questions about:
You don't know what caused him to move his head or neck.  So
now I'm asking Doctor Suite to articulate what kinds of things
can cause the patient to move head or neck.

THE COURT:  Bear with me just a second, please.

Overruled.

THE WITNESS:  The kinds of things that cause a
patient to move the head or neck would range from a sneeze or
a cough to simply looking around suddenly, looking up, looking
down, being sleepy.  We've all been in the position where
we're sitting up and we're sleeping or we're recumbent and
sleeping and our head jerks back and forth.  It could be quite
painful, actually.  Those are some of the adventitious
movements that could take place that will produce neck injury.

BY MR. ARONFELD:

Q.   Doctor Suite, did you see anything in the medical records
where the Carnival doctors or nurses had instructed Mr. Smith
not to move his head or neck after they had removed the
cervical immobilization collar?

A.   Nothing.  There was just a note about clearance for his
cervical spine and the removal of the cervical collar with
inadequate imaging performed.

Q.   Doctor Suite, because of these involuntary movements that

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 88

can be so subtle as a sneeze or nodding off, is that the purpose that patients who have suspected cervical spine injuries are required to wear an immobilization collar until those types of injuries can be ruled out?

A.    Absolutely, yes.

Q.    Doctor, in your private practice as a neurologist here in our community, do you commonly review radiology reports?

A.    Yes, I do.

Q.    Do you read MRI reports?

A.    I do.

Q.    Do you read CT scan reports?

A.    I do.

Q.    Do you read X-ray reports?

A.    I do.

Q.    And do you rely in your practice, Doctor Suite, on the radiologists who are trained, board certified, and experts in reading those diagnostic images to render those reports accurately?

A.    I absolutely do.  And I also look at the films myself to do what they require, which is a clinical correlation.  We have to remember that radiologists sit in a nice quiet darkroom, never examine a patient but yet offer opinions.  And will say clinical correlation recommended.  And that means the doctor that's examining the patient is invited to look at the films and correlate the findings on the films with the

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 89

physical exam findings or the history.  We are the ones that bring it together.  The radiologist is just a component of the total picture of care for the patient.

But we do look at the films.  We do interpret them. And we sometimes have disagreements with the radiologist, and the radiologist may have to make an adjustment or a recantation of the report because of what we tell them clinically.  So it's a collaborative interaction with a co-specialist.  It's all for the good of the patient.

Q.    And if the Hospiten CT scan was provided to you, would you read that report?

A.    Yes.

MR. DRAHOS:  Objection.

THE WITNESS:  Sorry.

THE COURT:  What's the objection?

MR. DRAHOS:  He's asking:  If the Hospiten CT film had been provided to you, would you read it?

He already testified in the case he hadn't read any films.  He hadn't even read the expert reports of my experts. So to now in hindsight argue that he would have had reviewed something, is totally irrelevant.  We know what he reviewed and what he didn't review.  Why he reviewed and didn't review --

THE COURT:  So that objection is overruled.  It's basically argument, Mr. Drahos, as to the witness'

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 90

credibility.  I'm aware of what the witness did review, didn't review, and his stated reasons for that; so I'm actually able to make whatever logical conclusions are appropriate flowing from your objection.  But objection overruled.

Next question, please.

BY MR. ARONFELD:

Q.   Doctor Suite, you are not a neuroradiologist?

A.   That's correct.

Q.   Did it matter to you in formulating your opinions in this case in utilizing the methodology that you utilized to come to your conclusions, what the paid consultant from Carnival's opinion was as a neuroradiologist, was that relevant to you?

A.   It was not relevant to me.

Q.   Could you please explain to the Court, please, why Carnival's paid consultant's neuroradiology evaluation was not important to you as a neurologist in rendering your causation opinions in this case?

A.   The reason it was not relevant for myself is because I had the opportunity to perform a clinical examination of the patient with my own knowledge, training, experience as a board certified neurologist for over 30 years.  I also had the opportunity to review detailed medical records from the University of Miami, from Hospiten, and from the ship board medical station.

Taking all of those into account, I felt that I had

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

enough information to come to the conclusions that I came to when I spoke to Mr. Drahos in deposition, when I prepared my report, and when I came before the Court today.  So to summarize, all of the opinions that I have have been unchanged since the time I spoke to Mr. Drahos.  And I maintain those opinions.

Of course, if additional records are surfacing that I may not be aware of, I'd be happy to look the a them.  But I will say none of the defense experts' opinions, or, you know, speculations, they don't have any bearing on what I have said today.

Q.    Thank you, Doctor.

So in terms of --

THE COURT:  Mr. Aronfeld, bear with me for just one minute.

MR. ARONFELD:  Of course.

THE COURT:  Doctor Suite, I may have misheard you, and I'm asking you to clarify what you said.

Did I hear you use the term Hospiten?

THE WITNESS:  Yes.  That's the hospital.

THE COURT:  What is the difference between Hospiten and hospital?

THE WITNESS:  Yes.  Hospiten is a chain of hospitals that is based in the country of Spain, and they have various facilities around the world.  Usually wherever they have a

large chain of Spanish hotels like they had established in Jamaica fairly recently.  They bought a building across from the -- I think from the Half Moon Hotel.  And I have been to that hospital.  I had a patient in there.  And I know exactly what they do and what they cannot do.  So Hospiten is the name that they have given to their chain of hospitals.  And that's basically it.

THE COURT:  Thank you.

Please, continue.

BY MR. ARONFELD:

Q.   Doctor Suite, would you like to look at the Hospiten CT scan now?

A.   Yes.

MR. ARONFELD:  Your Honor, may I approach?

MR. DRAHOS:  I don't see how that's not an ambush.

THE COURT:  We're not doing this.

MR. ARONFELD:  We just received it.

THE COURT:  Oh, you're talking about the film that was just sent to you --

MR. ARONFELD:  Yes, Your Honor.

THE COURT:  -- as a result of Mr. Drahos contacting his office?

Mr. Drahos, your position.

MR. DRAHOS:  The Doctor testified in his deposition that he didn't review any films, not because he didn't have

access to them or that my office didn't provide it in time, or anything other than that he didn't think it was necessary to his opinions. So for him to come in now today and say, Well, I want to look at these films and interpret them is an ambush because whatever he is going to say that's on the that film, I've had no opportunity to inquire in deposition, no opportunity for me to confer with my experts, to ask: This is what Doctor Suite's claiming he's seeing on the film. Is this accurate or inaccurate? Does this make sense? Does this not make sense? I don't have the ability to cross-examine him on that. Not only that, but it wasn't brought up during Mr. Aronfeld's direct.

THE COURT: I'm going to sustain the objection.

MR. ARONFELD: May I be heard on that, Judge, or do you want me to move on?

THE COURT: Move on, please.

MR. ARONFELD: Okay.

BY MR. ARONFELD:

Q. Doctor, just so the record's complete, you're not a neurosurgeon?

A. That is correct.

Q. So in terms of whoever Carnival hired to render whatever opinions they paid that doctor to render, does that influence the methodology that you utilized to come to your conclusions in this case, that the removal of the cervical immobilization

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 94

collar caused or contributed to Mr. Smith being a quadriplegic?

A.    Not at all.

Q.    Doctor, Mr. Drahos asked you questions regarding hematoma?

A.    Yes.

Q.    Is it your understanding on the record review that the doctor on the Carnival ship discontinued his Warfarin?

A.    Yes.

Q.    Could you explain to the Court what is the significance of that?

        MR. DRAHOS:  Your Honor, we would object.  The significance of him discontinuing his Warfarin was never disclosed in any report, wasn't --

        THE COURT:  Sustained.

        Mr. Aronfeld, there's a basic rule about experts. You know the rules.  The expert is supposed to reveal his or her opinions in the report, and, to the extent there is a deposition taken by the other side, the expert is free to amplify on those conclusion already provided.

        The mere fact that I have decided to have a Daubert opinion doesn't give you the opportunity to have your paid expert come in with all sorts of new opinions.  That's just not how it works.  Because if it did we would have a never-ending discovery period and no ability to make a timely

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 95

ruling.

So those are the rules.  You have to disclose them according to the Rules of Civil Procedure.  It's not an ongoing process.  You know that.

MR. ARONFELD:  May I be heard briefly on this?

THE COURT:  Sure.

MR. ARONFELD:  Thank you, Judge.

Mr. Drahos opened the odor.  He specifically asked Doctor Suite questions regarding the hematoma of the spinal canal, and I'm simply trying to get Doctor Suite to put in context as to what importance, if not, the hematoma of the spinal canal had, given the fact that Mr. Smith was on blood thinners and what effect that had in terms of his methodology. I believe that Mr. Drahos opened the door as to that.  So I was simply weighing the predicate.

THE COURT:  I don't think it really opened that odor. It was a little bit of a slightly different topic.  You want this doctor to testify about Warfarin, the impact of a decision to stop the Warfarin.  That's not in his expert report.  You're soliciting a new opinion.  We're not going to permit that today, please ask your next question.

BY MR. ARONFELD:

Q.   Doctor Suite, Mr. Drahos asked you questions regarding Mr. Smith's life expectancy.

Could you explain to the Court what your opinion is

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 96

regarding his life expectancy and as to how you came to that conclusion?

A.    Yes.

THE COURT:  Beyond the scope of direct.

Next question.

MR. ARONFELD:  Well, I'm redirecting him from the cross, Your Honor.  If you're not going to permit me to talk about the opinions that were elicited during the cross regarding --

THE COURT:  That's true.  That's true.  Mr. Drahos did ask about the life expectancy, so you can follow up with that specific line of questioning.

MR. ARONFELD:  Thank -- I don't need to thank you.

BY MR. ARONFELD:

Q.    Doctor Suite, in terms of your opinions regarding life expectancy, what are your opinions regarding Mr. Smith's life expectancy, and how did you arrive at those conclusions?

A.    Normally, when I consider life expectancy, I look at what are called life tables.  And these are published every year or two by a Governmental body.  They're very useful.  And I consider that.  I also consider the significant comorbidities that exist in Mr. Smith and have existed even before the incident took place.

When I initially saw Mr. Smith in 2024, I concluded, based on his findings at the time, that his life expectancy

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 97

was going to be, I think, around 15 years.  Then I came to know, over the next several months, that his condition had deteriorated and he had significant medical complications.  And when Mr. Drahos asked me that question in deposition, I told him that I was revising my assessment of his life expectancy down below the 15 years.  And when he asked me to pinpoint it, I could not pinpoint it.

He had an expert that declared -- and we talked about it in the deposition.  His expert declared that Mr. Smith will live no longer than one year, but I didn't feel that I could speculate to that extent because Mr. Smith is very resilient.  And I felt it would be a case-by-case basis that I could not apply within reasonable medical probability or without some degree of disingenuity, that this patient would only live a year or less.  And I felt that we need to see how he progressed.

And it's my understanding as of yesterday that he is still plugging away, he is not in a hospital, and his wounds are healing, and he's getting better.  So, again, we're six months or seven months out since the defense neurology expert examined the patient.  That defense expert said the patient would die within a year, and I don't agree with that.  I think we have to see how he does.  He's rallying.  So I could not give a number in terms of the years anymore.

I acknowledge that he was certainly getting worse

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE  98

last year, and by the time Doctor Merkler, who was the defense neurology expert, examined the patient, I think in January, he clearly had taken a turn for the worst.  And I concurred.  I reduced my life expectancy down from 15 years, but I could not give an exact period of time, one to three years.  I would have no basis whatsoever to speculate that it's less than a year, one year to three years, one year to five years.  That would be whimsical, speculative, and not to the standard of a federal proceeding that we have here today.

MR. ARONFELD:  Thank you very much, Doctor Suite.  I have no further questions..

THE COURT:  I have a few follow-up questions of my own.  It's, by the way, 11:34.

Doctor Suite, you were mentioning that you spoke to Mrs. Smith?

THE WITNESS:  Yes.

THE COURT:  And you spoke to Mrs. Smith while you were examining Mr. Smith?

THE WITNESS:  Yes.

THE COURT:  Based on your conversations with Mrs. Smith, is it your understanding that Mrs. Smith was with Mr. Smith in the onboard medical clinic while he was receiving treatment for his injuries?

THE WITNESS:  So that I don't have an answer for.  I do not know whether she spent all the time with him.  I don't

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 99

know that.

THE COURT:  Or maybe even any time with him?

THE WITNESS:  Yes, I do not know.

THE COURT:  Thank you so much.  You may step down.
Appreciate your help.  Take care.

THE WITNESS:  Okay.  Thanks.

(Witness excused.)

THE COURT:  Call your next witness, please.

MR. ARONFELD:  Your Honor, it's my understanding that
Doctor Raval was scheduled for 1:00 p.m. today.  That's the
time we told him to be here.

THE COURT:  So you don't have any additional
witnesses now?

MR. ARONFELD:  I do not.  I had it per your order.

THE COURT:  Well, my order said that we were going to
break for lunch from 12:00 to 1:00 and that each side would
have hour and a half each with Doctor Suite that would have
brought us from 9:00 until 12:00.  Also, you used up less time
than I allocated, and so now we're ready for our next witness.

MR. ARONFELD:  I apologize to the Court.  I must have
misunderstood your order.  And Doctor Raval is a practicing
emergency room doctor.  I told him to be here before 1:00, but
I didn't have him on standby at 11:30.  I can call him.

THE COURT:  Well, that's probably not going to be
much help because it's inconceivable that he'd be able to get

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 100

here before noon.

MR. ARONFELD: I don't even know where -- he may be here, as far as I know. He may be an early bird. I'm sorry to interrupt you, sir. If I can have a moment, we'll call him. Maybe he's downstairs for all I know.

THE COURT: Sure. Feel free to step outside the hallway and see if's there. I would be surprised if he was here because if you told him to be here at 1:00, normally doctors don't show up an hour and a half early, but feel free to see if he is.

MR. ARONFELD: I really apologize, Judge. I misunderstood your schedule.

THE COURT: Understood.

So do you want to --

MR. ARONFELD: Mr. Hayashi is calling him right now.

(Pause in proceedings.)

MR. HAYASHI: He's about an hour away, Your Honor.

THE COURT: Right. So just have him show up at 1:00 -- Actually, let's have it 12:45, if he can make it by then.

MR. ARONFELD: Judge, should I then schedule Mr. Ramos who is our third witness to be here.

THE COURT: No, because, remember, I have to break for a half hour in the afternoon, remember?

MR. ARONFELD: Yeah. I didn't know what time that

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 101

was, but yes.

What time should I tell Mr. Ramos to come?

THE COURT:  Well, first of all, I'm pretty sure that I mentioned we were going to be breaking from 2:45 to 3:15.

Did I mention that particular time?

MR. ARONFELD:  I didn't catch the time.  You told us you had a pending criminal matter with certain Government --

THE COURT:  That's right.  Gosh.  I could have -- I would have been.  I said 2:45.

MR. ARONFELD:  You may have and I missed it.

THE COURT:  In any event, just tell the emergency room doctor to be here at 12:45, if he can.  And then we'll just continue on.  I don't think you need to adjust the arrival time of your third witness.

MR. ARONFELD:  Your Honor, may I make a comment about the third witness?

It seems to me that the position the defense is taking is that Mr. Ramos who is the life care planner, his opinions regarding the life care planner dependent upon Doctor Suite who has just testified he doesn't know how long Mr. Smith's going to live.

So if that's the only issue for the Daubert, I can assure the Court and I've assured Mr. Drahos, Mr. Ramos does not have independent opinions regarding the life expectancy of Mr. Smith.  He only has opinions regarding what it would take

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 102

for him to survive per year.  So if he lives a year, it's X dollars.  If he lives three years it's 3x.  110 years, it's 110x.

So perhaps we could avoid having the Daubert hearing on that issue with Mr. Ramos.  It is quite expensive for the plaintiff to have these witnesses come live.  And if that's the only issue we can stipulate on the record, Judge, we do not intend at the trial for Mr. Ramos to voice any independent opinions regarding how long Mr. Smith is going to live.  He's not qualified for that.  He possesses no opinions on that.

MR. DRAHOS:  Can I have a moment to confer?

THE COURT:  Sure.

MR. DRAHOS:  I'm used to standing, but I'm just going to sit for this part.

So it is unusual to have at a case like this where there is no life expectancy opinion from any expert from the plaintiff.  That's the focus of our challenge of Paul Ramos' life care plan.  We find it to be inherently unhelpful.  In light of the representation made by Mr. Aronfeld, he won't be offering a life expectancy opinion, I think that bolsters the argument that we are making.  There are other aspects of how that life care plan that was developed that may be helpful for Your Honor to hear in the sense that there's a weird -- I don't even know how -- miscommunication between he and Doctor Suite, which I think would call into question some of the

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

other opinions that he has, to the extent that the Court believes that this life care plan could still be helpful.  But other than that, we would defer to the Court's judgment whether you need to hear from Mr. Ramos because our arguments are laid out pretty clearly, and we are centered in on that absence of a life expectancy opinion rendering his report unhelpful.

THE COURT:  I had scheduled this for evidentiary hearing at the specific request of one of the parties.  I think it was a defense request for an evidentiary hearing, no?

MR. DRAHOS:  It was actually the plaintiff's request.

THE COURT:  Plaintiff's request for an evidentiary hearing?

MR. DRAHOS:  Yeah.

THE COURT:  And so that's why I scheduled an evidentiary hearing.

Mr. Aronfeld, you are prepared to stipulate that your witness will not be providing any opinion testimony on Mr. Smith's lifespan, correct?

MR. ARONFELD:  That's correct, Your Honor.

THE COURT:  And that his opinion is simply that the amount of money it would take to provide adequate healthcare for Mr. Smith is X dollars per year, and then you would present argument and perhaps other evidence to the jury of how

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 104

many years should be used in the calculation.

Is that --

MR. ARONFELD:  The jury is going to have to use their best estimation because nobody knows.

THE COURT:  So, Mr. Drahos, listen, I am not right now as familiar as you with all the nuances of your challenge to the witness.  I am aware that the main thrust of the challenge is the lack of a specific number of years and an expected lifespan.  But to the extent that you have other aspects of your challenge, that you believe would be helpful to bring out in an evidentiary hearing before me that, I'm happy to have the scheduled hearing go forward.

On the other hand, if you think that those additional challenges are not worth the effort and your primary challenge is simply the lack of a specific estimated life expectancy, then probably we don't need to hear from the witness.

So I'm basically saying to you if you'd like the schedule to remain with the witness appearing, we'll go forward with that.  If you'd rather not do that and save the parties and the court time, fine as well.  The ball is in your court.

MR. DRAHOS:  Yeah.  We will defer to our brief that outlines our criticisms of Mr. Ramos.  We don't believe it's necessary to bring him in here to highlight what we've already written.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 105

THE COURT: All right. Fair enough.

So we'll cancel that witness, Mr. Ramos.

And Mr. Aronfeld you and/or Mr. Hayashi can contact Mr. Ramos and tell him that he is off for today. He is expected to arrive at what time.

MR. ARONFELD: I believe 3:00, Your Honor.

THE COURT: Okay. Fine.

MR. ARONFELD: I do have one point of clarification I need from Mr. Drahos et al., is when they say rely on the brief, it's my understanding that the sole concern in terms of this Daubert hearing was whether or not Mr. Ramos had opinions regarding how long Mr. Smith was going to live, if that's the only basis of their effort to have him dismissed as a witness, then I'm in agreement he doesn't need to come. But if they're going to try to challenge him on other things that were not clear to us in the brief, I don't want to take a chance that I'm missing something. So I just need some clarification from them, please.

MR. DRAHOS: So that the basis of our challenge is that the absence of a life expectancy opinion renders the life care plan unhelpful to the jury.

THE COURT: I think what you mean is the absence of a life expectancy --

MR. DRAHOS: Oh, yeah.

What I meant to say was the absence of a life

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

expectancy opinion from any expert on behalf of the plaintiff renders the life care plan unhelpful and speculative to the jury.  There's ancillary credibility issues with Mr. Ramos, which Doctor Suite just kind of cleaned up a little bit by saying he made a mistake when he testified, having not seen him -- or having not spoken to him.

So I don't need to bring Mr. Ramos in now because, apparently, Doctor Suite is saying he actually did speak to him.  So other than those types of issues, what kind of communications were going on between you and Doctor Suite to set support these opinions, really the thrust of the argument is the life expectancy and the absence of him being able to tell a jury this is exactly how much Mr. Smith is going to need for exactly how many years at exactly this cost.  He can't do that.  It's the defense's position that the plaintiff has the burden to be able to show a reasonable basis for future medical need that they won't be able to do in the absence of a life expectancy opinion.

MR. ARONFELD:  I want to make sure I understand.  And I apologize.

I'm making it clear he has no opinion about how long he will live.  But is the defense still trying to strike Mr. Ramos' opinions regarding what it would take for a year for him -- for the time he does live.  I don't want to waive the ability to have Mr. Ramos come and defend himself, if

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 107

they're going to later come around with a right hook and try to get him off our witness list.

MR. DRAHOS:  I want to make it easy for the Court and for Mr. Aronfeld.

The Daubert motion is focused on the absence of a life expectancy opinion, period.  There are credibility issues that we will reserve for trial and don't need to bring him in on a Daubert hearing that relate to his communications with Doctor Suite.  That's not necessary for our Daubert argument. We most certainly will make those arguments later for the jury.  It's not necessary to sort of parlay the overall presentation we were going to give Your Honor.

THE COURT:  Let me try to cut to the chase because this is an issue that arises from the inherent distrust between the two law firms.  It happens.

Mr. Aronfeld is suspicious that you've got an ace up your sleeve and that you're going to try to undermine his ability to use Mr. Ramos as an expert witness.  And you are pointing out certain aspects about your Daubert challenge, but you want to make sure you don't waive ancillary arguments to challenge Mr. Ramos at a trial.

So right now we're here on a Daubert motion, which is a pretrial motion, which ultimately will trigger a pretrial ruling on whether the witness or witnesses are able to testify at the trial.  If you prevail on the motion, Mr. Aronfeld,

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

concerning Mr. Ramos, then, phew, good for you.  You cleared hurdle number one.  The witness will now testify at the trial.

What Mr. Drahos is saying, you're not completely out of the woods yet because, like any expert witness, I want to challenge and attack that expert's opinions in front of the jury at trial.  And some of those attacks may relate to the lack of a specific life expectancy, but other challenges may be of a different type.  So that's what we are.

If you would like to shore up your ability with Mr. Ramos, we can call him as an expert at this Daubert hearing for a pretrial Daubert ruling.  Or you can say, I'm fine.  My only concern today is a threshold Daubert ruling. That's going to be based solely on the lack of a specific life expectancy opinion.  So...

MR. ARONFELD:  First of all, I had no trust issues with Mr. Drahos.  He and I are good friends, but I do want to say the following.

If they would withdraw the Daubert challenge to Mr. Ramos, I would have no concerns.  And, of course, they can cross-examine him to their contentness once he's on the witness stand.  But are they still asserting the Daubert challenge on Mr. Ramos, given the fact that we're withdrawing any opinions -- not that he ever had any -- regarding how Mr. Smith is going to live.  That would make, at least, a more peaceful night's sleep for me.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

REDIRECT EXAMINATION OF NICHOLAS DAVID ALEXANDER SUITE 109

MR. DRAHOS:  No, of course not.

The Daubert challenge is that Mr. Ramos's life care plan is inherently speculative and unreliable because he cannot tell a jury for how long of a period of time any of his recommendations --

THE COURT:  Well, of course.

MR. DRAHOS:  Okay.

THE COURT:  But you don't need him to be here in court to say that.  That's already an established fact.

MR. DRAHOS:  Yes.

THE COURT:  So, Mr. Aronfeld, listen, you told me that it's, among other issues, expensive for you to bring in an expert for a pretrial Daubert hearing, so if you want to eliminate that expense and not call him this afternoon, that's fine.  If you're still a little bit nervous and you want to bring him in anyway, but you need to let me know either way.

MR. ARONFELD:  May I have a moment to confer with my better half?

THE COURT:  Sure.  You can.

MR. ARONFELD:  I think I'm in a twilight episode.

So, unfortunately, Judge, I feel compelled to have Mr. Ramos come in so that there is no issue.

THE COURT:  Fine.  We'll see you back here at 12:45 to begin the examination of the second witness.

MR. ARONFELD:  Doctor Hitesh.   Thank you.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

THE COURT:  All right.  We'll be in recess.  Thank you.

(A lunch recess was taken at 11:55 a.m.)

A F T E R N O O N   S E S S I O N

(The following proceedings resumed at 12:44 p.m.)

THE COURT:  Folks, are we ready to resume?  My notes indicate that Doctor Raval is your next witness; is that correct?

MR. ARONFELD:  Yes, sir.

THE COURT:  All right.  Please call Doctor Raval.

(Witness duly sworn at 12:45 p.m.)

THE WITNESS:  Yes.

COURTROOM DEPUTY:  Please state your full name, spell your last name for the record, and your title.

THE WITNESS:  Hitesh Raval.  I am an emergency physician, D.O.

THE COURT:  And spell your first name, sir, if you don't mind.

THE WITNESS:  H-I-T-E-S-H, last name Raval R-A-V-A-L.

THE COURT:  Thank you, sir.

You may ask questions, Mr. Aronfeld.

MR. ARONFELD:  Thank you, Your Honor.

HITESH RAVAL,

called as a witness herein on behalf of the Plaintiff, having been first duly sworn, was examined and testified as follows:

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

DIRECT EXAMINATION

BY MR. ARONFELD:

Q. Sir, what is your current occupation?

A. I am an emergency physician.

Q. Are you board certified in emergency medicine?

A. Yes, I am board certified.

Q. Doctor, please let the Court know, putting all modesty aside, your background and your education and your qualifications to practice emergency medicine.

A. Sure. I attended medical school in New York City. Ultimately, did my training there in emergency medicine to specialize in residency for four years in New York as well. Ultimately, I moved to Miami for my post-residency career. And it's about 13 years now of me being specialized in emergency medicine.

In that time frame, I have assumed director roles at various institutions in Miami. Different hospitals, different settings, where I have further honed my practice and my craft in emergency medicine specifically.

BY MR. ARONFELD:

Q. Doctor, you're a doctor of osteopathic medicine?

A. Yes.

Q. Could you explain to the Court the difference between a doctor of osteopathic medicine versus someone who went to traditional medical school and has a medical degree?

A.   Sure.  Well, in the U.S. it's a bit bizarre.  There's two ways to become a medical doctor.  There is a D.O. and there's an M.D. title.  And they're both synonymous.  They're exactly the same thing.  And one can argue that in my training, we actually took additional classes and courses in medical school, but beyond that, it's effectively exactly the same thing.

Q.   You're currently employed where, sir?

A.   I work at Coral Gables Hospital in Miami.

Q.   And what do you do at Coral Gables Hospital?

A.   I am the associate director of emergency medicine.  I am also the emergency medical services director for my region.  And I have 18 doctors that work for me, a mix of D.O.s and M.D.s.

Q.   As part of your clinical practice as an emergency room physician here in Miami, do you evaluate potential cervical injuries in patients?

A.   Absolutely.  This is a relatively frequent occurrence, unfortunately.  It's devastating, but it's common enough that we see this on a regular basis.

Q.   Doctor, are you familiar with the standard protocols used to assess and clear patients in cervical spine injury cases?

A.   Absolutely.

Q.   What are those protocols?

     MR. DRAHOS:  Objection, Your Honor.  I'm raising this

objection in an effort to try and be as efficient with the Court's time.  Our challenge with Doctor Raval's testimony is very limited.  It has to do with causation, and it has to do with an opinion that he gave specifically as it relates to a worsening of the paralysis.

So to the extent there's going to be any questions asked of this witness on standard of care issues, it's not relevant to the Daubert proceeding.

MR. ARONFELD:  Well, that should save some time.

BY MR. ARONFELD:

Q.    Just so that I can have some kind of foundation for the questions I'm going to ask you on your methodology, do you have an opinion, sir, as to whether or not the physician on the cruise ship fell below the prevailing standard medical care when he ordered that the cervical immobilization collar be removed?

A.    The standard methodology that we use is -- there's several criteria.  NEXUS, I believe, is most common.  I do believe he failed to provide the standard of care by removing the collar early, inadequate imaging techniques, and I think the treatment fell below the standard.

Q.    I think I put one X too many there -- it's a double X.

A.    It's one.

Q.    It's two Xs?

A.    One X.

Q.    I put one X too many.

What does that mean?

A.    This scoring system has been validated, and it's standardized in all the healthcare around the world.  And there are several parameters that are used, and you use this clinical basis, clinical judgment and really the presentation of the patient to see if this clinical scoring system is even applicable for the patient.  There's excluded criteria. There's inclusion criteria.  So you have to be aware of this concept and when to use it and when not to use it.

Q.    And based -- And what did you review -- and we'll get to what your opinions are.

But what did you review to come to the opinions that you have in this case, Doctor?

A.    I have reviewed all of the medical reports that were supplied to me.  I've seen the clinical documentation.  That documentation consists of the history, the subjective component where the patient, Mr. Smith here, the subject, detailed his injuries and how he felt leading to the physical exam findings from the doctor.  The vital signs, the lab work, the imaging, and the entire totality of the medical workup is what I reviewed to come to my opinion.

In addition to this, I have also reviewed other expert witness testimony, depositions, and various other documents.

Q.   Doctor, let's talk about the methodology that you utilized in coming to your opinions.

What was the methodology that you used?

A.   So in medicine -- and it kind of refers back to what I just stated.  What I reviewed leads and is part of the methodology when evaluating a patient who undergoes a spinal injury.  This includes the history of presenting illness, and in layman terms, this means what occurred to the patient and how did they feel after this injury.  Ultimately, the physician's records, which are what is objective here -- what does the physician think happened, what do they believe happened, and what was documented on the physical exam, which is of utmost importance -- ultimately what leads to the assessment and plan, which is now what testing is the physician obtaining, what is their thought process, what test results have returned, and what is the plan going forward to treat this patient.  So it's really the whole totality of the treatment process and the investigation process that is the methodology that's standardized, and when applicable you use some clinical scoring system such as NEXUS.

Q.   Doctor, do you utilize that methodology in your clinical practice?

A.   Absolutely.  Nearly on a daily basis, yes.

Q.   Is that methodology commonly referred to in the profession of emergency medicine as a differential diagnosis?

A.    That is part of it, the critical part.

Q.    And did you apply that methodology in rendering your opinions in Mr. Smith's case?

A.    Yes.

Q.    Doctor, do you have an opinion within a reasonable degree of medical probability, based upon your education, your experience, your training, your review of the medical records and imaging and utilizing the NEXUS criteria, as to whether or not the removal of Mr. Smith's cervical immobilization collar caused or contributed to cause Mr. Smith's quadriplegia?

A.    I absolutely believe that the premature removal of the cervical collar then led to subsequent injury, and what we've seen in the timeline is there is a neurological deterioration of Mr. Smith, and absolutely that falls below the standard of care.

Q.    Doctor, can you explain within a reasonable degree of medical probability how the timing of Mr. Smith's neurological deterioration supports your opinion?

A.    When going through the timeline -- and this is off the top of my head, but the cervical collar was approximately removed at 11:00 p.m.  And, again, I believe this was done prematurely.  There was imaging that was obtained.  There was a clinical exam that was performed.  And there was neurological symptoms where I believe that the NEXUS criteria that is often referred to was misused.  And the collar came

off at 11:00 p.m.

Around 4:00 in the morning, we have documentation from the ship board medical records that indicates that now the patient is developing signs of spinal cord injury, and this includes right-sided symptoms.  The patient did have a history of previous left-side weakness from a previous stroke it seems.  However, now we're developing weakness and symptoms for the right side the body.

At around 4:40 a.m. we have an entry from Doctor -- the ship order emergency physician, Doctor Juarez, where he documents a physical exam that's consistent with what was documented at 4:00 a.m. by the nurse.  And now there is documented weakness and new neurological symptoms at that time.

Around 5:00 in the morning after this neurological weakness and new symptoms that have developed, Doctor Juarez documented that he then subsequently and inexplicably moved the neck of Mr. Smith, and this is clearly documented in flexion and extension.  That means taking your chin and touching the chest and looking at the ceiling and these movements then, in my opinion, caused further damage.

Q.   I'm sorry, Doctor.  What time was it that the doctor on the cruise ship moved Mr. Smith's neck without the collar?

A.   About an hour after the new neurological symptoms were diagnosed so around 5:00 a.m.

Q.   Doctor, do you have an opinion within a reasonable degree of medical probability, based on your education and training as a board certified emergency room physician as to whether or not it was below the standard of care for the doctor on the cruise ship to have moved Mr. Smith's neck without the immobilization collar on?

A.   Absolutely.  I believe that any emergency physician providing standard of care treatment would not have moved someone's neck after they sustained a neck injury and now exhibiting neurological symptoms.

Q.   Do you have an opinion as to whether that movement of his neck caused or contributed to cause Mr. Smith's quadriplegia?

A.   I believe that this absolutely exacerbated his current condition, which was he had sustained an initial injury from a fall, and now this absolutely, more likely than not, made it worse.

MR. ARONFELD:  Thank you, sir.  I have no further questions.

THE COURT:  Thank you.  The record will show it is now 12:57.

Mr. Drahos, cross-examination.

MR. DRAHOS:  Yes, Your Honor.

THE COURT:  And it will be 12:57 where you're starting.

MR. DRAHOS:  May I proceed?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

THE COURT:  Yes, sir.

MR. DRAHOS:  Thank you.

CROSS-EXAMINATION

BY MR. DRAHOS:

Q.   Good afternoon, Doctor Raval.

A.   Good afternoon.

Q.   So would you agree there's no evidence of Mr. Smith moving his neck at all between 11:00 p.m. and 4:40 a.m. when the right-sided deficits first came about?

A.   I would disagree with that actually.

Q.   Doctor Raval, you recall being deposed in this case, correct?

A.   Yes.

Q.   Your deposition was on April 8th of 2025?

A.   I believe so.

Q.   I took your deposition.

Do you remember that?

A.   Yes.

Q.   And at the time of the deposition, you swore to take an oath that all of your answers would be truthful?

A.   Absolutely.

Q.   And at any point in time during that deposition, did you have difficulty understanding any of the questions that I asked you?

A.   Nothing beyond what we discussed in the deposition.

There was some discrepancies, and I'm referring to what page numbers we were looking at and some minor issues, but overall I understood most of your questions.

MR. DRAHOS:  May I approach, Your Honor?

THE COURT:  Yes.

Thank you, sir.

THE WITNESS:  Thank you.

BY MR. DRAHOS:

Q.   Doctor, for purposes of identification I've handed you what -- your deposition transcript taken in the case on April the 8th of 2025.  And I'd like to ask you, sir, if you can please turn your attention to Page 82 of your deposition transcript.

Are you there, sir?

A.   Yes.

Q.   Specifically was it your testimony on April the 8th of 2025, starting on Line 9:

QUESTION:  Can you, as you sit here, identify for the members of the jury any movement where Mr. Smith moved his neck between 11:00 p.m. and 4:00 a.m.?

ANSWER:  That's not documented that I can see.

QUESTION:  So you can't, agreed?

ANSWER:  Correct.

This was your testimony, sir?

A.   Yes, that was.

Q.   Do you agree that the paralysis at 4:40 a.m. was permanent and irreversible?

A.   No, I do not agree with that.

Q.   Can you turn to Page 93 of your deposition transcript, sir?

A.   Can I elaborate on your question, the first question you asked me, about the neck movement.

Q.   I didn't ask for any elaboration.

A.   Okay.  I'm on Page 93.

Q.   If you're turn your attention to Page 5, Doctor:

          QUESTION:  Do you agree or disagree with the opinions that Doctor Suite has given in this case that at 4:40 a.m. when the paralysis occurred, it was permanent and irreversible?

          ANSWER:  I think we can argue.  I don't have a different answer that than that.

          That was your testimony, sir?

A.   Yes.

Q.   As we've talked about, it's your contention in this case that Doctor Juarez inappropriately moved Mr. Smith's neck at 5:00 a.m. after the reports of paralysis at 4:40 a.m., correct?

A.   Correct.

Q.   Did Doctor Juarez say in his deposition whether or not Mr. Smith actively or passively moved his neck?

A.    In his medical documentation he said active and passive. That was the verbiage that was used from him specifically.  In his deposition, off the top of my head, his response was a bit vague, but he acknowledged there was movement of the neck.

Q.    He acknowledged that he couldn't recall whether or not Mr. Smith actually moved his neck or he actively moved his neck, correct?

A.    I don't believe -- maybe we can point it out here, but I don't recall him using the words active or passive in his deposition.  But I believe he acknowledged that there was movement of the neck.

Q.    To be clear, though, this encounter is the one you are talking about occurred at 5:00 in the morning?

A.    Correct.

Q.    So I want to drill down specifically on this opinion you've given here in court that you believe that that 5:00 a.m. movement worsened Mr. Smith's condition.

      Is what you're telling the members of the -- well, I'm sorry.

      What you're telling Court is that Mr. Smith was paralyzed but this action at 5:00 a.m. made him more paralyzed?

A.    So the word paralysis is a spectrum in medicine.  Laymen terms we use the word paralysis.  In medicine we don't really rely on that word.  And why that is is because you can have a

spectrum of weakness or a spectrum of loss of feeling or sensation.  And it can be mild or severe.

So I'm not entirely understanding your question because it can be -- when you have a spinal cord injury, you could have a minor injury.  It can progress to a moderate injury to a more severe injury with complete loss of function.

Q.   All right.  So let's use your terms then.

Is what you're telling the Court Mr. Smith had an injury and then he became more injured by virtue of this 5:00 a.m. movement?  Is that what you're saying?

A.   Absolutely.  And that's documented in the timeline.

Q.   Well, we're going to talk about that, Doctor.

MR. DRAHOS:  So, Ms. Rose, can you pull up -- Well, let me do this.

BY MR. DRAHOS:

Q.   Do you have a copy of the medical chart there?  I assume you don't, Doctor.  It didn't look like you came up with anything.

A.   Yeah, I do.

Q.   Oh, you do?  Okay.

Can you take out the medical chart?

A.   It will take me a minute.

Q.   Sure.

A.   This would be ship board documentation?

Q.   Yes, sir.

MR. DRAHOS:  Would the Court like a copy of the medical chart?

THE COURT:  I would.

Bear with me just a minute, please, because I think your colleague and Trina are trying to work out some technical issues with our ELMO projector and the screen.  And it's difficult for me to listen to you and watch them out of the corner of my eye because there appears to be a technical problem.  Let's give them a minute or two to try to correct what's on the screen.

BY MR. DRAHOS:

Q.   Doctor, you have a copy of the chart?

A.   Yes, I do.

MR. DRAHOS:  Your Honor, may I approach?  I'd like to hand a copy --

THE COURT:  Sure.

THE WITNESS:  Thank you.

THE COURT:  By the way, this will be a great experience, learning what happens when you're in court and our systems are not working properly.  This is a new courtroom deputy who has joined the court from another court.  I'm guessing all courts have technical problems from time to time, and we're encountering them sooner rather than later.

THE COURT:  Mr. Llamas, how did you break our equipment?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

MR. LLAMAS:  Sorry.

THE COURT:  Just a joke.  Let the record show I'm not being serious.  These things happen from time to time.

Let's proceed.

MR. DRAHOS:  Okay.  Thank you.

BY MR. DRAHOS:

Q.   So, Doctor Raval, the only clinical evidence that you're pointing to in this case in support of your opinion that Mr. Smith was made worse by this movement at 5:00 a.m. are entries in the Carnival medical chart; is that correct?

A.   Correct.  The entries are in the top line.

Q.   Okay.  And so what I'd hope to do was to show for the Court as we're going through it, what entries specifically you're relying upon.

And so it's my understanding, Doctor, that if we look at Page 24 of the chart, you're first pointing to Doctor Juarez' note entry at 4:40 a.m., correct?

A.   Give me one second to pull this up.

Q.   Sure.

THE COURT:  This is Page 24 of 28; is that right?

MR. DRAHOS:  Yes, Your Honor.

THE WITNESS:  So I'm on Page 24.

What is your question, please?

BY MR. DRAHOS:

Q.   And if you'll turn your attention, there's a note there.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

It says:  Performed by Juarez, Mohammed Ramsad (ph.), January 24, 2024, 4:40 a.m.

Do you see that?

A.    Yes.

Q.    And this would be the note you're relying upon as the first entry in the medical chart of right-sided weakness, what we can call right sided injury?

A.    Yes.  This is where he developed some weakness.

Q.    And, specifically, it states in the note:  Patient suddenly verbalized that, quote, I cannot move my right hand, fingers, and right leg, end quote.

Correct?  I've read that correct?

A.    You know, I'm not seeing that line again.

THE COURT:  It's basically in the middle of the page, sir, under where it says January 24th, 4:40.  And it says notes.  And right underneath that it says:  Patient suddenly verbalized that, quote, I cannot move my right-hand fingers and right leg, closed quote.

Do you see that?

THE WITNESS:  Yes.  For some reason, again, the pages seem to be different.  I am on Page 26 where I see that line. But, yes, I do see it.

BY MR. DRAHOS:

Q.    And if we look three entries down, there's an asterisk there, and it says:  Patient right-hand fingers show 1 out of

5 power.  Flexion and extension absent patient can extend and flex the elbow.

Do you see that there?

A.    Yes.

Q.    Okay.  And so if I understand your testimony correctly, this is what you're saying is the first sign of right-sided deficits which would be the baseline of his injury at that moment in time, correct?

A.    Correct.  And I want to clarify what these deficits are versus what's documented later.  I think these nuances are really more important.

Q.    Well, why don't you let me ask the questions, and maybe they'll allow you to answer the way you'd like.

A.    Sure.

Q.    Do you know what Doctor Juarez meant by, quote, I cannot move my right-hand, fingers?

A.    I imagine that means exactly what he stated, he's not able to move his fingers.

Q.    Was Doctor Juarez questioned in his deposition -- you read Doctor Juarez' deposition?

A.    Correct.

Q.    Was Doctor Juarez' asked in his deposition to clarify what that entry means?

A.    I don't recall the exact verbiage from the deposition.

Q.    But your interpretation of that is that Mr. Smith

reported to Doctor Juarez, I cannot move my right-hand fingers?

A.   Yes.  That's the subjective component.  It is not the objective part.  But, yes, the patient did state this.

Q.   Okay.  And if we go three lines down where it says, patient right fingers show 1 out of 5 power, was Doctor Juarez asked to explain what 1 out of 5 power means?

A.   I don't recall his exact response or if he was asked this, but 1 out of 5 power in medical terms is standardized. That nomenclature, 1 to 5, is referring to something specific.

Q.   Okay.  To Doctor Raval it's standardized.

But as you sit here today, you do not don't know what Doctor Juarez' interpretation of 1 out of 5 power is, agreed?

A.   All physicians use this terminology.  It's not just my terminology.  It's not just terminology, but it means we can --

Q.   My question --

A.   But there's some movement.

Q.   My question, sir, was:  As you sit here today, you do not know what Doctor Juarez meant by 1 out of 5 power; do you?

A.   I do understand because this is standardized terminology and nomenclature, but we use the scoring system for the power as 0 out of 5 to 5 out of 5 being the full score.

Q.   What is 1 out of 5, sir?

A.   Zero is complete loss.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

Q.    What is 1 out of 5, in your interpretation?

A.    1 out of 5 means that there's some muscle fiber involvement and there's some movement that's visible.

Q.    So your testimony is that later entries in the chart by a nurse are indicative of a worsening condition, correct?

A.    There are later entries by other medical professionals that document further clinical exam findings --

Q.    And the other --

A.    -- and they show it worsening.

Q.    The other medical professional that you're speaking of is a nurse, correct?

A.    Yes, I believe so.

Q.    What do you know about that nurse's qualifications?

A.    There's assumptions I can make here.  There is a nurse working in the emergency department.  I imagine they have experience in treating emergencies.

Q.    What did that nurse say about his particular interpretation of Mr. Smith's condition on the day in question?

A.    I'm sorry.  Can you rephrase that?  I'm not understanding.

Q.    Sure.

      What did the nurse say in this case about his interpretation of Mr. Smith's condition on the morning in question?

A.   I can refer to the timeline to give you their interpretation of what happened.

Q.   Did you read any depositions of the nurse who's known entry you're relying upon in this case?

A.   I was not supplied the nurse's deposition.

Q.   So --

MR. ARONFELD:  Your Honor.  Excuse me.  I have an objection.

THE COURT:  What's the objection?

MR. ARONFELD:  Because I think that's an unfair cross.  I don't believe any nurses have testified in this case, so the suggestion that there was testimony from a nurse that he didn't read is an improper cross.

THE COURT:  Well, let's find out if it's a misleading question.

Was there any deposition taken of the nurse who made this entry?

MR. DRAHOS:  No, there wasn't.  And that's my point is that the nurse was never questioned, therefore, he has no understanding what the nurse's interpretation of Mr. Smith's condition was.

THE COURT:  I know.  But when you phrase the question, Mr. Drahos, you never read the nurse's deposition, there's sort of an implicit understanding that such a deposition exists.

MR. DRAHOS: Understand.

THE COURT: Apparently that's not the case.

MR. DRAHOS: I'll rephrase.

THE COURT: Please do. Thank you.

MR. DRAHOS: Thank you.

BY MR. DRAHOS:

Q. So as you sit here today, Doctor Raval, do you have any idea of what the nurse's interpretation of that particular entry means?

A. The medical entries that are documented in this timeline are very objective and clear, so based on my interpretation of the nurse's documentation is exactly what it states. It's not a matter of opinion. There's very clear documentation.

Q. Have you ever worked with this nurse before?

A. Of course not.

Q. And we all can agree this nurse was never deposed, so, therefore, you never had an opportunity to hear the nurse's interpretation of this note either, correct?

A. Correct.

Q. And, in particular, the entry in the nurse's note that you're relying upon is this nurse's description of the right arm?

A. There is a description of the right arm and right leg that's very clearly documented in the timeline.

Q. And, in particular, and for the Court's edification and

for yours as well, Doctor, to make sure we're on the same page, this would be a note entry by Paul James, RN, at 10:00 a.m. on January the 24th that begins on Page 23 of the medical chart?

THE COURT:  This is our Page 23.  And maybe the doctor has a different pagination.

THE WITNESS:  It's 23 on mine as well for some reason.

THE COURT:  All right.  So Page 23 of 28.  Bear with me just a minute.

And this is at what time, Mr. Drahos?

MR. DRAHOS:  10:00 in the morning, Your Honor.

THE COURT:  10:00.

THE WITNESS:  For me it continues to Page 24, so it's the bottom of 23.

THE COURT:  I'm not finding this.  At 10:00 a.m.?

MR. DRAHOS:  Yes.  So if Your Honor looks at Page 22, there's a timestamp of 10:00 a.m. but then the substance of that note carries on to Page 23.

THE COURT:  I see.

BY MR. DRAHOS:

Q.   So, Doctor, if we're looking at the substance of that 10:00 a.m. note, the entry that you're specifically relying upon is the comment by the nurse that states:  He cannot grip with his right hand.

Correct?

A.    That's part of it.  But there's a whole physical exam and documentation there that's important.

Q.    So would you agree that at 10:00 a.m. the nurse doesn't use the same power scale that Doctor Juarez did?  In other words, there is no 0 or 1 out of 5?  There is no 5 or quantification of any sort?

A.    Correct.  There's no quantification using that scale here, but it is mentioned that he cannot grip -- he cannot grip with his right hand.

Q.    Okay.  Do you know whether or not he was capable of gripping with his right hand with a power of 1 out of 5?

A.    Power 1 out of 5 means there some movement and muscle fiber involvement, unable to grip sounds -- based on nursing documentation and my interpretation of this, it's probably worsened.

Q.    Did you speak to anybody in the medical center, anyone from the Smith family, who told you that Mr. Smith got worse or his paralysis or injury got worse after 5:00 a.m.?

A.    No.  I have relied on the medical documentation.

Q.    And so these are medical documentations using two different descriptions, by two different authors with two different qualifications, agreed?

A.    Yes.

Q.    At no point in time did Mr. Smith himself say that his

right-side deficits got worse after 5:00 a.m., correct?

A.    No.  I think in this entry where the nurse documented what Mr. Smith said, he did get worse.  So referring to that same timestamp at 10:00 a.m., that entry by the nurse -- if you can see the third line from the bottom, it states that: He states he does thought have any sensation -- I'm sorry. Wrong line.

If we go up to the right arm exam, it's the line above:  He cannot grip with his right hand.  The end of that sentence states:  He does not have any sensation in his right hand.

This is a new neurological finding.  He lost all feeling in his arm at 5:00 in the morning.  This did not occur prior to that during his stay in the ER.  And now he is showing signs of new neurological injury.

Q.    Did Doctor Juarez say that there was a worsening at any point in time after 5:00 a.m. of his condition?

A.    Doctor Juarez' documentation does not address the neurological finding here, which is disappointing because that would be the standard of care.

Q.    So to make it abundantly clear, your reliance on this opinion that his condition was worse is based upon two different entries from two different authors where you don't have any testimony at all from the nurse and you don't have any testimony from Doctor Juarez stating that he's worse,

correct?

MR. ARONFELD:  Objection.

BY MR. DRAHOS:

Q.    I've summarized your opinion correctly?

MR. ARONFELD:  Excuse me.  Objection to form.

THE COURT:  Overruled.

THE WITNESS:  So when you're treating a patient, this is a team effort, and as a physician there's sometimes where I'll defer to a nurse to document where I'm at the bedside busy treating the patient.

So you need to view -- and I think the average physician views this medical chart in its totality.  And if there's a discrepancy between two different medical professionals in terms of documentation, this stands out to the physician.  Ultimately, it's their responsibility.  And what I will expect is any physician, prudent physician would document the contrary.  So if there's a disagreement in one medical professional's opinion versus another, the physician needs to address that in the medical chart.  When it's not addressed, its clear that there's a consensus and agreement to what is documented.  So I have 100 percent faith in the medical professional, whether it's a physician or a nurse taking care of a patient, to document what is actually happening at the bedside and what's happening to Mr. Smith. In this case it's clear, there's inability to grip with his

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

right hand, number one.  That's a motor movement issue, evidencing a spinal cord injury is getting worse.

But on top of that, now we have the inability to feel his right hand, and this is clearly a progressive neurological disease that's getting worse after the movement of the neck. And that's clearly documented where he lost sensation in his right hand, and that was never an issue prior to that, this time.

Q.  Doctor, in looking over this chart I think you told me you spent 19 hours in support of developing your opinions in this case, correct?

A.  At this point, probably more, yes, about, yes.

Q.  In looking at this medical chart, are there any entries from the same author indicating that Mr. Smith -- his condition worsened beyond 5:00?

A.  If you give me a minute.

Q.  Yep.

THE COURT:  By "the same author," you mean RN, Paul James?

BY MR. DRAHOS:

Q.  Did Paul James indicate at any point in time in any of his notes that Mr. Smith got worse?  Did Doctor Juarez at any point in time in his notes indicate that Mr. Smith's condition got worse, any nurse, any healthcare provider in this Carnival medical chart?

A.    Yes.  I think it's very clear at that 10:00 a.m. time that we're referring to, when they're documenting a physical exam and motor and sensory loss changes in their exam, it's clear that they are getting worse here.

Q.    Doctor, maybe my question wasn't clear enough because I understand you're interpreting those notes and comparing them.

But what I'm asking you is:  Can you take the same author and show us evidence of the same author saying, At this moment in time this is his condition, at this moment in time his condition is worse?

A.    So you're stating that I should only look at the nursing chart to see what -- I'm sorry, I'm really not understanding your question.

Q.    Sir, you're comparing two different authors.  You're saying the nurse is describing his condition as being worse because I'm comparing that the way Doctor Juarez described his condition.

What I am asking you to do is can you take the same author who we can then assume is using the same evaluation process and the same descriptive tools and show us evidence where the same author is saying his condition got worse?

A.    In this timeline just following it sequentially, chronologically, there's multiple physical exams and documentation, and it's linear.  I don't know if I can just remove some of the documentation and just follow the nurse's

chart and see what their exam looks like.

Q.   So in the 19-plus hours or more that you spent on a case, you cannot point to any particular example as you sit here today?

A.   I think when you look at the chart in its totality, you need to review all the physicians' charts and nurses' charts in chronological order to get the full story.  If you pick and choose, I think that's inappropriate validation and interpretation of the medical chart.

Q.   I want to ask you about cervical collars in particular.

When a cervical collar is correctly applied to a patient, is there still a degree of flexion and extension that that patient is capable of moving their neck?

A.   Very subtle movement, possible, if there is a cervical collar, but likely not enough to cause injury.

Q.   Is 30 degrees subtle?

A.   It's less than 90 degrees, so the collar does have benefit, if you're trying to say that there is no benefit.

Q.   So the question I have, though, is:  Wouldn't you agree that even if a cervical collar is correctly placed and patient is still capable of flexing or extending their neck at least 30 degrees?

A.   I would argue less than 30 degrees but perhaps in the right clinical setting, right scenario, if it's improperly placed you can get some, perhaps, more movement.  But even 30

degrees is less than 90, again, so there's utility of having a cervical collar.

Q.    Can you turn to Page 115 of your deposition, Doctor?

THE COURT:  What page, Mr. Drahos?

MR. DRAHOS:  115.

THE COURT:  115?

MR. DRAHOS:  Yes, Line 11.

THE COURT:  Oh, of the deposition?

MR. DRAHOS:  Yes.

THE WITNESS:  Yes.

THE COURT:  Okay.  Bear with me just a minute, please.

And the line number?

MR. DRAHOS:  Yes.  Line 11.

BY MR. DRAHOS:

Q.    When asked the question, Doctor, during your deposition on April 8, did you give the following answer:

QUESTION:  So do you agree with this statement: Collars do reduce movement of the neck, but even if correctly fitted, they still allow over 30 degrees of flexion and extension on rotation?

ANSWER:  That's possible.  30 degrees is not as significant as full flexion and extension, which would be beyond that.

QUESTION:  But the patient is still, under that

circumstance, capable of moving their neck at least 30 degrees?

ANSWER:  I bet you can still move, yeah, with a cervical spine collar.

That was your answer?

A.    Correct.

MR. DRAHOS:  Thank you, Doctor.  No further questions.

THE COURT:  All right.  So that will be the end of your examination at 1:28.

Do you have any further questions, Mr. Aronfeld?

MR. ARONFELD:  I do Your Honor.  Thank you.

THE COURT:  All right.  So 1:28 you're starting.

REDIRECT EXAMINATION

BY MR. ARONFELD:

Q.    Doctor, in your clinical practice at Coral Gables Hospital where you're an emergency room physician, is it common for you when you're treating patients to rely on the notes of nurses?

A.    Absolutely.  We work together as a team, and I view their information as very valuable and useful.

Q.    Is it common for you to rely on the notes of other physicians?

A.    Absolutely.

Q.    If a patient is in your emergency room for more than a

shift, do you rely on the notes from nurses and physicians from previous shifts?

A.    Absolutely.

Q.    And do doctors and nurses rely on your notes when they see a patient after they left your emergency room?

A.    Of course.

Q.    And is that common in emergency medicine?

A.    Yes.

Q.    Did it matter to you, sir, in the utilization of your methodology, in rendering your opinions in this case, whether or not the notations made in Mr. Smith's chart on board the ship was from different nurses?

A.    It's almost irrelevant.  What matters is the content of the actual documentation.

Q.    Did Doctor Juarez fall below the prevailing standard of care when he failed to document any new neurological findings?

A.    In a situation like this where the neurological exam and details are of utmost importance, I think that it does fall below the standard of care to not appropriately document in detail.

        MR. DRAHOS:  Just objecting, stating that opinion is beyond the scope of his written report and deposition testimony.

        MR. ARONFELD:  I think that Mr. Drahos opened that door wide open in his questioning.

THE COURT:  Overruled.

BY MR. ARONFELD:

Q.   Sir, there was some portion of Mr. Drahos' examination of you, where you wanted to clarify what you meant by the movement of the fingers, and I'd like to give you that opportunity now to explain to Judge Goodman precisely what that meant and what the importance of that is to you in terms of your methodology in rendering your opinion that the removal of the cervical collar caused or contributed to Mr. Smith's quadriplegia.

A.   So what's important to hear and for everyone to be aware of is that when you have a spinal cord injury, it's not just full paralysis or zero paralysis.  It's not you have full strength and sensation or zero strength and zero sensation. When you have an injury like Mr. Smith incurred, it can start off very subtle and with continuous movement and injury to the spinal cord that happens with further movement of the neck, you can have further consequences from that movement.

What does that mean?  I think what's highlighted in the documentation here and the timeline is that there is some clear loss of movement.  And if we're focusing on the right hand here, there is -- initially he has motor changes and deficits.  What does that mean?  There's issues moving his hand.  And it's documented clearly as Power 1 out of 5, meaning that he's lost the full strength that he had prior to

REDIRECT EXAMINATION OF HITESH RAVAL                    143

this injury.

On top of that, you can think about the sensory changes and injuries that occur.  What does that mean?  Nerves allow you to move and they allow you to feel things.  And it's clear the documentation from the 4:00 a.m. mark to the 10:00 a.m. mark, there is an advancement and progression of injury that's not just motor.

And I understand that -- I believe that we're talking about some semantics here where he had an injury but it did get worse.  You can argue it's subtle.  But there is a progression in the wrong direction, meaning there is an insult to the spinal cord that's going the wrong way.  That's just referring to the motor aspect, the movement aspect.

I think what we're failing to demonstrate is that -- not failing to demonstrate.  I want to clarify.  Failing to give importance to, is the loss of feeling to the right hand that is now new and documented for the first time at 10:00 a.m. and to clarify, 10:00 a.m. is now after the neck was moved.  And the injury --

Q.   I'm sorry to interrupt you.  I just to make sure our timeline is right.

10:00 a.m. is after the collar is removed?

A.   10:00 a.m. is now the time there's no collar.

Q.   No collar.

A.   And the neck was documented here by Doctor Juarez in his

medical chart that there was improper movement of the neck in flexion and extension.

Q.    Okay.

A.    That occurred at 5:00 a.m., and 10:00 a.m. now there's further neurological deficits.  He's getting worse, essentially.

Q.    And at that 10:00 a.m. point, Doctor, what is your opinion within a reasonable degree of medical probability based on your experience and your education, based on your training, and based on the methodology of the differential diagnosis as to whether or not that movement of the neck without the collar that was done by Doctor Juarez caused or contributed to a worsening of Mr. Smith's quadriplegia?

A.    With a known neck injury, clinically given the documentation that I reviewed, which includes the imaging, the physical exam findings, and what the patient was feeling, it would be a devastating insult to apply more pressure on a damaged spinal cord and a broken neck.  So with movement of the neck, whether it was intentional or not, whether Doctor Juarez meant it or not -- and I imagine he didn't do this intentionally.  But it was documented by him that there's movement of the neck, and that can, more likely than not, lead to further injury.  And this is commonsense.  You have a broken bone, you need to stop moving it.  In this case there was movement applied to the neck, and subsequently there was a

loss of feeling in the hand, inability to move the hand. And this can lead to long-term consequences and paralysis.

MR. ARONFELD: Thank you, Doctor. I have no further questions.

THE COURT: All right. Thank you. It's 1:35.

Doctor, thank you for your testimony. You may step down. You are excused.

(Witness excused.)

THE WITNESS: Thank you.

THE COURT: Take care.

THE WITNESS: Take care.

MR. ARONFELD: Mr. Hayashi has something he'd like to address before --

MR. HAYASHI: Your Honor, may -- can I address something briefly?

THE COURT: Does it have to do with this witness?

MR. HAYASHI: Yes.

THE COURT: Is it something you want to ask an additional question of this witness?

MR. HAYASHI: It may involve questioning, but can I just ask --

THE COURT: Well, before you do --

Doctor, do me a favor. Don't leave yet. Just step outside the courtroom, wait outside in the hallway, and we'll either summon you back or set you free.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

THE WITNESS:  Sure.  Understood.

MR. HAYASHI:  You know what, it's okay, Your Honor.

THE COURT:  So you're telling us that the doctor is free to go?

MR. ARONFELD:  Did you tell him to step out of the courtroom.

THE COURT:  I told him to step out of the courtroom until we determine whether we need him back or not.

MR. ARONFELD:  I missed that.

Okay.  Mr. Hayashi would like to tell you something, Judge.

THE COURT:  Stay outside in the corridor, Doctor. Thank you so much.

THE COURT:  Mr. Hayashi, come to the lectern.  You're hiding behind the board.  I can't even see you.

MR. HAYASHI:  Yes, Your Honor.  Excuse me.  Thank you.

Just in an abundance of caution, Your Honor, I believe there was some suggestion in the -- in the Daubert motion that this manipulation, you know, worsening Mr. Smith's paralysis, was some kind of new opinion brought up for the first time in the deposition.  But I have a copy of his report, and the opinions's clearly in there.  And I just wanted to know -- I don't believe this has actually been filed on the record yet.  I just wanted to know if you want me to

perhaps read it or --

THE COURT:  I'm not even sure what you're saying, to tell you the truth.

MR. HAYASHI:  Okay.

THE COURT:  So let's try to give me a differently phrased explanation concerning your area of concern.

MR. HAYASHI:  Yes.  Just in an abundance of caution, I will note, Your Honor, that the opinion that Mr. Smith's --

THE COURT:  Meaning the opinion by this doctor?

MR. HAYASHI:  That we just heard, yes.

THE COURT:  Okay.

MR. HAYASHI:  That is, in fact, in his report.  I just -- for the record, I can read it off, and maybe we can file it if you'd like, sir.

THE COURT:  So right now you're just making a comment.

What relief are you seeking from me at this point?  Do you want me to summon the witness back to ask him the question?  What exactly do you want me to do?

MR. HAYASHI:  Perhaps, Your Honor can take judicial notice that the report states the opinion.  And I can approach.

THE COURT:  Mr. Drahos, are you taking the position that this doctor, Doctor Raval, in his report did not opine that Mr. Smith's condition worsened after 5:00 a.m.?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

148

MR. DRAHOS:  That's not a basis of our Daubert. We're challenging his methodology.

MR. HAYASHI:  Perhaps I misunderstood it then, Your Honor.  In an abundance of caution I just wanted to raise this but no issue, Your Honor.  So my apologies.

THE COURT:  Wait just a minute.

Mr. Drahos, does the fact that Ravel's report opines that Mr. Smith's condition worsened after 5:00 a.m. as a result of movement of the neck?

MR. DRAHOS:  It wasn't as specific as the Court just raised it, but he did mention in his report that he believed that our actions worsened his condition.  And I inquired about it in the deposition, which is why I had all the information to ask.  So I'm not arguing that it wasn't properly disclosed.

MR. HAYASHI:  I didn't say that he was clearly saying that it wasn't argued.  I just was not 100 percent sure. Since we have clarity, I'm okay now, Your Honor.  Thank you very much.

THE COURT:  Very well.

When is your next witness getting here?

MR. ARONFELD:  I'm texting him right now, Judge.  He says 2:09.

THE COURT:  That's interesting.

MR. ARONFELD:  He's a life care planner, so he's very precise.  Not 2:10, not 2:11; 2:09.

THE COURT:  Or maybe he's OCD.  You never know.

MR. ARONFELD:  He could be both.

THE COURT:  He could be an OCD-plagued life care planner.

MR. ARONFELD:  Can I let Doctor Hitesh leave?

THE COURT:  You may.  Thank you.

MR. ARONFELD:  Thank you, sir.

THE COURT:  All right.  Folks, we'll be in recess until 2:09.

Thank you very much

(The proceedings recessed at 1:40 p.m.)

(The following proceedings resumed at 2:18 p.m.)

THE COURT:  Please be seated, folks.

Mr. Aronfeld, call your next witness, please.

MR. ARONFELD:  Thank you.

May it please the Court, we call Mr. Paul Ramos.

COURTROOM DEPUTY:  Please raise your right hand.

(Witness duly sworn at 2:19 p.m.)

THE WITNESS:  I do.

COURTROOM DEPUTY:  Please state your full name and spell your name for the record and also your title.

THE WITNESS:  My name is Paul Mario Ramos.  Last name is R-A-M-O-S.  I am a physical therapist and Certified Life Care Planner.

COURTROOM DEPUTY:  Thank you.

THE COURT: Mr. Aronfeld, it is now 2:19. You may proceed.

MR. ARONFELD: Thank you, Your Honor.

PAUL MARIO RAMOS,

called as a witness herein on behalf of the Plaintiff, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ARONFELD:

Q. Mr. Ramos, what is your current occupation?

A. I am a physical therapist and a life care planner.

Q. Can you please explain to Judge Goodman in detail your background and education in physical therapy and life care planning?

THE COURT: Aren't you going to ask him not to be modest?

BY MR. ARONFELD:

Q. And please put all modesty aside.

THE COURT: You have trained me in a certain way, Mr. Aronfeld, that when you vary from the script, I get very unnerved.

MR. ARONFELD: I was just seeing if you were paying attention.

THE COURT: You bet.

BY MR. DRAHOS:

Q. Put all modesty aside, sir, and please explain to Judge

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

Goodman your background, education, and training and experience in the fields of physical therapy and life care planning.

A.   Yes.  I am a registered physical therapist.  I have been licensed in the state of Florida since 2013.  I hold a bachelor's in physical therapy.  I am a Certified Life Care Planner with the International Commission of Healthcare Certification.  I have been certified as a life care planner since 2013.  I am a fellow of the International Academy of Life Care Planning.  I'm board certified in geriatric physical therapy through the American Physical Therapy Association.  I hold an advanced credential from the American Physical Therapy Association in balance and falls.  I am resident certified assistant technology professional and certified environmental access consultant.  And I am currently in a master's program at the University of Florida in gerontology.

Q.   Can you explain to Judge Goodman, please, what does a life care planner do?

A.   A life care planner prepares a document, a life care plan, which is done through a standard process and methodology.  That life care plan spells out the services, the care an individual is going to need currently and for the remainder of their life as a result of a catastrophic injury or illness.  That is done by a thorough review of medical records and evaluation of the individual, and then consulting

with the medical professionals.  And the research is done, and the life care plan is priced out in the geographic location where the individual lives and treats.

Q.    Mr. Ramos, in your experience as a board Certified Life Care Planner -- Well, let me back up for a second.

Are all life care planners board certified?

A.    No, not all life care planners are certified.

Q.    What does it mean to be a Certified Life Care Planner?

A.    A Certified Life Care Planner means you met the criteria to sit for the certification exam, which in the case of the exam that I have taken and recertified in, you need to have a certain amount of experience in a medical field.  You have to have a professional license in good standing, and you have to pass an exam, and then there's recertification every five years.

Q.    Mr. Ramos, do you have any experience in designing life care plans for patients who have been diagnosed with spinal cord injuries such as quadriplegia?

A.    Yes.  I've created many life care plans with individuals with quadriplegia.

Q.    Can you give Judge Goodman an approximation as to the number of life care plans you've created for patients who have spinal cord injuries including quadriplegia?

A.    I would guess somewhere between 50 and 75.

Q.    Mr. Ramos, are there certain standards that are utilized

life care planners in terms of developing a life care plan?

A.   Yes.  Certified Life Care Planners have standards of practice that we follow and also consensus and majority statements as well that help guide our practice.

Q.   Did you utilize a particular methodology in -- strike that.

Do you utilize a particular methodology in developing life care plans?

A.   I do.  And the methodology that I follow is peer reviewed.  As a fellow of the International Academy of Life Care Planners, my methodology is peer reviewed by other fellows every five years.

Q.   Mr. Ramos, turning to Mr. Smith's case, did you review any material in rendering or formulating your opinions regarding his life care plan?

A.   I did.  I reviewed medical records and depositions.

Q.   And what medical records did you review?

A.   And I apologize.  I left my glasses at the --

Q.   I'm happy to get them for you.

A.   Please, in the side pocket.

MR. ARONFELD:  Your Honor, may I approach the witness?

THE COURT:  Yes.

THE WITNESS:  I reviewed records from Piedmont Fayette Hospital Heart Failure Center; Emory Healthcare;

DIRECT EXAMINATION OF PAUL MARIO RAMOS                154

Gerald Hood, M.D.; Piedmont Healthcare; Day By Day Therapy, LLC; Atlanta Heart Associates, PC; Ken Stone Neuro; Life Bright; Atlanta Vascular Specialists; Wendy Swain ARNP; Carnival Glory; Mohammed Ramsad, M.D.; Community Radiology Associates, PA; Hospiten, Montego Bay; Jackson Health Systems; Downtran (ph.), D.O., Jessica B, Croftstone (ph.), M.D.; Goats Kevin (ph.) records; Iava Valer (ph.), RN; Nancy Lawler (ph.), PT; Oyeyemi Amosu; Sara M. Walker, OT; William Behm, M.D., Amaro Oskato, OTA; Abdulrahman Nasiru, M.D.; Michael Jurgens, M.D., Scott Hamlin M.D., Sagar Amin, M.D.; Sujith Kuruvilla, M.D., Pearson CrocketT, M.D.; Mark L. Wetherly, M.D., Wellstar health system; Mark I. Silverstein, M.D., Quantum Radiology; Rajid Suid (ph.), M.D.; Arthur Mullick (ph.), M.D.; Boyd Verd (ph.), M.D.; Michael Collins, M.D.; Aaron D. Khan; Andrew Woodman, PA; Sean P. Fagan, M.D.; Vikram Khasat, M.D.; Lauren M. Cannon; Rochelle Niki Taylor, LMSW; Emily Garrett, LD, Jeffrey D. Hiller; Karen M, Wellstar Medical Group, Hospital Medicine; Ritesh L. Patel, M.D.; Drake M.D.; Samir Mishra, M.D.; Aviana N. Herrera, PA; Christina Seixas, R.N.; Lisa M. Gorman.

And I believe that's it.

Q.    Mr. Ramos, would it be fair to say that in your methodology in rendering your opinion regarding the life care plan for Mr. Smith, you've reviewed thousands of pages of medical records?

A.    I did.  I reviewed thousands of pages.

Q.    Mr. Ramos, did you also incorporate in rendering your opinions in Mr. Smith's case any of the opinions of his treating physicians or experts in this case?

A.    I did.  I conferred with Doctor Nicholas Suite.

Q.    And when did you confer with Doctor Suite?

A.    I spoke with Doctor Suite on March the 1st 2025.

Q.    And what is your understanding, Mr. Ramos, as to what area of medicine is Doctor Nicholas Suite's area of specialization?

A.    Doctor Suite is a board certified neurologist.

Q.    And is it your understanding that Doctor Suite actually examined Mr. Smith?

A.    Yes.

Q.    Can you explain to Judge Goodman how you incorporated your conversations with Doctor Suite, your review of the medical records into rendering your opinion?

A.    I reviewed the medical records.  I then evaluated Mr. Smith along with his wife via video in his hospital room in Atlanta.  I then began drafting a general life care plan based on what I gleaned from the records and my evaluation and my education, experience, and training.  I then prepared that draft and provided it to Doctor Suite, who then we scheduled a phone call for Saturday morning, March the 1st, 2025, where we went over the draft life care plan in detail.  And Doctor

Suite was able to provide specific recommendations as far as medical evaluations and care, diagnostic testing, therapeutic evaluations and care, potential future surgeries, attendant care, mobility equipment, home modifications, medications, pretty much every category of the life care plan.

His recommendations were then put within the life care plan attributed to him, and that version of the life care plan was sent to Doctor Suite for his review. He reviewed it and signed off on the report.

Q.   Mr. Ramos, did you attempt to have a conversation with Mr. Smith himself regarding his condition?

A.   I did, I did a video evaluation of Mr. Smith, and Mrs. Smith was there and assisting.

Q.   Were you able to converse with Mr. Smith or was he already at that time unable to speak?

A.   He was able to communicate most nonverbally but also through his wife.

Q.   Was it important to you in rendering your opinion that you have here today to speak with Mr. Smith or at least communicate with him as well as his wife?

A.   Yes, an evaluation of the individual is important.

Q.   Can you kindly explain to Judge Goodman why it is important for you to have a conversation with the patient and a family member in rendering your opinion?

A.   So, yes, Your Honor, in these cases we want to evaluate

the individual, make sure that what we're seeing in the medical record, that is the treatment that they're actually getting.  We want to go over past medical history.  We want to go over current symptoms, pain levels, support systems at home, are the medications that are being -- that they're -- that are reflected in the medical record, are they actually taking them.

In the case of Mr. Smith he was in an institution at the time.  He was at what's called an LTC, a long-term care facility, where he was receiving care because he was currently on a ventilator.  So we want to figure out their discharge plans are, what their wishes are as far as the disposition once they go home, what care they were receiving prior to the incident in question as opposed to the care that they needed after the incident in question which in Mr. Smith's case was a spinal cord injury, and basically go over all the care that they're receiving and get an idea of what it is they're going to need in the future.

Q.   Mr. Ramos, the interaction that you had with Mr. Smith and his wife was on FaceTime?

A.   The equivalent.  I believe it's called Ring Central.

Q.   Ring Central.

Was that sufficient enough, in your opinion, as a life care planner to do a clinical assessment?

A.   It was sufficient for me to get a clear idea of what the

needs likely would be for Mr. Smith and to be able to frame my conversation with Doctor Suite.

Q.   Based upon your evaluation of Mr. Smith, reviewing his records, speaking to Doctor Nicholas Suite, what are the primary needs that Mr. Smith has in terms of medical and rehabilitation for the spinal cord injury he sustained as a result of the incident on the Carnival ship?

A.   Well, the needs are many and varied.  He's going to need extensive medical evaluations and care.  Doctor Suite and I discussed neurology, physiatry.  Mr. Smith suffers from neurogenic bladder and neurogenic bowel.

Q.   Can you explain to the Court what that means, please?

A.   Yes.  Neurogenic bladder, as a result of his spinal cord injury, Mr. Smith is unable to realize when his bladder is full and evacuate his bladder.  So he needs either catheterization where catheter is inserted in his urethra or what's called a suprapubic catheter or some other form of managing urine output.

He is also unable to evacuate his bowels as a normal function, so he needs to be on a bowel program.  In Mr. Smith's case, currently -- he did at the time of the evaluation have a colostomy bag that was managing his bowel function.  He did communicate to me during that evaluation that when able he would like to have that reversed.  He made that very clear.

In addition to medical evaluations -- well, other medical evaluations and care would be a registered dietician. Mr. Smith currently has a number of pressure ulcers or wounds. So he would need medical care for that.  So various amounts of medical care.  There is a likelihood of probability of future hospitalizations and emergency room visits that Doctor Suite spoke to.

He's also going to need a number of diagnostic studies over the course of his life, once again, to address neurogenic bladder, skeletal health because he, a quadriplegic, is going to lose bone density.

So there is a number of different diagnostic tests that we discussed.  He is going to need therapy.  That's physical therapy, occupational therapy.  He's also going to need speech therapy because of tracheostomy and a recent -- and the ventilator use.

In addition to that, he'll need counseling.  And, also, he's going to need different procedures over the course of his life.  Some are probable.  Some are possible.  And Doctor Suite and I discussed those.  He's going to need a wheelchair, power wheelchair and a manual wheelchair.  He will also need a backup wheelchair if one of those wheelchairs is not in good functioning order.  He's going to need some modifications to his home to make it more accessible because he is wheelchair bound and nonambulatory we discussed the need

for a specialty bed.  Extensive wound care, he's going to need, either home health or on an outpatient basis.  He's going to needs 24/7 support care from a nurse, around the clock.  And that's going to be something that he's going to need.

He's going to need transportation in the form of a wheelchair van to get to his different appointments and to be able to leave the home.

We went over all the supplies that Mr. Smith is going to need to manage the neurogenic bladder, to manage the wounds, to manage the skin in general.  Also respiratory supplies, because he was on ventilator and compromised from respiratory perspective.  We went over his medication.  And I'm sure there's a number of other of things that aren't coming to me.

Q.   Mr. Ramos, is the care you just outlined for Mr. Smith consistent with the recommendations of Mr. Smith's treating physician?

A.   It's consistent with much of the care that he's receiving currently.

Q.   Are the recommendations that you've made consistent with the opinions of the expert, Doctor Nicholas Suite?

A.   Yes.

Q.   Is the type of care you just recommended consistent for the needs of somebody who has suffered a severe cervical

spinal cord injury that has left them as a quadriplegic?

A.    Yeah.

Q.    Are the costs -- have you come up with a cost amount for what it would cost Mr. Smith to have the things that you and his physicians and the expert have recommended for him on a yearly basis?

A.    Yes, I costed out the services and items that are contained within the life care plan in the Atlanta, Georgia area.

Q.    And what did you base those costs on?  What sources did you utilize as a life care planner to come up with that opinion?

A.    I used a number of resources, one of which is the VA reasonable charges data, which is costing data that's used by the Federal Government by veterans administration and is considered UCR -- usual, customary, and reasonable -- by the Government.

I also used the FAIR Health database, which is a large database with billions of data points that we're able to search by geozip or by geographic location for the particular service.  There was also some phone calls made, some internet research, medical providers.  I used CMSdata.gov, which is the Government website that has charges of physician throughout the country that participate in the Medicare program and what they actually charge.  So I was able to use that for the

physicians in the Atlanta area.

Q.   Are those cost estimates that you relied upon estimates that are published and easily available to life care planners and other health care providers?

A.   Yes.  Another health care planner can reproduce those costs.

Q.   And what was the yearly amount of care that you came to an opinion on in terms of Mr. Smith?

A.   I did not calculate the actual costs.  I gave the costs of the line item.  However, I did testify at deposition that I felt in my best estimation it would be approximately a million dollars a year.

Q.   Mr. Ramos, it's our understanding, sir, that you do not have an opinion regarding what Mr. Smith's life expectancy is?

A.   That's correct.  As a life care planner and a physical therapist, I am unable to opine on life expectancy.

Q.   So how -- could you explain to the Court how your $1 million approximate yearly cost for taking care of Mr. Smith would be applied if Mr. Smith were to live 6 months or 6 years or 60 years?

A.   My estimation was at the moment approximately a million dollars a year.  If Mr. Smith were to live a year, that would be what my estimation would be.  If he were to live longer, then it would be a multiple of those years.  If he would live less years, it would be a fraction of that.

Q.   Would it be fair to say, Mr. Ramos, that however long Mr. Smith were to live that this amount would be prorated accordingly to his life?

A.   I believe so if I understood your question correctly. And as I just testified, I feel that was my best estimation at the moment of what the yearly costs would be.  I did not actually tabulate those yearly costs.

Q.   So that it's an approximately $1 million a year for however long Mr. Smith were to live?

A.   That is my estimation.

Q.   Are the methods that you utilize, Mr. Ramos, to come up with this estimation and the needs that Mr. Smith has are the same methods that you use in your every day practice as a Certified Life Care Planner?

A.   Yes, it's the same.

Q.   Are your opinions regarding the needs that Mr. Smith has medically, for the rest of his life, going to be helpful to the jury?

A.   Yes, I believe they are.

Q.   And did you apply the system methodology and principles of life care planning within a reasonable degree of probability in determining what Mr. Smith needed?

A.   I did.

       MR. ARONFELD:  Thank you, sir.  I have no further questions.

THE COURT:  Thank you.  It is now 2:43.

Mr. Drahos, cross-examination.

MR. DRAHOS:  Thank you.

THE COURT:  Starting at 2:43.

MR. DRAHOS:  May I proceed?

THE COURT:  Yes.

MR. DRAHOS:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DRAHOS:

Q.   Good afternoon, Mr. Ramos.

A.   Good afternoon.

Q.   So what I'd like to talk to you about is how different your methodology has been in this case than in your normal practice.

You would agree that you were retained in this case on February the 20th, correct?

A.   I don't have the date in front of me.  I'm sorry.

Q.   Well, you were asked that question during your deposition, and you did have that date available to you then.

So if I showed you a copy of your transcript, would that help refresh your recollection?

A.   If it was in my deposition, yes, then that would be the date.

MR. DRAHOS:  May I approach, Your Honor?

THE COURT:  Yes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

THE WITNESS:  Thank you.

THE COURT:  Thank you.

BY MR. DRAHOS:

Q.   So, Mr. Ramos, if you would kindly turn to Page 29 of your deposition, sir?

A.   Yes.

Q.   Specifically, Line 16.

Was it your testimony when asked this question on April 11th of 2025:

QUESTION:  So you had -- had you started any work at all in this case prior to February 20th of 2025?

ANSWER:  I don't think so.

QUESTION:  Okay.  And so at that time you were retained you were advised of the fact that your report would be due eight days later on February 28th?

ANSWER:  I was.

That was your deposition testimony, sir?

A.   Yes.

Q.   And would you agree an eight-day time frame in which to prepare your report is unusual for you?

A.   It is a compressed time frame.

Q.   And as you were asked during direct exam you were required to review tens of thousands of pages of documents, examine Mr. Smith, confer with physicians, and generate the report that you've talked about under that expedited time

frame, correct?

A.   Yes.  I did review thousands of pages, correct.

Q.   And you indicated that you had a virtual exam of Mr. Smith on February the 26th, correct?

A.   I believe so, yes.

Q.   And you've never seen him in person?

A.   I have not.

Q.   And you said that conversation was important to your opinions?

A.   I feel it was, yes.

Q.   And he was connected to a ventilator at the time, correct?

A.   Yes.

Q.   So he wasn't capable of speaking?

A.   Speaking, no.  He was able to communicate nonverbally and via his wife.

Q.   Now, when you were formulating your opinions in this case, you intentionally chose not to speak to any of the treating physicians, correct?

A.   I did not speak to the treating physicians.

Q.   It was your preference to speak to Doctor Suite?

A.   I had access to Doctor Suite, yes, to be able to have his opinions.

Q.   Okay.  And it's your testimony here today you spoke to Doctor Suite on March the 1st?

A.    Yes.

Q.    Which would have been the day after your report was due?

A.    I believe so.  I can't recall the date of the report.

Q.    Well, you do recall, at least according to your deposition testimony, having agreed that your report was due on February 28th?

A.    Yes.

Q.    Okay.  So at the time that you submitted the report to the defendants in this case, there had been no physician sign-off or physician conferral?

A.    That is correct.  It was a preliminary report.

Q.    And this is the only instance that you can recall turning in a preliminary life care report in a litigating case without conferring with a physician?

A.    I have prepared many preliminary reports without physician input and review.

Q.    And can you refer to Page 36 of your deposition, sir, specifically Line 1:

         QUESTION:  So first let me ask you this question. Have you ever turned in a life care plan in a litigated case as an expert without having conferred with any treating physicians?

         ANSWER:  Final life care plan, I have not.  I don't believe so.

         QUESTION:  Have you ever turned in a preliminary life

care plan without conferring with any physicians?

ANSWER:  I can't be certain if I have done that before.

QUESTION:  So as you sit here today, this is the first instance that you can recall, the only instance that you can recall, where you've submitted a life care plan of a, quote, preliminary nature without having conferred with any physicians?

ANSWER:  I believe so, but I can't be certain.

That was your testimony, sir?

A.   That was my testimony, and I answered incorrectly.  I must have not understood the question because I do prepare preliminary life care plans frequently under preliminary nature without physician input or review.  I submitted one today.

Q.   So when you submitted a supplemental life care plan in this case on March the 3rd, it's your contention that you had conferred with Doctor Suite?

A.   Yes.

Q.   Is it part of your practice to have physicians sign off on life care reports?

A.   I do frequently, yes.

Q.   Why do you do that?

A.   It's -- out of thoroughness.  It's not really a requirement, but I do it out of thoroughness to make sure the

recommendations -- I got them right.

MR. DRAHOS:  May I approach, Your Honor?

THE COURT:  Yes.

Thank you.

BY MR. DRAHOS:

Q.   Mr. Ramos, I've handed you what was previously marked as an exhibit in defendants' motion -- Daubert motion.  It's your life care report that was generated in this case, the final life care report.

And it is dated March the 4th, correct?

A.   It's dated March the 3rd.

Q.   At what time?

A.   It doesn't have a time on the document.

Q.   Do you see there along the top there's an email which indicates date and time?

A.   The email, yes.

Q.   And does this email say March the 4th?

A.   It does.  The report is dated March the 3rd.

Q.   Would you agree that at the time you submitted that life care report Doctor Suite had not signed off on it yet?

A.   I'm not certain.  I don't know.

MR. DRAHOS:  May I approach, Your Honor?

THE COURT:  Yes.

Thank you.

BY MR. DRAHOS:

Q.   Mr. Ramos, I've handed you what's been produced to the defendants in this case, it's a copy of correspondence that went back and forth between your office and Doctor Suite's office.

Do you see that, sir?

A.   I do.

Q.   And can you tell the Court what date Doctor Suite's office sent his signed report or his signature indicating that he reviewed your report?

A.   I believe it says March the 5th.

Q.   So you received that signature from Doctor Suite after you had turned in a report indicating it was a final report?

A.   And it was a final report.  There were no changes.

Q.   Would you agree, Mr. Ramos, that your recommendations are not reliable unless certified by a treating physician or an expert physician?

A.   The recommendations that require medical foundation, yes, need to be provided by a physician.

Q.   And in this case you would agree that specifically Mr. Smith's life expectancy has not been certified or offered by any treating physician or expert for the plaintiff in this case?

A.   I don't recall seeing anyone opining on life expectancy.

Q.   And as you've stated, you do not have the expertise to be

able to offer that yourself, correct?

A.   That is correct.

Q.   And so you would agree that as this report stands today, there is no expert for the plaintiff or treating physician for the plaintiff who has certified exactly how long any of the recommendations you suggest are needed for Mr. Smith?

A.   The recommendations within the report are for life, many of them.  And that be what -- what it is.  I leave that up to the trier of fact.

Q.   And in this particular case, there's no information that you can point to to indicate how long of a period of time any of those recommendations may be needed?

A.   That is correct.  And that is the normal methodology in life care planning.  And I may point out that the life care planner that was retained by the defense also provided recommendations through life expectancy without a finite number, which is the correct way to do it.

Q.   So the expert for the defense who you're referring to is Doctor Alexander Merkler, correct?

A.   No.  It's the life care planner that prepared the report.

Q.   Are you familiar with the opinion of Doctor Alexander Merkler?

A.   I did read it.

Q.   And it is Doctor Merkler who has seen Mr. Smith more recent in time than Doctor Suite, correct?

A.   I believe so.

Q.   As a matter of fact, Doctor Suite hasn't seen Mr. Smith in over a year, agree?

A.   I believe so.

Q.   And it was Doctor Merkler's opinion that Mr. Smith had less than one year to survive or to live?

A.   I believe that's what I read.

THE COURT:  Mr. Ramos, just say that name one more time slowly and spell it.

MR. DRAHOS:  Doctor Alexander Merkler, M-E-R-K-L-E-R.

THE COURT:  And what type of doctor is Mr. Merkler?

MR. DRAHOS:  He is a neurologist.

THE COURT:  A defense retained expert?

MR. DRAHOS:  Yes, Your Honor.

THE COURT:  And his conclusion was a one-year life expectancy or less than one year life expectancy?

MR. DRAHOS:  If you'd like, Your Honor.  I have a copy of the report.  I can show it to Mr. Ramos and provide it to the Court so that we all have the same report that's being referenced.

THE COURT:  Sure.

MR. DRAHOS:  May I approach, Your Honor?

THE COURT:  Yes.

Thank you.

BY MR. DRAHOS:

Q.   Mr. Ramos, I've handed you what's been previously marked as an exhibit to the Daubert motion.  It's a report written by Doctor Alexander Merkler.

Do you have it there in front of you, sir?

A.   I do.

Q.   And would you agree that that is the only report you received from any physician indicating any degree of survivability or life expectancy that has a numeric value?

A.   Yeah.

Q.   And it's Doctor Merkler's opinion that Mr. Smith has less than one year left to live, correct?

A.   I believe so.

Q.   Mr. Ramos, are you familiar with the position that's been taken by Mr. Smith's attorneys in this case as it relates to his life expectancy?

A.   No, I'm not familiar.

Q.   If it's been represented by the plaintiff's lawyers in this case that it is, quote, not just a real possibility that Mr. Smith may pass away in the near future but an imminent likelihood, end quote, would you have any reason to dispute your clients in this case?

A.   I don't understand the question.

MR. ARONFELD:  Your Honor, I'm objecting.

THE COURT:  Wait just a minute, sir.

What's the nature of the objection?

MR. ARONFELD:  We're not expert witness -- he's asking him to opine on what the lawyer said in completing.  I don't think that's an appropriate question for this expert.

THE COURT:  Well, he's asking if he is familiar with the plaintiff's representation.  And I'm familiar enough to know -- with this file, to know what Mr. Drahos is referring to.  He's referring to a motion or request that you made of the Court for a special setting because you represented to the Court that the witness would be -- would probably die soon, or words to that effect.  So Mr. Drahos is asking this witness if he's familiar with that representation which you made to the Court.

THE WITNESS:  I'm sorry.  Could you repeat the question?

BY MR. DRAHOS:

Q.   Sure.

Are you familiar with the representations made by Mr. Smith's attorneys in this case that his death is not only -- I'll go back and quote it to make sure we right; not just a real possibility that Mr. Smith may pass away in the near future but an imminent likelihood?

A.   I have no knowledge of that.

Q.   As you sit here today, are you in any position to dispute what's been represented in legal pleadings in this case?

A.   I can't dispute or affirm.

MR. DRAHOS:  Thank you, sir.  Those are all the questions I have.

THE COURT:  All right.  So it is now 2:57.

And, Mr. Aronfeld, do you have redirect?

MR. ARONFELD:  Thank you, Your Honor.

THE COURT:  So it's 2:58.  Okay.  Go ahead.

REDIRECT EXAMINATION

BY MR. ARONFELD:

Q.   Mr. Ramos, you initially produced a preliminary report in this case?

A.   Yes.

Q.   And then you produced a formal final report in this case?

A.   Yes.

Q.   And you produced a preliminary report because of the Court's deadlines that required initial expert disclosures?

A.   Yes.

Q.   Did your final report substantially change in any meaningful way the preliminary opinions that you had?

A.   There were some changes, but I wouldn't say they were substantial, no.

Q.   And then when you filed your final report, were those opinions based upon the use of the methodology that you utilize as a Certified Life Care Planner?

A.   Yes.

Q. Does it matter to you -- or as a life care planner, whether or not a physician actually signs your life care plan?

A. In my personal practice, I have the physician sign off on the report just out of thoroughness.

Q. And did Doctor Suite sign your life care plan?

A. He did. He reviewed it signed it.

Q. I understand, Mr. Ramos, that you don't have an opinion as to how long Mr. Smith's going to live.

A. That's correct.

Q. Does it change your life care plan for Mr. Smith not knowing how long he's going to live?

A. It does not.

Q. Have you ever created a life care plan for an individual who lives longer than a life care expectancy?

A. I'm unsure how to answer that because I don't follow -- I don't follow the individual after the life care plan has been generated. I can say that I do create a number of life care plans for individuals that have exceeded the life expectancy that's outlined in the national tables.

Q. In terms of patients who have severe spinal cord injuries like Mr. Smith and who are quadriplegics like Mr. Smith, with proper care, such as all the things that you outlined in your life care plan, does that type of care increase their life expectancy?

MR. DRAHOS: Objection, Your Honor. That's outside

the scope of his expertise through his own admission.

THE COURT:  Sustained.

BY MR. ARONFELD:

Q.   Does the life care plan that you authored for Mr. Smith take into consideration that he may improve?

A.   Yes.

Q.   And are the things that you designed in his life care plan -- what is the intent behind all those things that you outlined that he needs?  Why does he need those things?

A.   In life care plan, in general, we include care and services that help that individual live as healthy, as independent, and avoid complications, to a degree that we can given the disease process and disability.  So in the case of, Mr. Smith, he needs attendant care.  He's unable to care for himself.  He's unable to move his extremities or -- he needs attendant care, for instance.  So we would have that in, otherwise he would not survive.

Q.   That's exactly my point.

Without the things outlined in your report, could Mr. Smith live?

A.   No.  Mr. Smith needs care for the rest of his life as a result of his injury.

MR. ARONFELD:  Thank you.  I have no further questions.

THE COURT:  Okay.  Thank you very much.  It's now

3:02. I have a question or two myself.

So within the past few years, Doctor, because of -- actually because of a ski injury I had to go through physical therapy. And I also have some friends who's children are now physical therapists. And I am of the opinion -- please correct me if I'm wrong. I am of the opinion that nowadays students are in school for physical therapy to be a physical therapist, who are just starting off, in order to get your license you need have to a Ph.D. in physical therapy in Florida; is that correct?

THE WITNESS: It's nationwide, Your Honor, and it's actually a DPT, Doctor of Physical Therapy.

THE COURT: Doctor of Physical Therapy?

THE WITNESS: Yes.

THE COURT: Which is more advanced than a Master's degree?

THE WITNESS: Yes.

THE COURT: All right. And so with a bachelor's degree, you're grandfathered, in so to speak?

THE WITNESS: Yes. The doctorate degree did not exist when I graduated.

THE COURT: Right.

So somebody who now gets a new license to be a physical therapist should be called doctor, I guess.

THE WITNESS: Yes, they can go by doctor.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

THE COURT: Have you ever testified in a trial where you are offering your life care plan opinions where the finder of fact was not also provided with an opinion on the patient's estimated life expectancy?

THE WITNESS: Your Honor, I don't recall testifying in a trial where life expectancy was brought up or was an issue. I don't recall that ever happening.

THE COURT: Well, when you say you don't remember testifying in a trial where life expectancy was an issue, does that mean that in those cases where you testified, the number of years of the expected life expectancy was established or supported with evidence as opposed to being unknown?

THE WITNESS: Your Honor, it was that it was not contested, that I recall, in any of the trials that I have testified in.

THE COURT: Thank you so much. You may step down. I appreciate your help.

THE WITNESS: Thank you.

THE COURT: Take care.

MR. DRAHOS: Your Honor, would it be okay if I ask Mr. Ramos a follow-up question to the Court's question?

THE COURT: Sure. And I'll give Mr. Aronfeld an equal opportunity.

MR. DRAHOS: Thank you.

RECROSS-EXAMINATION

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

FURTHER REDIRECT EXAMINATION OF PAUL MARIO RAMOS      180

BY MR. DRAHOS:

Q.   Mr. Ramos, can you tell us how many times you testified in court as an expert?

A.   I would be guessing, but I believe it's eight, in that neighborhood.

Q.   Here in the Southern District of Florida?

A.   Yes.

Q.   How many times?

A.   In total I believe it's been somewhere around eight times.

MR. DRAHOS:  Thank you.

FURTHER REDIRECT EXAMINATION

BY MR. ARONFELD:

Q.   In those eight times, Mr. Ramos, have you ever had your opinions or qualifications or methodology in terms of rendering opinions as to a life care plan disqualified?

A.   I have not.

Q.   And in followup to what Judge Goodman asked, is the life expectancy required for you to render your opinion regarding Mr. Smith's needs?

MR. DRAHOS:  Objection.  I think that's outside the scope of what this witness is capable of answering.

THE COURT:  Well, it's outside the scope of my limited questions, so I'm going to sustain that objection.

Anything else, Mr. Aronfeld, to follow up on what

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

information I brought out through my limited questioning?

MR. ARONFELD:  I have no further questions.  Thank you, sir.

THE COURT:  Take care, sir.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  No further witness testimony is my understanding, correct?

MR. ARONFELD:  We have no further witnesses.

THE COURT:  And Mr. Drahos, no witnesses from you?

MR. DRAHOS:  Correct.  There's no witnesses for us.

THE COURT:  Understood.

All right, folks.  Let's talk about logistics.

A little bit later on today I'm going to be issuing a post-hearing administrative order, in effect, memorializing the list of homework assignments of who's going to be filing certain documents on CM/ECF, who's going to be serving additional information and documents on opposing counsel.  But we're going to need to figure out two things regarding the post-hearing briefing.  I'm not talking about the post-hearing submission of papers.  I'm talking about an actual legal memorandum.

And the issue in the legal memorandum has to do with whether an expert witness is able to offer opinion testimony at trial, if the witness did not include those opinions in his

or her expert report or provide them in a deposition.

So the first question is:  How long do you believe that memorandum should be and, number two, what deadline should I impose?  Please don't think that this question is going to send you on a -- or propel you into an analogous road trip to a car dealer where you're coming up with a high estimate or low estimate because you think the car salesmen is going to give you a counteroffer.  My point is, if you think that you really can get this done in a week, don't say to me two weeks because you think I'm going to change it.  And if you really need 10 pages, don't say We need 20 pages with the thought I'm going to cut it.  Just tell me what you think you're going to need, both as to the length of the memorandum and the deadline, and I'll know what's really being proffered.

So, Mr. Drahos, what are your thoughts as to both of those topics?

MR. DRAHOS:  Your Honor, we believe 10 pages in two weeks.  And I just wanted to clarify.

THE COURT:  10 days or two --

MR. DRAHOS:  10 pages within the next two weeks.  And I wanted to clarify did the Court ask the parties to research whether experts are able to offer opinions in a Daubert hearing or trial?

MR. DRAHOS:  No.  Actually both.

MR. DRAHOS:  Okay.

THE COURT:  It will be sort of a bifurcated issue at a Daubert hearing and then, assuming that you even you clear that hurdle, at trial.

So do you still want 10 pages or is that going to generate a little bit more writing since I've now given you a little bit more of a nuanced view of what I am looking for?

MR. DRAHOS:  We're now asking for 15 pages, Your Honor, 15 pages within two weeks.

THE COURT:  Mr. Aronfeld?

MR. HAYASHI:  I think, Your Honor, 10 pages should be sufficient.  I'm a little concerned about this, kind of, expanding further than it needs to.  But in any case, I think two weeks is okay.  I can agree to that.

Also, just so we're clear, you said briefing on new opinions or new fleshing out of the methodology because I'm -- anyway -- or just the opinions?

THE COURT:  Well, sometimes, Mr. Hayashi, you have a tendency to provide more than the information asked for.  And so, therefore, now that you brought up that point, I'm going to include both topics:  Whether an expert is allowed to provide testimony at a Daubert hearing and/or at trial with, A, new or different methodology or, B, new or different opinions.  So it will be both.

MR. HAYASHI:  Yeah, maybe the 15 pages is fine, Your Honor.

THE COURT:  Very well.  That will be 15 pages in two weeks.  And I'm going to phrase the issue also in the post-hearing administrative order.  I think both sides have a pretty good idea of what I'm looking for, but I'm just now giving you the assignment off the top of my head.  When I go back in chambers -- and I'll get to massage the language a little bit better -- it will sound a little bit more polished, a little more professional, a little bit more Judge-like, something I can be a little prouder of than some verbiage that I happen to mention at the end of a full day's hearing.

And you should not treat the 15 pages as aspirational.  So if you can get it done in less pages, terrific.  Don't feel like, Gee, Judge Goodman gave us 15, I've only got 9, I need to fill up six more pages.  There's an old saying sometimes attributed to Mark Twain, sometimes attributed to Napoleon, regardless, probably one or both of them if they did say that, stole it from somebody else.  But the famous saying is --

You know where I'm going with this?

MR. ARONFELD:  Less is more.

THE COURT:  Not a bad guess, but no.

Mr. Drahos?

MR. DRAHOS:  I don't have any idea, no.

THE COURT:  So the famous saying is -- Or let's ask your colleague.

MR. LLAMAS:  I was going --

MS. ROSE:  I was going with less is more.

THE COURT:  Sound guesses, but no.

The old saying is:  I apologize for writing such a long letter.  I didn't have the time to write a shorter one.

So that comment triggers a brief anecdote that you're going to have to suffer through.  And that anecdote is many years ago, back in the day when I was at the U.S. Attorney's Office, I had to submit a brief to the 11th Circuit Court of Appeals.  Back then we didn't have word counts because we really didn't have that sophisticated type of computer.  We just had pages.

And so my page limit was 50 pages.  And I decided to submit a 75-page brief along with a simultaneously filed motion for leave to file an extra long brief.  And, foolishly, I didn't file that motion before the actual brief was filed. I filed it, as I indicated, simultaneously.

Within two or three days we received back an order from the 11th Circuit Court of Appeals, motion denied, and you have -- and it was some incredibly short deadline maybe like three days to submit a page-compliant brief.  Now, you can't take a 75-page brief and cut it to 50 pages by just editing. Oh, I'll take a word out here.  I'll rephrase this sentence. Maybe I'll massage this paragraph.  Maybe that will get you three or four pages, not 25 pages.  So I had to completely

rewrite the entire brief from scratch.

And I also knew the message that the Court was sending, so I didn't use even 50 pages.  I think it was like 42 pages.  It turned out to be, in retrospect, a better brief at 42 pages than it was at 75 pages.

So although you have 15, keep that anecdote in mind when you're drafting.

All right, folks.  Good to spend a good part of the day with you.

Anything further from either side?

MR. ARONFELD:  Nothing further.  Thank you, Judge.

MR. DRAHOS:  Nothing, Your Honor.  Thank you.

THE COURT:  Okay.  We'll be in recess.

Take care.  Bye now.

(The proceedings adjourned at 3:16 p.m.)

# C E R T I F I C A T E

I certify that the foregoing pages represent a true and correct transcript of the above-styled proceedings as reported on the date, time, and location listed.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was reported, and further that I am not financially nor otherwise interested in the outcome of the above-entitled matter.

DATE: 6/23/25 /s/Mary Ann Casale, RDR, FPR-C, CLR, CSR-IL
          Official Court Reporter
          United States District Court
          Southern District of Florida
          400 North Miami Avenue
          Miami, Florida 33128
          MaryAnn_Casale@flsd.uscourts.gov

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

**0**

**0** [2] - 128:23, 133:6

**1**

**1** [18] - 77:5, 126:25, 128:6, 128:7, 128:9, 128:10, 128:13, 128:20, 128:24, 129:1, 129:2, 133:6, 133:12, 133:13, 142:24, 162:18, 163:8, 167:18
**10** [9] - 2:4, 36:7, 77:10, 182:11, 182:17, 182:19, 182:20, 183:4, 183:10
**100** [4] - 49:16, 135:21, 148:16
**101** [1] - 78:25
**10:00** [16] - 132:2, 132:12, 132:13, 132:16, 132:18, 132:23, 133:4, 134:4, 137:1, 143:5, 143:17, 143:18, 143:22, 143:23, 144:4, 144:7
**10:10** [1] - 40:11
**10:27** [1] - 50:9
**10:41** [1] - 55:20
**10:43** [1] - 59:14
**11** [2] - 139:7, 139:14
**110** [1] - 102:2
**110x** [1] - 102:3
**111** [1] - 2:7
**115** [3] - 139:3, 139:5, 139:6
**119** [1] - 2:8
**11:00** [25] - 30:5, 31:2, 40:10, 40:18, 40:25, 41:24, 43:5, 43:14, 60:9, 61:8, 61:13, 62:4, 62:6, 62:9, 63:24, 64:19, 65:11, 65:23, 66:4, 67:17, 67:22, 116:21, 117:1, 119:8, 120:20
**11:15** [2] - 84:13, 84:17
**11:30** [1] - 99:23
**11:34** [1] - 98:13
**11:55** [1] - 110:3
**11th** [3] - 165:9, 185:9, 185:19
**12** [2] - 12:25, 77:9
**12-pound** [1] - 36:7
**12:00** [2] - 99:16, 99:18
**12:20** [1] - 30:8
**12:44** [1] - 110:5
**12:45** [4] - 100:19, 101:12, 109:23, 110:11
**12:57** [2] - 118:20, 118:23
**13** [4] - 18:23, 71:23,

72:13, 111:14
**14** [1] - 67:19
**140** [1] - 2:8
**15** [11] - 12:6, 97:1, 97:6, 98:4, 183:7, 183:8, 183:24, 184:1, 184:11, 184:13, 186:6
**150** [1] - 2:10
**16** [1] - 165:7
**164** [1] - 2:11
**175,180** [1] - 2:11
**179** [1] - 2:12
**18** [2] - 68:10, 112:13
**19** [1] - 136:10
**19-plus** [1] - 138:2
**1986** [1] - 11:14
**1992** [1] - 12:7
**19th** [1] - 64:21
**1:00** [5] - 99:10, 99:16, 99:22, 100:8, 100:19
**1:07** [2] - 30:9, 60:22
**1:28** [2] - 140:10, 140:13
**1:35** [1] - 145:5
**1:40** [1] - 149:11
**1st** [3] - 155:7, 155:24, 166:25

**2**

**20** [2] - 77:5, 182:11
**20,000** [1] - 85:20
**2013** [2] - 151:5, 151:9
**2014** [1] - 19:3
**2021** [1] - 18:20
**2024** [4] - 30:8, 64:22, 96:24, 126:2
**2025** [13] - 54:5, 63:3, 63:9, 63:20, 68:11, 83:19, 119:14, 120:11, 120:17, 155:7, 155:24, 165:9, 165:11
**20th** [2] - 164:16, 165:11
**21** [3] - 71:22, 72:13, 72:25
**22** [1] - 132:17
**23** [6] - 132:3, 132:5, 132:7, 132:9, 132:15, 132:19
**24** [7] - 30:8, 72:25, 125:16, 125:20, 125:22, 126:2, 132:14
**24-21213** [1] - 3:3
**24/7** [1] - 160:3
**24th** [2] - 126:15, 132:3
**25** [1] - 185:25
**26** [2] - 21:17, 126:21
**26th** [2] - 14:4, 166:4
**28** [3] - 54:2, 125:20, 132:9
**28th** [5] - 8:15, 53:18,

54:5, 165:15, 167:6
**29** [1] - 165:4
**2:09** [3] - 148:22, 148:25, 149:9
**2:10** [4] - 30:11, 60:23, 82:21, 148:25
**2:11** [1] - 148:25
**2:18** [1] - 149:12
**2:19** [2] - 149:18, 150:1
**2:43** [2] - 164:1, 164:4
**2:45** [3] - 5:2, 101:4, 101:9
**2:57** [1] - 175:4
**2:58** [1] - 175:7

**3**

**30** [9] - 16:24, 90:21, 138:16, 138:22, 138:23, 138:25, 139:20, 139:22, 140:1
**30-seconds** [1] - 9:11
**30-something** [1] - 85:17
**32** [3] - 12:11, 13:16, 17:17
**34** [1] - 12:14
**35** [1] - 86:4
**36** [1] - 167:17
**3:00** [1] - 105:6
**3:02** [1] - 178:1
**3:15** [2] - 5:2, 101:4
**3:16** [1] - 186:15
**3rd** [3] - 168:17, 169:11, 169:18
**3x** [1] - 102:2

**4**

**4** [1] - 18:23
**42** [2] - 186:4, 186:5
**49** [3] - 63:17, 67:19, 68:6
**4:00** [6] - 30:23, 60:23, 117:2, 117:12, 120:20, 143:5
**4:10** [2] - 30:12, 60:25
**4:40** [27] - 30:13, 30:18, 40:6, 42:5, 42:14, 43:15, 61:4, 61:9, 61:13, 62:3, 62:10, 63:24, 64:19, 65:11, 65:24, 66:4, 67:17, 67:22, 82:22, 117:9, 119:8, 121:1, 121:12, 121:21, 125:17, 126:2, 126:15
**4th** [8] - 63:3, 63:9, 63:20, 68:10, 83:19, 84:7, 169:10, 169:17

**5**

**5** [21] - 63:18, 63:21, 121:10, 127:1, 128:6, 128:7, 128:9, 128:10, 128:13, 128:20, 128:23, 128:24, 129:1, 129:2, 133:6, 133:12, 133:13, 142:24
**50** [7] - 49:18, 77:5, 78:8, 152:24, 185:13, 185:22, 186:3
**59** [1] - 2:5
**5:00** [16] - 117:15, 117:25, 121:21, 122:13, 122:16, 122:21, 123:9, 125:9, 133:19, 134:1, 134:13, 134:17, 136:15, 144:4, 147:25, 148:8
**5th** [1] - 170:11

**6**

**6** [3] - 83:16, 162:19, 162:20
**60** [3] - 64:22, 65:5, 162:20
**6th** [5] - 52:4, 54:8, 55:6, 55:7, 56:4

**7**

**75** [2] - 152:24, 186:5
**75-page** [2] - 185:14, 185:22

**8**

**8** [1] - 139:17
**82** [1] - 120:12
**83** [1] - 83:13
**84** [1] - 2:5
**8:43** [2] - 52:2, 56:4
**8th** [4] - 55:20, 119:14, 120:11, 120:16

**9**

**9** [2] - 120:17, 184:14
**90** [2] - 138:17, 139:1
**93** [2] - 121:4, 121:9
**9:00** [5] - 29:25, 30:20, 30:23, 60:13, 99:18
**9:05** [1] - 34:11
**9:12** [1] - 30:4
**9:14** [1] - 55:8
**9:16** [1] - 5:17
**9:21** [2] - 5:18, 55:17
**9:27** [2] - 10:10, 10:17

**A**

**A-N-K-Y-L-O-S-E-D** [1] - 43:8
**a.m** [72] - 5:17, 5:18, 10:10, 30:8, 30:9, 30:11, 30:12, 30:13, 30:18, 30:23, 42:5, 42:14, 43:15, 52:2, 55:8, 55:17, 55:20, 60:22, 60:23, 60:25, 61:4, 61:9, 61:13, 62:3, 62:11, 63:24, 64:19, 65:11, 65:24, 66:4, 67:17, 67:23, 82:21, 82:22, 110:3, 117:9, 117:12, 117:25, 119:8, 120:20, 121:1, 121:12, 121:21, 122:17, 122:21, 123:10, 125:9, 125:17, 126:2, 132:3, 132:16, 132:18, 132:23, 133:4, 133:19, 134:1, 134:4, 134:17, 137:1, 143:5, 143:6, 143:18, 143:22, 143:23, 144:4, 144:7, 147:25, 148:8
**Aaron** [1] - 154:14
**Abdulrahman** [1] - 154:9
**ability** [7] - 20:22, 20:24, 93:10, 94:25, 106:25, 107:18, 108:9
**able** [33] - 3:8, 3:19, 3:23, 15:19, 15:23, 26:5, 26:7, 27:13, 35:18, 38:13, 62:6, 76:8, 76:11, 90:2, 99:25, 106:12, 106:16, 106:17, 107:24, 127:18, 156:1, 156:14, 156:16, 158:1, 158:24, 160:8, 161:19, 161:25, 166:15, 166:22, 171:1, 181:24, 182:22
**abnormal** [1] - 82:6
**absence** [7] - 103:6, 105:20, 105:22, 105:25, 106:12, 106:18, 107:5
**absent** [1] - 127:1
**absolutely** [22] - 13:19, 17:22, 17:25, 20:21, 41:9, 67:11, 68:19, 88:5, 88:19, 112:18, 112:23, 115:23, 116:11, 116:14, 118:7, 118:13, 118:15, 119:21, 123:11, 140:20, 140:24, 141:3
**abundance** [3] - 146:18, 147:7, 148:4
**abundantly** [1] - 134:21
**Academy** [2] - 151:9, 153:10
**accepted** [4] - 11:22, 17:21, 17:23, 46:17

**KEYWORD INDEX**

Case 1:24-cv-21213-KMW   Document 161   Entered on FLSD Docket 06/24/2025   Page 189 of 210

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

189

**access** [3] - 93:1, 151:15, 166:22
**accessible** [1] - 159:24
**according** [4] - 65:15, 76:22, 95:3, 167:4
**accordingly** [1] - 163:3
**account** [1] - 90:25
**accredited** [1] - 12:21
**accumulate** [3] - 74:16, 74:19, 75:1
**accumulates** [2] - 74:7, 74:20
**accurate** [4] - 3:18, 8:17, 38:20, 93:9
**accurately** [1] - 88:18
**ace** [1] - 107:16
**acknowledge** [1] - 97:25
**acknowledged** [3] - 122:4, 122:5, 122:10
**action** [2] - 73:9, 122:21
**actions** [2] - 64:14, 148:12
**active** [2] - 122:1, 122:9
**actively** [3] - 82:3, 121:25, 122:6
**actual** [10] - 24:14, 25:3, 25:6, 51:7, 51:8, 78:19, 141:14, 162:9, 181:21, 185:16
**acute** [3] - 47:23, 48:1, 81:3
**added** [1] - 32:1
**addition** [4] - 24:11, 114:23, 159:1, 159:17
**additional** [15] - 3:19, 4:24, 5:6, 12:3, 15:15, 15:25, 23:7, 36:16, 84:14, 91:7, 99:12, 104:13, 112:5, 145:19, 181:18
**additionally** [1] - 13:25
**address** [6] - 7:23, 134:18, 135:19, 145:13, 145:14, 159:9
**addressed** [3] - 56:5, 64:6, 135:20
**adequate** [3] - 3:15, 3:17, 103:23
**adherent** [1] - 70:5
**adhesive** [1] - 35:20
**adjourned** [1] - 186:15
**adjust** [1] - 101:13
**adjustment** [1] - 89:6
**administration** [1] - 161:15
**administrative** [2] - 181:15, 184:3
**admission** [1] - 177:1
**admit** [1] - 32:22
**ADMITTED** [1] - 2:16
**admitted** [2] - 24:14,

33:10
**advance** [2] - 52:11, 55:11
**advanced** [2] - 151:12, 178:15
**advancement** [1] - 143:6
**adventitious** [1] - 87:15
**advised** [3] - 51:3, 57:1, 165:14
**affect** [1] - 21:25
**affected** [1] - 27:8
**affirm** [1] - 175:1
**afternoon** [6] - 100:24, 109:14, 119:5, 119:6, 164:10, 164:11
**agencies** [1] - 5:5
**ago** [7] - 9:14, 25:17, 60:7, 60:15, 77:7, 185:8
**agonizing** [1] - 74:22
**agree** [47] - 60:6, 60:8, 60:11, 60:18, 61:2, 61:8, 61:12, 62:8, 63:23, 64:9, 66:15, 66:19, 69:17, 71:7, 73:2, 73:5, 74:3, 74:6, 75:15, 75:20, 75:23, 77:23, 78:13, 79:12, 81:7, 81:16, 81:25, 83:4, 84:7, 97:22, 119:7, 121:1, 121:3, 121:11, 131:16, 133:4, 138:19, 139:18, 164:15, 165:19, 169:19, 170:15, 170:20, 171:3, 172:3, 173:7, 183:13
**agreed** [8] - 61:7, 65:25, 76:5, 78:24, 120:22, 128:13, 133:23, 167:5
**agreement** [2] - 105:14, 135:20
**ahead** [2] - 84:18, 175:7
**Aid** [2] - 11:16, 11:22
**aimed** [1] - 33:25
**al** [1] - 105:9
**ALEXANDER** [2] - 2:4, 10:19
**Alexander** [5] - 10:14, 171:19, 171:21, 172:10, 173:4
**aligned** [1] - 36:19
**alignment** [1] - 35:3
**alive** [1] - 83:7
**Allan** [2] - 42:15, 78:20
**alleged** [1] - 76:17
**allocated** [1] - 99:19
**allow** [7] - 28:13, 38:7, 75:8, 127:13, 139:20, 143:4
**allowed** [3] - 43:19, 49:8, 183:20
**allows** [2] - 35:17, 36:7
**almost** [3] - 49:16, 69:11,

141:13
**alter** [2] - 24:24, 25:18
**alternative** [2] - 48:12, 48:22
**alternatives** [1] - 3:17
**Alto** [1] - 14:15
**Amaro** [1] - 154:9
**ambush** [2] - 92:15, 93:4
**ambushed** [1] - 21:1
**ameliorate** [1] - 21:25
**American** [2] - 151:11, 151:12
**Amin** [1] - 154:10
**Amosu** [1] - 154:8
**amount** [5] - 103:23, 152:12, 161:3, 162:7, 163:2
**amounts** [1] - 159:4
**amplify** [1] - 94:20
**analogous** [1] - 182:5
**analogy** [4] - 43:9, 43:12, 43:15, 82:14
**analyses** [1] - 37:3
**analysis** [1] - 81:17
**anatomic** [1] - 38:16
**anatomically** [1] - 74:25
**anatomy** [6] - 15:5, 36:14, 74:9, 75:18, 75:22, 77:12
**ancillary** [2] - 106:3, 107:20
**Andrew** [4] - 14:16, 70:22, 73:19, 154:14
**anecdote** [3] - 185:6, 185:7, 186:6
**animated** [1] - 80:6
**ankylosed** [1] - 43:8
**ankylosis** [3] - 75:6, 75:7, 75:10
**ANSWER** [17] - 68:17, 72:18, 73:4, 77:16, 77:22, 83:22, 83:24, 120:21, 120:23, 121:15, 139:22, 140:3, 165:12, 165:16, 167:23, 168:2, 168:9
**answer** [15] - 26:23, 27:7, 41:20, 47:5, 47:7, 64:2, 66:7, 69:16, 74:8, 98:24, 121:16, 127:13, 139:17, 140:5, 176:15
**answered** [1] - 168:11
**answering** [2] - 65:2, 180:22
**answers** [1] - 119:20
**anticipate** [1] - 22:5
**anticipated** [2] - 5:21, 32:11
**anticoagulants** [1] - 75:24
**anyway** [2] - 109:16,

183:16
**apologies** [4] - 5:9, 53:25, 72:10, 148:5
**apologize** [6] - 55:1, 99:20, 100:11, 106:20, 153:18, 185:4
**Appeals** [2] - 185:10, 185:19
**appear** [1] - 51:9
**appearance** [2] - 4:3, 75:13
**appearing** [1] - 104:18
**applicable** [2] - 114:8, 115:19
**applied** [5] - 11:21, 17:13, 138:11, 144:25, 162:19
**apply** [5] - 28:4, 97:13, 116:2, 144:17, 163:20
**applying** [1] - 46:21
**appointments** [1] - 160:7
**appreciate** [6] - 9:18, 27:17, 38:13, 66:7, 99:5, 179:17
**appreciated** [1] - 55:18
**approach** [17] - 18:6, 18:9, 18:11, 33:13, 39:11, 50:3, 62:24, 92:14, 120:4, 124:14, 147:22, 153:21, 164:24, 169:2, 169:22, 172:22
**appropriate** [9] - 34:16, 34:18, 34:23, 39:14, 40:22, 41:10, 55:13, 90:3, 174:4
**appropriately** [1] - 141:19
**approximate** [1] - 162:18
**approximation** [1] - 152:21
**April** [11] - 63:3, 63:9, 63:20, 68:10, 83:19, 84:7, 119:14, 120:10, 120:16, 139:17, 165:9
**area** [7] - 14:7, 76:17, 147:6, 155:9, 161:9, 162:1
**argue** [8] - 6:21, 21:18, 38:18, 89:20, 112:4, 121:15, 138:23, 143:10
**argued** [1] - 148:16
**arguing** [1] - 148:14
**argument** [8] - 38:9, 39:25, 41:18, 89:25, 102:21, 103:25, 106:11, 107:9
**arguments** [4] - 24:16, 103:4, 107:10, 107:20
**arise** [1] - 17:7
**arises** [1] - 107:14
**arm** [5] - 30:11, 131:22,

131:23, 134:8, 134:13
**ARNP** [1] - 154:3
**ARONFELD** [147] - 4:5, 6:3, 6:16, 7:2, 7:11, 8:25, 9:4, 9:7, 9:18, 9:21, 9:24, 10:3, 10:6, 10:8, 10:18, 10:23, 13:8, 13:10, 13:12, 13:13, 15:9, 16:3, 21:7, 22:4, 23:13, 24:19, 24:20, 25:9, 25:11, 25:13, 27:4, 28:3, 28:6, 28:11, 28:18, 28:19, 28:24, 29:1, 29:5, 29:19, 32:18, 33:13, 33:16, 35:6, 35:8, 40:4, 40:14, 40:16, 40:19, 40:21, 41:13, 41:15, 41:23, 44:13, 45:5, 45:14, 46:12, 46:13, 49:10, 50:7, 73:22, 73:25, 84:16, 84:20, 85:13, 86:21, 86:25, 87:3, 87:17, 90:6, 91:16, 92:10, 92:14, 92:17, 92:20, 93:14, 93:17, 93:18, 95:5, 95:7, 95:22, 96:6, 96:13, 96:14, 98:10, 99:9, 99:14, 99:20, 100:2, 100:11, 100:15, 100:21, 100:25, 101:6, 101:10, 101:15, 103:21, 104:3, 105:6, 105:8, 106:19, 108:15, 109:17, 109:20, 109:25, 110:9, 110:22, 111:2, 111:20, 113:9, 113:10, 118:17, 130:7, 130:10, 135:2, 135:5, 140:12, 140:15, 141:24, 142:2, 145:3, 145:12, 146:5, 146:9, 148:21, 148:24, 149:2, 149:5, 149:7, 149:15, 150:3, 150:8, 150:16, 150:21, 153:21, 163:24, 173:24, 174:2, 175:6, 175:9, 177:3, 177:23, 180:13, 181:2, 181:9, 184:20, 186:11
**Aronfeld** [43] - 2:4, 2:5, 2:7, 2:8, 2:10, 2:11, 4:6, 8:19, 8:24, 10:17, 10:25, 15:1, 21:6, 21:23, 24:9, 24:25, 27:2, 27:11, 28:21, 32:16, 33:11, 39:10, 40:12, 57:13, 84:14, 91:14, 94:16, 102:19, 103:18, 105:3, 107:4, 107:16, 107:25, 109:11, 110:21, 140:11, 149:14, 150:1, 150:19, 175:5, 179:22, 180:25, 183:9
**Aronfeld's** [2] - 57:20, 93:12

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

**arose** [2] - 61:4, 61:25
**arrival** [1] - 101:14
**arrive** [2] - 96:17, 105:5
**arrived** [1] - 34:12
**arteries** [2] - 48:3, 48:7
**Arthur** [1] - 154:13
**article** [2] - 19:22, 19:25
**articles** [5] - 20:18,
21:21, 22:1, 22:8, 23:6
**articulate** [3] - 35:12,
75:9, 87:5
**ASAP** [3] - 55:18, 55:21,
59:2
**ASIA** [1] - 42:16
**aside** [5] - 11:10, 66:5,
111:8, 150:17, 150:25
**asleep** [3] - 65:13, 68:21,
82:4
**aspect** [2] - 143:13
**aspects** [3] - 102:21,
104:10, 107:19
**Aspen** [1] - 33:25
**aspirational** [1] - 184:12
**assert** [1] - 14:19
**asserted** [1] - 21:3
**asserting** [1] - 108:21
**assertions** [1] - 32:2
**assess** [1] - 112:22
**assessment** [5] - 16:14,
17:2, 97:5, 115:14, 157:24
**assessments** [3] - 60:20,
60:22, 64:19
**assignment** [1] - 184:5
**assignments** [1] -
181:16
**assist** [1] - 33:1
**assistant** [2] - 52:8,
151:14
**assisting** [1] - 156:13
**associate** [2] - 14:14,
112:11
**Associates** [2] - 154:2,
154:5
**Association** [2] - 151:11,
151:13
**assume** [2] - 123:16,
137:19
**assumed** [2] - 51:23,
111:16
**assuming** [1] - 183:2
**assumptions** [1] -
129:14
**assure** [2] - 6:17, 101:23
**assured** [1] - 101:23
**asterisk** [1] - 126:24
**Atlanta** [7] - 14:7, 80:17,
154:2, 154:3, 155:20,
161:8, 162:1
**attach** [1] - 51:7

**attached** [1] - 23:19
**attachments** [1] - 24:12
**attack** [1] - 108:5
**attacks** [1] - 108:6
**attained** [1] - 12:19
**attempt** [1] - 156:10
**attendant** [3] - 156:3,
177:14, 177:16
**attended** [1] - 111:10
**attention** [9] - 16:5, 16:6,
63:17, 68:9, 71:23,
120:12, 121:10, 125:25,
150:22
**attorney** [1] - 51:19
**Attorney's** [1] - 185:8
**attorneys** [2] - 173:15,
174:19
**attributed** [3] - 156:7,
184:15, 184:16
**audio** [3] - 3:6, 3:15,
24:25
**author** [6] - 136:14,
136:18, 137:8, 137:19,
137:21
**authored** [2] - 18:14,
177:4
**authorities** [1] - 22:23
**authority** [1] - 20:22
**authors** [3] - 133:22,
134:23, 137:14
**available** [4] - 16:15,
17:4, 162:3, 164:19
**average** [1] - 135:11
**Aviana** [1] - 154:19
**avoid** [4] - 41:18, 55:22,
102:4, 177:12
**aware** [8] - 15:9, 28:8,
73:24, 90:1, 91:8, 104:7,
114:9, 142:11

## B

**bachelor's** [2] - 151:6,
178:18
**background** [4] - 11:9,
111:8, 150:12, 151:1
**backup** [1] - 159:22
**backward** [1] - 37:18
**backwards** [1] - 68:22
**bad** [1] - 184:21
**bag** [2] - 36:24, 158:22
**balance** [1] - 151:13
**ball** [1] - 104:20
**Baltimore** [1] - 11:13
**bamboo** [1] - 75:13
**bamboo-like** [1] - 75:13
**base** [1] - 161:10
**based** [31] - 14:23, 15:8,
15:25, 17:3, 17:4, 26:6,
31:19, 37:10, 40:22,

42:22, 43:3, 46:25, 47:24,
49:21, 86:3, 91:24, 96:25,
98:20, 108:13, 114:11,
116:6, 118:2, 131:11,
133:14, 134:22, 144:9,
144:10, 155:21, 158:3,
175:23
**baseline** [1] - 127:7
**basic** [1] - 94:16
**basis** [19] - 18:2, 26:8,
26:15, 30:23, 49:24, 85:6,
86:17, 97:12, 98:6,
105:13, 105:19, 106:16,
112:20, 114:6, 115:23,
148:1, 160:2, 161:6
**Bay** [12] - 6:8, 14:2,
50:17, 50:18, 50:22, 51:4,
54:7, 54:16, 56:13, 56:17,
58:22, 154:5
**Beach** [2] - 58:9, 58:16
**bear** [7] - 22:12, 84:13,
87:7, 91:14, 124:4, 132:9,
139:11
**bearing** [1] - 91:10
**became** [3] - 11:16,
68:12, 123:9
**become** [6] - 6:4, 48:13,
66:25, 68:13, 82:1, 112:2
**becomes** [1] - 43:21
**becoming** [3] - 42:25,
45:17, 46:16
**bed** [7] - 61:9, 61:14,
84:22, 85:8, 86:5, 86:10,
160:1
**beds** [2] - 85:15, 85:19
**bedside** [2] - 135:9,
135:24
**Beeharry** [1] - 18:18
**beforehand** [1] - 77:9
**began** [2] - 11:23, 155:20
**begin** [2] - 59:10, 109:24
**begins** [1] - 132:3
**behalf** [7] - 4:11, 4:13,
4:16, 10:20, 106:1,
110:24, 150:5
**BEHARRY** [1] - 18:18
**beheaded** [2] - 36:1,
69:12
**behind** [2] - 146:15,
177:8
**Behm** [1] - 154:8
**beings** [1] - 33:4
**believer** [1] - 5:12
**believes** [1] - 103:2
**below** [8] - 36:19, 97:6,
113:14, 113:21, 116:14,
118:4, 141:15, 141:19
**bench** [2] - 5:7, 22:6
**bend** [1] - 75:9
**benefit** [2] - 138:18

**best** [6] - 5:14, 43:12,
43:16, 104:4, 162:11,
163:5
**bet** [2] - 140:3, 150:23
**better** [7] - 6:17, 10:4,
83:8, 97:19, 109:18,
184:7, 186:4
**between** [25] - 7:6,
30:23, 35:20, 35:23, 36:6,
37:19, 37:22, 42:8, 49:12,
61:8, 61:12, 63:23, 65:10,
65:23, 66:3, 91:21,
102:24, 106:10, 107:15,
111:23, 119:8, 120:20,
135:13, 152:24, 170:4
**beyond** [10] - 39:2,
39:22, 41:11, 49:1, 96:4,
112:6, 119:25, 136:15,
139:24, 141:22
**bifurcated** [1] - 183:1
**big** [1] - 5:12
**bigger** [1] - 57:23
**bill** [2] - 67:5, 67:6
**billions** [1] - 161:19
**biomechanics** [1] - 85:9
**bird** [1] - 100:3
**bit** [14] - 51:15, 54:1,
58:2, 95:17, 106:4,
109:15, 112:1, 122:3,
181:14, 183:5, 183:6,
184:7, 184:8
**bizarre** [1] - 112:1
**bladder** [6] - 158:11,
158:13, 158:14, 158:15,
159:10, 160:10
**bleeding** [3] - 74:4, 74:7,
76:1
**bless** [1] - 13:2
**blessed** [1] - 48:20
**blood** [3] - 34:20, 47:10,
95:12
**board** [29] - 12:8, 12:10,
12:16, 12:18, 13:3, 13:4,
13:14, 13:17, 16:23,
29:21, 34:4, 40:23, 66:25,
85:18, 86:5, 88:16, 90:20,
90:23, 111:5, 111:6,
117:3, 118:3, 123:24,
141:11, 146:15, 151:10,
152:4, 152:6, 155:11
**bodies** [1] - 75:9
**body** [6] - 30:6, 35:17,
36:17, 77:12, 96:20, 117:8
**bolsters** [1] - 102:20
**bone** [9] - 35:20, 36:17,
36:18, 36:19, 75:12,
144:24, 159:11
**bones** [3] - 35:11, 35:13,
75:7
**bony** [1] - 36:5

**book** [1] - 18:16
**bottom** [2] - 132:15,
134:5
**bought** [1] - 92:2
**bound** [1] - 159:25
**bowel** [3] - 158:11,
158:20, 158:22
**bowels** [1] - 158:19
**boxed** [1] - 28:14
**Boyd** [1] - 154:13
**bracket** [1] - 55:10
**Bradley** [1] - 12:4
**brain** [2] - 11:4, 35:17
**break** [4] - 5:2, 99:16,
100:23, 124:24
**breaking** [1] - 101:4
**brief** [13] - 22:20, 104:22,
105:10, 105:16, 185:6,
185:9, 185:14, 185:15,
185:16, 185:21, 185:22,
186:1, 186:4
**briefing** [2] - 181:20,
183:14
**briefly** [6] - 11:8, 11:9,
12:15, 29:20, 95:5, 145:15
**Bright** [1] - 154:3
**bring** [14] - 7:1, 7:3,
15:19, 15:24, 16:1, 33:2,
33:21, 89:2, 104:11,
104:24, 106:7, 107:7,
109:12, 109:16
**bringing** [2] - 8:21, 26:10
**brittle** [1] - 75:13
**broken** [5] - 35:25,
68:13, 69:12, 144:18,
144:24
**brought** [8] - 30:2, 70:4,
93:11, 99:18, 146:21,
179:6, 181:1, 183:19
**building** [2] - 4:21, 92:2
**Building** [2] - 4:22
**burden** [2] - 21:10,
106:16
**business** [1] - 54:9
**busy** [3] - 5:11, 135:10
**BY** [67] - 10:23, 13:13,
16:3, 24:20, 25:13, 28:19,
29:19, 33:16, 40:4, 40:16,
40:21, 41:13, 41:23,
44:13, 45:5, 45:14, 46:13,
49:10, 59:24, 63:1, 63:8,
71:2, 71:19, 72:12, 74:1,
77:15, 79:11, 81:14,
84:20, 85:13, 86:21,
87:17, 90:6, 92:10, 93:18,
95:22, 96:14, 111:2,
111:20, 113:10, 119:4,
120:8, 123:15, 124:11,
125:6, 125:24, 126:23,
131:6, 132:21, 135:3,

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

191

136:20, 139:15, 140:15, 142:2, 150:8, 150:16, 150:24, 164:9, 165:3, 169:5, 170:1, 173:1, 174:16, 175:9, 177:3, 180:1, 180:13

**bye** [1] - 186:14

## C

**C2** [1] - 76:18
**C4** [3] - 35:23, 36:6, 36:17
**C4-5** [1] - 76:4
**C4-C5** [1] - 70:3
**C5** [3] - 35:23, 36:6, 36:17
**calculate** [1] - 162:9
**calculation** [1] - 104:1
**California** [2] - 19:7, 19:8
**camera** [1] - 69:5
**canal** [9] - 35:15, 74:4, 74:5, 74:7, 74:10, 74:12, 74:15, 95:10, 95:12
**cancel** [1] - 105:2
**Cancer** [1] - 11:19
**Cannon** [1] - 154:16
**cannot** [16] - 51:5, 69:3, 76:7, 83:5, 83:7, 92:5, 109:4, 126:10, 126:17, 127:15, 128:1, 132:24, 133:9, 134:9, 138:3
**capable** [7] - 65:2, 133:11, 138:13, 138:21, 140:1, 166:14, 180:22
**car** [2] - 182:6, 182:7
**care** [119] - 44:8, 47:12, 73:6, 83:11, 83:21, 89:3, 99:5, 101:18, 101:19, 102:18, 102:22, 103:2, 105:21, 106:2, 109:2, 113:7, 113:15, 113:19, 116:15, 118:4, 118:8, 134:20, 135:23, 141:16, 141:19, 145:10, 145:11, 148:24, 149:3, 150:10, 150:12, 151:2, 151:8, 151:18, 151:19, 151:21, 151:22, 152:2, 152:6, 152:7, 152:17, 152:19, 152:22, 153:1, 153:8, 153:15, 154:23, 155:20, 155:25, 156:2, 156:3, 156:4, 156:5, 156:7, 157:9, 157:10, 157:13, 157:14, 157:16, 157:24, 158:9, 159:2, 159:4, 159:5, 160:1, 160:3, 160:16, 160:19, 160:24, 161:8, 161:11, 162:3,

162:4, 162:5, 162:7, 162:15, 162:18, 163:21, 167:13, 167:20, 167:23, 168:1, 168:6, 168:13, 168:16, 168:21, 169:8, 169:9, 169:20, 171:14, 171:20, 176:1, 176:2, 176:5, 176:10, 176:13, 176:14, 176:16, 176:17, 176:22, 176:23, 177:4, 177:7, 177:10, 177:14, 177:16, 177:21, 179:2, 179:19, 180:16, 181:4, 186:14
**Care** [10] - 149:24, 151:6, 151:10, 152:5, 152:8, 152:9, 153:2, 153:11, 163:14, 175:24
**career** [1] - 111:13
**careful** [1] - 69:24
**carefully** [1] - 69:21
**Carnival** [16] - 3:2, 4:12, 4:14, 4:16, 7:4, 13:23, 29:22, 34:4, 43:22, 87:19, 93:22, 94:8, 125:10, 136:24, 154:4, 158:7
**Carnival's** [3] - 40:24, 90:11, 90:15
**carried** [1] - 78:19
**carries** [1] - 132:19
**carrying** [1] - 26:14
**Case** [1] - 3:3
**case** [81] - 8:10, 13:20, 15:2, 16:10, 18:3, 21:11, 25:19, 27:12, 30:24, 35:22, 45:1, 49:20, 54:25, 55:14, 61:6, 62:2, 63:2, 65:20, 66:10, 66:14, 67:14, 67:16, 68:17, 69:3, 71:11, 72:17, 76:22, 82:17, 83:24, 89:18, 90:10, 90:17, 93:25, 97:12, 102:15, 114:14, 116:3, 119:11, 120:10, 121:12, 121:19, 125:8, 129:23, 130:4, 130:12, 131:2, 135:25, 136:11, 138:2, 141:10, 144:24, 152:10, 153:13, 155:3, 155:4, 157:8, 157:15, 158:21, 164:13, 164:15, 165:11, 166:18, 167:9, 167:13, 167:20, 168:17, 169:8, 170:3, 170:20, 170:23, 171:10, 173:15, 173:19, 173:22, 174:19, 174:25, 175:11, 175:13, 177:13, 183:12
**case-by-case** [1] - 97:12
**cases** [4] - 16:25,

112:22, 156:25, 179:10
**catastrophic** [1] - 151:23
**catch** [1] - 101:6
**category** [1] - 156:5
**catheter** [2] - 158:16, 158:17
**catheterization** [1] - 158:16
**caught** [1] - 54:24
**causation** [3] - 44:8, 90:16, 113:3
**caused** [17] - 17:7, 42:24, 43:5, 45:17, 46:15, 47:14, 48:2, 82:11, 82:25, 83:1, 87:4, 94:1, 116:10, 117:21, 118:12, 142:9, 144:12
**causes** [10] - 37:18, 45:21, 45:25, 46:1, 47:25, 48:10, 48:12, 48:22, 48:25, 49:5
**causing** [1] - 17:8
**caution** [3] - 146:18, 147:7, 148:4
**ceiling** [1] - 117:20
**Center** [3] - 11:18, 11:19, 153:25
**center** [8] - 30:3, 60:20, 61:10, 64:8, 64:14, 66:2, 133:17
**centered** [1] - 103:5
**Central** [2] - 157:21, 157:22
**central** [1] - 74:10
**certain** [11] - 5:23, 50:14, 101:7, 107:19, 150:18, 152:12, 152:25, 168:2, 168:9, 169:21, 181:17
**certainly** [4] - 8:21, 12:22, 97:25, 107:10
**certainty** [4] - 17:12, 43:4, 49:12, 49:15
**certification** [1] - 152:10
**Certification** [1] - 151:8
**certified** [29] - 8:9, 12:8, 12:10, 12:16, 12:18, 13:3, 13:5, 13:14, 13:17, 16:24, 40:23, 66:25, 85:18, 86:5, 88:16, 90:21, 111:5, 111:6, 118:3, 151:8, 151:10, 151:13, 151:14, 152:6, 152:7, 155:11, 170:16, 170:21, 171:5
**Certified** [8] - 149:23, 151:6, 152:4, 152:8, 152:9, 153:2, 163:14, 175:24
**cervical** [81] - 13:18, 19:13, 20:2, 20:4, 20:5, 33:18, 34:1, 34:14, 34:17,

34:24, 35:9, 35:10, 35:11, 35:13, 35:15, 35:21, 40:13, 40:25, 41:4, 41:8, 42:11, 42:17, 43:4, 43:10, 44:15, 45:11, 46:15, 47:23, 49:6, 49:9, 60:8, 66:6, 68:2, 68:5, 69:11, 70:2, 77:1, 77:18, 77:24, 78:1, 78:5, 78:6, 78:7, 78:14, 78:15, 78:20, 78:22, 79:13, 79:14, 79:17, 79:18, 80:7, 80:15, 80:18, 80:20, 80:24, 80:25, 81:5, 81:8, 81:16, 82:7, 82:9, 87:21, 87:23, 88:2, 93:25, 112:16, 112:22, 113:15, 116:9, 116:12, 116:20, 138:10, 138:11, 138:14, 138:20, 139:2, 140:4, 142:9, 160:25
**Cervical** [4] - 18:13, 18:21, 19:2, 20:10
**chain** [3] - 91:23, 92:1, 92:6
**chairman** [1] - 12:4
**challenge** [15] - 27:22, 102:17, 104:6, 104:8, 104:10, 104:14, 105:15, 105:19, 107:19, 107:21, 108:5, 108:18, 108:22, 109:2, 113:2
**challenged** [2] - 21:10, 22:22
**challenges** [2] - 104:14, 108:7
**challenging** [2] - 44:7, 148:2
**chambers** [1] - 184:6
**chance** [1] - 105:16
**change** [5] - 24:24, 25:19, 175:18, 176:10, 182:10
**changes** [5] - 137:3, 142:22, 143:3, 170:14, 175:20
**chapter** [1] - 19:11
**charge** [1] - 161:25
**charges** [2] - 161:14, 161:23
**chart** [20] - 123:16, 123:21, 124:2, 124:12, 125:10, 125:16, 126:6, 129:4, 132:4, 135:12, 135:19, 136:9, 136:13, 136:25, 137:12, 138:1, 138:5, 138:9, 141:11, 144:1
**charts** [2] - 138:6
**chase** [1] - 107:13

**check** [2] - 8:17, 62:5
**checked** [2] - 9:1, 57:2
**chest** [1] - 117:20
**Chicago** [1] - 14:17
**chief** [3] - 11:24, 12:1, 19:10
**children** [1] - 178:4
**chin** [1] - 117:19
**choose** [1] - 138:8
**chose** [2] - 45:23, 166:18
**Christina** [1] - 154:19
**Christopher** [1] - 18:16
**chronological** [1] - 138:7
**chronologically** [1] - 137:23
**Circuit** [2] - 185:9, 185:19
**circumstance** [1] - 140:1
**City** [2] - 11:14, 111:10
**civil** [1] - 3:3
**civil** [1] - 3:3
**claim** [1] - 64:22
**claimed** [1] - 64:23
**claiming** [1] - 93:8
**clarification** [4] - 51:16, 74:19, 105:8, 105:17
**clarify** [9] - 74:8, 91:18, 127:9, 127:22, 142:4, 143:15, 143:18, 182:18, 182:21
**clarity** [1] - 148:17
**classes** [1] - 112:5
**classification** [1] - 42:16
**cleaned** [1] - 106:4
**clear** [26] - 17:19, 18:1, 27:25, 28:3, 32:19, 39:13, 51:17, 54:4, 105:16, 106:21, 112:22, 122:12, 131:11, 131:13, 134:21, 135:20, 135:25, 137:1, 137:4, 137:5, 142:21, 143:5, 157:25, 158:25, 183:2, 183:14
**clearance** [2] - 30:4, 87:22
**cleared** [1] - 108:1
**clearly** [10] - 82:20, 98:3, 103:5, 117:18, 131:24, 136:4, 136:6, 142:24, 146:23, 148:15
**clients** [1] - 173:22
**clinic** [1] - 98:22
**clinical** [22] - 12:7, 16:25, 20:11, 31:24, 64:13, 67:3, 88:20, 88:23, 90:19, 112:15, 114:6, 114:7, 114:16, 115:20, 115:21, 116:23, 125:7, 129:7, 138:24, 140:16, 157:24
**Clinical** [3] - 19:2, 19:21,

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

192

20:12

**clinically** [3] - 67:3, 89:8, 144:14

**clock** [1] - 160:4

**closed** [2] - 54:11, 126:18

**closer** [1] - 7:16

**CM/ECF** [3] - 24:12, 33:7, 181:17

**CMSdata.gov** [1] - 161:22

**co** [1] - 89:9

**co-specialist** [1] - 89:9

**collaborative** [1] - 89:8

**collar** [72] - 30:2, 30:5, 31:2, 31:4, 31:6, 33:18, 33:23, 33:25, 34:2, 34:3, 34:6, 34:8, 34:10, 34:13, 34:16, 34:25, 36:12, 37:13, 40:6, 40:10, 40:13, 40:17, 40:25, 41:7, 41:24, 41:25, 42:3, 42:19, 42:24, 43:5, 43:11, 43:17, 43:23, 44:16, 45:11, 45:17, 45:21, 46:15, 49:7, 60:8, 60:19, 62:9, 62:23, 66:6, 77:20, 82:11, 82:13, 82:18, 87:21, 87:23, 88:3, 94:1, 113:15, 113:20, 116:9, 116:12, 116:20, 116:25, 117:23, 118:6, 138:11, 138:15, 138:17, 138:20, 139:2, 140:4, 142:9, 143:22, 143:23, 143:24, 144:12

**collars** [4] - 33:22, 33:25, 138:10, 139:19

**colleague** [2] - 124:5, 184:25

**colleagues** [1] - 58:19

**Collins** [1] - 154:14

**colon** [2] - 19:18, 20:12

**colostomy** [1] - 158:22

**column** [8] - 35:4, 35:23, 35:24, 41:7, 69:1, 70:4, 75:8, 76:14

**columns** [3] - 68:3, 68:4, 69:2

**comfortable** [1] - 3:5

**comfortably** [2] - 30:10, 30:12

**coming** [4] - 37:4, 115:2, 160:15, 182:6

**comment** [10] - 28:22, 50:19, 54:19, 75:21, 76:7, 76:9, 101:15, 132:24, 147:16, 185:6

**Commission** [1] - 151:7

**common** [5] - 112:19, 113:18, 140:18, 140:22,

141:7

**commonly** [3] - 22:8, 88:7, 115:24

**commonsense** [1] - 144:23

**communicate** [5] - 35:17, 156:16, 156:20, 158:23, 166:15

**communication** [3] - 56:1, 56:15, 59:16

**communications** [2] - 106:10, 107:8

**Community** [1] - 154:4

**community** [2] - 50:1, 88:7

**comorbidities** [2] - 16:19, 96:21

**comparing** [3] - 137:6, 137:14, 137:16

**compelled** [1] - 109:21

**complaining** [1] - 30:9

**complete** [5] - 27:6, 42:17, 93:19, 123:6, 128:25

**completed** [4] - 4:25, 11:24, 12:21, 30:4

**completely** [6] - 21:1, 38:25, 43:8, 82:7, 108:3, 185:25

**completing** [3] - 11:20, 12:1, 174:3

**compliant** [1] - 185:21

**complications** [2] - 97:3, 177:12

**component** [3] - 89:2, 114:18, 128:3

**compress** [1] - 74:20

**compressed** [1] - 165:21

**compressing** [1] - 47:24

**compression** [2] - 37:19, 47:14

**comprised** [1] - 17:6

**compromised** [1] - 160:12

**computer** [2] - 4:20, 185:11

**computers** [1] - 33:4

**concept** [1] - 114:10

**concepts** [1] - 74:2

**concern** [4] - 47:22, 105:10, 108:12, 147:6

**concerned** [4] - 34:19, 56:17, 57:5, 183:11

**concerning** [3] - 55:6, 108:1, 147:6

**concerns** [2] - 47:21, 108:19

**concluded** [1] - 96:24

**conclusion** [4] - 47:3, 94:20, 96:2, 172:15

**conclusions** [5] - 90:3, 90:11, 91:1, 93:24, 96:17

**concurred** [1] - 98:3

**condition** [21] - 64:13, 97:2, 118:14, 122:17, 129:5, 129:18, 129:24, 130:21, 134:17, 134:22, 136:15, 136:23, 137:9, 137:10, 137:15, 137:17, 137:21, 147:25, 148:8, 148:12, 156:11

**confer** [5] - 93:7, 102:11, 109:17, 155:6, 165:24

**conferral** [1] - 167:10

**conferred** [5] - 38:13, 155:5, 167:21, 168:7, 168:18

**conferring** [2] - 167:14, 168:1

**confined** [1] - 15:6

**confirm** [5] - 20:22, 31:14, 51:2, 53:15, 53:19

**confounders** [1] - 16:20

**connected** [1] - 166:11

**Connecticut** [1] - 33:24

**consensus** [2] - 135:20, 153:3

**consequences** [3] - 22:21, 142:18, 145:2

**consider** [5] - 16:21, 46:7, 96:18, 96:21

**considerably** [1] - 19:14

**consideration** [1] - 177:5

**considered** [8] - 26:5, 45:19, 47:7, 47:14, 47:17, 47:20, 161:16

**considering** [2] - 48:12, 48:22

**consistent** [5] - 117:11, 160:17, 160:19, 160:21, 160:24

**consists** [1] - 114:17

**consult** [2] - 83:9, 84:5

**consultant** [2] - 90:11, 151:15

**consultant's** [1] - 90:15

**consultants** [1] - 73:23

**consulted** [4] - 43:23, 44:2, 44:4, 83:23

**consulting** [1] - 151:25

**contact** [1] - 105:3

**contacting** [1] - 92:21

**contained** [2] - 36:13, 161:8

**content** [1] - 141:13

**contention** [2] - 121:19, 168:17

**contentness** [1] - 108:20

**contested** [1] - 179:14

**context** [2] - 16:21, 95:11

**continue** [13] - 24:18, 26:23, 29:18, 32:8, 33:12, 39:18, 40:3, 41:16, 44:12, 69:16, 73:21, 92:9, 101:13

**continues** [2] - 74:18, 132:14

**continuous** [2] - 12:7, 142:16

**contrary** [1] - 135:17

**contributed** [9] - 42:25, 43:5, 45:17, 46:15, 94:1, 116:10, 118:12, 142:9, 144:13

**contributors** [1] - 17:10

**conversation** [4] - 156:10, 156:23, 158:2, 166:8

**conversations** [3] - 65:19, 98:20, 155:16

**converse** [1] - 156:14

**Cooper** [3] - 51:22, 52:7, 56:6

**copies** [10] - 7:3, 22:4, 22:11, 23:3, 24:11, 50:24, 51:2, 52:8, 56:11, 56:25

**copy** [19] - 6:6, 6:10, 6:12, 19:22, 32:4, 32:9, 32:14, 32:16, 33:3, 54:10, 63:5, 123:16, 124:1, 124:12, 124:15, 146:22, 164:20, 170:3, 172:18

**copying** [1] - 55:12

**Coral** [3] - 112:9, 112:10, 140:16

**Cord** [1] - 19:6

**cord** [52] - 11:5, 16:25, 17:24, 19:10, 19:12, 35:15, 36:3, 36:21, 37:21, 42:16, 43:11, 44:19, 44:23, 47:14, 47:19, 47:24, 47:25, 48:2, 48:4, 48:5, 48:7, 48:18, 49:6, 49:8, 50:4, 68:5, 69:18, 69:20, 69:24, 70:2, 70:9, 74:11, 74:12, 74:15, 74:18, 74:21, 82:8, 83:1, 117:4, 123:4, 136:2, 142:12, 142:17, 143:12, 144:18, 152:18, 152:23, 157:16, 158:6, 158:13, 161:1, 176:20

**cords** [1] - 38:15

**Cornell** [7] - 11:16, 11:17, 11:18, 11:22, 12:1, 12:22, 18:25

**corner** [1] - 124:8

**Corporation** [3] - 3:3, 4:12, 4:14

**correct** [80] - 26:8, 54:13, 60:9, 60:17, 60:25, 61:15,

63:10, 63:16, 64:11, 64:15, 64:20, 64:22, 65:8, 66:6, 66:17, 69:4, 71:9, 72:21, 73:8, 74:19, 76:6, 77:11, 77:16, 77:22, 78:1, 78:16, 79:16, 80:20, 83:7, 90:8, 93:21, 103:20, 103:21, 110:8, 119:12, 120:23, 121:22, 121:23, 122:7, 122:14, 124:9, 125:10, 125:11, 125:17, 126:12, 127:8, 127:9, 127:21, 129:5, 129:11, 131:18, 131:19, 133:1, 133:8, 134:1, 135:1, 136:11, 140:6, 162:15, 164:16, 166:1, 166:2, 166:4, 166:12, 166:19, 167:11, 169:10, 171:1, 171:2, 171:13, 171:17, 171:19, 171:25, 173:12, 176:9, 178:6, 178:10, 181:8, 181:11

**corrected** [1] - 5:9

**correctly** [8] - 50:16, 53:2, 127:5, 135:4, 138:11, 138:20, 139:19, 163:4

**correlate** [2] - 67:3, 88:25

**correlation** [2] - 88:20, 88:23

**correspondence** [1] - 170:3

**corridor** [1] - 146:12

**cost** [5] - 106:14, 161:3, 161:4, 162:2, 162:18

**costed** [1] - 161:7

**costing** [1] - 161:14

**costs** [7] - 161:3, 161:10, 162:6, 162:9, 163:6, 163:7

**cough** [1] - 87:11

**counsel** [7] - 6:5, 6:6, 54:5, 55:13, 55:15, 58:23, 181:18

**Counsel** [2] - 7:15, 13:6

**counseling** [1] - 159:17

**counteroffer** [1] - 182:8

**counters** [1] - 32:1

**country** [3] - 12:25, 91:24, 161:24

**counts** [1] - 185:10

**course** [15] - 15:7, 18:10, 28:5, 28:24, 34:7, 57:1, 91:7, 91:16, 108:19, 109:1, 109:6, 131:15, 141:6, 159:9, 159:18

**courses** [1] - 112:5

**Court** [50] - 3:1, 4:6, 5:19, 6:18, 7:7, 11:1,

**KEYWORD INDEX**

Case 1:24-cv-21213-KMW   Document 161   Entered on FLSD Docket 06/24/2025   Page 193 of
210

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

193

12:15, 16:8, 18:8, 21:1, 25:23, 31:1, 31:5, 31:7, 31:9, 33:19, 34:6, 38:1, 41:2, 43:2, 49:11, 72:11, 73:7, 90:14, 91:3, 94:10, 95:25, 99:20, 101:23, 103:1, 107:3, 111:7, 111:23, 122:20, 123:8, 124:1, 125:13, 148:10, 149:16, 158:12, 162:17, 170:8, 172:19, 174:9, 174:10, 174:13, 182:21, 185:9, 185:19, 186:2

**court** [13] - 3:14, 4:19, 10:2, 22:1, 79:4, 104:20, 104:21, 109:9, 122:16, 124:19, 124:21, 180:3

**COURT** [290] - 3:4, 3:8, 3:10, 3:23, 4:2, 4:9, 4:17, 6:13, 6:25, 7:9, 7:12, 7:14, 7:17, 8:24, 9:2, 9:5, 9:8, 9:19, 9:22, 9:25, 10:4, 10:7, 10:9, 10:17, 13:9, 13:11, 14:21, 14:24, 15:18, 19:15, 19:18, 19:24, 20:3, 20:5, 20:7, 20:14, 20:16, 21:6, 21:23, 22:12, 23:20, 23:24, 24:7, 24:25, 25:10, 25:12, 26:24, 27:2, 27:11, 28:2, 28:5, 28:7, 28:12, 28:21, 28:25, 29:2, 29:7, 31:16, 31:21, 32:7, 32:13, 32:25, 33:15, 35:7, 37:5, 38:4, 38:21, 39:21, 40:2, 40:12, 41:17, 44:11, 45:4, 45:12, 46:8, 46:25, 49:3, 50:9, 50:13, 50:18, 51:11, 51:21, 51:25, 52:4, 52:6, 52:13, 52:16, 52:22, 53:3, 53:6, 53:10, 53:21, 53:23, 54:4, 54:14, 55:5, 55:25, 56:5, 56:8, 56:15, 56:20, 57:11, 57:14, 57:17, 58:7, 58:13, 58:18, 58:25, 59:5, 59:7, 59:10, 59:13, 59:16, 59:22, 62:25, 63:7, 72:3, 72:5, 72:7, 72:9, 73:10, 73:16, 73:18, 73:20, 73:24, 77:13, 79:4, 81:13, 84:12, 84:17, 85:2, 85:6, 85:11, 86:8, 86:17, 86:20, 87:2, 87:7, 89:15, 89:24, 91:14, 91:17, 91:21, 92:8, 92:16, 92:18, 92:21, 93:13, 93:16, 94:15, 95:6, 95:16, 96:4, 96:10, 98:12, 98:17, 98:20, 99:2, 99:4, 99:8, 99:12, 99:15, 99:24, 100:6, 100:13, 100:18, 100:23, 101:3, 101:8,

101:11, 102:12, 103:8, 103:13, 103:16, 103:22, 104:5, 105:1, 105:7, 105:22, 107:13, 109:6, 109:8, 109:11, 109:19, 109:23, 110:1, 110:6, 110:10, 110:17, 110:20, 118:19, 118:23, 119:1, 120:5, 124:3, 124:16, 124:18, 124:24, 125:2, 125:20, 126:14, 130:9, 130:14, 130:22, 131:2, 131:4, 132:5, 132:9, 132:13, 132:16, 132:20, 135:6, 136:18, 139:4, 139:6, 139:8, 139:11, 140:9, 140:13, 142:1, 145:5, 145:10, 145:16, 145:18, 145:22, 146:3, 146:7, 146:12, 146:14, 147:2, 147:5, 147:9, 147:11, 147:15, 147:23, 148:6, 148:19, 148:23, 149:1, 149:3, 149:6, 149:8, 149:13, 150:1, 150:14, 150:18, 150:23, 153:23, 164:1, 164:4, 164:6, 164:25, 165:2, 169:3, 169:23, 172:8, 172:11, 172:13, 172:15, 172:21, 172:23, 173:25, 174:5, 175:4, 175:7, 177:2, 177:25, 178:13, 178:15, 178:18, 178:22, 179:1, 179:8, 179:16, 179:19, 179:22, 180:23, 181:4, 181:7, 181:10, 181:12, 182:19, 183:1, 183:9, 183:17, 184:1, 184:21, 184:24, 185:3, 186:13

**Court's** [9] - 7:23, 16:5, 22:5, 23:22, 103:3, 113:2, 131:25, 175:16, 179:21

**courtroom** [9] - 7:1, 9:10, 25:5, 58:6, 59:18, 124:20, 145:24, 146:6, 146:7

**COURTROOM** [8] - 3:2, 3:12, 5:20, 10:12, 110:13, 149:17, 149:20, 149:25

**courts** [1] - 124:22

**cover** [2] - 71:16, 71:20

**craft** [1] - 111:18

**crazy** [1] - 9:12

**create** [1] - 176:17

**created** [3] - 152:19, 152:22, 176:13

**creating** [1] - 80:9

**credential** [1] - 151:12

**credibility** [3] - 90:1, 106:3, 107:6

**criminal** [2] - 5:3, 101:7

**criteria** [7] - 15:13, 113:18, 114:8, 114:9, 116:8, 116:24, 152:9

**critical** [1] - 116:1

**criticisms** [1] - 104:23

**CrocketT** [1] - 154:11

**Croftstone** [1] - 154:6

**CROSS** [3] - 59:23, 119:3, 164:8

**Cross** [3] - 2:5, 2:8, 2:11

**cross** [15] - 6:1, 15:20, 16:1, 20:24, 32:15, 50:11, 59:11, 93:10, 96:7, 96:8, 108:20, 118:21, 130:11, 130:13, 164:2

**CROSS-EXAMINATION** [3] - 59:23, 119:3, 164:8

**Cross-Examination** [3] - 2:5, 2:8, 2:11

**cross-examination** [7] - 6:1, 15:20, 32:15, 50:11, 59:11, 118:21, 164:2

**cross-examine** [2] - 93:10, 108:20

**crossed** [1] - 5:14

**crosstalk** [3] - 70:25, 71:17, 79:3

**cruise** [10] - 13:22, 13:23, 43:22, 84:22, 85:21, 85:25, 86:6, 113:14, 117:23, 118:5

**cruises** [1] - 85:23

**CT** [17] - 44:15, 44:18, 44:23, 67:1, 78:4, 79:18, 79:21, 80:3, 80:4, 81:1, 81:5, 81:7, 81:15, 88:11, 89:10, 89:16, 92:11

**Cureus** [2] - 18:22, 18:23

**CUREUS** [1] - 18:23

**current** [7] - 11:1, 11:8, 17:8, 111:3, 118:13, 150:9, 157:4

**customary** [1] - 161:16

**cut** [4] - 36:6, 107:13, 182:12, 185:22

## D

**D.O** [3] - 110:16, 112:2, 154:6

**D.O.s** [1] - 112:13

**daily** [1] - 115:23

**damage** [2] - 83:1, 117:21

**damaged** [2] - 68:5, 144:18

**dangerous** [2] - 36:10,

68:25

**darkroom** [1] - 88:22

**data** [4] - 16:15, 161:14, 161:19

**database** [2] - 161:18, 161:19

**date** [10] - 53:13, 56:10, 57:2, 80:15, 164:17, 164:19, 164:23, 167:3, 169:15, 170:8

**dated** [3] - 169:10, 169:11, 169:18

**Daubert** [37] - 14:23, 15:10, 15:13, 15:21, 21:8, 22:21, 26:9, 28:10, 31:17, 31:19, 31:23, 37:25, 38:5, 94:21, 101:22, 102:4, 105:11, 107:5, 107:8, 107:9, 107:19, 107:22, 108:10, 108:11, 108:12, 108:18, 108:21, 109:2, 109:13, 113:8, 146:19, 148:1, 169:7, 173:3, 182:22, 183:2, 183:21

**DAVID** [2] - 2:4, 10:19

**David** [1] - 10:14

**day's** [1] - 184:10

**days** [8] - 6:19, 23:2, 23:9, 33:11, 165:15, 182:19, 185:18, 185:21

**deadline** [5] - 23:2, 23:11, 182:3, 182:14, 185:20

**deadlines** [1] - 175:16

**deal** [1] - 27:22

**dealer** [1] - 182:6

**dealing** [1] - 36:15

**death** [1] - 174:19

**decided** [2] - 94:21, 185:13

**decision** [4] - 15:20, 43:23, 44:15, 95:19

**declared** [2] - 97:8, 97:9

**deduce** [1] - 17:5

**defend** [1] - 106:25

**defendant** [4] - 4:12, 72:2, 72:16, 73:3

**defendants** [2] - 167:9, 170:3

**defendants'** [2] - 23:18, 169:7

**defense** [34] - 4:9, 6:1, 14:12, 20:18, 21:25, 22:5, 22:11, 23:3, 27:18, 27:19, 27:21, 27:22, 27:24, 28:8, 28:10, 32:14, 36:25, 50:21, 51:12, 52:16, 54:5, 54:10, 55:12, 55:15, 91:9, 97:20, 97:21, 98:1, 101:17, 103:10, 106:22,

171:15, 171:18, 172:13

**defense's** [2] - 73:23, 106:15

**defer** [3] - 103:3, 104:22, 135:9

**deference** [2] - 26:12, 38:6

**defibrillator** [2] - 79:23, 79:24

**deficits** [11] - 60:16, 60:24, 61:4, 61:24, 62:10, 119:9, 127:7, 127:9, 134:1, 142:23, 144:5

**define** [1] - 47:2

**definitive** [1] - 31:3

**definitively** [1] - 49:16

**degree** [18] - 11:13, 12:19, 37:2, 42:22, 49:22, 97:14, 111:25, 116:5, 116:16, 118:1, 138:12, 144:8, 163:21, 173:8, 177:12, 178:16, 178:19, 178:20

**degrees** [8] - 138:16, 138:17, 138:22, 138:23, 139:1, 139:20, 139:22, 140:2

**delay** [1] - 5:6

**delicate** [3] - 36:3, 68:5, 82:8

**demonstrate** [2] - 143:14, 143:15

**demonstrating** [1] - 37:23

**denied** [1] - 185:19

**density** [1] - 159:11

**department** [3] - 11:23, 12:4, 129:15

**dependent** [1] - 101:19

**deposed** [3] - 63:2, 119:11, 131:16

**deposition** [96] - 8:6, 15:7, 15:12, 15:14, 20:20, 22:3, 22:25, 25:20, 27:15, 31:4, 37:23, 38:17, 38:19, 38:24, 39:4, 41:6, 41:12, 41:21, 49:2, 49:20, 60:7, 62:15, 63:6, 63:10, 63:12, 63:18, 64:9, 66:15, 66:24, 68:7, 69:19, 70:12, 70:19, 71:7, 71:10, 71:21, 71:22, 73:13, 75:5, 76:10, 77:2, 77:23, 78:8, 78:12, 78:15, 78:24, 79:15, 79:17, 80:14, 80:19, 80:22, 81:15, 81:20, 82:5, 83:13, 84:1, 86:19, 91:2, 92:24, 93:6, 94:19, 97:4, 97:9, 119:14, 119:16, 119:19, 119:22, 119:25, 120:10,

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

194

120:12, 121:4, 121:24, 122:3, 122:10, 127:19, 127:20, 127:22, 127:24, 130:5, 130:16, 130:23, 130:25, 139:3, 139:8, 139:16, 141:22, 146:22, 148:13, 162:10, 164:19, 164:22, 165:5, 165:17, 167:5, 167:17, 182:1

**depositions** [4] - 64:17, 114:24, 130:3, 153:16

**DEPUTY** [8] - 3:2, 3:12, 5:20, 10:12, 110:13, 149:17, 149:20, 149:25

**deputy** [1] - 124:21

**describe** [2] - 11:8, 11:9

**described** [2] - 76:13, 137:16

**describing** [2] - 50:16, 137:15

**description** [2] - 131:21, 131:23

**descriptions** [1] - 133:22

**descriptive** [1] - 137:20

**designed** [1] - 177:7

**designing** [1] - 152:16

**destroyed** [1] - 36:5

**detail** [9] - 11:11, 19:12, 33:5, 37:2, 70:10, 70:12, 141:20, 150:11, 155:25

**detailed** [2] - 90:22, 114:19

**details** [1] - 141:18

**deteriorated** [1] - 97:3

**deterioration** [2] - 116:13, 116:18

**determine** [1] - 146:8

**determining** [3] - 44:19, 48:17, 163:22

**devastating** [2] - 112:19, 144:17

**developed** [3] - 102:22, 117:16, 126:8

**developing** [5] - 117:4, 117:7, 136:10, 153:1, 153:7

**device** [1] - 66:6

**diagnosed** [2] - 117:25, 152:17

**diagnoses** [1] - 17:5

**diagnosing** [1] - 13:18

**Diagnosis** [1] - 19:5

**diagnosis** [15] - 17:1, 17:6, 17:20, 17:23, 22:9, 45:8, 45:15, 45:19, 46:5, 46:6, 46:18, 77:17, 115:25, 144:11

**diagnostic** [6] - 31:3, 44:18, 88:17, 156:2, 159:8, 159:12

**dichotomy** [1] - 39:5

**die** [2] - 97:22, 174:10

**dietician** [1] - 159:2

**difference** [4] - 49:12, 69:25, 91:21, 111:23

**differences** [1] - 71:14

**different** [27] - 4:21, 9:15, 21:13, 38:25, 65:19, 95:17, 108:8, 111:17, 121:16, 126:21, 132:6, 133:22, 133:23, 134:23, 135:13, 137:14, 141:12, 159:12, 159:18, 160:7, 164:12, 183:22

**differential** [11] - 17:5, 17:6, 17:20, 45:8, 45:15, 45:19, 46:4, 46:6, 46:18, 115:25, 144:10

**differently** [4] - 42:6, 71:25, 72:14, 147:5

**difficult** [1] - 124:7

**difficulties** [2] - 4:19, 8:2

**difficulty** [2] - 58:2, 119:23

**diffuse** [1] - 75:11

**digitally** [4] - 58:11, 58:13, 58:15, 58:21

**Direct** [3] - 2:4, 2:7, 2:10

**direct** [8] - 5:25, 61:16, 63:17, 68:9, 71:23, 93:12, 96:4, 165:22

**DIRECT** [3] - 10:22, 111:1, 150:7

**direction** [1] - 143:11

**directly** [1] - 57:15

**director** [3] - 111:16, 112:11, 112:12

**disability** [1] - 177:13

**disagree** [2] - 119:10, 121:11

**disagreement** [1] - 135:17

**disagreements** [1] - 89:5

**disappear** [1] - 42:5

**disappointing** [1] - 134:19

**discharge** [1] - 157:11

**disclose** [1] - 95:2

**disclosed** [7] - 52:10, 54:12, 55:11, 86:18, 94:14, 148:14

**disclosure** [2] - 51:6, 53:19

**disclosures** [1] - 175:16

**discontinued** [1] - 94:8

**discontinuing** [1] - 94:13

**discovery** [1] - 94:25

**discrepancies** [1] - 120:1

**discrepancy** [1] - 135:13

**discussed** [5] - 119:25, 158:10, 159:13, 159:20, 159:25

**discussion** [1] - 80:6

**disease** [2] - 136:5, 177:13

**DISH** [1] - 75:11

**disingenuity** [1] - 97:14

**disk** [7] - 47:23, 48:3, 70:3, 70:4, 70:5, 70:9, 75:8

**disks** [3] - 35:12, 35:20, 75:8

**dismissed** [1] - 105:13

**Disorders** [1] - 19:5

**dispatched** [1] - 30:1

**disposition** [1] - 157:12

**dispute** [3] - 173:21, 174:24, 175:1

**disqualified** [1] - 180:16

**disrespectful** [1] - 74:9

**disrupt** [1] - 82:8

**distinction** [1] - 42:8

**District** [1] - 180:6

**distrust** [1] - 107:14

**Doctor** [222] - 5:10, 5:24, 6:4, 7:10, 8:6, 8:12, 9:20, 9:22, 13:4, 13:15, 13:20, 14:13, 14:16, 14:25, 15:4, 15:5, 15:12, 15:21, 16:8, 17:18, 20:19, 21:2, 21:15, 22:2, 22:15, 22:16, 22:17, 23:4, 23:5, 23:7, 23:16, 23:18, 24:4, 24:21, 25:14, 26:16, 26:19, 27:4, 27:12, 27:17, 28:20, 30:22, 31:5, 31:16, 32:5, 32:9, 33:8, 33:17, 37:1, 38:7, 38:10, 38:15, 40:22, 42:15, 42:21, 43:9, 44:7, 44:14, 44:22, 50:3, 52:21, 53:1, 53:3, 53:11, 53:19, 54:6, 54:17, 56:18, 57:25, 59:11, 59:25, 61:22, 62:2, 62:8, 63:9, 64:10, 66:7, 67:15, 68:6, 70:1, 70:16, 70:20, 70:22, 71:15, 73:11, 73:13, 73:19, 74:2, 75:15, 75:17, 75:21, 76:6, 76:11, 76:15, 76:19, 76:20, 76:23, 78:11, 78:20, 78:21, 83:14, 84:21, 85:2, 85:21, 86:3, 87:5, 87:18, 87:25, 88:15, 90:7, 91:12, 91:17, 92:11, 92:24, 93:8, 95:9, 95:10, 95:23, 96:15, 98:1, 98:10, 98:14, 99:10, 99:17, 99:21, 101:19, 102:24, 106:4, 106:8, 106:10,

107:9, 109:25, 110:7, 110:10, 113:2, 114:14, 117:9, 117:10, 117:16, 117:22, 119:5, 119:11, 121:10, 121:12, 121:20, 121:24, 123:12, 123:17, 125:7, 125:15, 125:16, 127:15, 127:19, 127:20, 127:22, 128:1, 128:6, 128:11, 128:13, 128:20, 131:7, 132:1, 132:22, 133:5, 134:16, 134:18, 134:25, 136:22, 137:5, 137:16, 139:3, 139:16, 140:7, 141:15, 143:25, 144:7, 144:12, 144:19, 145:3, 146:12, 147:24, 149:5, 155:5, 155:6, 155:7, 155:9, 155:11, 155:12, 155:16, 155:23, 155:25, 156:8, 158:2, 158:4, 158:9, 159:6, 159:20, 160:22, 166:21, 166:22, 166:25, 168:18, 169:20, 170:4, 170:8, 170:12, 171:19, 171:21, 171:24, 171:25, 172:2, 172:5, 172:10, 173:4, 173:11, 176:5, 178:2, 178:12, 178:13

**doctor** [67] - 5:11, 10:15, 13:17, 14:15, 16:4, 18:5, 19:15, 24:1, 26:13, 29:20, 33:1, 37:5, 39:4, 39:8, 40:5, 41:24, 42:18, 43:22, 44:2, 44:9, 45:6, 46:14, 48:11, 49:11, 49:19, 49:24, 53:3, 63:2, 73:15, 85:14, 85:25, 88:6, 88:24, 93:19, 93:23, 94:4, 94:8, 95:18, 99:22, 101:12, 111:7, 111:21, 111:24, 112:2, 112:21, 114:20, 115:1, 115:21, 116:5, 116:16, 117:22, 118:1, 118:4, 120:9, 124:12, 132:6, 136:9, 140:16, 145:6, 145:23, 146:3, 147:9, 147:24, 172:11, 178:24, 178:25

**doctor's** [1] - 39:23

**doctorate** [1] - 178:20

**doctors** [9] - 48:16, 70:18, 73:12, 73:14, 73:22, 87:19, 100:9, 112:13, 141:4

**doctors'** [1] - 15:25

**document** [10] - 31:11, 33:1, 129:7, 135:9, 135:17, 135:23, 141:16,

141:19, 151:19, 169:13

**documentation** [18] - 114:16, 114:17, 117:2, 122:1, 123:24, 131:12, 131:13, 133:3, 133:15, 133:20, 134:18, 135:14, 137:24, 137:25, 141:14, 142:20, 143:5, 144:15

**documentations** [1] - 133:21

**documented** [22] - 36:20, 37:14, 41:5, 42:15, 82:20, 115:12, 117:12, 117:13, 117:17, 117:18, 120:21, 123:11, 127:10, 131:10, 131:24, 134:2, 135:21, 136:6, 142:24, 143:17, 143:25, 144:21

**documenting** [1] - 137:2

**documents** [13] - 7:4, 15:15, 23:16, 24:22, 25:14, 26:1, 69:21, 114:25, 117:11, 165:23, 181:17, 181:18

**dollars** [4] - 102:2, 103:24, 162:12, 162:22

**done** [22] - 17:17, 31:3, 32:5, 41:10, 44:10, 45:1, 58:21, 60:22, 77:19, 79:23, 80:17, 81:3, 82:3, 116:21, 144:12, 151:20, 151:24, 152:1, 168:2, 182:9, 184:12

**door** [3] - 86:25, 95:14, 141:25

**double** [1] - 113:22

**down** [19] - 3:12, 3:23, 12:2, 35:6, 35:8, 57:14, 68:10, 72:8, 77:14, 79:4, 87:12, 97:6, 98:4, 99:4, 122:15, 126:24, 128:5, 145:7, 179:16

**downstairs** [1] - 100:5

**Downtran** [1] - 154:6

**DPT** [1] - 178:12

**draft** [2] - 155:23, 155:25

**drafting** [2] - 155:20, 186:7

**DRAHOS** [147] - 4:10, 7:13, 7:20, 7:22, 14:19, 14:22, 14:25, 20:17, 21:17, 23:21, 26:12, 31:10, 32:4, 32:21, 36:25, 38:3, 38:5, 39:18, 40:1, 41:11, 44:6, 45:3, 46:23, 49:1, 57:13, 57:16, 57:19, 58:9, 58:17, 59:9, 59:12, 59:15, 59:19, 59:24, 62:24, 63:1, 63:5, 63:8, 71:2, 71:19, 72:4, 72:6,

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

72:8, 72:10, 72:12, 73:15, 73:17, 73:19, 74:1, 77:14, 77:15, 79:11, 81:12, 81:14, 84:11, 85:1, 85:5, 85:7, 86:7, 86:16, 86:18, 86:24, 89:13, 89:16, 92:15, 92:24, 94:12, 102:11, 102:13, 103:12, 103:15, 104:22, 105:19, 105:24, 107:3, 109:1, 109:7, 109:10, 112:25, 118:22, 118:25, 119:2, 119:4, 120:4, 120:8, 123:13, 123:15, 124:1, 124:11, 124:14, 125:5, 125:6, 125:21, 125:24, 126:23, 130:18, 131:1, 131:3, 131:5, 131:6, 132:12, 132:17, 132:21, 135:3, 136:20, 139:5, 139:7, 139:9, 139:14, 139:15, 140:7, 141:21, 148:1, 148:10, 150:24, 164:3, 164:5, 164:7, 164:9, 164:24, 165:3, 169:2, 169:5, 169:22, 170:1, 172:10, 172:12, 172:14, 172:17, 172:22, 173:1, 174:16, 175:2, 176:25, 179:20, 179:24, 180:1, 180:11, 180:21, 181:11, 182:17, 182:20, 182:24, 182:25, 183:7, 184:23, 186:12

**Drahos** [55] - 2:5, 2:8, 2:11, 2:12, 4:11, 7:5, 7:12, 9:10, 15:18, 20:16, 23:20, 24:12, 24:15, 31:22, 32:2, 37:23, 38:21, 46:4, 46:7, 50:14, 50:21, 51:23, 56:7, 57:12, 60:1, 73:10, 89:25, 91:2, 91:5, 92:21, 92:23, 94:4, 95:8, 95:14, 95:23, 96:10, 97:4, 101:23, 104:5, 105:9, 108:3, 108:16, 118:21, 130:23, 132:11, 139:4, 141:24, 147:23, 148:7, 164:2, 174:7, 174:11, 181:10, 182:15, 184:22
**Drahos'** [2] - 37:9, 142:3
**Drahos's** [2] - 26:2, 50:10
**Drahos..** [1] - 72:3
**Drake** [1] - 154:18
**draw** [1] - 16:5
**drill** [1] - 122:15
**due** [5] - 42:2, 42:11, 165:15, 167:2, 167:5
**duly** [7] - 10:10, 10:21,

49:3, 110:11, 110:25, 149:18, 150:6
**during** [23] - 6:4, 23:7, 60:23, 63:12, 65:1, 65:5, 65:9, 65:16, 65:22, 69:19, 70:19, 71:21, 77:2, 80:13, 81:16, 93:11, 96:8, 119:22, 134:14, 139:16, 158:23, 164:18, 165:22

**E**

**early** [4] - 84:9, 100:3, 100:9, 113:20
**ears** [1] - 3:25
**ease** [1] - 38:1
**easier** [2] - 19:23, 57:7
**easiest** [1] - 58:11
**easily** [1] - 162:3
**easy** [2] - 60:5, 107:3
**edification** [1] - 131:25
**editing** [1] - 185:22
**educated** [1] - 11:12
**education** [12] - 11:9, 16:23, 25:24, 40:22, 42:23, 111:8, 116:6, 118:2, 144:9, 150:12, 151:1, 155:22
**effect** [3] - 95:13, 174:11, 181:15
**effectively** [1] - 112:6
**efficient** [1] - 113:1
**effort** [6] - 3:20, 27:5, 104:14, 105:13, 113:1, 135:8
**eight** [6] - 30:9, 165:15, 165:19, 180:4, 180:9, 180:14
**eight-day** [1] - 165:19
**either** [15] - 7:17, 20:19, 57:14, 58:19, 64:19, 67:25, 71:8, 71:15, 86:19, 109:16, 131:18, 145:25, 158:15, 160:2, 186:10
**elaborate** [1] - 121:6
**elaboration** [1] - 121:8
**elbow** [1] - 127:2
**electric** [2] - 52:24, 52:25
**elicited** [1] - 96:8
**eliminate** [3] - 21:23, 21:24, 109:14
**ELMO** [1] - 124:6
**elsewhere** [1] - 33:24
**email** [13] - 51:13, 55:7, 55:15, 55:19, 56:2, 56:3, 56:4, 56:5, 56:16, 58:20, 169:14, 169:16, 169:17
**emailed** [2] - 50:25, 51:12
**embedded** [1] - 25:8

**embolism** [1] - 48:2
**emergencies** [1] - 129:16
**emergency** [24] - 17:16, 47:11, 99:22, 101:11, 110:15, 111:4, 111:5, 111:9, 111:11, 111:15, 111:19, 112:11, 112:12, 112:15, 115:25, 117:10, 118:3, 118:7, 129:15, 140:17, 140:25, 141:5, 141:7, 159:6
**Emily** [1] - 154:16
**Emory** [1] - 153:25
**employ** [1] - 26:20
**employed** [3] - 16:6, 16:9, 112:8
**enclosed** [1] - 56:23
**encompassed** [1] - 78:18
**encounter** [1] - 122:12
**encountering** [1] - 124:23
**end** [6] - 55:11, 126:11, 134:9, 140:9, 173:21, 184:10
**ended** [1] - 54:19
**ending** [1] - 94:25
**enforcement** [1] - 5:5
**entered** [1] - 23:21
**entertained** [1] - 45:21
**entire** [3] - 35:25, 114:21, 186:1
**entirely** [2] - 38:19, 123:3
**entities** [1] - 17:7
**entitled** [5] - 18:13, 18:21, 19:1, 19:5, 27:4
**entries** [9] - 125:10, 125:11, 125:13, 126:24, 129:4, 129:6, 131:10, 134:23, 136:13
**entry** [12] - 117:9, 125:17, 126:6, 127:23, 130:4, 130:17, 131:9, 131:20, 132:2, 132:23, 134:2, 134:4
**environmental** [1] - 151:14
**epidural** [11] - 26:10, 47:8, 74:3, 74:6, 74:14, 74:25, 77:1, 77:24, 78:7, 78:16, 80:20
**episode** [1] - 109:20
**equal** [1] - 179:23
**equipment** [3] - 3:15, 124:25, 156:4
**equivalent** [1] - 157:21
**ER** [1] - 134:14
**error** [1] - 84:5
**especially** [2] - 34:18,

86:10
**essentially** [3] - 26:8, 53:8, 144:6
**establish** [1] - 27:5
**established** [4] - 5:23, 92:1, 109:9, 179:11
**estimate** [2] - 182:7
**estimated** [2] - 104:15, 179:4
**estimates** [2] - 162:2
**estimation** [8] - 48:19, 104:4, 162:11, 162:21, 162:23, 163:5, 163:10, 163:12
**et** [1] - 105:9
**evacuate** [2] - 158:15, 158:19
**evaluate** [2] - 112:16, 156:25
**evaluated** [1] - 155:18
**evaluating** [1] - 115:6
**evaluation** [10] - 25:25, 90:15, 137:19, 151:25, 155:21, 156:12, 156:21, 158:3, 158:22, 158:23
**evaluations** [5] - 156:2, 156:3, 158:9, 159:1, 159:2
**event** [4] - 9:16, 29:4, 60:12, 101:11
**events** [1] - 45:20
**eventually** [2] - 80:17, 81:1
**everyday** [1] - 17:14
**evidence** [22] - 23:17, 23:22, 24:10, 24:14, 26:4, 26:7, 32:22, 32:25, 33:10, 48:9, 61:13, 61:16, 61:18, 62:11, 63:24, 77:19, 103:25, 119:7, 125:7, 137:8, 137:20, 179:12
**EVIDENCE** [1] - 2:16
**evidencing** [1] - 136:2
**evidentiary** [9] - 14:23, 38:6, 54:9, 59:1, 103:8, 103:10, 103:13, 103:17, 104:11
**exacerbated** [1] - 118:13
**exact** [4] - 69:23, 98:5, 127:24, 128:8
**exactly** [11] - 92:4, 106:13, 106:14, 112:3, 112:6, 127:17, 131:12, 147:19, 171:5, 177:18
**exam** [20] - 16:18, 65:5, 89:1, 114:20, 115:12, 116:23, 117:11, 129:7, 133:2, 134:8, 137:3, 138:1, 141:17, 144:16, 152:10, 152:11, 152:14, 165:22, 166:3

**EXAMINATION** [11] - 10:22, 59:23, 84:19, 111:1, 119:3, 140:14, 150:7, 164:8, 175:8, 179:25, 180:12
**examination** [16] - 6:1, 12:23, 12:24, 15:20, 16:16, 32:15, 50:11, 59:11, 65:1, 65:16, 90:19, 109:24, 118:21, 140:10, 142:3, 164:2
**Examination** [10] - 2:4, 2:5, 2:5, 2:7, 2:8, 2:8, 2:10, 2:11, 2:11, 2:12
**examine** [5] - 7:10, 88:22, 93:10, 108:20, 165:24
**examined** [9] - 10:21, 14:10, 14:25, 64:21, 97:21, 98:2, 110:25, 150:6, 155:13
**examining** [2] - 88:24, 98:18
**example** [4] - 26:10, 48:6, 75:8, 138:3
**exams** [1] - 137:23
**exceeded** [1] - 176:18
**excellent** [1] - 7:5
**excerpted** [1] - 19:11
**exchange** [3] - 63:12, 79:15, 80:11
**excluded** [4] - 17:11, 45:22, 47:15, 114:8
**excuse** [4] - 51:18, 130:7, 135:5, 146:16
**Excuse** [3] - 3:6, 11:8, 25:15
**excused** [4] - 99:7, 145:7, 145:8, 181:6
**exhibit** [4] - 40:20, 63:6, 169:7, 173:3
**exhibiting** [1] - 118:10
**EXHIBITS** [1] - 2:16
**exhibits** [1] - 23:25
**exist** [3] - 16:20, 96:22, 178:21
**existed** [2] - 57:25, 96:22
**existing** [2] - 28:15, 39:9
**exists** [2] - 54:16, 130:25
**expanding** [1] - 183:12
**expect** [4] - 9:10, 33:4, 86:9, 135:16
**expectancy** [40] - 83:6, 95:24, 96:1, 96:11, 96:16, 96:17, 96:18, 96:25, 97:6, 98:4, 101:24, 102:16, 102:20, 103:6, 104:15, 105:20, 105:23, 106:1, 106:12, 106:18, 107:6, 108:7, 108:14, 162:14,

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

196

162:16, 170:21, 170:24, 171:16, 172:16, 173:9, 173:16, 176:14, 176:18, 176:24, 179:4, 179:6, 179:9, 179:11, 180:19
**expected** [3] - 104:9, 105:5, 179:11
**expedited** [1] - 165:25
**expense** [1] - 109:14
**expensive** [2] - 102:5, 109:12
**experience** [19] - 13:18, 16:23, 16:24, 25:25, 40:23, 42:22, 48:20, 85:25, 86:4, 90:20, 116:7, 124:19, 129:16, 144:9, 151:2, 152:4, 152:12, 152:16, 155:22
**expert** [48] - 6:9, 8:11, 14:13, 15:22, 21:12, 21:19, 22:21, 27:12, 49:20, 52:17, 53:18, 72:1, 72:15, 72:22, 73:3, 85:9, 89:19, 94:17, 94:19, 94:23, 95:19, 97:8, 97:9, 97:20, 97:21, 98:2, 102:16, 106:1, 107:18, 108:4, 108:10, 109:13, 114:24, 160:22, 161:5, 167:21, 170:17, 170:22, 171:4, 171:18, 172:13, 174:2, 174:4, 175:16, 180:3, 181:24, 182:1, 183:20
**expert's** [5] - 38:23, 51:8, 52:18, 58:4, 108:5
**expertise** [2] - 170:25, 177:1
**experts** [17] - 20:23, 26:3, 26:17, 27:19, 27:21, 27:24, 28:4, 28:8, 28:10, 28:13, 28:15, 88:16, 89:19, 93:7, 94:16, 155:4, 182:22
**experts'** [1] - 91:9
**explain** [22] - 12:15, 16:12, 27:7, 29:20, 46:20, 49:11, 50:24, 58:25, 90:14, 94:10, 95:25, 111:23, 116:16, 128:7, 142:6, 150:11, 150:25, 151:17, 155:15, 156:22, 158:12, 162:17
**explained** [2] - 45:7, 66:24
**explaining** [3] - 37:6, 39:13, 43:10
**explanation** [3] - 67:18, 67:23, 147:6
**explode** [5] - 43:13,

43:14, 43:15, 82:15
**explosion** [1] - 82:17
**extend** [1] - 127:1
**extending** [1] - 138:21
**extension** [6] - 117:19, 127:1, 138:12, 139:21, 139:23, 144:2
**extensive** [2] - 158:9, 160:1
**extent** [8] - 6:24, 32:23, 75:1, 94:18, 97:11, 103:1, 104:9, 113:6
**external** [3] - 43:7, 68:1, 86:12
**externally** [1] - 75:10
**extra** [2] - 32:9, 185:15
**extremely** [3] - 35:16, 43:7, 76:15
**extremities** [3] - 42:10, 42:12, 177:15
**eye** [1] - 124:8

## F

**facet** [5] - 36:23, 68:25, 69:14, 69:17, 82:25
**FaceTime** [1] - 157:20
**facilities** [2] - 14:7, 91:25
**facility** [3] - 14:1, 47:11, 157:10
**fact** [21] - 7:24, 23:22, 27:17, 33:5, 39:9, 44:4, 47:1, 49:16, 58:3, 62:14, 71:10, 94:21, 95:12, 108:22, 109:9, 147:12, 148:7, 165:14, 171:9, 172:2, 179:3
**facts** [2] - 29:20, 29:23
**Fagan** [1] - 154:15
**failed** [2] - 113:19, 141:16
**failing** [3] - 143:14, 143:15
**Failure** [1] - 153:25
**FAIR** [1] - 161:18
**fair** [3] - 105:1, 154:22, 163:1
**fairly** [1] - 92:2
**faith** [1] - 135:21
**fall** [4] - 60:12, 118:15, 141:15, 141:18
**fallen** [1] - 61:14
**falling** [2] - 68:21, 82:4
**falls** [3] - 29:24, 116:14, 151:13
**falsehood** [1] - 67:10
**familiar** [11] - 38:22, 53:6, 104:6, 112:21, 171:21, 173:14, 173:17, 174:5, 174:6, 174:12,

174:18
**familiarity** [1] - 41:20
**family** [3] - 66:3, 133:18, 156:24
**famous** [2] - 184:18, 184:24
**far** [6] - 6:17, 8:14, 23:4, 100:3, 156:1, 157:12
**fashion** [5] - 36:6, 37:24, 41:18, 43:20, 68:15
**fast** [3] - 72:6, 72:8, 72:9
**favor** [4] - 17:11, 45:22, 49:5, 145:23
**Fayette** [1] - 153:25
**February** [12] - 8:15, 30:8, 53:17, 54:2, 54:4, 58:1, 58:3, 164:16, 165:11, 165:15, 166:4, 167:6
**Federal** [1] - 161:15
**federal** [2] - 5:5, 98:9
**fell** [4] - 11:21, 13:24, 113:14, 113:21
**fellow** [2] - 151:9, 153:10
**fellows** [1] - 153:12
**felt** [5] - 90:25, 97:12, 97:15, 114:19, 162:11
**Ferguson** [1] - 4:22
**few** [7] - 5:15, 37:6, 51:11, 80:1, 82:5, 98:12, 178:2
**fiber** [2] - 129:2, 133:14
**fibrocartilaginous** [1] - 48:2
**field** [5] - 11:3, 12:18, 16:16, 48:17, 152:12
**fields** [1] - 151:2
**figure** [2] - 157:11, 181:19
**figured** [1] - 60:5
**file** [7] - 24:12, 33:7, 33:10, 147:14, 174:7, 185:15, 185:16
**filed** [7] - 15:8, 28:9, 146:24, 175:22, 185:14, 185:16, 185:17
**filing** [3] - 24:13, 33:7, 181:16
**fill** [1] - 184:14
**film** [15] - 8:3, 8:12, 8:13, 8:16, 8:18, 8:20, 9:9, 56:17, 79:13, 79:18, 81:15, 89:16, 92:18, 93:5, 93:8
**films** [34] - 6:7, 6:9, 6:12, 7:1, 7:4, 7:9, 8:7, 37:1, 50:14, 50:22, 50:23, 52:14, 55:2, 55:3, 55:24, 57:8, 57:9, 57:21, 57:24, 58:1, 58:4, 67:7, 67:10,

67:12, 67:14, 72:17, 88:19, 88:25, 89:4, 89:19, 92:25, 93:4
**final** [7] - 167:23, 169:8, 170:13, 170:14, 175:13, 175:18, 175:22
**finally** [2] - 19:4, 48:5
**finder** [1] - 179:2
**findings** [8] - 67:4, 88:25, 89:1, 96:25, 114:20, 129:7, 141:16, 144:16
**fine** [7] - 58:12, 104:20, 105:7, 108:12, 109:15, 109:23, 183:24
**fingers** [10] - 5:14, 58:15, 126:11, 126:17, 126:25, 127:16, 127:18, 128:2, 128:6, 142:5
**finish** [1] - 69:7
**finished** [1] - 59:7
**finite** [1] - 171:16
**firm** [3] - 4:11, 51:20, 58:20
**firms** [2] - 7:6, 107:15
**first** [40] - 4:3, 6:2, 7:23, 8:3, 8:15, 10:21, 18:12, 18:19, 22:2, 22:22, 25:22, 26:3, 30:13, 30:16, 31:24, 33:17, 50:21, 57:24, 58:4, 61:3, 61:25, 62:10, 74:22, 101:3, 108:15, 110:17, 110:25, 119:9, 121:6, 125:16, 126:6, 127:6, 143:17, 146:22, 150:6, 167:19, 168:5, 182:2
**fitted** [1] - 139:20
**five** [6] - 30:4, 85:24, 85:25, 98:7, 152:14, 153:12
**fix** [1] - 78:19
**flagged** [1] - 9:16
**flawed** [2] - 26:4
**fleshing** [1] - 183:15
**flex** [1] - 127:2
**flexible** [1] - 7:19
**flexing** [1] - 138:21
**flexion** [6] - 117:19, 127:1, 138:12, 139:20, 139:23, 144:2
**Florida** [5] - 12:13, 151:5, 151:16, 178:10, 180:6
**flowing** [1] - 90:3
**focus** [2] - 16:22, 102:17
**focused** [1] - 107:5
**focusing** [2] - 11:4, 142:21
**Folks** [3] - 3:4, 110:6, 149:8

**folks** [4] - 5:22, 149:13, 181:13, 186:8
**follow** [12] - 9:14, 51:11, 55:19, 96:11, 98:12, 137:25, 153:3, 153:9, 176:15, 176:16, 179:21, 180:25
**follow-up** [5] - 9:14, 51:11, 55:19, 98:12, 179:21
**followed** [2] - 19:19, 54:9
**following** [13] - 5:18, 20:9, 22:19, 24:11, 33:6, 60:18, 62:9, 63:21, 108:17, 110:5, 137:22, 139:17, 149:12
**follows** [4] - 10:21, 29:23, 110:25, 150:6
**followup** [1] - 180:18
**foolishly** [1] - 185:15
**forbidden** [1] - 41:9
**force** [2] - 68:1, 86:12
**forgot** [2] - 51:7, 56:13
**form** [4] - 64:1, 135:5, 158:17, 160:6
**formal** [1] - 175:13
**formats** [1] - 31:20
**formed** [1] - 30:23
**forming** [2] - 13:21, 18:2
**formulate** [1] - 17:2
**formulating** [4] - 45:6, 90:9, 153:14, 166:17
**forth** [4] - 18:17, 36:8, 87:14, 170:4
**fortunately** [1] - 29:2
**forward** [4] - 43:20, 104:12, 104:19, 115:16
**foundation** [2] - 113:11, 170:18
**four** [13] - 18:10, 18:11, 20:18, 21:21, 22:1, 23:6, 30:3, 42:10, 42:12, 85:24, 85:25, 111:12, 185:25
**fraction** [1] - 162:25
**fracture** [21] - 34:1, 35:22, 35:24, 36:11, 37:3, 37:14, 41:7, 41:8, 43:19, 43:21, 49:9, 69:11, 70:4, 76:4, 76:8, 76:9, 76:13, 76:14, 78:20, 81:4
**fractured** [6] - 36:2, 43:8, 68:2, 68:3, 69:1, 82:7
**fractures** [1] - 19:13
**Fractures** [2] - 18:13, 18:21
**frame** [5] - 111:16, 158:1, 165:19, 165:21, 166:1
**frames** [1] - 5:24
**framework** [1] - 28:2
**free** [6] - 14:1, 94:19,

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

197

100:6, 100:9, 145:25, 146:4

**free-standing** [1] - 14:1
**frequent** [1] - 112:18
**frequently** [2] - 168:13, 168:22
**Friday** [8] - 51:1, 51:12, 51:13, 52:2, 52:4, 54:8, 54:14, 56:4
**friends** [2] - 108:16, 178:4
**front** [9] - 12:25, 21:14, 25:6, 29:9, 35:19, 49:21, 108:5, 164:17, 173:5
**full** [13] - 10:12, 11:15, 67:1, 110:13, 128:23, 138:7, 139:23, 142:13, 142:25, 149:20, 158:15, 184:10
**fully** [2] - 65:2, 66:24
**function** [3] - 123:6, 158:20, 158:23
**functioning** [1] - 159:23
**FURTHER** [1] - 180:12
**fusing** [1] - 75:7
**fusion** [1] - 75:10
**future** [7] - 55:14, 106:17, 156:3, 157:18, 159:5, 173:20, 174:22

**G**

**Gables** [3] - 112:9, 112:10, 140:16
**gander** [1] - 28:8
**Garrett** [1] - 154:16
**gears** [1] - 83:3
**Gee** [1] - 184:13
**general** [4] - 11:5, 155:20, 160:11, 177:10
**generally** [2] - 17:20, 46:17
**generate** [3] - 5:6, 165:24, 183:5
**generated** [2] - 169:8, 176:17
**geographic** [2] - 152:2, 161:20
**Georgia** [2] - 14:7, 161:8
**geozip** [1] - 161:20
**Gerald** [1] - 154:1
**geriatric** [1] - 151:10
**gerontology** [1] - 151:16
**Gillis** [1] - 18:16
**given** [11] - 16:16, 40:11, 62:2, 92:6, 95:12, 108:22, 121:12, 122:16, 144:14, 177:13, 183:5
**glasses** [1] - 153:18
**gleaned** [1] - 155:21

**Glory** [1] - 154:4
**gloss** [1] - 39:9
**goal** [1] - 17:13
**Goats** [1] - 154:6
**God** [1] - 29:6
**Goodman** [12] - 45:7, 46:20, 49:21, 142:6, 150:11, 151:1, 151:17, 152:21, 155:15, 156:22, 180:18, 184:13
**goodness** [1] - 5:20
**goose** [1] - 28:7
**Gorman** [1] - 154:20
**gosh** [1] - 101:8
**Government** [4] - 101:7, 161:15, 161:17, 161:23
**Governmental** [1] - 96:20
**graduated** [1] - 178:21
**grandfathered** [1] - 178:19
**granted** [1] - 32:7
**Gray** [1] - 4:11
**great** [2] - 19:12, 124:18
**greater** [2] - 14:7, 49:18
**Gregory** [1] - 53:1
**grenade** [2] - 43:13, 82:15
**grilled** [1] - 13:1
**grip** [6] - 132:24, 133:9, 133:10, 133:14, 134:9, 135:25
**gripping** [1] - 133:12
**Group** [1] - 154:17
**guess** [5] - 32:1, 53:9, 152:24, 178:24, 184:21
**guesses** [1] - 185:3
**guessing** [2] - 124:22, 180:4
**guide** [1] - 153:4
**guidelines** [2] - 18:6, 18:9

**H**

**Half** [1] - 92:3
**half** [6] - 5:25, 63:13, 99:17, 100:9, 100:24, 109:18
**hallway** [2] - 100:7, 145:24
**Hamlin** [1] - 154:10
**hand** [23] - 9:13, 35:10, 104:13, 124:15, 126:10, 126:17, 126:25, 127:16, 128:1, 132:25, 133:10, 133:12, 134:9, 134:11, 136:1, 136:4, 136:7, 142:22, 142:24, 143:16, 145:1, 149:17

**handed** [4] - 120:9, 169:6, 170:2, 173:2
**handheld** [4] - 13:9, 25:5, 25:7, 59:17
**happy** [4] - 22:11, 91:8, 104:12, 153:19
**hard** [2] - 33:25, 36:12
**harmless** [1] - 51:6
**Harold** [5] - 8:12, 14:13, 15:3, 70:20, 73:15
**hash** [1] - 39:17
**Hayashi** [15] - 4:7, 6:5, 6:17, 6:21, 7:25, 8:2, 8:24, 50:11, 50:13, 100:15, 105:3, 145:12, 146:10, 146:14, 183:17
**HAYASHI** [41] - 50:12, 50:17, 50:23, 51:15, 51:22, 52:2, 52:5, 52:7, 52:15, 52:20, 52:23, 53:5, 53:8, 53:13, 53:22, 54:12, 54:21, 56:3, 56:6, 56:9, 56:19, 56:21, 58:12, 58:24, 59:3, 59:6, 100:17, 145:14, 145:17, 145:20, 146:2, 146:16, 147:4, 147:7, 147:10, 147:12, 147:20, 148:3, 148:15, 183:10, 183:24
**head** [21] - 36:7, 43:20, 61:21, 61:22, 68:15, 68:22, 81:6, 82:5, 84:23, 86:6, 86:11, 86:15, 86:23, 87:4, 87:6, 87:10, 87:14, 87:20, 116:20, 122:3, 184:5
**headphones** [2] - 4:19, 10:2
**healing** [1] - 97:19
**Health** [3] - 18:17, 154:5, 161:18
**health** [5] - 154:12, 159:10, 160:2, 162:4, 162:5
**healthcare** [3] - 103:23, 114:4, 136:24
**Healthcare** [3] - 151:7, 153:25, 154:1
**healthy** [1] - 177:11
**hear** [15] - 3:8, 3:24, 7:20, 9:11, 10:2, 23:7, 27:2, 27:20, 56:8, 91:19, 102:23, 103:4, 104:16, 131:17, 142:11
**heard** [5] - 5:11, 56:9, 93:14, 95:5, 147:10
**hearing** [48] - 6:19, 7:3, 8:3, 8:15, 8:20, 14:18, 14:23, 15:10, 21:9, 22:19, 22:21, 23:2, 24:11, 26:16,

31:18, 33:6, 37:25, 38:6, 38:24, 39:7, 51:10, 51:24, 52:11, 54:9, 55:12, 55:21, 57:17, 57:24, 59:1, 102:4, 103:9, 103:10, 103:14, 103:17, 104:11, 104:12, 105:11, 107:8, 108:11, 109:13, 181:15, 181:20, 182:23, 183:2, 183:21, 184:3, 184:10
**Heart** [2] - 153:25, 154:2
**help** [7] - 40:20, 99:5, 99:25, 153:4, 164:21, 177:11, 179:17
**helpful** [8] - 7:11, 18:11, 26:21, 27:9, 102:22, 103:2, 104:10, 163:17
**helpfulness** [1] - 27:6
**hematoma** [16] - 26:11, 47:9, 74:3, 74:6, 74:16, 75:1, 76:18, 76:19, 77:1, 77:24, 78:7, 78:16, 80:20, 94:5, 95:9, 95:11
**hemorrhagic** [1] - 47:8
**hemorrhage** [1] - 77:19
**herein** [3] - 10:20, 110:24, 150:5
**herniated** [1] - 47:23
**Herrera** [1] - 154:19
**Hi** [1] - 3:4
**hiding** [1] - 146:15
**high** [2] - 17:15, 182:6
**highest** [1] - 12:19
**highlight** [1] - 104:24
**highlighted** [1] - 142:19
**highly** [2] - 36:11, 86:9
**hiller** [1] - 154:17
**himself** [5] - 68:20, 106:25, 133:25, 156:11, 177:15
**hindsight** [1] - 89:20
**hired** [1] - 93:22
**history** [13] - 8:18, 16:15, 16:17, 16:20, 26:6, 45:20, 65:8, 65:9, 89:1, 114:17, 115:7, 117:6, 157:3
**Hitesh** [3] - 109:25, 110:15, 149:5
**HITESH** [3] - 2:7, 110:19, 110:23
**hold** [4] - 30:14, 62:5, 151:5, 151:12
**holding** [1] - 35:10
**home** [6] - 156:4, 157:5, 157:13, 159:24, 160:2, 160:8
**homework** [1] - 181:16
**honed** [1] - 111:18
**honesty** [2] - 54:23, 56:21

**Honor** [108] - 3:6, 3:9, 3:11, 4:5, 4:10, 4:15, 7:13, 8:1, 8:23, 14:19, 21:7, 23:15, 26:12, 26:23, 31:10, 32:4, 32:19, 33:13, 38:7, 38:13, 39:18, 39:22, 44:6, 45:3, 50:12, 50:24, 51:10, 52:5, 52:15, 52:20, 52:23, 53:9, 53:18, 53:25, 54:12, 54:21, 54:24, 55:4, 55:23, 56:19, 56:22, 57:8, 58:6, 58:12, 58:24, 59:3, 59:6, 59:12, 59:21, 62:24, 63:5, 73:22, 81:12, 86:7, 87:1, 92:14, 92:20, 94:12, 96:7, 99:9, 100:17, 101:15, 102:23, 103:21, 105:6, 107:12, 110:22, 112:25, 118:22, 120:4, 124:14, 125:21, 130:7, 132:12, 132:17, 140:12, 145:14, 146:2, 146:16, 146:18, 147:8, 147:20, 148:4, 148:5, 148:17, 150:3, 153:21, 156:25, 164:7, 164:24, 169:2, 169:22, 172:14, 172:17, 172:22, 173:24, 175:6, 176:25, 178:11, 179:5, 179:13, 179:20, 181:5, 182:17, 183:8, 183:10, 183:25, 186:12
**Hood** [1] - 154:1
**hook** [1] - 107:1
**hope** [1] - 125:12
**hopefully** [3] - 4:24, 5:15, 9:2
**Hopkins** [1] - 11:12
**horizontal** [2] - 36:7, 37:18
**hospital** [21] - 6:8, 14:1, 41:5, 50:15, 52:17, 53:12, 54:7, 54:16, 56:18, 58:22, 61:9, 84:22, 85:14, 85:19, 86:5, 86:10, 91:20, 91:22, 92:4, 97:18, 155:19
**Hospital** [10] - 11:17, 11:19, 14:3, 14:6, 18:25, 112:9, 112:10, 140:17, 153:25, 154:17
**hospitalizations** [1] - 159:6
**hospitals** [4] - 14:6, 91:23, 92:6, 111:17
**Hospiten** [10] - 14:1, 89:10, 89:16, 90:23, 91:19, 91:21, 91:23, 92:5, 92:11, 154:5
**host** [1] - 46:1
**Hotel** [1] - 92:3

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

198

**hotels** [1] - 92:1
**hour** [8] - 5:25, 50:10, 63:13, 99:17, 100:9, 100:17, 100:24, 117:24
**hours** [9] - 60:11, 61:8, 61:12, 63:13, 65:10, 65:23, 84:24, 136:10, 138:2
**housekeeping** [1] - 23:14
**human** [1] - 33:4
**hundreds** [1] - 86:4
**hurdle** [2] - 108:2, 183:3
**husband's** [1] - 65:23
**hyperostosis** [2] - 75:11, 75:12

## I

**lava** [1] - 154:7
**ice** [1] - 52:25
**idea** [10] - 21:21, 64:2, 64:12, 73:4, 73:5, 131:8, 157:17, 157:25, 184:4, 184:23
**identification** [4] - 25:18, 32:20, 32:21, 120:9
**IDENTIFIED** [1] - 2:16
**identified** [3] - 20:19, 23:19, 31:13
**identify** [4] - 15:1, 23:15, 31:13, 120:18
**if's** [1] - 100:7
**ill** [1] - 6:6
**illness** [2] - 115:7, 151:24
**image** [3] - 76:5, 77:8, 77:21
**images** [4] - 7:4, 8:13, 81:19, 88:17
**imagine** [4] - 84:21, 127:17, 129:15, 144:20
**imaging** [21] - 31:3, 51:5, 51:7, 51:8, 52:17, 52:19, 53:11, 54:7, 54:15, 56:14, 56:18, 57:3, 58:21, 66:18, 87:24, 113:20, 114:21, 116:8, 116:22, 144:15
**immediately** [3] - 58:20, 58:21, 58:22
**imminent** [2] - 173:20, 174:22
**immobilization** [13] - 34:16, 40:25, 42:24, 43:10, 44:16, 45:11, 46:15, 87:21, 88:3, 93:25, 113:15, 116:9, 118:6
**immobilized** [2] - 30:1, 44:22
**immobilizing** [1] - 34:1

**impact** [1] - 95:18
**implicit** [1] - 130:24
**implied** [2] - 70:13, 70:15
**importance** [5] - 95:11, 115:13, 141:18, 142:7, 143:16
**important** [17] - 6:4, 27:7, 35:16, 38:16, 42:8, 44:18, 44:22, 75:3, 75:4, 90:16, 127:11, 133:3, 142:11, 156:18, 156:21, 156:23, 166:8
**importantly** [1] - 27:9
**impose** [1] - 182:4
**impression** [1] - 56:24
**improper** [2] - 130:13, 144:1
**improperly** [1] - 138:24
**improve** [2] - 59:16, 177:5
**inability** [3] - 135:25, 136:3, 145:1
**inaccurate** [1] - 93:9
**inadequate** [2] - 87:24, 113:20
**inadvertently** [2] - 56:13, 80:1
**inappropriate** [2] - 41:3, 138:8
**inappropriately** [1] - 121:20
**inches** [1] - 25:3
**incident** [6] - 30:19, 30:20, 96:23, 157:14, 157:15, 158:7
**include** [4] - 13:23, 177:10, 181:25, 183:20
**included** [3] - 54:22, 56:7, 57:7
**includes** [3] - 115:7, 117:5, 144:15
**including** [6] - 16:15, 27:24, 36:8, 36:9, 68:24, 152:23
**inclusion** [1] - 114:9
**inconceivable** [1] - 99:25
**incorporate** [1] - 155:2
**incorporated** [1] - 155:15
**incorrect** [1] - 76:11
**incorrectly** [2] - 72:17, 168:11
**increase** [1] - 176:23
**incredibly** [1] - 185:20
**incurred** [1] - 142:15
**indeed** [2] - 31:14, 57:13
**independent** [3] - 101:24, 102:8, 177:12
**indicate** [5] - 63:25, 110:7, 136:21, 136:23,

171:11
**indicated** [3] - 34:23, 166:3, 185:17
**indicates** [2] - 117:3, 169:15
**indicating** [4] - 136:14, 170:9, 170:13, 173:8
**indication** [3] - 47:10, 60:23, 61:3
**indicative** [1] - 129:5
**indiscernible** [1] - 9:24
**Indiscernible** [2] - 10:3, 71:1
**indiscernible)** [1] - 18:20
**individual** [8] - 151:22, 151:25, 152:3, 156:21, 157:1, 176:13, 176:16, 177:11
**individuals** [2] - 152:19, 176:18
**inexplicably** [1] - 117:17
**inflammation** [1] - 47:18
**influence** [1] - 93:23
**inform** [1] - 15:20
**information** [10] - 21:4, 22:22, 36:13, 91:1, 140:21, 148:13, 171:10, 181:1, 181:18, 183:18
**informs** [1] - 19:13
**infrastructure** [1] - 36:5
**inherent** [1] - 107:14
**inherently** [2] - 102:18, 109:3
**initial** [5] - 15:24, 18:19, 53:20, 118:14, 175:16
**injured** [1] - 123:9
**Injuries** [4] - 19:2, 19:16, 20:1, 20:10
**injuries** [14] - 13:18, 17:24, 20:3, 20:5, 50:5, 88:3, 88:4, 98:23, 112:17, 114:19, 143:3, 152:18, 152:23, 176:20
**injury** [54] - 16:25, 19:10, 19:12, 22:10, 34:15, 34:17, 34:24, 42:11, 42:17, 44:20, 44:24, 47:25, 48:3, 48:18, 49:6, 49:8, 70:2, 75:14, 87:16, 112:22, 115:7, 115:9, 116:12, 117:4, 118:9, 118:14, 123:4, 123:5, 123:6, 123:9, 126:7, 127:7, 133:19, 134:15, 136:2, 138:15, 142:12, 142:15, 142:16, 143:1, 143:6, 143:9, 143:19, 144:14, 144:23, 151:23, 157:16, 158:6, 158:14, 161:1, 177:22, 178:3

**input** [2] - 167:16, 168:14
**inquire** [2] - 7:8, 93:6
**inquired** [1] - 148:12
**inserted** [1] - 158:16
**Insights** [3] - 19:2, 19:22, 20:12
**instability** [3] - 37:14, 70:3, 83:1
**instance** [6] - 34:24, 60:9, 167:12, 168:5, 177:16
**instead** [3] - 24:9, 24:10, 54:18
**Institutes** [1] - 18:17
**institution** [2] - 11:22, 157:8
**institutions** [1] - 111:17
**instruct** [1] - 57:21
**instructed** [1] - 87:19
**instructive** [1] - 25:23
**insult** [2] - 143:11, 144:17
**intact** [1] - 36:2
**integrity** [1] - 35:18
**intend** [2] - 59:19, 102:8
**Intensive** [4] - 19:3, 19:20, 20:8, 20:12
**intent** [1] - 177:8
**intentional** [1] - 144:19
**intentionally** [3] - 26:14, 144:21, 166:18
**interaction** [2] - 89:8, 157:19
**interest** [1] - 32:11
**interesting** [2] - 80:5, 148:23
**internal** [1] - 11:15
**internally** [2] - 36:1, 69:12
**International** [3] - 151:7, 151:9, 153:10
**internet** [1] - 161:21
**internist** [2] - 11:16, 11:20
**internship** [1] - 11:14
**interpret** [5] - 37:1, 66:19, 67:7, 89:4, 93:4
**interpretation** [13] - 71:13, 127:25, 128:13, 129:1, 129:18, 129:24, 130:2, 130:20, 131:8, 131:11, 131:18, 133:15, 138:9
**interpreting** [2] - 81:18, 137:6
**interrupt** [3] - 79:9, 100:4, 143:20
**interrupted** [1] - 27:1
**interrupting** [2] - 79:6

**intervals** [1] - 82:20
**intimate** [1] - 41:20
**INTO** [1] - 2:16
**introduce** [1] - 24:10
**investigation** [1] - 115:18
**invited** [2] - 12:24, 88:24
**involuntary** [1] - 87:25
**involve** [1] - 145:20
**involved** [2] - 54:25, 76:17
**involvement** [2] - 129:3, 133:14
**irrelevant** [3] - 44:10, 89:21, 141:13
**irreversible** [2] - 121:2, 121:14
**Irvine** [2] - 19:7
**issue** [24] - 6:3, 8:22, 9:16, 9:17, 22:6, 22:20, 23:9, 29:10, 44:9, 69:20, 73:14, 101:22, 102:5, 102:7, 107:14, 109:22, 136:1, 136:7, 148:5, 179:7, 179:9, 181:23, 183:1, 184:2
**issues** [11] - 9:1, 80:9, 106:3, 106:9, 107:6, 108:15, 109:12, 113:7, 120:2, 124:6, 142:23
**issuing** [1] - 181:14
**item** [1] - 162:10
**items** [2] - 22:24, 161:7
**itself** [8] - 36:21, 48:3, 70:6, 70:9, 76:5, 78:10, 82:18

## J

**Jackson** [3] - 14:3, 36:20, 154:5
**Jamaica** [6] - 6:8, 14:2, 50:15, 50:17, 54:7, 92:2
**James** [4] - 4:8, 132:2, 136:19, 136:21
**January** [5] - 14:5, 98:2, 126:1, 126:15, 132:3
**Jarnagin** [5] - 51:22, 52:1, 54:15, 55:6, 56:6
**Jeffrey** [1] - 154:17
**jerk** [1] - 68:22
**jerking** [1] - 82:4
**jerks** [1] - 87:14
**Jessica** [1] - 154:6
**job** [1] - 29:16
**Johns** [1] - 11:12
**joined** [1] - 124:21
**Joining** [1] - 4:6
**joke** [1] - 125:2
**Jones** [2] - 4:13, 4:16

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

**Joseph** [1] - 18:14
**journal** [4] - 18:22, 19:21, 20:11
**journals** [2] - 24:22, 25:16
**Juarez** [22] - 61:22, 62:2, 64:10, 117:10, 117:16, 121:20, 121:24, 126:1, 127:15, 127:19, 128:1, 128:6, 128:20, 133:5, 134:16, 134:25, 136:22, 137:16, 141:15, 143:25, 144:12, 144:20
**Juarez'** [5] - 125:17, 127:20, 127:22, 128:13, 134:18
**judge** [2] - 6:3, 100:21
**Judge** [35] - 3:21, 4:1, 10:18, 28:3, 28:22, 28:25, 29:7, 29:10, 29:11, 29:12, 29:13, 29:14, 35:6, 45:7, 46:20, 49:21, 59:1, 93:14, 95:7, 100:11, 102:7, 109:21, 142:6, 146:11, 148:21, 150:11, 150:25, 151:17, 152:21, 155:15, 156:22, 180:18, 184:8, 184:13, 186:11
**Judge-like** [1] - 184:8
**judgment** [2] - 103:3, 114:6
**judicial** [1] - 147:20
**jump** [1] - 69:17
**jumped** [4] - 36:22, 68:24, 69:14, 82:25
**jumping** [1] - 38:8
**June** [6] - 52:4, 54:8, 55:6, 55:7, 55:20, 56:4
**Jurgens** [1] - 154:9
**jury** [18] - 15:14, 21:14, 26:21, 27:10, 29:9, 29:13, 29:15, 38:6, 103:25, 104:3, 105:21, 106:3, 106:13, 107:11, 108:6, 109:4, 120:19, 163:18

**K**

**Karen** [1] - 154:17
**keen** [1] - 32:11
**keep** [4] - 5:14, 44:22, 73:10, 186:6
**Ken** [1] - 154:2
**Kenya** [1] - 52:24
**Kettering** [1] - 11:18
**Kevin** [1] - 154:7
**key** [1] - 62:8
**KEY** [1] - 52:23
**keyboards** [1] - 58:15
**Keyserling** [16] - 8:12,

14:13, 22:16, 23:5, 24:4, 26:19, 52:21, 53:1, 53:4, 54:17, 57:25, 70:20, 73:15, 75:16, 75:17, 75:22
**Keyserling's** [6] - 15:4, 53:11, 53:19, 54:6, 56:18, 76:6
**Khan** [1] - 154:14
**Khasat** [1] - 154:15
**Kim** [1] - 18:24
**kind** [15] - 17:2, 25:22, 47:13, 47:16, 54:24, 62:19, 62:21, 86:11, 86:22, 106:4, 106:9, 113:11, 115:4, 146:21, 183:11
**kindly** [3] - 6:23, 156:22, 165:4
**kinds** [2] - 87:5, 87:9
**King** [1] - 4:22
**kink** [1] - 37:21
**knowing** [1] - 176:11
**knowledge** [4] - 13:2, 74:9, 90:20, 174:23
**known** [2] - 130:3, 144:14
**knows** [3] - 26:13, 38:15, 104:4
**Krishnan** [1] - 18:15
**Kuruvilla** [1] - 154:10

**L**

**lab** [1] - 114:20
**lack** [5] - 85:10, 104:8, 104:15, 108:7, 108:13
**laid** [1] - 103:5
**language** [1] - 184:6
**large** [3] - 47:23, 92:1, 161:19
**last** [11] - 9:1, 10:13, 17:17, 54:8, 80:13, 82:21, 98:1, 110:14, 110:19, 149:22
**late** [2] - 26:19, 27:19
**Lauren** [2] - 4:15, 154:15
**lavalier** [1] - 13:8
**law** [7] - 4:11, 5:5, 5:12, 15:9, 21:11, 107:15
**Lawler** [1] - 154:7
**laws** [1] - 86:13
**lawyer** [5] - 9:25, 29:11, 29:12, 174:3
**lawyers** [4] - 29:9, 39:1, 72:5, 173:18
**lay** [1] - 86:5
**layman** [1] - 115:8
**laymen** [1] - 122:23
**LD** [1] - 154:16
**lead** [2] - 144:22, 145:2

**leading** [1] - 114:19
**leads** [2] - 115:5, 115:13
**learning** [2] - 22:1, 124:19
**least** [9] - 17:10, 21:20, 76:8, 76:22, 108:24, 138:21, 140:1, 156:19, 167:4
**leave** [5] - 145:23, 149:5, 160:8, 171:8, 185:15
**lectern** [5] - 25:4, 25:8, 50:11, 57:17, 146:14
**led** [1] - 116:12
**left** [7] - 35:10, 42:2, 117:6, 141:5, 153:18, 161:1, 173:12
**left-side** [1] - 117:6
**leg** [3] - 126:11, 126:18, 131:23
**legal** [7] - 23:9, 29:8, 29:15, 29:16, 174:25, 181:21, 181:23
**length** [1] - 182:13
**lens** [1] - 16:22
**lesion** [3] - 47:8, 48:6, 48:8
**less** [14] - 31:3, 97:15, 98:6, 99:18, 138:17, 138:23, 139:1, 162:25, 172:6, 172:16, 173:11, 184:12, 184:20, 185:2
**letter** [1] - 185:5
**level** [1] - 35:13
**levels** [1] - 157:4
**Levi** [7] - 42:15, 68:23, 70:1, 70:16, 76:11, 76:20, 78:20
**Levi's** [2] - 76:15, 76:23
**liaison** [1] - 58:20
**license** [3] - 152:13, 178:9, 178:23
**licensed** [2] - 12:12, 151:5
**Life** [11] - 149:23, 151:6, 151:10, 152:4, 152:8, 152:9, 153:2, 153:10, 154:2, 163:14, 175:24
**life** [117] - 83:5, 83:11, 83:21, 95:24, 96:1, 96:11, 96:15, 96:16, 96:18, 96:19, 96:25, 97:5, 98:4, 101:18, 101:19, 101:24, 102:16, 102:18, 102:20, 102:22, 103:2, 103:6, 104:15, 105:20, 105:23, 105:25, 106:2, 106:12, 106:18, 107:6, 108:7, 108:13, 109:2, 148:24, 149:3, 150:10, 150:12, 151:2, 151:8, 151:18,

151:19, 151:21, 151:23, 152:2, 152:6, 152:7, 152:16, 152:19, 152:22, 153:1, 153:8, 153:15, 154:23, 155:20, 155:25, 156:5, 156:6, 156:7, 157:24, 159:9, 159:19, 161:8, 161:11, 162:3, 162:14, 162:15, 162:16, 163:3, 163:17, 163:21, 167:13, 167:20, 167:23, 167:25, 168:6, 168:13, 168:16, 168:21, 169:8, 169:9, 169:19, 170:21, 170:24, 171:7, 171:14, 171:16, 171:20, 172:15, 172:16, 173:9, 173:16, 176:1, 176:2, 176:5, 176:10, 176:13, 176:14, 176:16, 176:17, 176:18, 176:23, 177:4, 177:7, 177:10, 177:21, 179:2, 179:4, 179:6, 179:9, 179:11, 180:16, 180:18
**lifespan** [2] - 103:20, 104:9
**ligaments** [2] - 35:19
**light** [2] - 23:22, 102:19
**likelihood** [3] - 159:5, 173:21, 174:22
**likely** [9] - 17:5, 17:10, 39:11, 49:18, 82:23, 118:15, 138:15, 144:22, 158:1
**limb** [1] - 86:12
**limine** [2] - 32:3, 37:9
**limit** [1] - 185:13
**limited** [4] - 15:11, 113:3, 180:24, 181:1
**Line** [14] - 63:18, 63:21, 67:19, 68:10, 71:23, 72:13, 72:25, 77:5, 77:9, 120:17, 139:7, 139:14, 165:7, 167:18
**line** [11] - 41:21, 56:7, 96:12, 125:11, 126:13, 126:21, 134:5, 134:7, 134:8, 139:13, 162:10
**linear** [1] - 137:24
**lines** [1] - 128:5
**Lisa** [1] - 154:19
**list** [3] - 48:10, 107:2, 181:16
**listed** [3] - 33:8, 76:21, 77:25
**listen** [5] - 38:22, 54:15, 104:5, 109:11, 124:7
**Literature** [1] - 18:21
**literature** [2] - 25:16, 25:22

**litigated** [1] - 167:20
**litigating** [1] - 167:13
**live** [21] - 97:10, 97:14, 101:21, 102:6, 102:9, 105:12, 106:22, 106:24, 108:24, 162:19, 162:22, 162:23, 162:24, 163:2, 163:9, 172:6, 173:12, 176:8, 176:11, 177:11, 177:20
**lives** [4] - 102:1, 102:2, 152:3, 176:14
**LLAMAS** [3] - 4:13, 125:1, 185:1
**Llamas** [2] - 4:13, 124:24
**LLC** [1] - 154:2
**LMSW** [1] - 154:16
**loading** [1] - 53:16
**located** [1] - 58:8
**location** [2] - 152:2, 161:20
**logical** [1] - 90:3
**logistics** [1] - 181:13
**long-term** [2] - 145:2, 157:9
**look** [27] - 8:2, 14:17, 16:17, 16:18, 31:19, 37:15, 66:23, 67:9, 67:12, 67:14, 76:24, 78:12, 79:18, 81:5, 88:19, 88:24, 89:4, 91:8, 92:11, 93:4, 96:18, 123:17, 125:15, 126:24, 137:11, 138:5
**looked** [3] - 8:11, 64:15, 76:25
**looking** [12] - 8:14, 31:11, 87:11, 117:20, 120:2, 132:22, 136:9, 136:13, 183:6, 184:4
**looks** [3] - 5:13, 132:17, 138:1
**lose** [1] - 159:11
**loss** [9] - 30:13, 30:17, 123:1, 123:6, 128:25, 137:3, 142:21, 143:16, 145:1
**lost** [4] - 82:23, 134:12, 136:6, 142:25
**loud** [1] - 3:24
**louder** [1] - 53:21
**Louis** [3] - 4:13, 19:9, 19:11
**love** [2] - 11:21, 52:25
**low** [1] - 182:7
**LTC** [1] - 157:9
**luck** [1] - 3:10
**lunch** [2] - 99:16, 110:3
**lying** [1] - 84:22

**KEYWORD INDEX**

**James Smith vs. Carnival Corporation, et al.**
**Case No. 1:24-cv-21213-KMW**

200

## M

**M-E-R-K-L-E-R** [1] - 172:10
**M.D** [22] - 112:3, 154:1, 154:4, 154:6, 154:8, 154:9, 154:10, 154:11, 154:12, 154:13, 154:14, 154:15, 154:18, 154:19
**M.D.s** [1] - 112:14
**main** [2] - 47:21, 104:7
**maintain** [3] - 35:3, 35:18, 91:5
**maintained** [1] - 12:4
**major** [1] - 30:14
**majority** [1] - 153:3
**manage** [3] - 160:10, 160:11
**management** [1] - 17:1
**Management** [6] - 18:21, 19:1, 19:5, 19:16, 19:25, 20:10
**managing** [2] - 158:18, 158:22
**Manhattan** [1] - 11:23
**manifest** [1] - 49:9
**manipulation** [1] - 146:20
**manual** [1] - 159:21
**March** [11] - 64:21, 84:4, 155:7, 155:24, 166:25, 168:17, 169:10, 169:11, 169:17, 169:18, 170:11
**Mario** [1] - 149:22
**MARIO** [2] - 2:10, 150:4
**mark** [7] - 23:24, 24:7, 32:20, 52:12, 63:6, 143:5, 143:6
**Mark** [3] - 154:11, 154:12, 184:15
**marked** [3] - 25:17, 169:6, 173:2
**marking** [1] - 32:21
**Mary** [1] - 18:19
**Maryland** [1] - 11:13
**massage** [2] - 184:6, 185:24
**master's** [1] - 151:15
**Master's** [1] - 178:15
**material** [4] - 20:25, 21:2, 23:3, 153:14
**materials** [2] - 13:20, 15:2
**Matt** [1] - 55:8
**matter** [13] - 5:3, 7:24, 16:16, 16:22, 58:14, 62:14, 71:10, 90:9, 101:7, 131:13, 141:9, 172:2, 176:1
**matters** [3] - 5:1, 9:19,

141:13
**Matthias** [1] - 4:7
**McMordie** [1] - 18:14
**mean** [11] - 46:6, 75:4, 80:24, 105:22, 114:2, 136:18, 142:19, 142:23, 143:3, 152:8, 179:10
**meaning** [4] - 52:4, 142:25, 143:11, 147:9
**meaningful** [1] - 175:19
**means** [20] - 12:15, 12:19, 12:20, 42:10, 42:17, 69:14, 78:25, 80:22, 88:23, 115:8, 117:19, 127:17, 127:23, 128:7, 128:15, 129:2, 131:9, 133:13, 152:9, 158:12
**meant** [7] - 52:10, 105:25, 127:15, 128:20, 142:4, 142:7, 144:20
**mechanism** [1] - 82:6
**medical** [102] - 10:15, 11:13, 13:22, 13:25, 14:2, 14:13, 17:12, 20:11, 22:23, 23:4, 23:6, 24:1, 24:3, 24:22, 25:14, 25:15, 25:16, 30:3, 39:6, 42:22, 43:3, 49:12, 49:15, 49:22, 60:19, 61:10, 64:8, 64:14, 64:15, 64:16, 66:2, 66:5, 69:22, 74:2, 81:24, 87:18, 90:22, 90:24, 97:3, 97:13, 98:22, 106:17, 111:10, 111:25, 112:2, 112:5, 112:12, 113:14, 114:15, 114:21, 116:6, 116:7, 116:17, 117:3, 118:2, 122:1, 123:16, 123:21, 124:2, 125:10, 126:6, 128:9, 129:6, 129:10, 131:10, 132:3, 133:17, 133:20, 133:21, 135:12, 135:13, 135:18, 135:19, 135:22, 136:13, 136:25, 138:9, 144:1, 144:8, 151:24, 152:1, 152:12, 153:16, 153:17, 154:25, 155:17, 155:18, 156:2, 157:2, 157:3, 157:6, 158:5, 158:9, 159:1, 159:2, 159:4, 159:5, 161:22, 170:18
**Medical** [2] - 11:18, 154:17
**medically** [3] - 17:11, 45:22, 163:17
**Medicare** [1] - 161:24
**medication** [1] - 160:13
**medications** [2] - 156:4,

157:5
**medicine** [18] - 11:15, 16:17, 17:13, 54:24, 111:5, 111:9, 111:11, 111:15, 111:19, 111:21, 111:24, 112:11, 115:4, 115:25, 122:23, 122:24, 141:7, 155:9
**Medicine** [10] - 12:2, 19:2, 19:3, 19:10, 19:21, 19:22, 20:8, 20:12, 20:13, 154:18
**meet** [2] - 5:4, 15:13
**member** [1] - 156:24
**members** [2] - 120:19, 122:18
**memoranda** [1] - 23:9
**memorandum** [4] - 181:22, 181:23, 182:3, 182:13
**Memorial** [2] - 11:18, 14:3
**memorializing** [1] - 181:15
**memorizing** [1] - 33:4
**memory** [1] - 67:20
**men's** [1] - 8:25
**mention** [8] - 7:24, 52:13, 57:25, 58:5, 76:25, 101:5, 148:11, 184:10
**mentioned** [14] - 19:16, 22:2, 22:3, 22:24, 23:6, 53:11, 54:17, 56:18, 69:17, 76:23, 78:23, 79:17, 101:4, 133:9
**mentioning** [2] - 37:6, 98:14
**mentions** [4] - 52:14, 52:17, 52:18, 54:6
**mere** [1] - 94:21
**Merkler** [7] - 98:1, 171:19, 171:22, 171:24, 172:10, 172:11, 173:4
**Merkler's** [2] - 172:5, 173:11
**message** [6] - 51:16, 51:17, 51:25, 55:6, 58:19, 186:2
**messages** [2] - 84:3, 84:4
**met** [1] - 152:9
**method** [7] - 16:11, 16:14, 17:3, 17:10, 17:13, 17:14, 81:17
**methodology** [49] - 16:6, 16:8, 17:15, 17:19, 17:20, 17:23, 18:1, 21:9, 21:16, 26:20, 27:5, 27:8, 45:7, 45:16, 46:17, 46:21, 48:11, 48:13, 48:16,

90:10, 93:24, 95:13, 113:12, 113:17, 115:1, 115:3, 115:6, 115:19, 115:21, 115:24, 116:2, 141:10, 142:8, 144:10, 148:2, 151:21, 153:5, 153:7, 153:9, 153:11, 154:23, 163:20, 164:13, 171:13, 175:23, 180:15, 183:15, 183:22
**methods** [2] - 163:11, 163:13
**Miami** [18] - 12:2, 12:6, 12:22, 14:4, 14:6, 33:23, 47:12, 58:10, 58:16, 69:13, 76:12, 90:23, 111:13, 111:17, 112:9, 112:16
**mic** [5] - 13:8, 25:5, 25:7, 57:15, 59:17
**Michael** [3] - 4:10, 154:9, 154:14
**microphone** [10] - 7:16, 7:18, 10:1, 13:7, 13:9, 25:2, 25:3, 25:6, 25:8, 45:13
**middle** [2] - 84:22, 126:14
**midnight** [1] - 60:22
**midst** [1] - 59:1
**midway** [1] - 68:9
**might** [2] - 33:2, 33:24
**mild** [1] - 123:2
**million** [4] - 162:11, 162:18, 162:21, 163:8
**mind** [3] - 17:10, 110:18, 186:6
**mine** [1] - 132:7
**minor** [2] - 120:2, 123:5
**minute** [11] - 22:12, 84:13, 91:15, 123:22, 124:4, 124:9, 132:10, 136:16, 139:11, 148:6, 173:25
**minutes** [6] - 4:23, 4:24, 5:15, 37:7, 64:22, 65:6
**miscommunication** [1] - 102:24
**misheard** [1] - 91:17
**Mishra** [1] - 154:18
**misleading** [1] - 130:14
**misrepresent** [1] - 6:20
**missed** [2] - 101:10, 146:9
**missing** [2] - 54:15, 105:17
**Missouri** [1] - 19:11
**mistake** [3] - 51:6, 84:2, 106:5
**mistaken** [1] - 56:25

**misunderstood** [3] - 99:21, 100:12, 148:3
**misused** [1] - 116:25
**mix** [1] - 112:13
**mobility** [1] - 156:4
**model** [2] - 35:4, 36:23
**moderate** [1] - 123:5
**modest** [1] - 150:15
**modesty** [4] - 11:10, 111:7, 150:17, 150:25
**modifications** [2] - 156:4, 159:24
**modify** [1] - 22:14
**Mohammed** [2] - 126:1, 154:4
**moment** [17] - 25:17, 40:14, 40:15, 40:19, 60:7, 60:15, 77:7, 81:12, 82:16, 100:4, 102:11, 109:17, 127:8, 137:9, 162:21, 163:6
**moments** [3] - 8:1, 8:22, 58:6
**Monday** [2] - 52:11, 55:22
**Monday's** [1] - 55:12
**money** [1] - 103:23
**Montego** [12] - 6:8, 14:2, 50:17, 50:18, 50:22, 51:4, 54:7, 54:16, 56:13, 56:17, 58:22, 154:5
**months** [5] - 9:14, 97:2, 97:20, 162:19
**Moon** [1] - 92:3
**morning** [29] - 3:4, 4:5, 4:10, 4:15, 6:12, 7:24, 10:24, 10:25, 40:7, 50:14, 50:20, 52:7, 55:9, 55:20, 55:23, 56:8, 57:1, 59:25, 60:1, 84:3, 84:4, 84:8, 117:2, 117:15, 122:13, 129:24, 132:12, 134:13, 155:24
**most** [8] - 11:5, 17:11, 41:8, 45:22, 107:10, 113:18, 120:3, 156:16
**mostly** [1] - 14:15
**motion** [29] - 14:23, 15:8, 15:21, 23:18, 26:2, 26:8, 26:9, 27:18, 28:10, 31:23, 31:25, 32:3, 37:9, 60:25, 82:4, 82:7, 86:13, 107:5, 107:22, 107:23, 107:25, 146:20, 169:7, 173:3, 174:8, 185:15, 185:16, 185:19
**motor** [5] - 136:1, 137:3, 142:22, 143:7, 143:13
**mouth** [1] - 78:17
**move** [30] - 7:15, 10:6,

**KEYWORD INDEX**

**James Smith vs. Carnival Corporation, et al.**
**Case No. 1:24-cv-21213-KMW**

201

23:16, 24:21, 35:12, 62:7, 68:14, 82:1, 82:2, 85:8, 86:1, 86:6, 86:15, 86:22, 87:4, 87:6, 87:10, 87:20, 93:15, 93:16, 126:10, 126:17, 127:16, 127:18, 128:1, 140:3, 143:4, 145:1, 177:15

**moveable** [1] - 7:18
**moved** [28] - 43:20, 61:18, 61:22, 62:3, 62:12, 62:16, 62:18, 63:25, 64:5, 65:10, 65:23, 67:17, 67:22, 67:25, 68:1, 68:20, 111:13, 117:17, 117:23, 118:5, 118:8, 120:19, 121:20, 121:25, 122:6, 143:19

**movement** [50] - 30:6, 30:7, 36:8, 37:17, 37:18, 42:4, 42:5, 42:10, 61:24, 62:19, 62:22, 68:2, 68:23, 69:4, 69:15, 82:12, 82:23, 82:24, 84:23, 86:12, 118:11, 120:19, 121:7, 122:4, 122:11, 122:17, 123:10, 125:9, 128:18, 129:3, 133:13, 136:1, 136:5, 138:14, 138:25, 139:19, 142:5, 142:16, 142:17, 142:18, 142:21, 143:13, 144:1, 144:11, 144:18, 144:22, 144:25, 148:9

**movements** [5] - 36:9, 85:9, 87:16, 87:25, 117:21
**moves** [4] - 43:19, 62:20, 62:21
**moving** [11] - 25:1, 30:11, 59:17, 61:21, 82:22, 86:10, 119:8, 138:13, 140:1, 142:23, 144:24

**MR** [338] - 4:5, 4:10, 4:13, 6:3, 6:16, 7:2, 7:11, 7:13, 7:20, 7:22, 8:25, 9:4, 9:7, 9:18, 9:21, 9:24, 10:3, 10:6, 10:8, 10:18, 10:23, 13:8, 13:10, 13:12, 13:13, 14:19, 14:22, 14:25, 15:9, 16:3, 20:17, 21:7, 21:17, 22:4, 23:13, 23:21, 24:19, 24:20, 25:9, 25:11, 25:13, 26:12, 27:4, 28:3, 28:6, 28:11, 28:18, 28:19, 28:24, 29:1, 29:5, 29:19, 31:10, 32:4, 32:18, 32:21, 33:13, 33:16, 35:6, 35:8, 36:25, 38:3, 38:5, 39:18, 40:1, 40:4, 40:14, 40:16,

40:19, 40:21, 41:11, 41:13, 41:15, 41:23, 44:6, 44:13, 45:3, 45:5, 45:14, 46:12, 46:13, 46:23, 49:1, 49:10, 50:7, 50:12, 50:17, 50:23, 51:15, 51:22, 52:2, 52:5, 52:7, 52:15, 52:20, 52:23, 53:5, 53:8, 53:13, 53:22, 54:12, 54:21, 56:3, 56:6, 56:9, 56:19, 56:21, 57:13, 57:16, 57:19, 58:9, 58:12, 58:17, 58:24, 59:3, 59:6, 59:9, 59:12, 59:15, 59:19, 59:24, 62:24, 63:1, 63:5, 63:8, 71:2, 71:19, 72:4, 72:6, 72:8, 72:10, 72:12, 73:15, 73:17, 73:19, 73:22, 73:25, 74:1, 77:14, 77:15, 79:11, 81:12, 81:14, 84:11, 84:16, 84:20, 85:1, 85:5, 85:7, 85:13, 86:7, 86:16, 86:18, 86:21, 86:24, 86:25, 87:3, 87:17, 89:13, 89:16, 90:6, 91:16, 92:10, 92:14, 92:15, 92:17, 92:20, 92:24, 93:14, 93:17, 93:18, 94:12, 95:5, 95:7, 95:22, 96:6, 96:13, 96:14, 98:10, 99:9, 99:14, 99:20, 100:2, 100:11, 100:15, 100:17, 100:21, 100:25, 101:6, 101:10, 101:15, 102:11, 102:13, 103:12, 103:15, 103:21, 104:3, 104:22, 105:6, 105:8, 105:19, 105:24, 106:19, 107:3, 108:15, 109:1, 109:7, 109:10, 109:17, 109:20, 109:25, 110:9, 110:22, 111:2, 111:20, 112:25, 113:9, 113:10, 118:17, 118:22, 118:25, 119:2, 119:4, 120:4, 120:8, 123:13, 123:15, 124:1, 124:11, 124:14, 125:1, 125:5, 125:6, 125:21, 125:24, 126:23, 130:7, 130:10, 130:18, 131:1, 131:3, 131:5, 131:6, 132:12, 132:17, 132:21, 135:2, 135:3, 135:5, 136:20, 139:5, 139:7, 139:9, 139:14, 139:15, 140:7, 140:12, 140:15, 141:21, 141:24, 142:2, 145:3, 145:12, 145:14, 145:17, 145:20, 146:2, 146:5, 146:9, 146:16, 147:4, 147:7, 147:10, 147:12,

147:20, 148:1, 148:3, 148:10, 148:15, 148:21, 148:24, 149:2, 149:5, 149:7, 149:15, 150:3, 150:8, 150:16, 150:21, 150:24, 153:21, 163:24, 164:3, 164:5, 164:7, 164:9, 164:24, 165:3, 169:2, 169:5, 169:22, 170:1, 172:10, 172:12, 172:14, 172:17, 172:22, 173:1, 173:24, 174:2, 174:16, 175:2, 175:6, 175:9, 176:25, 177:3, 177:23, 179:20, 179:24, 180:1, 180:11, 180:13, 180:21, 181:2, 181:9, 181:11, 182:17, 182:20, 182:24, 182:25, 183:7, 183:10, 183:24, 184:20, 184:23, 185:1, 186:11, 186:12

**MRI** [25] - 67:1, 77:18, 78:1, 78:2, 78:5, 78:6, 78:14, 78:22, 79:13, 79:14, 79:17, 79:21, 79:23, 79:25, 80:1, 80:7, 80:15, 80:18, 80:23, 80:25, 81:1, 81:5, 81:8, 81:16, 88:9

**MS** [2] - 4:15, 185:2
**Mullick** [1] - 154:13
**multiple** [2] - 137:23, 162:24
**Murphy** [1] - 5:13
**Murphy's** [1] - 5:12
**muscle** [2] - 129:2, 133:13
**muscles** [1] - 36:4
**must** [4] - 67:16, 67:22, 99:20, 168:12
**myelitis** [1] - 47:18
**mystery** [1] - 8:20

## N

**Naiman** [1] - 48:1
**NAIMAN** [1] - 48:1
**name** [20] - 4:6, 10:12, 10:13, 10:14, 20:11, 33:23, 51:22, 70:16, 76:23, 76:25, 92:5, 110:13, 110:14, 110:17, 110:19, 149:20, 149:21, 149:22, 172:8
**namely** [3] - 15:24, 56:17, 66:6
**names** [1] - 73:13
**Nancy** [2] - 53:1, 154:7
**Napoleon** [1] - 184:16

**Nasiru** [1] - 154:9
**National** [1] - 18:17
**national** [1] - 176:19
**nationwide** [1] - 178:11
**naturally** [1] - 15:22
**nature** [5] - 62:23, 69:18, 168:7, 168:14, 174:1
**near** [2] - 173:20, 174:22
**nearly** [1] - 115:23
**necessarily** [1] - 24:13
**necessary** [5] - 40:12, 93:2, 104:24, 107:9, 107:11
**neck** [67] - 20:4, 30:1, 30:9, 36:4, 43:18, 61:16, 61:18, 62:3, 62:7, 62:12, 62:16, 62:19, 63:25, 64:5, 65:10, 65:23, 67:17, 67:22, 67:25, 68:13, 68:14, 82:1, 82:2, 82:12, 82:24, 84:23, 86:15, 86:23, 87:4, 87:6, 87:10, 87:16, 87:20, 117:18, 117:23, 118:5, 118:9, 118:12, 119:8, 120:20, 121:7, 121:20, 121:25, 122:4, 122:6, 122:7, 122:11, 136:5, 138:13, 138:21, 139:19, 140:1, 142:17, 143:18, 143:25, 144:1, 144:11, 144:14, 144:18, 144:19, 144:22, 144:25, 148:9
**need** [51] - 3:18, 5:2, 5:4, 7:9, 7:15, 40:19, 57:14, 96:13, 97:15, 101:13, 103:4, 104:16, 105:9, 105:14, 105:17, 106:7, 106:14, 106:17, 107:7, 109:8, 109:16, 135:11, 138:6, 144:24, 146:8, 151:22, 152:11, 157:18, 158:8, 159:4, 159:8, 159:13, 159:15, 159:17, 159:18, 159:20, 159:22, 159:23, 159:25, 160:2, 160:5, 160:6, 160:10, 170:19, 177:9, 178:9, 181:19, 182:11, 182:13, 184:14
**needed** [5] - 81:4, 157:14, 163:22, 171:6, 171:12
**needs** [18] - 4:24, 15:5, 135:19, 158:1, 158:5, 158:8, 158:15, 158:20, 160:3, 160:25, 163:12, 163:16, 177:9, 177:14, 177:15, 177:21, 180:20, 183:12

**neighborhood** [1] - 180:5
**Nemani** [1] - 18:24
**NEMANI** [1] - 18:24
**nerves** [2] - 11:5, 143:3
**nervous** [2] - 3:16, 109:15
**Nesbitt** [4] - 28:22, 28:25, 29:7, 29:11
**Neuro** [1] - 154:2
**neurogenic** [5] - 158:11, 158:13, 159:10, 160:10
**neurological** [14] - 116:13, 116:17, 116:24, 117:13, 117:15, 117:24, 118:10, 134:12, 134:15, 134:19, 136:4, 141:16, 141:17, 144:5
**neurologist** [16] - 12:20, 13:17, 16:24, 40:23, 44:2, 44:4, 48:14, 53:5, 53:7, 85:18, 86:5, 88:6, 90:16, 90:21, 155:11, 172:12
**neurologists** [1] - 44:18
**neurology** [23] - 11:3, 11:6, 11:10, 11:21, 11:23, 11:24, 12:8, 12:10, 12:12, 12:16, 12:18, 13:14, 17:21, 19:7, 19:9, 22:9, 48:17, 49:25, 66:25, 97:20, 98:2, 158:10
**neurora** [1] - 70:24
**neuroradiologist** [8] - 8:12, 67:5, 71:3, 72:2, 72:16, 73:17, 90:7, 90:12
**neuroradiology** [1] - 90:15
**neurorehabilitation** [1] - 11:4
**neurosurgeon** [7] - 14:16, 43:24, 71:5, 73:1, 73:3, 73:19, 93:20
**never** [20] - 9:15, 22:24, 38:17, 64:9, 65:22, 66:16, 67:9, 69:17, 76:5, 83:23, 88:22, 94:13, 94:25, 130:19, 130:23, 131:16, 131:17, 136:7, 149:1, 166:6
**never-ending** [1] - 94:25
**New** [5] - 11:14, 11:17, 33:24, 111:10, 111:12
**new** [35] - 21:2, 21:4, 22:22, 22:23, 23:3, 27:23, 28:9, 28:14, 28:15, 32:24, 36:25, 37:3, 39:9, 39:12, 46:24, 47:1, 94:23, 95:20, 117:13, 117:16, 117:24, 124:20, 134:12, 134:15, 141:16, 143:17, 146:21,

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

202

178:23, 183:14, 183:15, 183:22

**Newton's** [1] - 86:13
**next** [16] - 23:12, 24:21, 28:17, 47:4, 64:5, 85:12, 90:5, 95:21, 96:5, 97:2, 99:8, 99:19, 110:7, 148:20, 149:14, 182:20
**NEXUS** [4] - 113:18, 115:20, 116:8, 116:24
**nice** [1] - 88:21
**NICHOLAS** [2] - 2:4, 10:19
**Nicholas** [5] - 10:14, 155:5, 155:9, 158:4, 160:22
**night** [3] - 64:8, 64:14, 66:3
**night's** [1] - 108:25
**Niki** [1] - 154:16
**nine** [1] - 30:11
**NO** [1] - 2:16
**nobody** [1] - 104:4
**nomenclature** [2] - 128:10, 128:22
**nonambulatory** [1] - 159:25
**none** [2] - 20:18, 91:9
**nonverbally** [2] - 156:16, 166:15
**noon** [1] - 100:1
**normal** [3] - 158:19, 164:13, 171:13
**normally** [4] - 29:8, 75:8, 96:18, 100:8
**NOT** [1] - 27:13
**notations** [1] - 141:11
**note** [12] - 36:20, 87:22, 125:17, 125:25, 126:5, 126:9, 131:18, 131:20, 132:2, 132:19, 132:23, 147:8
**noted** [7] - 30:7, 30:8, 30:10, 30:11, 30:16, 45:4, 49:3
**notes** [13] - 31:17, 33:8, 36:13, 41:5, 110:6, 126:16, 136:22, 136:23, 137:6, 140:19, 140:22, 141:1, 141:4
**noteworthy** [1] - 8:5
**nothing** [11] - 8:9, 31:24, 39:12, 43:25, 44:3, 44:5, 61:20, 87:22, 119:25, 186:11, 186:12
**notice** [6] - 9:11, 20:21, 24:13, 32:24, 33:7, 147:21
**notices** [1] - 4:3
**notify** [1] - 55:13
**notion** [1] - 43:25

**nowadays** [1] - 178:6
**nuanced** [1] - 183:6
**nuances** [4] - 38:12, 38:22, 104:6, 127:10
**number** [15] - 97:24, 104:8, 108:2, 136:1, 139:13, 152:22, 159:3, 159:8, 159:12, 160:14, 161:13, 171:17, 176:17, 179:10, 182:3
**numbers** [1] - 120:2
**numeric** [2] - 83:5, 173:9
**nurse** [29] - 30:7, 30:8, 30:10, 30:11, 60:19, 64:18, 65:15, 117:12, 129:5, 129:11, 129:14, 129:17, 129:23, 130:3, 130:12, 130:16, 130:19, 131:14, 131:16, 132:24, 133:4, 134:2, 134:4, 134:24, 135:9, 135:22, 136:24, 137:15, 160:3
**nurse's** [10] - 129:13, 130:5, 130:20, 130:23, 131:8, 131:12, 131:17, 131:20, 131:21, 137:25
**nurses** [8] - 64:18, 82:19, 87:19, 130:11, 140:19, 141:1, 141:4, 141:12
**nurses'** [1] - 138:6
**nursing** [2] - 133:14, 137:11

**O**

**oath** [4] - 63:10, 63:20, 83:19, 119:20
**object** [6] - 23:21, 26:14, 32:23, 39:2, 44:6, 94:12
**objecting** [3] - 36:25, 141:21, 173:24
**objection** [42] - 14:19, 15:18, 16:2, 21:3, 22:13, 22:15, 22:18, 26:15, 26:25, 39:17, 39:22, 41:11, 41:17, 45:3, 46:11, 46:23, 46:25, 49:1, 64:1, 85:1, 85:4, 85:6, 86:7, 86:16, 86:24, 89:13, 89:15, 89:24, 90:4, 93:13, 112:25, 113:1, 130:8, 130:9, 135:2, 135:5, 174:1, 176:25, 180:21, 180:24
**objections** [2] - 38:10, 39:15
**objective** [3] - 115:10, 128:4, 131:11
**objects** [1] - 20:18
**observed** [1] - 85:18

**obtained** [2] - 7:4, 116:22
**obtaining** [1] - 115:15
**obvious** [1] - 70:11
**obviously** [4] - 3:18, 4:18, 9:10, 15:23
**occult** [1] - 47:13
**occupation** [3] - 11:2, 111:3, 150:9
**occupational** [1] - 159:14
**occur** [4] - 30:19, 80:10, 134:13, 143:3
**occurred** [7] - 16:21, 47:9, 60:12, 115:8, 121:13, 122:13, 144:4
**occurrence** [1] - 112:18
**OCD** [2] - 149:1, 149:3
**OCD-plagued** [1] - 149:3
**ocean** [1] - 84:23
**odor** [2] - 95:8, 95:16
**offer** [4] - 88:22, 171:1, 181:24, 182:22
**offered** [1] - 170:21
**offering** [2] - 102:20, 179:2
**office** [14] - 52:9, 57:20, 57:21, 58:8, 58:9, 58:10, 58:14, 58:16, 92:22, 93:1, 170:4, 170:5, 170:9
**Office** [1] - 185:9
**officer** [1] - 33:2
**offices** [1] - 55:10
**often** [1] - 116:25
**old** [6] - 28:23, 29:1, 29:2, 29:6, 184:15, 185:4
**onboard** [2] - 13:22, 98:22
**once** [5] - 17:2, 43:17, 108:20, 157:13, 159:9
**one** [57] - 5:22, 17:11, 18:12, 18:24, 28:13, 30:14, 32:21, 33:24, 36:18, 36:23, 37:18, 40:14, 41:8, 43:16, 45:22, 46:2, 48:3, 48:6, 49:5, 50:10, 53:20, 58:18, 65:12, 68:13, 77:25, 79:1, 79:2, 80:7, 80:10, 86:10, 91:14, 97:10, 98:5, 98:7, 103:9, 105:8, 108:2, 112:4, 113:22, 113:23, 113:25, 114:1, 122:12, 125:18, 135:17, 136:1, 159:22, 161:13, 168:14, 172:6, 172:8, 172:15, 172:16, 173:12, 184:16, 185:5
**one-year** [1] - 172:15
**ones** [1] - 89:1

**ongoing** [1] - 95:4
**online** [1] - 24:5
**open** [3] - 54:19, 73:7, 141:25
**open-ended** [1] - 54:19
**opened** [5] - 86:25, 95:8, 95:14, 95:16, 141:24
**operative** [1] - 36:20
**opine** [3] - 147:24, 162:16, 174:3
**opined** [1] - 6:9
**opines** [1] - 148:7
**opining** [1] - 170:24
**opinion** [76] - 15:5, 15:24, 21:12, 27:21, 38:23, 42:21, 43:1, 43:2, 43:3, 44:8, 45:6, 45:10, 45:16, 46:14, 47:2, 49:19, 61:5, 62:2, 67:16, 67:19, 67:21, 72:18, 86:18, 90:12, 94:22, 95:20, 95:25, 102:16, 102:20, 103:6, 103:19, 103:22, 105:20, 106:1, 106:18, 106:21, 107:6, 108:14, 113:4, 113:13, 114:22, 116:5, 116:18, 117:21, 118:1, 118:11, 122:15, 125:8, 131:13, 134:22, 135:4, 135:18, 141:21, 142:8, 144:8, 146:21, 147:8, 147:9, 147:21, 154:23, 155:17, 156:18, 156:24, 157:23, 161:12, 162:8, 162:14, 171:21, 172:5, 173:11, 176:7, 178:5, 178:6, 179:3, 180:19, 181:24
**opinions** [85] - 8:9, 13:21, 15:13, 15:16, 16:5, 16:7, 16:9, 18:2, 24:24, 25:19, 26:18, 26:21, 27:6, 27:14, 27:16, 27:22, 27:23, 28:9, 28:14, 28:15, 28:16, 30:24, 32:23, 32:24, 37:1, 37:3, 37:5, 39:9, 39:10, 44:7, 46:24, 49:19, 66:14, 73:3, 73:4, 88:22, 90:9, 90:17, 91:4, 91:6, 91:9, 93:3, 93:23, 94:18, 94:23, 96:8, 96:15, 96:16, 101:19, 101:24, 101:25, 102:9, 102:10, 103:1, 105:11, 106:11, 106:23, 108:5, 108:23, 114:12, 114:13, 115:2, 116:3, 121:11, 136:10, 141:10, 153:14, 155:3, 160:22, 163:16, 166:9, 166:17, 166:23, 175:19,

175:23, 179:2, 180:15, 180:16, 181:25, 182:22, 183:15, 183:16, 183:23
**opinions's** [1] - 146:23
**opportunity** [17] - 14:12, 21:20, 22:7, 22:20, 24:15, 24:16, 26:17, 39:8, 70:11, 90:19, 90:22, 93:6, 93:7, 94:22, 131:17, 142:6, 179:23
**opposed** [2] - 157:14, 179:12
**opposing** [3] - 6:5, 6:6, 181:18
**opposite** [2] - 39:10, 39:11
**opposition** [1] - 23:17
**OR** [1] - 2:16
**oral** [1] - 12:24
**order** [14] - 33:1, 40:10, 62:18, 82:1, 99:14, 99:15, 99:21, 117:10, 138:7, 159:23, 178:8, 181:15, 184:3, 185:18
**Order** [2] - 3:1, 5:19
**ordered** [2] - 59:1, 113:15
**orders** [1] - 5:23
**Oskato** [1] - 154:9
**ossified** [1] - 70:3
**osteopathic** [2] - 111:21, 111:24
**OT** [1] - 154:8
**OTA** [1] - 154:9
**otherwise** [1] - 177:17
**outlined** [5] - 160:16, 176:19, 176:22, 177:9, 177:19
**outlines** [1] - 104:23
**outpatient** [1] - 160:2
**output** [1] - 158:18
**outside** [7] - 100:6, 145:24, 146:12, 176:25, 180:21, 180:23
**overall** [2] - 107:11, 120:2
**overgrowth** [1] - 75:12
**overlies** [1] - 74:15
**overruled** [9] - 15:19, 16:2, 47:1, 86:8, 87:8, 89:24, 90:4, 135:6, 142:1
**Overview** [1] - 18:14
**own** [9] - 3:25, 17:14, 25:24, 58:4, 61:21, 76:15, 90:20, 98:13, 177:1
**Oyeyemi** [1] - 154:8

**P**

**p.m** [36] - 29:25, 30:4,

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

203

30:5, 30:21, 30:23, 31:2, 40:10, 40:11, 40:18, 40:25, 41:24, 43:5, 43:14, 60:9, 60:13, 61:9, 61:13, 62:4, 62:9, 63:24, 65:11, 65:24, 66:4, 67:17, 67:22, 99:10, 110:5, 110:11, 116:21, 117:1, 119:8, 120:20, 149:11, 149:12, 149:18, 186:15

**PA** [3] - 154:5, 154:15, 154:19

**page** [7] - 77:4, 120:1, 126:14, 132:2, 139:4, 185:13, 185:21

**Page** [28] - 63:17, 67:19, 68:6, 71:22, 72:13, 72:25, 77:5, 77:9, 78:8, 83:13, 83:16, 120:12, 121:4, 121:9, 121:10, 125:16, 125:20, 125:22, 126:21, 132:3, 132:5, 132:9, 132:14, 132:17, 132:19, 139:3, 165:4, 167:17

**PAGE** [1] - 2:3

**page-compliant** [1] - 185:21

**pages** [27] - 126:20, 154:24, 155:1, 165:23, 166:2, 182:11, 182:17, 182:20, 183:4, 183:7, 183:8, 183:10, 183:24, 184:1, 184:11, 184:12, 184:14, 185:12, 185:13, 185:22, 185:25, 186:3, 186:4, 186:5

**pagination** [1] - 132:6

**paid** [4] - 90:11, 90:15, 93:23, 94:22

**pain** [8] - 30:9, 74:17, 74:22, 74:24, 75:3, 75:4, 157:4

**painful** [2] - 47:16, 87:15

**Palm** [2] - 58:9, 58:16

**Palo** [1] - 14:15

**papers** [1] - 181:21

**paragraph** [1] - 185:24

**paralysis** [17] - 42:2, 42:12, 74:21, 74:23, 75:2, 82:19, 113:5, 121:1, 121:13, 121:21, 122:23, 122:24, 133:19, 142:13, 145:2, 146:21

**paralyzed** [7] - 42:1, 43:21, 46:2, 68:12, 68:13, 122:21, 122:22

**parameters** [1] - 114:5

**parentheses** [1] - 33:9

**paresis** [2] - 42:9, 42:13

**parlay** [1] - 107:11

**part** [16] - 8:7, 11:5, 18:16, 27:14, 62:15, 67:2, 67:5, 102:14, 112:15, 115:5, 116:1, 128:4, 133:2, 168:20, 186:8

**participate** [1] - 161:24

**particular** [15] - 52:17, 65:5, 65:22, 69:3, 101:5, 129:17, 131:8, 131:20, 131:25, 138:3, 138:10, 153:5, 153:7, 161:20, 171:10

**particularly** [9] - 8:5, 38:16, 64:18, 77:18, 78:22, 79:1, 80:6, 80:23, 80:25

**parties** [3] - 103:9, 104:20, 182:21

**pass** [5] - 13:2, 82:16, 152:14, 173:20, 174:21

**passed** [2] - 12:23, 60:12

**passenger** [1] - 34:4

**passes** [1] - 82:8

**passive** [2] - 122:1, 122:9

**passively** [2] - 68:20, 121:25

**past** [4] - 16:18, 37:6, 157:3, 178:2

**Patel** [1] - 154:18

**patient** [55] - 13:24, 16:17, 16:19, 25:25, 26:6, 29:24, 30:16, 34:17, 34:19, 34:25, 44:22, 47:9, 47:15, 62:6, 84:22, 86:10, 86:14, 86:22, 87:6, 87:10, 88:22, 88:24, 89:3, 89:9, 90:20, 92:4, 97:14, 97:21, 98:2, 114:7, 114:8, 114:18, 115:6, 115:8, 115:17, 117:4, 117:5, 126:9, 126:16, 126:25, 127:1, 128:4, 128:6, 135:7, 135:10, 135:23, 138:12, 138:13, 138:20, 139:25, 140:25, 141:5, 144:16, 156:23

**patient's** [6] - 16:20, 17:8, 47:11, 67:10, 86:6, 179:3

**patients** [12] - 17:1, 50:4, 85:14, 85:17, 86:4, 88:2, 112:17, 112:22, 140:18, 152:17, 152:22, 176:20

**Paul** [8] - 83:9, 83:20, 102:17, 132:2, 136:18, 136:21, 149:16, 149:22

**PAUL** [2] - 2:10, 150:4

**Pause** [2] - 3:22, 100:16

**paying** [1] - 150:21

**PC** [1] - 154:2

**peaceful** [1] - 108:25

**Pearson** [1] - 154:11

**peer** [6] - 18:5, 18:8, 21:12, 22:8, 153:9, 153:11

**pending** [2] - 14:23, 101:7

**people** [2] - 69:13, 79:5

**per** [3] - 99:14, 102:1, 103:24

**percent** [5] - 49:16, 49:18, 135:21, 148:16

**perfectly** [1] - 39:16

**perform** [1] - 90:19

**performed** [5] - 44:23, 65:1, 87:24, 116:23, 126:1

**perhaps** [9] - 51:6, 56:13, 102:4, 103:25, 138:23, 138:25, 147:1, 147:20, 148:3

**period** [8] - 74:16, 74:17, 81:3, 94:25, 98:5, 107:6, 109:4, 171:11

**periodically** [1] - 60:20

**permanent** [2] - 121:2, 121:13

**permanently** [1] - 68:5

**permit** [2] - 95:21, 96:7

**permitted** [3] - 15:21, 21:15, 47:3

**person** [2] - 4:20, 166:6

**personal** [1] - 176:3

**perspective** [1] - 160:13

**ph** [9] - 126:1, 154:6, 154:7, 154:13, 154:14

**Ph.D** [1] - 178:9

**phew** [1] - 108:1

**phone** [2] - 155:24, 161:21

**phrase** [3] - 54:18, 130:22, 184:2

**phrased** [1] - 147:6

**physiatry** [1] - 158:10

**physical** [26] - 16:16, 16:18, 65:1, 89:1, 114:19, 115:12, 117:11, 133:2, 137:2, 137:23, 144:16, 149:23, 150:10, 150:12, 151:2, 151:4, 151:6, 151:10, 159:14, 162:15, 178:3, 178:5, 178:7, 178:9, 178:24

**Physical** [4] - 151:11, 151:12, 178:12, 178:13

**physically** [2] - 24:7, 58:14

**physician** [36] - 11:3, 40:24, 64:10, 66:12, 110:16, 111:4, 112:16, 113:13, 115:11, 115:15,

117:10, 118:3, 118:7, 135:8, 135:12, 135:15, 135:16, 135:18, 135:22, 140:17, 160:18, 161:23, 167:9, 167:10, 167:14, 167:16, 168:14, 170:16, 170:17, 170:19, 170:22, 171:4, 173:8, 176:2, 176:3

**physician's** [1] - 115:10

**physicians** [17] - 17:16, 48:19, 66:10, 66:16, 128:14, 140:23, 141:1, 155:4, 161:5, 162:1, 165:24, 166:19, 166:20, 167:22, 168:1, 168:8, 168:20

**physicians'** [1] - 138:6

**pick** [1] - 138:7

**picture** [2] - 68:4, 89:3

**Piedmont** [2] - 153:24, 154:1

**pin** [2] - 43:13, 82:14

**pinpoint** [6] - 39:8, 56:16, 56:19, 69:3, 97:7

**place** [4] - 34:24, 79:23, 87:16, 96:23

**placed** [8] - 30:2, 34:3, 34:8, 34:10, 34:13, 36:21, 138:20, 138:25

**placement** [1] - 36:12

**plagued** [1] - 149:3

**plaintiff** [17] - 4:4, 8:14, 30:3, 30:5, 30:9, 30:10, 30:11, 30:12, 33:6, 83:21, 102:6, 102:17, 106:1, 106:15, 170:22, 171:4, 171:5

**Plaintiff** [3] - 10:20, 110:24, 150:5

**plaintiff's** [8] - 30:1, 30:7, 54:5, 58:23, 103:12, 103:13, 173:18, 174:6

**plan** [37] - 83:11, 102:18, 102:22, 103:2, 105:21, 106:2, 109:3, 115:14, 115:16, 151:20, 151:21, 152:2, 153:1, 153:15, 154:24, 155:20, 155:25, 156:5, 156:7, 156:8, 161:8, 167:20, 167:23, 168:1, 168:6, 168:16, 176:2, 176:5, 176:10, 176:13, 176:16, 176:23, 177:4, 177:8, 177:10, 179:2, 180:16

**Planner** [7] - 149:24, 151:7, 152:5, 152:8, 152:9, 163:14, 175:24

**planner** [16] - 83:21, 101:18, 101:19, 148:24,

149:4, 150:10, 151:8, 151:18, 151:19, 157:24, 161:11, 162:5, 162:15, 171:15, 171:20, 176:1

**planners** [4] - 152:6, 152:7, 153:1, 162:3

**Planners** [2] - 153:2, 153:11

**Planning** [1] - 151:10

**planning** [8] - 20:23, 20:25, 21:2, 21:4, 150:13, 151:3, 163:21, 171:14

**plans** [7] - 152:17, 152:19, 152:22, 153:8, 157:12, 168:13, 176:18

**pleadings** [1] - 174:25

**plegia** [2] - 42:8, 42:12

**plugging** [1] - 97:18

**plus** [1] - 25:25

**pocket** [1] - 153:20

**point** [45] - 7:23, 9:2, 11:21, 13:3, 15:24, 20:25, 23:10, 26:16, 26:20, 26:22, 30:14, 35:11, 36:14, 42:3, 61:2, 61:21, 62:3, 62:8, 62:10, 62:11, 63:14, 63:25, 65:9, 66:15, 69:21, 81:16, 82:12, 105:8, 119:22, 122:8, 130:18, 133:25, 134:17, 136:12, 136:21, 136:23, 138:3, 144:7, 147:17, 171:11, 171:14, 177:18, 182:8, 183:19

**pointing** [3] - 107:19, 125:8, 125:16

**points** [2] - 15:19, 161:19

**police** [2] - 33:2, 33:3

**polished** [1] - 184:7

**portion** [1] - 142:3

**position** [12] - 21:8, 23:20, 25:23, 36:22, 80:5, 87:12, 92:23, 101:17, 106:15, 147:23, 173:14, 174:24

**possesses** [1] - 102:10

**possibility** [6] - 47:8, 47:17, 78:15, 80:20, 173:19, 174:21

**possible** [9] - 11:11, 17:7, 45:21, 48:10, 68:16, 80:8, 138:14, 139:22, 159:19

**post** [5] - 111:13, 181:15, 181:20, 184:3

**post-hearing** [4] - 181:15, 181:20, 184:3

**post-residency** [1] - 111:13

**KEYWORD INDEX**

**James Smith vs. Carnival Corporation, et al.**
**Case No. 1:24-cv-21213-KMW**

204

**potential** [3] - 46:1, 112:16, 156:3
**potentially** [1] - 34:19
**Power** [2] - 133:13, 142:24
**power** [10] - 127:1, 128:6, 128:7, 128:9, 128:13, 128:20, 128:22, 133:5, 133:12, 159:21
**practice** [23] - 8:8, 12:7, 12:12, 14:16, 17:14, 22:9, 48:14, 49:25, 67:2, 88:6, 88:15, 111:9, 111:18, 112:15, 115:22, 140:16, 153:3, 153:4, 163:13, 164:14, 168:20, 176:3
**practicing** [3] - 11:3, 17:16, 99:21
**precise** [1] - 148:25
**precisely** [1] - 142:6
**predicate** [2] - 85:10, 95:15
**preexisting** [2] - 27:23, 42:2
**preference** [1] - 166:21
**prehearing** [1] - 39:23
**prejudice** [4] - 21:25, 22:7, 22:11, 55:22
**preliminary** [11] - 9:19, 167:11, 167:13, 167:15, 167:25, 168:7, 168:13, 175:10, 175:15, 175:19
**premature** [2] - 46:8, 116:11
**prematurely** [1] - 116:22
**preparation** [3] - 14:17, 20:24, 33:9
**prepare** [2] - 165:20, 168:12
**prepared** [9] - 6:21, 32:12, 33:1, 59:10, 91:2, 103:18, 155:22, 167:15, 171:20
**prepares** [1] - 151:19
**presence** [2] - 47:22, 73:6
**present** [2] - 78:16, 103:25
**presentation** [2] - 107:12, 114:6
**presenting** [1] - 115:7
**preserve** [1] - 41:18
**preserved** [2] - 42:4
**press** [1] - 74:18
**pressure** [2] - 144:17, 159:3
**presume** [1] - 34:14
**pretrial** [4] - 107:23, 108:11, 109:13
**pretty** [4] - 101:3, 103:5,

156:5, 184:4
**prevail** [1] - 107:25
**prevailing** [2] - 113:14, 141:15
**prevented** [1] - 79:25
**prevents** [1] - 15:17
**previous** [3] - 117:6, 141:2
**previously** [5] - 21:3, 26:18, 54:25, 169:6, 173:2
**priced** [1] - 152:2
**primary** [2] - 104:14, 158:5
**principles** [1] - 163:20
**private** [1] - 88:6
**privately** [1] - 31:18
**privilege** [1] - 4:7
**probability** [12] - 42:22, 43:4, 49:13, 49:17, 49:22, 97:13, 116:6, 116:17, 118:2, 144:8, 159:5, 163:22
**probable** [3] - 17:11, 45:23, 159:19
**probe** [1] - 9:6
**probing** [1] - 3:19
**problem** [13] - 3:20, 17:8, 34:21, 34:22, 36:16, 37:20, 38:1, 46:6, 47:12, 57:23, 62:19, 70:8, 124:9
**problematic** [1] - 5:1
**problems** [1] - 124:22
**Procedure** [1] - 95:3
**procedures** [1] - 159:18
**proceed** [5] - 59:21, 118:25, 125:4, 150:2, 164:5
**proceeding** [5] - 23:19, 25:18, 44:10, 98:9, 113:8
**proceedings** [8] - 3:22, 5:17, 5:18, 100:16, 110:5, 149:11, 149:12, 186:15
**process** [8] - 6:18, 95:4, 115:15, 115:18, 137:20, 151:20, 177:13
**produce** [4] - 26:7, 82:18, 87:16
**produced** [5] - 23:8, 170:2, 175:10, 175:13, 175:15
**producing** [1] - 24:11
**profession** [2] - 17:21, 115:25
**professional** [10] - 3:14, 5:11, 12:5, 12:19, 48:14, 129:10, 135:22, 151:14, 152:13, 184:8
**professional's** [1] - 135:18
**professionals** [3] -

129:6, 135:14, 152:1
**Professor** [1] - 12:3
**professor** [3] - 14:14, 19:6, 19:9
**professors** [1] - 12:25
**proffered** [1] - 182:14
**program** [6] - 11:16, 12:21, 18:25, 151:15, 158:20, 161:24
**Program** [2] - 11:17, 11:22
**progress** [1] - 123:5
**progressed** [1] - 97:16
**progression** [2] - 143:6, 143:11
**progressive** [2] - 47:16, 136:4
**prohibits** [1] - 21:11
**projector** [1] - 124:6
**promulgating** [1] - 67:11
**pronouncing** [1] - 53:2
**proof** [1] - 21:10
**propel** [1] - 182:5
**proper** [2] - 26:20, 176:22
**properly** [2] - 124:20, 148:14
**prorated** [1] - 163:2
**protection** [1] - 43:18
**protective** [1] - 66:6
**protocols** [2] - 112:21, 112:24
**prouder** [1] - 184:9
**provide** [20] - 6:10, 6:23, 7:8, 15:21, 22:4, 22:11, 23:3, 26:4, 27:13, 37:2, 55:21, 83:5, 93:1, 103:23, 113:19, 156:1, 172:18, 182:1, 183:18, 183:21
**provided** [10] - 56:12, 56:25, 57:9, 89:10, 89:17, 94:20, 155:23, 170:19, 171:15, 179:3
**provider** [1] - 136:24
**providers** [2] - 161:22, 162:4
**provides** [1] - 22:22
**providing** [2] - 103:19, 118:8
**prudent** [1] - 135:16
**PT** [1] - 154:8
**publications** [1] - 18:5
**published** [5] - 18:16, 18:20, 18:22, 96:19, 162:3
**pull** [3] - 43:13, 123:13, 125:18
**pulling** [1] - 82:14
**purpose** [4] - 35:1, 35:2, 35:3, 88:2
**purposes** [1] - 120:9

**put** [14] - 8:13, 11:10, 18:17, 21:19, 34:6, 34:16, 45:23, 49:5, 95:10, 113:22, 114:1, 150:17, 150:25, 156:6
**puts** [1] - 58:14
**putting** [3] - 38:8, 78:17, 111:7

**Q**

**quadriparesis** [2] - 42:9, 42:11
**quadriplegia** [14] - 42:9, 42:10, 42:14, 43:6, 49:9, 82:11, 83:2, 116:10, 118:12, 142:10, 144:13, 152:18, 152:20, 152:23
**quadriplegic** [11] - 42:7, 42:18, 42:25, 45:18, 46:16, 48:13, 67:24, 82:1, 94:2, 159:11, 161:1
**quadriplegics** [1] - 176:21
**qualifications** [4] - 111:9, 129:13, 133:23, 180:15
**qualified** [2] - 66:22, 102:10
**quality** [1] - 25:1
**quantification** [2] - 133:7, 133:8
**Quantum** [1] - 154:12
**QUESTION** [17] - 63:22, 68:16, 72:14, 73:1, 77:21, 83:20, 83:23, 120:18, 120:22, 121:11, 139:18, 139:25, 165:10, 165:13, 167:19, 167:25, 168:4
**questioned** [3] - 80:8, 127:19, 130:19
**questioning** [4] - 96:12, 141:25, 145:20, 181:1
**questions** [27] - 50:8, 51:11, 64:6, 65:3, 66:8, 84:11, 84:15, 87:3, 94:4, 95:9, 95:23, 98:12, 110:21, 113:6, 113:12, 118:18, 119:23, 120:3, 127:12, 140:8, 140:11, 145:4, 163:25, 175:3, 177:24, 180:24, 181:2
**questions.** [1] - 98:11
**quicker** [1] - 5:21
**quickly** [2] - 9:5, 36:24
**quiet** [1] - 88:21
**quite** [3] - 21:13, 87:14, 102:5
**quote** [15] - 54:10, 54:11, 55:9, 55:11, 68:11, 69:23,

126:10, 126:11, 126:17, 126:18, 127:15, 168:7, 173:19, 173:21, 174:20

**R**

**R-A-M-O-S** [1] - 149:23
**R-A-V-A-L** [1] - 110:19
**R.N** [1] - 154:19
**radio** [2] - 53:5, 53:6
**radiologist** [8] - 6:9, 53:9, 67:2, 67:4, 67:6, 89:2, 89:5, 89:6
**radiologists** [4] - 38:14, 81:18, 88:16, 88:21
**radiology** [2] - 78:18, 88:7
**Radiology** [2] - 154:4, 154:12
**raise** [2] - 148:4, 149:17
**raised** [1] - 148:11
**raising** [2] - 38:10, 112:25
**Rajid** [1] - 154:13
**rallying** [1] - 97:23
**RAMOS** [2] - 2:10, 150:4
**Ramos** [53] - 83:9, 83:20, 100:22, 101:2, 101:18, 101:23, 102:5, 102:8, 103:4, 104:23, 105:2, 105:4, 105:11, 106:3, 106:7, 106:25, 107:18, 107:21, 108:1, 108:10, 108:19, 108:22, 109:22, 149:16, 149:22, 150:9, 152:4, 152:16, 152:25, 153:13, 154:22, 155:2, 155:8, 156:10, 157:19, 160:16, 162:13, 163:1, 163:11, 164:10, 165:4, 169:6, 170:2, 170:15, 172:8, 172:18, 173:2, 173:14, 175:10, 176:7, 179:21, 180:2, 180:14
**Ramos'** [2] - 102:17, 106:23
**Ramos's** [1] - 109:2
**Ramsad** [2] - 126:1, 154:4
**range** [1] - 87:10
**rare** [1] - 47:25
**rather** [4] - 25:24, 82:2, 104:19, 124:23
**Raval** [12] - 99:10, 99:21, 110:7, 110:10, 110:15, 110:19, 119:5, 119:11, 125:7, 128:11, 131:7, 147:24
**RAVAL** [2] - 2:7, 110:23
**Raval's** [1] - 113:2

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

**Ravel's** [1] - 148:7
**ray** [2] - 67:1, 88:13
**rays** [1] - 67:9
**reach** [1] - 47:2
**reacting** [1] - 31:23
**read** [36] - 18:12, 19:18, 19:19, 26:2, 31:25, 64:9, 64:17, 66:19, 67:20, 69:21, 71:13, 72:7, 72:16, 72:18, 73:11, 76:6, 76:11, 76:22, 77:6, 79:15, 88:9, 88:11, 88:13, 89:11, 89:17, 89:18, 89:19, 126:12, 127:20, 130:3, 130:13, 130:23, 147:1, 147:13, 171:23, 172:7
**reading** [2] - 31:16, 88:17
**ready** [2] - 99:19, 110:6
**real** [2] - 173:19, 174:21
**realistic** [3] - 84:21, 85:8, 86:3
**reality** [1] - 39:13
**realize** [1] - 158:14
**really** [15] - 34:20, 36:24, 95:16, 100:11, 106:11, 114:6, 115:17, 122:24, 127:11, 137:12, 168:24, 182:9, 182:11, 182:14, 185:11
**reason** [14] - 6:11, 7:6, 24:25, 25:21, 25:22, 26:1, 48:12, 57:4, 57:9, 76:24, 90:18, 126:20, 132:8, 173:21
**reasonable** [15] - 17:12, 18:11, 42:21, 43:3, 45:23, 49:22, 97:13, 106:16, 116:5, 116:16, 118:1, 144:8, 161:14, 161:16, 163:21
**reasons** [1] - 90:2
**rebut** [7] - 26:17, 27:18, 73:2, 73:5, 78:6, 78:15, 80:19
**rebuttal** [2] - 26:18, 27:24
**rebutting** [1] - 27:21
**recantation** [1] - 89:7
**received** [10] - 9:15, 11:13, 50:25, 52:9, 55:8, 55:9, 92:17, 170:12, 173:8, 185:18
**receives** [1] - 54:5
**receiving** [5] - 98:22, 157:10, 157:13, 157:17, 160:19
**recent** [2] - 159:15, 171:25
**recently** [1] - 92:2

**recertification** [1] - 152:14
**recertified** [1] - 152:11
**recess** [5] - 5:16, 110:1, 110:3, 149:8, 186:13
**recessed** [2] - 5:17, 149:11
**recognition** [1] - 12:20
**recollection** [1] - 164:21
**recommendations** [12] - 109:5, 156:1, 156:6, 160:17, 160:21, 169:1, 170:15, 170:18, 171:6, 171:7, 171:12, 171:16
**recommended** [3] - 88:23, 160:24, 161:5
**record** [35] - 10:13, 17:19, 18:1, 18:12, 24:14, 27:14, 28:3, 32:19, 36:20, 38:9, 39:2, 39:19, 44:3, 51:19, 61:20, 64:16, 67:11, 67:20, 69:22, 72:19, 78:10, 80:12, 81:24, 84:12, 94:7, 102:7, 110:14, 118:19, 125:2, 146:25, 147:13, 149:21, 157:2, 157:6
**record's** [2] - 51:17, 93:19
**records** [44] - 13:22, 13:25, 14:3, 14:5, 14:8, 14:13, 14:15, 15:25, 16:18, 17:4, 22:15, 22:23, 23:5, 23:8, 24:2, 24:3, 24:17, 26:7, 37:11, 37:12, 39:6, 40:5, 41:5, 43:25, 61:11, 76:12, 76:25, 87:18, 90:22, 91:7, 115:10, 116:7, 117:3, 151:25, 153:16, 153:17, 153:24, 154:7, 154:25, 155:17, 155:18, 155:21, 158:4
**RECROSS** [1] - 179:25
**Recross** [1] - 2:12
**RECROSS-EXAMINATION** [1] - 179:25
**Recross-Examination** [1] - 2:12
**recumbent** [1] - 87:13
**REDIRECT** [4] - 84:19, 140:14, 175:8, 180:12
**Redirect** [3] - 2:5, 2:8, 2:11
**redirect** [2] - 6:1, 175:5
**redirecting** [1] - 96:6
**reduce** [1] - 139:19
**reduced** [1] - 98:4
**refer** [2] - 130:1, 167:17

**reference** [2] - 18:13, 19:15
**referenced** [3] - 24:2, 51:7, 172:20
**references** [3] - 23:8, 24:17, 51:4
**referencing** [1] - 23:16
**referred** [2] - 115:24, 116:25
**referring** [11] - 31:11, 62:7, 79:14, 120:1, 128:10, 134:3, 137:2, 143:13, 171:18, 174:7, 174:8
**refers** [1] - 115:4
**reflect** [1] - 40:5
**reflected** [1] - 157:6
**refresh** [1] - 164:21
**regarding** [23] - 16:16, 83:11, 94:4, 95:9, 95:23, 96:1, 96:9, 96:15, 96:16, 101:19, 101:24, 101:25, 102:9, 105:12, 106:23, 108:23, 153:15, 154:23, 156:11, 162:14, 163:16, 180:19, 181:19
**regardless** [1] - 184:16
**region** [1] - 112:12
**registered** [2] - 151:4, 159:2
**regular** [3] - 25:8, 45:12, 112:20
**regularly** [1] - 17:17
**rehabilitation** [1] - 158:6
**relate** [2] - 107:8, 108:6
**relates** [3] - 21:4, 113:4, 173:15
**relationship** [3] - 7:5, 12:5
**relative** [2] - 26:18, 36:18
**relatively** [1] - 112:18
**relevance** [1] - 44:7
**relevant** [5] - 51:10, 90:12, 90:13, 90:18, 113:8
**reliable** [2] - 26:21, 170:16
**reliance** [2] - 20:21, 134:21
**relied** [9] - 15:6, 23:4, 25:24, 64:16, 78:6, 80:19, 81:24, 133:20, 162:2
**relief** [1] - 147:17
**rely** [13] - 20:25, 21:2, 21:15, 22:23, 23:23, 25:24, 88:15, 105:9, 122:25, 140:18, 140:22, 141:1, 141:4
**relying** [6] - 78:14, 125:14, 126:5, 130:4, 131:21, 132:23

**remain** [2] - 7:17, 104:18
**remainder** [1] - 151:23
**remaining** [1] - 36:1
**remember** [11] - 28:25, 29:6, 63:2, 70:17, 80:11, 84:9, 88:21, 100:23, 100:24, 119:17, 179:8
**remind** [1] - 79:9
**removal** [16] - 42:24, 43:4, 43:10, 45:11, 45:16, 45:20, 46:14, 60:19, 62:9, 66:5, 82:11, 87:23, 93:25, 116:9, 116:11, 142:8
**remove** [6] - 41:6, 43:17, 43:23, 44:15, 137:25
**removed** [18] - 30:5, 31:2, 40:6, 40:10, 40:17, 40:24, 41:24, 41:25, 42:3, 42:18, 49:7, 60:8, 82:13, 87:20, 113:16, 116:21, 143:22
**removing** [3] - 31:4, 31:6, 113:19
**render** [8] - 15:13, 16:6, 16:9, 41:16, 88:17, 93:22, 93:23, 180:19
**rendered** [4] - 25:19, 49:20, 66:14, 67:24
**rendering** [15] - 45:10, 45:16, 46:14, 90:16, 103:6, 116:2, 141:10, 142:8, 153:14, 154:23, 155:2, 155:17, 156:18, 156:24, 180:16
**renders** [3] - 76:1, 105:20, 106:2
**repair** [1] - 4:24
**repaired** [1] - 4:25
**repeat** [2] - 28:22, 174:14
**rephrase** [4] - 50:19, 129:20, 131:3, 185:23
**report** [119] - 8:13, 15:4, 20:19, 21:19, 22:3, 22:24, 25:20, 27:15, 31:14, 31:24, 33:3, 37:7, 37:8, 37:15, 38:17, 38:19, 38:23, 39:3, 39:23, 41:12, 41:21, 45:24, 49:2, 49:5, 49:21, 51:4, 51:8, 52:17, 52:18, 52:20, 53:11, 53:14, 54:6, 54:17, 56:12, 56:18, 56:23, 57:3, 58:1, 58:4, 58:5, 61:3, 62:10, 64:24, 69:18, 70:10, 70:13, 70:15, 70:16, 71:13, 73:12, 75:19, 76:6, 76:21, 76:22, 76:24, 77:21, 78:14, 79:1, 79:14, 79:19, 80:4, 80:18, 81:1, 81:3, 81:8, 83:24, 86:19,

89:7, 89:11, 91:3, 94:14, 94:18, 95:20, 103:6, 141:22, 146:23, 147:12, 147:21, 147:24, 148:7, 148:11, 156:9, 165:14, 165:20, 165:25, 167:2, 167:3, 167:5, 167:8, 167:11, 167:13, 169:8, 169:9, 169:18, 169:20, 170:9, 170:10, 170:13, 170:14, 171:3, 171:7, 171:20, 172:18, 172:19, 173:3, 173:7, 175:10, 175:13, 175:15, 175:18, 175:22, 176:4, 177:19, 182:1
**reported** [5] - 60:16, 60:24, 61:24, 70:1, 128:1
**reporter** [4] - 3:14, 10:2, 72:11, 79:4
**reporter's** [1] - 4:19
**reports** [27] - 30:3, 30:13, 37:2, 53:19, 71:8, 73:11, 77:16, 77:18, 78:12, 78:13, 78:17, 78:18, 78:22, 78:25, 79:1, 80:23, 88:7, 88:9, 88:11, 88:13, 88:17, 89:19, 114:15, 121:21, 167:15, 168:21
**representation** [3] - 102:19, 174:6, 174:12
**representations** [1] - 174:18
**representatives** [1] - 5:5
**represented** [4] - 7:25, 173:18, 174:9, 174:25
**representing** [1] - 4:8
**reproduce** [1] - 162:5
**request** [20] - 6:15, 6:25, 7:1, 7:3, 9:8, 9:13, 32:7, 50:20, 50:21, 51:13, 54:22, 55:9, 55:13, 57:7, 59:8, 103:9, 103:10, 103:12, 103:13, 174:8
**requested** [1] - 50:24
**requests** [3] - 51:2, 55:14, 56:10
**require** [2] - 88:20, 170:18
**required** [8] - 21:17, 21:19, 34:18, 67:6, 88:3, 165:23, 175:16, 180:19
**requirement** [1] - 168:25
**requires** [2] - 15:10, 36:11
**rescue** [1] - 34:11
**research** [4] - 21:13, 152:1, 161:22, 182:21
**reserve** [4] - 22:13,

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

22:17, 39:20, 107:7
  **reserving** [1] - 23:23
  **residency** [8] - 11:15, 11:24, 11:25, 12:1, 12:21, 111:12, 111:13
  **resident** [1] - 151:13
  **resilient** [1] - 97:11
  **resources** [1] - 161:13
  **respect** [1] - 26:13
  **respiratory** [2] - 160:11, 160:13
  **respond** [1] - 24:15
  **responded** [3] - 51:2, 55:7, 55:17
  **response** [10] - 27:3, 29:25, 50:25, 51:17, 55:5, 55:14, 55:16, 55:23, 122:3, 128:8
  **responses** [1] - 56:10
  **responsibility** [1] - 135:15
  **rest** [4] - 19:19, 35:17, 163:17, 177:21
  **resting** [2] - 36:22, 61:9
  **result** [7] - 86:12, 92:21, 148:9, 151:23, 158:7, 158:13, 177:22
  **results** [1] - 115:16
  **resume** [1] - 110:6
  **resumed** [3] - 5:18, 110:5, 149:12
  **retained** [8] - 72:2, 72:16, 73:3, 83:20, 164:15, 165:14, 171:15, 172:13
  **retrospect** [4] - 48:8, 54:21, 57:6, 186:4
  **return** [2] - 9:3, 9:5
  **returned** [1] - 115:16
  **reveal** [1] - 94:17
  **reversed** [1] - 158:24
  **review** [29] - 8:7, 13:21, 15:25, 21:21, 22:7, 37:11, 80:3, 88:7, 89:22, 89:23, 90:1, 90:2, 90:22, 92:25, 94:7, 114:11, 114:13, 116:7, 138:6, 151:24, 153:13, 153:17, 155:16, 156:8, 165:23, 166:2, 167:16, 168:14
  **Review** [1] - 18:22
  **reviewed** [43] - 6:9, 13:22, 13:25, 14:2, 14:5, 14:8, 15:2, 15:3, 15:6, 15:11, 15:15, 18:5, 18:8, 21:13, 22:8, 22:16, 24:3, 27:18, 36:21, 41:6, 51:8, 54:7, 69:22, 71:8, 80:7, 89:20, 89:21, 89:22, 114:15, 114:22, 114:23,

115:5, 144:15, 153:10, 153:11, 153:16, 153:24, 154:24, 155:1, 155:18, 156:8, 170:10, 176:6
  **reviewing** [3] - 14:12, 32:14, 158:3
  **revising** [1] - 97:5
  **rewrite** [1] - 186:1
  **right-hand** [4] - 126:17, 126:25, 127:16, 128:1
  **right-side** [1] - 134:1
  **right-sided** [9] - 60:16, 60:24, 61:3, 61:24, 62:10, 117:5, 119:9, 126:6, 127:6
  **rights** [1] - 39:16
  **rigid** [3] - 34:25, 35:1, 36:12
  **rigidity** [1] - 35:3
  **rigorous** [1] - 16:14
  **Ring** [2] - 157:21, 157:22
  **risk** [1] - 29:13
  **Ritesh** [1] - 154:18
  **RN** [3] - 132:2, 136:18, 154:7
  **road** [1] - 182:5
  **Robert** [2] - 19:6, 19:8
  **Robinson** [1] - 4:11
  **Rochelle** [1] - 154:16
  **rocking** [3] - 62:21, 68:21, 82:4
  **roles** [1] - 111:16
  **roll** [1] - 79:8
  **rolling** [1] - 86:11
  **room** [12] - 8:25, 17:16, 65:17, 99:22, 101:12, 112:15, 118:3, 140:17, 140:25, 141:5, 155:19, 159:6
  **ROSE** [2] - 4:15, 185:2
  **rose** [1] - 123:13
  **Rose** [1] - 4:15
  **rotation** [1] - 139:21
  **roving** [1] - 25:5
  **rule** [9] - 15:9, 21:10, 21:17, 29:11, 44:23, 46:11, 48:22, 48:25, 94:16
  **Rule** [1] - 21:17
  **ruled** [3] - 29:13, 49:4, 88:4
  **Rules** [1] - 95:3
  **rules** [3] - 29:10, 94:17, 95:2
  **ruling** [16] - 22:6, 22:13, 22:14, 22:17, 23:23, 27:11, 28:13, 39:14, 41:16, 41:19, 41:21, 46:9, 95:1, 107:24, 108:11, 108:12
  **rulings** [3] - 29:8, 29:16

**S**

  **S-U-I-T-E** [1] - 10:15
  **Sagar** [1] - 154:10
  **salesmen** [1] - 182:7
  **Sam** [1] - 52:25
  **Samir** [1] - 154:18
  **sandbagging** [1] - 21:24
  **Sara** [1] - 154:8
  **satisfy** [1] - 13:1
  **Saturday** [2] - 84:3, 155:24
  **sauce** [2] - 28:7
  **save** [2] - 104:19, 113:9
  **saw** [12] - 26:2, 69:14, 71:14, 72:24, 76:5, 77:17, 78:22, 79:19, 80:3, 80:23, 83:8, 96:24
  **scale** [2] - 133:5, 133:8
  **scan** [12] - 44:15, 44:18, 44:23, 69:14, 78:4, 79:18, 80:3, 81:2, 81:6, 88:11, 89:10, 92:12
  **scenario** [2] - 67:25, 138:24
  **scenarios** [1] - 68:22
  **schedule** [3] - 100:12, 100:21, 104:18
  **scheduled** [5] - 99:10, 103:8, 103:16, 104:12, 155:23
  **scheduling** [1] - 5:23
  **school** [5] - 17:15, 111:10, 111:25, 112:6, 178:7
  **School** [2] - 12:2, 19:9
  **scientific** [7] - 16:11, 16:14, 17:3, 17:9, 17:13, 81:17
  **scooter** [4] - 13:24, 29:24, 30:19, 30:20
  **scope** [7] - 41:11, 49:1, 96:4, 141:22, 177:1, 180:22, 180:23
  **score** [1] - 128:23
  **scoring** [4] - 114:3, 114:7, 115:20, 128:22
  **Scott** [1] - 154:10
  **scratch** [1] - 186:1
  **screen** [2] - 124:6, 124:10
  **screenshots** [3] - 8:13, 58:1, 58:3
  **script** [2] - 79:8, 150:19
  **scroll** [1] - 53:14
  **scrolling** [1] - 53:18
  **Sean** [1] - 154:15
  **search** [1] - 161:20
  **seat** [1] - 7:18
  **seated** [4] - 3:5, 5:20,

59:4, 149:13
  **second** [9] - 18:18, 29:25, 30:14, 47:13, 53:14, 87:7, 109:24, 125:18, 152:5
  **secondary** [1] - 49:4
  **see** [42] - 5:10, 8:17, 9:17, 20:23, 46:10, 47:16, 51:3, 53:13, 57:2, 57:8, 60:3, 63:19, 64:6, 69:9, 69:21, 77:19, 78:8, 79:12, 87:18, 92:15, 97:15, 97:23, 100:7, 100:10, 109:23, 112:20, 114:7, 120:21, 126:3, 126:19, 126:21, 126:22, 127:3, 132:20, 134:5, 137:12, 138:1, 141:5, 146:15, 169:14, 170:6
  **seeing** [5] - 93:8, 126:13, 150:21, 157:1, 170:24
  **seeking** [4] - 25:22, 28:9, 32:22, 147:17
  **seem** [1] - 126:21
  **segments** [1] - 35:21
  **Seixas** [1] - 154:19
  **selected** [1] - 18:11
  **semantics** [2] - 78:25, 143:9
  **send** [14] - 52:8, 54:10, 54:18, 55:14, 55:18, 55:25, 56:14, 57:22, 58:11, 58:15, 58:19, 58:21, 58:22, 182:5
  **sending** [1] - 186:3
  **sensation** [8] - 30:13, 30:17, 123:2, 134:6, 134:10, 136:6, 142:14
  **sense** [3] - 93:9, 93:10, 102:23
  **sensory** [2] - 137:3, 143:2
  **sent** [8] - 52:1, 54:20, 55:19, 56:15, 58:13, 92:19, 156:8, 170:9
  **sentence** [3] - 75:19, 134:10, 185:23
  **separate** [1] - 82:20
  **sequentially** [1] - 137:22
  **serious** [1] - 125:3
  **service** [2] - 19:10, 161:21
  **services** [5] - 4:21, 112:12, 151:21, 161:7, 177:11
  **serving** [1] - 181:17
  **set** [4] - 17:5, 64:5, 106:11, 145:25
  **setting** [3] - 41:7, 138:24, 174:9

  **settings** [1] - 111:18
  **setup** [1] - 72:23
  **seven** [2] - 35:13, 97:20
  **seventh** [1] - 30:8
  **several** [5] - 6:19, 18:10, 97:2, 113:18, 114:5
  **severe** [8] - 74:17, 74:22, 76:8, 76:9, 123:2, 123:6, 160:25, 176:20
  **severity** [1] - 76:13
  **shall** [1] - 9:17
  **share** [3] - 43:2, 72:19, 73:6
  **shift** [2] - 64:18, 141:1
  **shifts** [1] - 141:2
  **ship** [25] - 13:23, 29:22, 34:4, 36:9, 40:24, 43:22, 44:2, 47:11, 68:21, 82:4, 84:22, 85:21, 86:1, 86:6, 90:23, 94:8, 113:14, 117:3, 117:10, 117:23, 118:5, 123:24, 141:12, 158:7
  **ship's** [3] - 62:20, 64:10, 64:17
  **ships** [2] - 85:9, 86:1
  **shore** [1] - 108:9
  **short** [1] - 185:20
  **shorter** [1] - 185:5
  **shorthand** [1] - 41:18
  **shortly** [2] - 29:25, 30:20
  **show** [22] - 31:7, 31:9, 33:19, 34:6, 36:23, 37:24, 72:22, 73:9, 84:4, 84:12, 100:9, 100:18, 106:16, 118:19, 125:2, 125:12, 126:25, 128:6, 129:9, 137:8, 137:20, 172:18
  **showed** [2] - 81:19, 164:20
  **showing** [2] - 37:25, 134:15
  **shows** [1] - 35:4
  **sic]** [1] - 18:18
  **side** [17] - 5:24, 5:25, 30:6, 30:7, 30:13, 30:18, 42:2, 42:4, 42:5, 82:22, 94:19, 99:16, 117:6, 117:8, 134:1, 153:20, 186:10
  **side's** [1] - 28:13
  **sided** [10] - 60:16, 60:24, 61:3, 61:24, 62:10, 117:5, 119:9, 126:6, 126:7, 127:6
  **sides** [7] - 22:20, 28:14, 29:15, 38:22, 39:7, 39:13, 184:3
  **sign** [5] - 127:6, 167:10, 168:20, 176:3, 176:5
  **sign-off** [1] - 167:10

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

207

**signal** [1] - 39:24
**signature** [2] - 170:9, 170:12
**signed** [4] - 156:9, 169:20, 170:9, 176:6
**significance** [2] - 94:10, 94:13
**significant** [3] - 96:21, 97:3, 139:23
**signs** [4] - 114:20, 117:4, 134:15, 176:2
**Silverstein** [1] - 154:12
**similar** [2] - 34:2, 48:20
**simple** [1] - 86:14
**simply** [11] - 7:7, 24:14, 33:8, 51:9, 55:2, 55:23, 87:11, 95:10, 95:15, 103:22, 104:15
**Simultaneous** [3] - 70:25, 71:17, 79:3
**simultaneously** [2] - 185:14, 185:17
**single** [4] - 33:5, 41:20, 41:21
**sit** [15] - 57:14, 63:23, 64:12, 76:7, 83:4, 88:21, 102:14, 120:18, 128:12, 128:19, 131:7, 138:3, 152:10, 168:4, 174:24
**sits** [1] - 74:13
**sitting** [1] - 87:13
**situation** [4] - 9:16, 47:17, 68:25, 141:17
**six** [2] - 97:19, 184:14
**sixth** [1] - 30:7
**skeletal** [2] - 75:11, 159:10
**ski** [1] - 178:3
**skin** [2] - 36:4, 160:11
**skull** [1] - 35:9
**sleep** [2] - 36:9, 108:25
**sleeping** [5] - 30:10, 30:12, 69:10, 87:13, 87:14
**sleepy** [1] - 87:12
**sleeve** [1] - 107:17
**slightly** [3] - 22:14, 38:25, 95:17
**Sloan** [1] - 11:18
**slow** [2] - 72:8, 77:14
**slowly** [4] - 19:19, 52:22, 77:13, 172:9
**Smith** [118] - 3:2, 4:8, 6:7, 14:4, 14:9, 14:10, 29:21, 30:22, 34:3, 34:8, 35:22, 36:16, 41:4, 41:25, 42:18, 42:25, 44:14, 45:17, 46:16, 48:12, 52:9, 55:10, 58:21, 60:16, 60:20, 60:24, 61:9, 64:21, 65:2, 65:16, 65:20, 65:22,

66:3, 67:16, 75:23, 81:25, 87:19, 94:1, 95:12, 96:22, 96:24, 97:9, 97:11, 98:15, 98:17, 98:18, 98:21, 98:22, 101:25, 102:9, 103:24, 105:12, 106:13, 108:24, 114:18, 116:14, 117:18, 119:7, 120:19, 121:25, 122:6, 122:20, 123:8, 125:9, 127:25, 133:18, 133:25, 134:3, 135:24, 136:14, 136:22, 142:15, 154:24, 155:13, 155:19, 156:11, 156:12, 156:13, 156:14, 156:19, 157:8, 157:19, 158:1, 158:3, 158:5, 158:10, 158:14, 159:3, 160:9, 160:16, 161:4, 162:8, 162:19, 162:22, 163:2, 163:9, 163:12, 163:16, 163:22, 165:24, 166:4, 171:6, 171:24, 172:2, 172:5, 173:11, 173:20, 174:21, 176:10, 176:21, 177:4, 177:14, 177:20, 177:21
**Smith's** [49] - 16:10, 18:2, 30:19, 40:24, 42:24, 43:6, 43:11, 43:18, 43:23, 62:3, 64:13, 66:9, 78:16, 83:5, 95:24, 96:16, 101:21, 103:20, 116:3, 116:9, 116:10, 116:17, 117:23, 118:5, 118:12, 121:20, 122:17, 129:18, 129:24, 130:20, 136:23, 141:11, 142:9, 144:13, 146:20, 147:8, 147:25, 148:8, 153:13, 155:3, 157:15, 158:21, 160:17, 162:14, 170:21, 173:15, 174:19, 176:8, 180:20
**smokescreen** [1] - 8:22
**sneeze** [3] - 86:14, 87:10, 88:1
**so..** [2] - 46:24, 108:14
**soft** [3] - 35:16, 36:3
**sole** [1] - 105:10
**solely** [1] - 108:13
**soliciting** [1] - 95:20
**solve** [1] - 8:19
**someone** [4] - 46:2, 62:20, 82:25, 111:24
**sometimes** [8] - 29:9, 47:19, 75:11, 89:5, 135:8, 183:17, 184:15
**somewhere** [2] - 152:24, 180:9
**soon** [2] - 8:20, 174:10

**sooner** [1] - 124:23
**sophisticated** [1] - 185:11
**sorry** [17] - 6:5, 40:9, 41:15, 57:16, 72:7, 85:3, 89:14, 100:3, 117:22, 122:19, 125:1, 129:20, 134:6, 137:12, 143:20, 164:17, 174:14
**Sorry** [2] - 52:23, 69:6
**sort** [4] - 107:11, 130:24, 133:7, 183:1
**sorts** [1] - 94:23
**sought** [1] - 26:1
**Sound** [1] - 185:3
**sound** [2] - 52:13, 184:7
**sounds** [1] - 133:14
**sources** [1] - 161:10
**Southern** [1] - 180:6
**space** [5] - 70:3, 70:4, 70:6, 70:9, 74:14
**Spain** [1] - 91:24
**Spanish** [1] - 92:1
**speaking** [7] - 3:24, 65:2, 84:8, 129:10, 158:4, 166:14, 166:15
**Special** [2] - 11:19, 19:1
**special** [1] - 174:9
**specialist** [1] - 89:9
**Specialists** [1] - 154:3
**specialization** [1] - 155:10
**specialize** [1] - 111:12
**specialized** [1] - 111:14
**specializing** [1] - 53:9
**specialty** [1] - 160:1
**specific** [16] - 9:13, 54:22, 55:1, 57:7, 58:4, 63:23, 69:4, 96:12, 103:9, 104:8, 104:15, 108:7, 108:13, 128:10, 148:10, 156:1
**specifically** [23] - 7:2, 15:3, 16:25, 21:9, 50:23, 54:15, 65:6, 78:23, 80:14, 80:19, 81:8, 95:8, 111:19, 113:4, 120:16, 122:2, 122:15, 125:13, 126:9, 132:23, 165:7, 167:18, 170:20
**specifics** [1] - 71:20
**spectrum** [3] - 122:23, 123:1
**speculate** [2] - 97:11, 98:6
**speculation** [1] - 85:7
**speculations** [1] - 91:10
**speculative** [6] - 62:15, 62:18, 64:3, 98:8, 106:2, 109:3

**speech** [1] - 159:15
**spell** [6] - 10:13, 52:22, 110:13, 110:17, 149:21, 172:9
**spells** [1] - 151:21
**Spencer** [1] - 4:6
**spend** [1] - 186:8
**spent** [3] - 98:25, 136:10, 138:2
**Spinal** [1] - 19:5
**spinal** [65] - 11:5, 16:25, 17:24, 19:10, 19:12, 22:10, 30:4, 34:17, 35:4, 35:15, 36:3, 36:21, 37:21, 38:15, 42:16, 43:11, 44:19, 44:23, 47:18, 47:25, 48:2, 48:4, 48:5, 48:7, 48:17, 49:6, 49:8, 50:4, 68:5, 69:18, 69:20, 69:24, 70:2, 74:3, 74:4, 74:5, 74:6, 74:7, 74:10, 74:12, 74:15, 74:21, 74:25, 75:6, 82:8, 83:1, 95:9, 95:12, 115:6, 117:4, 123:4, 136:2, 142:12, 142:17, 143:12, 144:18, 152:17, 152:23, 157:16, 158:6, 158:13, 161:1, 176:20
**Spine** [6] - 18:13, 18:21, 19:2, 19:16, 20:1, 20:10
**spine** [40] - 13:18, 19:13, 20:3, 20:5, 34:1, 34:15, 34:24, 35:9, 35:10, 35:12, 35:14, 35:18, 35:25, 36:2, 41:4, 41:8, 42:11, 42:17, 43:5, 43:8, 47:14, 49:9, 68:2, 69:11, 69:12, 75:13, 76:4, 77:18, 78:5, 78:16, 78:20, 78:22, 80:24, 81:5, 82:8, 82:9, 87:23, 88:2, 112:22, 140:4
**spoken** [2] - 14:9, 106:6
**St** [2] - 19:9, 19:11
**stability** [1] - 43:7
**stabilized** [1] - 68:14
**stand** [5] - 9:23, 39:2, 39:16, 68:19, 108:21
**standard** [17] - 19:14, 21:13, 44:8, 98:8, 112:21, 113:7, 113:14, 113:17, 113:19, 113:21, 116:14, 118:4, 118:8, 134:20, 141:15, 141:19, 151:20
**standardized** [5] - 114:4, 115:19, 128:9, 128:11, 128:21
**standards** [2] - 152:25, 153:2
**standby** [1] - 99:23

**standing** [5] - 7:17, 14:1, 39:19, 102:13, 152:13
**stands** [2] - 135:14, 171:3
**Stanford** [1] - 14:14
**start** [4] - 4:25, 32:14, 72:10, 142:15
**started** [3] - 51:16, 60:5, 165:10
**starting** [7] - 4:3, 83:16, 118:24, 120:17, 140:13, 164:4, 178:8
**state** [9] - 10:12, 12:13, 44:3, 72:1, 75:3, 110:13, 128:4, 149:20, 151:5
**statement** [2] - 68:10, 139:18
**statements** [1] - 153:4
**states** [10] - 37:9, 38:11, 61:1, 126:9, 131:12, 132:24, 134:5, 134:6, 134:10, 147:21
**static** [1] - 45:13
**static-y** [1] - 45:13
**stating** [3] - 134:25, 137:11, 141:21
**station** [1] - 90:24
**stay** [2] - 134:14, 146:12
**STENOGRAPHER** [8] - 3:6, 3:9, 3:11, 3:21, 4:1, 7:15, 7:21, 13:6
**step** [9] - 5:7, 6:13, 99:4, 100:6, 145:6, 145:23, 146:5, 146:7, 179:16
**still** [15] - 30:5, 30:10, 40:12, 55:21, 97:18, 103:2, 106:22, 108:21, 109:15, 138:12, 138:21, 139:20, 139:25, 140:3, 183:4
**stipulate** [2] - 102:7, 103:18
**stole** [1] - 184:17
**Stone** [1] - 154:2
**stop** [2] - 95:19, 144:24
**stopped** [1] - 3:7
**story** [1] - 138:7
**straight** [1] - 31:25
**straw** [2] - 37:19, 37:20
**strength** [3] - 142:14, 142:25
**stress** [1] - 36:21
**stretcher** [1] - 30:2
**strike** [5] - 21:2, 23:18, 25:15, 106:22, 153:5
**stroke** [3] - 42:3, 48:5, 117:6
**structure** [1] - 35:16
**students** [2] - 17:15, 178:7

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

208

**studies** [2] - 66:18, 159:9
**study** [1] - 31:3
**subject** [2] - 24:21, 114:18
**subjected** [1] - 15:10
**subjective** [2] - 114:17, 128:3
**submission** [1] - 181:21
**submit** [3] - 185:9, 185:14, 185:21
**submitted** [5] - 167:8, 168:6, 168:14, 168:16, 169:19
**Subpoenas** [1] - 55:10
**subpoenas** [2] - 50:25, 52:9
**subsequent** [3] - 14:5, 43:6, 116:12
**subsequently** [2] - 117:17, 144:25
**substance** [3] - 16:4, 132:18, 132:22
**substantial** [1] - 175:21
**substantially** [2] - 34:2, 175:18
**substantiate** [1] - 21:16
**substantiated** [2] - 15:15, 48:6
**substantiating** [1] - 21:12
**substantive** [1] - 32:25
**substantively** [2] - 24:13, 33:10
**subtle** [5] - 88:1, 138:14, 138:16, 142:16, 143:10
**successfully** [1] - 12:23
**sudden** [2] - 37:20, 82:18
**suddenly** [4] - 46:2, 87:11, 126:10, 126:16
**suffer** [1] - 185:7
**suffered** [1] - 160:25
**suffers** [1] - 158:10
**suffice** [1] - 5:4
**sufficient** [4] - 77:17, 157:23, 157:25, 183:11
**suggest** [3] - 62:16, 62:18, 171:6
**suggesting** [1] - 82:10
**suggestion** [3] - 78:7, 130:12, 146:19
**suggestions** [1] - 37:10
**Suid** [1] - 154:13
**SUITE** [2] - 2:4, 10:19
**Suite** [98] - 5:10, 5:24, 7:10, 8:6, 9:20, 9:22, 10:15, 13:4, 14:25, 15:12, 15:21, 16:8, 19:15, 21:15, 22:15, 23:4, 23:16, 23:18, 24:22, 25:14, 26:16, 27:4,

27:12, 27:17, 28:20, 30:22, 31:5, 33:17, 37:1, 38:7, 38:11, 38:15, 42:21, 43:9, 44:14, 59:11, 59:25, 62:8, 63:2, 63:9, 67:15, 68:6, 71:15, 73:11, 73:13, 74:2, 83:14, 84:21, 85:2, 85:14, 85:21, 85:25, 86:3, 87:5, 87:18, 87:25, 88:15, 90:7, 91:17, 92:11, 95:9, 95:10, 95:23, 96:15, 98:10, 98:14, 99:17, 101:20, 102:25, 106:4, 106:8, 106:10, 107:9, 121:12, 155:5, 155:6, 155:7, 155:11, 155:12, 155:16, 155:23, 156:1, 156:8, 158:2, 158:4, 158:9, 159:6, 159:20, 160:22, 166:21, 166:22, 166:25, 168:18, 169:20, 170:12, 171:25, 172:2, 176:5
**Suite's** [13] - 6:4, 15:5, 20:19, 21:2, 22:3, 23:7, 32:5, 33:8, 44:7, 93:8, 155:9, 170:4, 170:8
**suited** [1] - 6:17
**Sujith** [1] - 154:10
**summarize** [1] - 91:4
**summarized** [1] - 135:4
**summary** [1] - 14:11
**summon** [2] - 145:25, 147:18
**Sunday** [7] - 55:19, 55:20, 55:25, 56:1, 56:16, 84:3, 84:8
**supplement** [1] - 39:1
**supplemental** [1] - 168:16
**supplemented** [1] - 56:24
**supplied** [2] - 114:16, 130:5
**supplies** [2] - 160:9, 160:12
**supplying** [1] - 48:7
**support** [13] - 15:2, 18:6, 18:9, 23:17, 25:23, 43:25, 44:3, 66:14, 106:11, 125:8, 136:10, 157:4, 160:3
**supported** [2] - 35:12, 179:12
**supports** [1] - 116:18
**supposed** [2] - 39:5, 94:17
**suprapubic** [1] - 158:17
**surfacing** [1] - 91:7
**surgeon** [1] - 78:19

**surgeries** [1] - 156:3
**surgery** [3] - 68:24, 78:19, 81:4
**Surgery** [2] - 11:19, 19:1
**Surgical** [1] - 20:1
**surgical** [1] - 20:3
**surprise** [1] - 28:15
**surprised** [1] - 100:7
**survivability** [1] - 173:9
**survive** [3] - 102:1, 172:6, 177:17
**susceptible** [3] - 75:14, 75:15, 76:1
**suspected** [5] - 34:1, 34:14, 34:17, 34:24, 88:2
**suspicious** [1] - 107:16
**sustain** [2] - 93:13, 180:24
**sustained** [7] - 85:11, 86:20, 94:15, 118:9, 118:14, 158:6, 177:2
**Swain** [1] - 154:3
**swear** [1] - 10:9
**switch** [2] - 45:12, 83:3
**swore** [2] - 63:10, 119:19
**sworn** [6] - 10:10, 10:21, 110:11, 110:25, 149:18, 150:6
**symptoms** [8] - 116:24, 117:5, 117:7, 117:13, 117:16, 117:24, 118:10, 157:4
**syndrome** [1] - 48:1
**synonymous** [1] - 112:3
**system** [10] - 3:7, 3:16, 5:8, 42:17, 114:3, 114:7, 115:20, 128:22, 154:12, 163:20
**systematically** [1] - 17:9
**systems** [2] - 124:20, 157:4
**Systems** [1] - 154:5

## T

**tables** [2] - 96:19, 176:19
**tabulate** [1] - 163:7
**Taylor** [1] - 154:16
**teach** [1] - 17:15
**teaching** [3] - 12:3, 12:5, 42:23
**team** [5] - 9:11, 29:25, 34:11, 135:8, 140:20
**technical** [6] - 4:18, 4:20, 8:1, 124:5, 124:8, 124:22
**techniques** [1] - 113:20
**technology** [1] - 151:14
**ten** [2] - 30:12, 31:24
**tendency** [1] - 183:18
**tens** [1] - 165:23

**term** [4] - 53:6, 91:19, 145:2, 157:9
**termed** [1] - 75:11
**terminology** [5] - 74:8, 128:14, 128:15, 128:21
**terms** [22] - 22:9, 36:14, 37:15, 39:13, 45:8, 91:13, 93:22, 95:13, 96:15, 97:24, 105:10, 115:8, 122:24, 123:7, 128:9, 135:14, 142:7, 153:1, 158:5, 162:8, 176:20, 180:15
**terrific** [2] - 28:12, 184:13
**test** [1] - 115:15
**testified** [20] - 8:6, 10:21, 24:23, 25:17, 60:7, 60:15, 62:14, 64:13, 89:18, 92:24, 101:20, 106:5, 110:25, 130:11, 150:6, 163:5, 179:1, 179:10, 179:15, 180:2
**testify** [6] - 39:3, 63:20, 95:18, 107:24, 108:2, 162:10
**testifying** [4] - 31:12, 32:5, 179:5, 179:9
**testimony** [47] - 6:4, 15:8, 15:22, 21:18, 23:7, 26:22, 27:13, 27:20, 33:2, 38:19, 38:25, 39:23, 41:12, 49:2, 61:5, 68:18, 71:18, 72:21, 73:8, 83:13, 83:19, 84:1, 84:6, 84:7, 86:19, 103:19, 113:2, 114:24, 120:16, 120:24, 121:17, 127:5, 129:4, 130:12, 134:24, 134:25, 141:23, 145:6, 165:8, 165:17, 166:24, 167:5, 168:10, 168:11, 181:7, 181:24, 183:21
**testing** [3] - 67:1, 115:14, 156:2
**tests** [1] - 159:12
**text** [10] - 51:16, 51:17, 51:25, 55:6, 55:8, 56:1, 56:4, 58:19, 84:2, 84:4
**textbook** [1] - 19:4
**textbooks** [1] - 23:6
**texted** [1] - 51:19
**texting** [1] - 148:21
**thanking** [1] - 29:14
**THE** [361] - 3:4, 3:6, 3:8, 3:9, 3:10, 3:11, 3:21, 3:23, 4:1, 4:2, 4:9, 4:17, 6:13, 6:25, 7:9, 7:12, 7:14, 7:15, 7:17, 7:21, 8:24, 9:2, 9:5, 9:8, 9:19,

9:22, 9:25, 10:4, 10:7, 10:9, 10:11, 10:14, 10:17, 13:6, 13:9, 13:11, 14:21, 14:24, 15:18, 19:15, 19:17, 19:18, 19:20, 19:24, 20:2, 20:3, 20:4, 20:5, 20:6, 20:7, 20:9, 20:14, 20:15, 20:16, 21:6, 21:23, 22:12, 23:20, 23:24, 24:5, 24:7, 24:25, 25:10, 25:12, 26:23, 26:24, 27:1, 27:2, 27:11, 28:1, 28:2, 28:5, 28:7, 28:12, 28:21, 28:25, 29:2, 29:7, 31:16, 31:17, 31:21, 31:22, 32:7, 32:11, 32:13, 32:16, 32:25, 33:15, 35:7, 35:9, 37:5, 37:8, 38:4, 38:21, 39:21, 40:2, 40:12, 41:17, 44:11, 45:4, 45:12, 46:8, 46:25, 47:6, 49:3, 49:4, 50:9, 50:13, 50:18, 51:11, 51:21, 51:25, 52:4, 52:6, 52:13, 52:16, 52:22, 53:3, 53:6, 53:10, 53:21, 53:23, 53:25, 54:4, 54:14, 55:5, 55:7, 55:25, 56:5, 56:8, 56:15, 56:20, 57:11, 57:14, 57:17, 58:7, 58:13, 58:18, 58:25, 59:5, 59:7, 59:10, 59:13, 59:16, 59:22, 62:25, 63:7, 71:1, 71:18, 72:3, 72:5, 72:7, 72:9, 73:10, 73:16, 73:18, 73:20, 73:24, 77:13, 79:4, 81:13, 84:12, 84:17, 85:2, 85:6, 85:11, 86:8, 86:9, 86:17, 86:20, 87:2, 87:7, 87:9, 89:14, 89:15, 89:24, 91:14, 91:17, 91:20, 91:21, 91:23, 92:8, 92:16, 92:18, 92:21, 93:13, 93:16, 94:15, 95:6, 95:16, 96:4, 96:10, 98:12, 98:16, 98:17, 98:19, 98:20, 98:24, 99:2, 99:3, 99:4, 99:6, 99:8, 99:12, 99:15, 99:24, 100:6, 100:13, 100:18, 100:23, 101:3, 101:8, 101:11, 102:12, 103:8, 103:13, 103:16, 103:22, 104:5, 105:1, 105:7, 105:22, 107:13, 109:6, 109:8, 109:11, 109:19, 109:23, 110:1, 110:6, 110:10, 110:12, 110:15, 110:17, 110:19, 110:20, 118:19, 118:23, 119:1, 120:5, 120:7, 124:3, 124:16, 124:17, 124:18, 124:24, 125:2,

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

125:20, 125:22, 126:14, 126:20, 130:9, 130:14, 130:22, 131:2, 131:4, 132:5, 132:7, 132:9, 132:13, 132:14, 132:16, 132:20, 135:6, 135:7, 136:18, 139:4, 139:6, 139:8, 139:10, 139:11, 140:9, 140:13, 142:1, 145:5, 145:9, 145:10, 145:11, 145:16, 145:18, 145:22, 146:1, 146:3, 146:7, 146:12, 146:14, 147:2, 147:5, 147:9, 147:11, 147:15, 147:23, 148:6, 148:19, 148:23, 149:1, 149:3, 149:6, 149:8, 149:13, 149:19, 149:22, 150:1, 150:14, 150:18, 150:23, 153:23, 153:24, 164:1, 164:4, 164:6, 164:25, 165:1, 165:2, 169:3, 169:23, 172:8, 172:11, 172:13, 172:15, 172:21, 172:23, 173:25, 174:5, 174:14, 175:4, 175:7, 177:2, 177:25, 178:11, 178:13, 178:14, 178:15, 178:17, 178:18, 178:20, 178:22, 178:25, 179:1, 179:5, 179:8, 179:13, 179:16, 179:18, 179:19, 179:22, 180:23, 181:4, 181:5, 181:7, 181:10, 181:12, 182:19, 183:1, 183:9, 183:17, 184:1, 184:21, 184:24, 185:3, 186:13

**theory** [2] - 26:3, 81:25
**therapeutic** [1] - 156:2
**therapist** [6] - 149:23, 150:10, 151:4, 162:16, 178:8, 178:24
**therapists** [1] - 178:5
**therapy** [11] - 150:12, 151:2, 151:6, 151:11, 159:13, 159:14, 159:15, 178:4, 178:7, 178:9
**Therapy** [5] - 151:11, 151:12, 154:1, 178:12, 178:13
**thereafter** [1] - 20:20
**therefore** [3] - 130:19, 131:17, 183:19
**they've** [2] - 51:2, 72:20
**thinking** [1] - 57:5
**thinner** [2] - 34:20, 47:10
**thinners** [1] - 95:13
**third** [7] - 18:24, 19:15, 30:2, 100:22, 101:14,

101:16, 134:5
**thirdly** [1] - 8:11
**thorough** [1] - 151:24
**thoroughness** [3] - 168:24, 168:25, 176:4
**though,I** [1] - 54:22
**thoughts** [1] - 182:15
**thousands** [4] - 154:24, 155:1, 165:23, 166:2
**three** [20] - 23:2, 23:8, 25:3, 33:11, 35:23, 35:24, 41:7, 68:3, 68:4, 69:1, 70:4, 76:14, 98:5, 98:7, 102:2, 126:24, 128:5, 185:18, 185:21, 185:25
**three-column** [5] - 35:23, 35:24, 41:7, 70:4, 76:14
**threshold** [1] - 108:12
**throughout** [1] - 161:23
**thrust** [2] - 104:7, 106:11
**tightly** [1] - 35:20
**timeline** [10] - 29:24, 116:13, 116:19, 123:11, 130:1, 131:10, 131:24, 137:22, 142:20, 143:21
**timely** [1] - 94:25
**timestamp** [2] - 132:18, 134:4
**timing** [2] - 45:20, 116:17
**tissues** [1] - 36:4
**title** [10] - 10:13, 19:19, 19:24, 19:25, 20:7, 20:9, 110:14, 112:3, 149:21
**today** [61] - 4:7, 5:2, 5:13, 6:18, 7:10, 8:16, 8:22, 9:9, 21:3, 21:20, 22:6, 23:6, 24:8, 24:23, 26:20, 26:22, 27:21, 31:23, 37:4, 37:22, 38:18, 39:9, 44:9, 49:21, 51:3, 51:10, 51:24, 57:18, 63:23, 64:12, 69:16, 72:1, 72:15, 73:2, 76:7, 80:5, 81:15, 83:4, 83:8, 84:6, 91:3, 91:11, 93:3, 95:21, 98:9, 99:10, 105:4, 108:12, 128:12, 128:19, 131:7, 138:4, 156:19, 166:24, 168:4, 168:15, 171:3, 174:24, 181:14
**today's** [7] - 6:19, 14:18, 21:18, 23:2, 26:16, 31:17, 44:10
**together** [5] - 4:7, 35:10, 75:7, 89:2, 140:20
**took** [8] - 21:8, 58:1, 63:9, 65:8, 65:9, 96:23, 112:5, 119:16
**tool** [1] - 44:18

**tools** [1] - 137:20
**top** [8] - 76:17, 116:20, 122:3, 125:11, 136:3, 143:2, 169:14, 184:5
**topic** [1] - 95:17
**topics** [2] - 182:16, 183:20
**total** [2] - 89:3, 180:9
**totality** [4] - 114:21, 115:17, 135:12, 138:5
**totally** [2] - 44:10, 89:21
**totter** [1] - 36:7
**touching** [1] - 117:20
**tracheostomy** [1] - 159:15
**traditional** [1] - 111:25
**trained** [4] - 8:8, 18:25, 88:16, 150:18
**training** [17] - 11:10, 11:20, 12:3, 12:21, 16:23, 25:25, 40:23, 42:23, 48:20, 90:20, 111:11, 112:4, 116:7, 118:2, 144:10, 151:1, 155:22
**transcript** [6] - 3:18, 63:6, 120:10, 120:13, 121:4, 164:20
**transected** [5] - 38:15, 69:17, 69:20, 69:24, 70:9
**transection** [4] - 69:23, 70:1, 70:2, 70:8
**translated** [1] - 36:18
**translational** [4] - 62:21, 68:23, 69:15, 82:7
**transpired** [1] - 29:21
**transportation** [1] - 160:6
**transverse** [1] - 47:18
**transversely** [1] - 36:6
**Trauma** [3] - 19:20, 20:8, 20:12
**trauma** [6] - 11:4, 19:2, 47:9, 47:24, 61:16, 68:22
**treat** [3] - 50:4, 115:17, 184:11
**treaters** [1] - 73:23
**treating** [15] - 66:9, 66:12, 66:16, 129:16, 135:7, 135:10, 140:18, 155:4, 160:17, 166:19, 166:20, 167:21, 170:16, 170:22, 171:4
**treatises** [3] - 21:12, 22:23, 24:22
**treatment** [6] - 51:4, 98:23, 113:21, 115:18, 118:8, 157:2
**treats** [1] - 152:3
**trial** [24] - 5:12, 9:25, 15:22, 21:14, 27:6, 27:13,

28:11, 28:16, 33:3, 33:8, 67:8, 102:8, 107:7, 107:21, 107:25, 108:2, 108:6, 179:1, 179:6, 179:9, 181:25, 182:23, 183:3, 183:21
**trials** [1] - 179:14
**trier** [1] - 171:9
**trigger** [1] - 107:23
**triggers** [1] - 185:6
**Trina** [1] - 124:5
**trip** [1] - 182:6
**trouble** [1] - 63:14
**true** [4] - 66:23, 71:15, 96:10
**trust** [1] - 108:15
**truth** [2] - 63:10, 147:3
**truthful** [1] - 119:20
**try** [9] - 5:8, 34:21, 105:15, 107:1, 107:13, 107:17, 113:1, 124:9, 147:5
**trying** [7] - 19:24, 55:2, 69:9, 95:10, 106:22, 124:5, 138:18
**tumor** [1] - 47:13
**turn** [10] - 25:7, 68:6, 83:13, 98:3, 120:12, 121:4, 121:10, 125:25, 139:3, 165:4
**turned** [5] - 59:17, 167:20, 167:25, 170:13, 186:4
**turning** [3] - 13:20, 153:13, 167:12
**turns** [1] - 47:1
**Twain** [1] - 184:15
**twilight** [1] - 109:20
**two** [35] - 5:12, 7:6, 9:6, 37:19, 60:11, 63:13, 65:19, 73:12, 73:13, 73:22, 79:5, 82:20, 96:20, 107:15, 112:1, 113:24, 124:9, 133:21, 133:22, 134:22, 134:23, 135:13, 137:14, 178:1, 181:19, 182:3, 182:10, 182:17, 182:19, 182:20, 183:8, 183:13, 184:1, 185:18
**type** [8] - 39:22, 41:8, 53:3, 108:8, 160:24, 172:11, 176:23, 185:11
**types** [2] - 88:4, 106:9
**typical** [1] - 33:23
**typically** [2] - 42:11, 51:23
**typing** [1] - 59:7
**typos** [1] - 80:2

**U**

**U.S** [2] - 112:1, 185:8
**UCR** [1] - 161:16
**ulcers** [1] - 159:3
**ultimately** [7] - 74:23, 107:23, 111:11, 111:13, 115:9, 115:13, 135:15
**unable** [8] - 6:11, 133:14, 156:15, 158:14, 158:19, 162:16, 177:14, 177:15
**uncertain** [1] - 37:15
**unchanged** [1] - 91:4
**under** [9] - 33:7, 56:23, 63:20, 81:25, 83:19, 126:15, 139:25, 165:25, 168:13
**undergo** [1] - 44:14
**undergoes** [1] - 115:6
**undermine** [1] - 107:17
**underneath** [1] - 126:16
**understood** [7] - 44:11, 100:13, 120:3, 146:1, 163:4, 168:12, 181:12
**unexpected** [2] - 5:3, 82:24
**unfair** [1] - 130:10
**unfortunately** [5] - 6:16, 8:25, 29:1, 109:21, 112:19
**unhelpful** [4] - 102:18, 103:7, 105:21, 106:2
**University** [14] - 11:12, 12:2, 12:6, 12:22, 14:3, 14:6, 14:14, 19:7, 19:9, 47:12, 69:13, 76:12, 90:23, 151:16
**unknown** [1] - 179:12
**unless** [2] - 59:17, 170:16
**unnerved** [1] - 150:20
**unprotected** [2] - 62:23, 68:15
**unrealistic** [1] - 86:9
**unreliable** [1] - 109:3
**unstable** [14] - 19:13, 20:3, 20:5, 22:9, 36:11, 41:4, 41:8, 43:7, 43:21, 49:8, 68:25, 69:11, 76:15
**Unstable** [4] - 19:1, 19:16, 19:25, 20:10
**unsure** [1] - 176:15
**untimely** [1] - 66:5
**untoward** [4] - 43:20, 55:3, 57:10, 82:24
**unusual** [2] - 102:15, 165:20
**up** [58] - 5:3, 8:21, 9:14, 9:22, 11:14, 17:4, 26:3, 26:10, 27:24, 28:9, 28:13, 29:10, 37:4, 37:10, 38:8,

**KEYWORD INDEX**

James Smith vs. Carnival Corporation, et al.
Case No. 1:24-cv-21213-KMW

39:2, 39:9, 39:16, 48:7, 48:9, 50:10, 51:11, 54:10, 54:24, 55:19, 56:10, 57:1, 62:9, 66:15, 73:10, 80:9, 87:11, 87:13, 93:11, 96:11, 98:12, 99:18, 100:9, 100:18, 106:4, 107:16, 108:9, 123:13, 123:17, 125:18, 134:8, 146:21, 152:5, 161:3, 161:11, 163:11, 171:8, 179:6, 179:21, 180:25, 182:6, 183:19, 184:14

**upset** [1] - 37:13
**urethra** [1] - 158:16
**urine** [1] - 158:18
**useful** [2] - 96:20, 140:21
**usual** [1] - 161:16
**utility** [1] - 139:1
**utilization** [1] - 141:9
**utilize** [9] - 43:9, 45:6, 45:15, 115:21, 153:5, 153:7, 161:11, 163:11, 175:24
**utilized** [14] - 16:11, 17:3, 18:2, 18:6, 18:9, 22:8, 46:16, 48:14, 49:24, 50:3, 90:10, 93:24, 115:2, 152:25
**utilizing** [3] - 48:11, 90:10, 116:8
**utmost** [2] - 115:13, 141:18

**V**

**VA** [2] - 14:14, 161:13
**vague** [4] - 46:23, 46:25, 54:19, 122:4
**Valer** [1] - 154:7
**validated** [1] - 114:3
**validation** [1] - 138:8
**valuable** [2] - 66:5, 140:21
**value** [2] - 83:5, 173:9
**van** [1] - 160:7
**varied** [1] - 158:8
**various** [7] - 14:6, 32:2, 45:21, 91:24, 111:17, 114:24, 159:4
**vary** [1] - 150:19
**Vascular** [1] - 154:3
**ventilator** [4] - 157:11, 159:16, 160:12, 166:11
**verbalized** [2] - 126:10, 126:17
**verbatim** [1] - 32:1
**verbiage** [3] - 122:2, 127:24, 184:9
**Verd** [1] - 154:13

**version** [1] - 156:7
**versus** [4] - 3:2, 111:24, 127:10, 135:18
**vertebral** [5] - 36:17, 69:1, 74:12, 75:7, 75:9
**vessel** [1] - 86:10
**veterans** [1] - 161:15
**via** [3] - 55:8, 155:19, 166:16
**Vibhu** [1] - 18:14
**VIBHU** [1] - 18:15
**video** [5] - 13:23, 69:5, 69:9, 155:19, 156:12
**view** [3] - 135:11, 140:20, 183:6
**views** [1] - 135:12
**Vikram** [1] - 154:15
**violent** [2] - 68:21, 82:3
**viral** [1] - 47:19
**virtual** [1] - 166:3
**virtue** [3] - 22:1, 43:6, 123:9
**visible** [1] - 129:3
**visiting** [1] - 5:13
**visits** [1] - 159:6
**Viswanathan** [1] - 18:15
**VISWANATHAN** [1] - 18:15
**vital** [1] - 114:20
**voice** [2] - 39:16, 102:8
**Volume** [1] - 18:23

**W**

**wait** [7] - 10:1, 28:11, 85:2, 145:24, 173:25
**Wait** [1] - 148:6
**waive** [2] - 106:24, 107:20
**waiver** [1] - 41:19
**waiving** [2] - 38:10, 39:15
**walked** [1] - 8:1
**Walker** [3] - 4:13, 4:16, 154:8
**Walter** [1] - 12:4
**wand** [1] - 7:18
**Warfarin** [5] - 75:25, 94:8, 94:13, 95:18, 95:19
**watch** [1] - 124:7
**water** [1] - 33:17
**ways** [1] - 112:2
**weakness** [10] - 42:12, 42:13, 47:16, 117:6, 117:7, 117:13, 117:16, 123:1, 126:6, 126:8
**wear** [2] - 40:13, 88:3
**website** [1] - 161:23
**week** [1] - 182:9
**weeks** [8] - 6:19, 9:14,

182:10, 182:18, 182:20, 183:8, 183:13, 184:2
**weighing** [1] - 95:15
**Weill** [1] - 11:17
**WEILL** [1] - 11:18
**weird** [1] - 102:23
**welcome** [1] - 31:19
**Wellstar** [2] - 154:11, 154:17
**Wendy** [1] - 154:3
**West** [1] - 58:16
**Wetherly** [1] - 154:11
**whatsoever** [1] - 98:6
**wheelchair** [6] - 159:21, 159:22, 159:25, 160:7
**wheelchairs** [1] - 159:22
**wherein** [1] - 80:7
**whimsical** [1] - 98:8
**whispering** [1] - 10:4
**whole** [4] - 13:1, 39:12, 115:17, 133:2
**wide** [1] - 141:25
**wife** [6] - 65:8, 155:19, 156:17, 156:20, 157:20, 166:16
**William** [1] - 154:8
**Williams** [1] - 3:3
**wish** [1] - 26:4
**wishes** [1] - 157:12
**withdraw** [1] - 108:18
**withdrawing** [1] - 108:22
**witness** [51] - 5:24, 6:2, 9:23, 10:9, 10:20, 15:10, 21:11, 22:21, 31:11, 33:14, 35:6, 90:1, 99:7, 99:8, 99:19, 100:22, 101:14, 101:16, 103:19, 104:7, 104:16, 104:18, 105:2, 105:13, 107:2, 107:18, 107:24, 108:2, 108:4, 108:21, 109:24, 110:7, 110:24, 113:7, 114:24, 145:8, 145:16, 145:19, 147:18, 148:20, 149:14, 150:5, 153:22, 174:2, 174:10, 174:11, 180:22, 181:6, 181:7, 181:24, 181:25
**Witness** [3] - 10:10, 110:11, 149:18
**WITNESS** [64] - 2:3, 10:11, 10:14, 19:17, 19:20, 20:2, 20:4, 20:6, 20:9, 20:15, 24:5, 26:23, 27:1, 28:1, 31:17, 31:22, 32:11, 32:16, 35:9, 37:8, 47:6, 49:4, 53:25, 55:7, 71:1, 71:18, 86:9, 87:9, 89:14, 91:20, 91:23, 98:16, 98:19, 98:24, 99:3,

99:6, 110:12, 110:15, 110:19, 120:7, 124:17, 125:22, 126:20, 132:7, 132:14, 135:7, 139:10, 145:9, 145:11, 146:1, 149:19, 149:22, 153:24, 165:1, 174:14, 178:11, 178:14, 178:17, 178:20, 178:25, 179:5, 179:13, 179:18, 181:5
**witness'** [1] - 89:25
**witnesses** [8] - 5:9, 79:9, 99:13, 102:6, 107:24, 181:9, 181:10, 181:11
**Woodman** [1] - 154:15
**woods** [1] - 108:4
**Woolsey** [1] - 19:8
**WOOLSEY** [1] - 19:8
**word** [8] - 5:8, 71:25, 72:14, 122:23, 122:24, 122:25, 185:10, 185:23
**words** [8] - 27:15, 76:15, 78:17, 80:25, 82:10, 122:9, 133:6, 174:11
**works** [2] - 51:23, 94:24
**workup** [1] - 114:21
**world** [2] - 91:25, 114:4
**worldwide** [1] - 48:16
**worse** [20] - 10:5, 97:25, 118:16, 125:9, 133:18, 133:19, 134:1, 134:3, 134:22, 134:25, 136:2, 136:5, 136:22, 136:24, 137:4, 137:10, 137:15, 137:21, 143:10, 144:5
**worsened** [6] - 122:17, 133:16, 136:15, 147:25, 148:8, 148:12
**worsening** [6] - 113:5, 129:5, 129:9, 134:16, 144:13, 146:20
**worst** [1] - 98:3
**worth** [1] - 104:14
**wound** [1] - 160:1
**wounds** [3] - 97:18, 159:3, 160:11
**write** [1] - 185:5
**writing** [2] - 183:5, 185:4
**written** [5] - 12:24, 27:15, 104:25, 141:22, 173:3
**wrote** [2] - 64:15, 82:19

**X**

**X-ray** [2] - 67:1, 88:13
**x-rays** [1] - 67:9
**Xs** [1] - 113:24

**Y**

**year** [23] - 12:3, 54:3, 96:19, 97:10, 97:15, 97:22, 98:1, 98:7, 102:1, 103:24, 106:23, 162:12, 162:22, 163:8, 172:3, 172:6, 172:15, 172:16, 173:12
**yearly** [5] - 161:6, 162:7, 162:18, 163:6, 163:7
**years** [33] - 12:6, 12:11, 12:13, 12:14, 13:16, 16:24, 17:17, 85:18, 86:4, 90:21, 97:1, 97:6, 97:24, 98:4, 98:5, 98:7, 102:2, 104:1, 104:8, 106:14, 111:12, 111:14, 152:15, 153:12, 162:20, 162:24, 162:25, 178:2, 179:11, 185:8
**yellow** [1] - 52:24
**yesterday** [3] - 66:13, 83:8, 97:17
**York** [5] - 11:14, 11:17, 33:24, 111:10, 111:12
**Young** [1] - 19:6
**yourself** [4] - 3:5, 50:4, 53:24, 171:1

**Z**

**Zelby** [7] - 14:16, 22:17, 23:5, 24:4, 26:19, 70:22, 73:19
**Zelby's** [1] - 15:4
**zero** [5] - 42:10, 128:25, 142:13, 142:14

**KEYWORD INDEX**