UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 24-21213-CIV-WILLIAMS/GOODMAN

JAMES SMITH

      Plaintiff,

v.

CARNIVAL CORPORATION,

      Defendant.

_____/

### ORDER ON DEFENDANT CARNIVAL'S *DAUBERT*[1] MOTION

In this personal injury maritime lawsuit, Carnival Corporation ("Carnival" or "Defendant") filed a *Daubert* motion against James Smith ("Smith" or "Plaintiff"), a former passenger on one of its cruise ships, challenging four of Smith's expert witnesses. [ECF No. 136].[2] Smith later dropped one of his experts (Kristi Kirby, an economist). Carnival filed its *Daubert* motion on the same day it filed its summary judgment motion. [ECF No. 134]. United States District Judge Kathleen M. Williams referred both motions to the Undersigned, who determined that the *Daubert* motion needed to be resolved first.

---

[1]     *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 582, 113 S. Ct. 2786, 2791, 125 L. Ed. 2d 469 (1993).

[2]     Carnival entitled its challenge as a "Motion *in Limine* to Exclude Certain Opinions and Testimony of Dr. Nicholas Suite, Dr. Hitesh Raval, Paul Ramos, and Kristi Kirby." [ECF No. 136].

Plaintiff filed a response to the *Daubert* motion, but Carnival did not file a reply. The Undersigned held an evidentiary *Daubert* hearing. [ECF Nos. 139, 155] and required both sides to submit post-hearing memoranda focused on an expert's ability to provide new opinions at a *Daubert* hearing (or to rely on new reference and resource materials). The parties filed the Court-ordered memoranda. [ECF Nos. 159;160]. But Carnival filed an additional memorandum [ECF No. 162], so the Undersigned permitted Plaintiff to file a response, which he did. [ECF No. 164].

For the reasons outlined in greater detail below, the Undersigned **grants in part and denies in part** Carnival's *Daubert* motion.

By way of summary, though, **none** of Plaintiff's three expert witnesses may testify at trial about opinions which were not disclosed in their expert witness reports or depositions. In other words, they cannot come up with new opinions at trial by testifying about them for the first time at the evidentiary hearing. In addition, at trial they may not rely on medical records or materials (such as textbooks and medical journal articles) which were not in their reports or depositions. Finally, Plaintiff's life care expert may testify only about one year's worth of medical and rehabilitative needs, as Plaintiff has not introduced any competent evidence of Plaintiff's life expectancy beyond one year.

But Plaintiff's expert neurologist, Dr. Nicholas Suite, *may* offer opinion testimony that the removal of Plaintiff's cervical collar by the on-board medical staff caused his paralysis. In addition, Plaintiff's emergency room expert may offer opinion testimony

that the subsequent movement of Plaintiff's neck after he reported a loss of sensation and a nearly-complete loss of movement on his right side marginally worsened his paralysis. Naturally, Carnival will be able to comprehensively cross-examine both of these experts, whose opinions are surely less than perfect and generate a risk that the jury might not accept all (or even any) of their opinions. But they will be permitted to offer them, warts and all.

**Factual Background**

Smith alleges he was rendered a paraplegic following a fall out of his motorized scooter onboard a Carnival ship on or about January 23, 2024. [ECF No. 1, ¶ 22]. Plaintiff initially alleged that Carnival was liable for negligently causing his fall from his scooter due to an alleged "lump" on the floor surface. *Id*. at ¶ 21.

Plaintiff has amended his Complaint five (5) times. In his Second Amended Complaint, Smith added medical negligence claims against Carnival relating to the medical treatment he received in the ship's medical center. [ECF No. 29, ¶ 136]. In his Fourth Amended Complaint, Plaintiff withdrew his claims against Carnival regarding an alleged "lump" in the floor surface, causing him to fall, alleging only his current claims of medical negligence. [ECF No. 84]. Smith now claims his paraplegia was singularly caused by the removal of his cervical neck collar in the ship's medical center. [ECF No. 97, ¶ 35].

In accordance with the Court's scheduling order, the parties exchanged expert witness disclosures and reports on February 28, 2025. Smith disclosed expert medical witnesses including Dr. Nicholas Suite, M.D., Dr. Hitesh Raval, D.O., and Paul Ramos, C.L.C.P. (Life Care Planner) [ECF No. 136-1]. Dr. Suite is Plaintiff's only expert who opined that the removal of Plaintiff's cervical collar directly caused his paraplegia. Dr. Raval opined that the medical care Plaintiff received fell below an accepted standard of medical care and that removal of the collar made Plaintiff's injuries "marginally worse." Ramos opined on the projected annual costs of Plaintiff's future medical care but is unable to provide a total future cost of care opinion because Plaintiff does not have an expert who can testify about his life expectancy.[3]

Carnival disclosed medical experts Dr. Alexander Merkler, Dr. David Talan, Dr. Harold Keyserling, and Dr. Andrew Zelby. [ECF No. 136-2]. Relevant to the *Daubert* Motion and this brief, Dr. Keyserling, a radiologist and neuroradiologist, and Dr. Zelby, a neurosurgeon, concluded that based on Plaintiff's medical records, the most likely cause of his paraplegia was not the removal of his neck collar, but rather an epidural hematoma (bleeding within the spinal canal) that formed due to his fall, that gradually compressed

---

[3]     According to Carnival, the only evidence in the record of Plaintiff's life expectancy comes from *Carnival's* expert, Dr. Alexander Merkler, who estimated that Plaintiff's life expectancy is one year from the date of his examination of Plaintiff, which was February 18, 2025. Additionally, Carnival explained that it conducted a comprehensive search and could not find a single example of a Life Care Plan ("LCP") being admitted at trial without a corresponding expert life expectancy opinion.

4

Plaintiff's spinal cord. [ECF Nos. 135-5; 135-8].

On March 23 and March 24, 2025, respectively, Plaintiff served two rebuttal expert reports. The first report, authored by Dr. Raval, rebutted the opinions of Dr. David Talan and concerned whether the treatment Plaintiff received in the ship's medical center met the requisite medical standard of care. Plaintiff's second rebuttal report, authored by Dr. Suite, rebutted Dr. Merkler's opinion that Plaintiff's life expectancy is one-year. Notably, Plaintiff did not proffer any rebuttal to the opinions of Dr. Keyserling or Dr. Zelby.

Dr. Suite sat for his deposition on April 4, 2025. He testified that he had not read Carnival's experts' reports and that he was not making any rebuttal opinions. Specifically, he testified that:

> Q.     All right. Let me word it differently then. Are you here today to say that the expert neuroradiologist that's been retained by the defendant read the films incorrectly in this case?
>
> A.     I don't know that I've read that opinion. If you'd like to share that record with me, I'll do that. So I don't know what they've said.
>
> Q.     So as you sit here today, you are not in a position to be able to revise the opinion of the expert neuroradiologist for the defendant, correct?
>
> A.     That is correct, yes.
>
> Q.     And so same question for the neurosurgeon. Would you agree that you are not here today to rebut the opinions of the expert neurosurgeon retained by the defendants?
>
> A.     I have no idea what those opinions are. I could agree with them. I could rebut them. I have no idea what they said. If you care to share it with me in the presence of the court, I'd be open to that.

[ECF No. 135-7, pp. 21:13–22:5].

The <u>*Daubert* Motion</u>

The *Daubert* Motion challenges Dr. Suite's opinion that the removal of Plaintiff's neck collar caused Plaintiff's paraplegia and Dr. Raval's opinion that removal of the collar made Plaintiff's injuries "marginally worse." But Carnival notes that the mere act of removing the cervical collar would not *in and of itself* have caused Plaintiff's paralysis, which Dr. Suite and Dr. Raval both admit. Instead, the subsequent *movement* of Plaintiff's neck *without the collar* is what Dr. Suite and Dr. Raval say would have caused Plaintiff to become paralyzed, yet Carnival contends that neither cites any evidence to support this conclusion.

Therefore, Carnival argues, Dr. Suite's causation opinion is entirely speculative and Dr. Raval's opinion that removal of the collar made Plaintiff's injuries "marginally worse" is also speculative, as it was based on his subjective interpretation of Plaintiff's shipboard medical records. Dr. Raval's opinion also contradicts Dr. Suite's testimony that once Plaintiff's paralysis set in, it was permanent and irreparable and therefore could not deteriorate further.

The *Daubert* motion discusses at length Dr. Harold Keyserling and Dr. Andrew Zelby's conclusions that Plaintiff's paraplegia was the result of his initial fall and most likely caused by an epidural hematoma that progressively compressed his spinal cord, which is supported by the factual record and Plaintiff's medical records. [ECF No. 136, p.

6

10–11]. In his Response to the *Daubert* motion, Plaintiff requested a *Daubert* hearing. Plaintiff's Response does not mention Dr. Keyserling nor Dr. Zelby, however.

The <u>*Daubert* Hearing</u>

Dr. Suite, Dr. Raval, and Paul Ramos testified in person.

Dr. Suite stated that he had relied on various scholarly resources in preparation for the hearing that he had not disclosed as bases for his expert opinion in either his expert report or at his deposition.[4] He further testified that since his deposition, he had read Dr. Keyserling's report and was prepared and planning to rebut Dr. Keyserling's opinions at the *Daubert* hearing. [ECF No. 161, pp. 18:5–22:11].

In his pre-hearing deposition, Dr. Suite testified that he did not review any films or images before rendering his opinion because he did not think they were necessary. [ECF No. 135-7, p. 18]. However, Dr. Suite explained then that, although he had not reviewed the actual scans (the CT and an MRI), he had "reviewed the printed reports of the scans to understand how this all happened." [ECF 135-7, p. 18].

Carnival objected to any of Plaintiff's experts giving testimony that: (1) was based on source materials that were not disclosed in the experts' reports or at their deposition; or (2) concerned any new and/or rebuttal opinion, including rebuttal opinions, that were not previously disclosed. *Id.* at 14: 12–16:2, 25:14–27:10.

---

[4]     The *Daubert* Evidentiary Hearing transcript is available at ECF No. 161.

The Undersigned did not allow Dr. Suite to testify at the hearing about the new source materials or new opinion(s) that were not contained in his expert report or discussed at his deposition. However, I reserved ruling on Carnival's objection and requested the parties brief the issue following the hearing. *Id.* at 22:12–23:11, 27:11–28:17, 181:13–184:10; *see also* Post-*Daubert* Hearing Administrative Order [ECF No. 156].

After the hearing, in compliance with a directive to submit the new materials, Plaintiff filed eleven documents which are "the medical records and medical journal articles or treatise excerpts Dr. Suite referenced during his testimony." [ECF No. 158]. Of these eleven documents: three are articles previously unmentioned by Dr. Suite as source materials;[5] two are the expert reports of Drs. Keyserling and Zelby, which Dr. Suite testified at his deposition he had not reviewed at all; and one document is Dr. Suite's personal preparation notes for his hearing testimony (never previously disclosed), which he had with him on the witness stand at the *Daubert* hearing. The remaining five documents are medical records previously in Carnival's possession.[6]

---

[5]     The three articles previously undisclosed by Dr. Suite as source materials are: "Cervical Spine Fractures Overview"; "Management of Cervical Spine Fractures"; and "Management of Unstable Cervical Spine Injuries." [ECF No. 158].

[6]     The Undersigned instructed Plaintiff to file *all* medical sources Dr. Suite referenced at the hearing, but Plaintiff did not include the fourth source cited by Dr. Suite, an excerpted chapter from a book titled "Diagnosis and Management of Disorders of the Spinal Cord." [ECF No. 161, p. 19:4-14].

**Applicable Legal Principles and Analysis**

New Expert Opinions

Federal Rule of Civil Procedure 26 provides that any expert "retained or specially employed to provide expert testimony in the case," must provide a written report at the time the parties' expert disclosure is due and the report "must contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B). Further, Rule 37 provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is **not allowed to use that information** or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added). In conjunction, these rules require exclusion of untimely expert testimony at any hearing (including a *Daubert* hearing) or at trial. *Id.*

"Courts routinely strike expert reports or exclude expert testimony which is not timely disclosed, even if the consequence is to preclude a party's entire claim or defense." *Mirage Yacht, Inc. v. A 2013 63' Marquis Yachts Rec. Vessel*, No. 24-cv-21095, 2025 WL 1638057, at *4 (S.D. Fla. June 10, 2025); *see also Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 822 (11th Cir. 2009) (striking expert because they testified at *Daubert* hearing that they relied on eleven **new sources not previously disclosed** and finding that "letting in new information so late in the proceedings would be unfair and prejudicial"); *see also Reese v.*

*Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (striking untimely expert affidavit); *Corwin v. Walt Disney World Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007) (striking untimely expert reports); *Wilkerson v. Carnival Corp.*, No. 23-CV-24050-MOORE/Elfenbein, 2025 WL 1635247 (S.D. Fla. June 10, 2025) (striking untimely supplemental expert report).

In fact, Dr. Suite's testimony has previously been stricken for this **exact** reason, which should mean that Dr. Suite is intimately aware of the need to timely disclose materials he relied upon and to render complete opinions.

In *Brown v. NCL (Bahamas) Ltd.*, the Court struck an opinion given by Dr. Suite during his deposition, which had not been stated in his expert report, nor in any supplemental or rebuttal report. 190 F. Supp. 3d 1136, 1142 (S.D. Fla. 2016) ("[T]he Court finds that [the] [p]laintiff violated Rule[ ] 26(a)(2) by failing to provide a <u>complete</u> statement of all opinions Dr. Suite will express and the basis and reasons for them, and violated Rule 26(e) for failing to timely supplement or correct Dr. Suite's Initial Evaluation. Because [the] [d]efendant did not know that Dr. Suite had changed his diagnosis until the deposition, [the] [d]efendant was deprived of the opportunity to prepare for effective cross-examination. [The] [d]efendant was also deprived of the opportunity to have its own expert rebut the new diagnosis." (emphasis in original)).

Dr. Suite's undisclosed opinions and reference materials are particularly problematic here because the new sources he cited and his planned rebuttal opinion were first mentioned at the *Daubert* hearing. This hearing occurred after the expiration of the

Court's expert disclosure and rebuttal disclosure deadlines, after his deposition, after the close of discovery, and after Carnival raised the *Daubert* challenges.

In his memorandum, Plaintiff argues that Dr. Suite's hearing testimony "merely expanded upon" the "reasoning and methodology disclosed in his report and deposition." [ECF No. 159, p. 1]. He also notes that an expert may disclose a "totally new or different methodology" if the disclosure is "substantially justified or harmless" – and he implies that this exception applies here. Specifically, he notes that Carnival had a full opportunity to cross-examine Dr. Suite on his new methodologies (assuming they were, in fact, new), analogizing that to having the ability to "effectively depose[] [Dr. Suite] again." *Id.* at 3–4.

But the Undersigned is not convinced. Dr. Suite's hearing testimony (and his *planned* hearing testimony, which the Undersigned prevented when I ruled that "no new opinions could be injected into the hearing") was, in fact, based on new opinions, new methodologies and new grounds (*i.e.*, new reference sources and authorities). The authorities which Plaintiff's counsel later filed, **after** the hearing (and at the Undersigned's direction) were indisputably not contained in his report or deposition testimony.

Likewise, Dr. Suite testified that, after his deposition, he had read Dr. Keyserling's report and was planning to rebut Dr. Keyserling's opinions at the *Daubert* hearing. Dr. Suite also testified that he had seen records from Dr. Zelby *in preparation for the Daubert*

11

*hearing.*

According to Carnival, Dr. Suite's testimony at the Daubert hearing is "nothing short of an ambush" on Carnival, intending to distract from a deficient claim with no medical causation support. [ECF No. 160, p. 10].

The Undersigned **rejects** Plaintiff's theory that the untimely disclosure of new opinions and reference/research authorities is harmless.

"The Eleventh Circuit has instructed district courts to review three factors when deciding whether to exclude the testimony of witnesses who are untimely disclosed: (1) the importance of the testimony; (2) the reason for the failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness is allowed to testify." *Mirage Yacht, Inc.*, 2025 WL 1638057 at *5 (citing *Pete's Towing Co. v. City of Tampa, Fla.*, 378 F. App'x 917, 920 (11th Cir. 2010)).

Here, all three factors weigh heavily in favor of exclusion.

First, the importance of the testimony is significant and substantial. The testimony given at a *Daubert* hearing is critical to the determination of a party's *Daubert* motion, which in this case could be dispositive. Without a valid medical causation opinion, Plaintiff cannot meet his burden of proof, a required element of a medical negligence claim.[7]

---

[7]      *Landivar v. Celebrity Cruises, Inc.*, 584 F. Supp. 3d 1150, 1159 (S.D. Fla. 2022) (citing *Law v. Carnival Corp.*, No. 20-21105-Civ, 2021 WL 3129631, at *2 (S.D. Fla. July 23, 2021);

Second, there is no justifiable reason for Plaintiff's failure to timely disclose: (a) all sources relied upon by Dr. Suite and/or (b) Dr. Suite's purported rebuttal opinion. Plaintiff and Dr. Suite were in possession of Carnival's experts' reports since February 28, 2025. There is simply no reasonable explanation for Plaintiff not to have disclosed this testimony before the *Daubert* hearing.

Third, the prejudice to Carnival is tangible. Carnival had no prior knowledge of Dr. Suite's intention to testify about three never previously-disclosed scholarly articles and worse, Carnival had no prior knowledge of Dr Suite's intention to rebut Carnival's experts at the *Daubert* hearing (because at his deposition he stated precisely to the contrary). Thus, Carnival had no opportunity to prepare for either scenario.

> Presenting expert opinions for the first time at a *Daubert* hearing instead of in an expert report would be contrary to the rules regarding expert disclosures and **unfair** to the defendants. With no prior knowledge as to what [an expert's] new opinions may be, the defendants would not be able to adequately test those opinions through cross examination or rebut those opinions with their own expert testimony.

*In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin) Prods. Liab. Litig.,* No. 5:18-MD-2809-KKC, 2021 WL 5410242, at *4 (E.D. Ky. Mar. 19, 2021) (emphasis added); *see also Easterling v. Ford Motor Co.,* 303 F. Supp. 3d 1211, 1227 (N.D. Ala. 2018) ("It would be unduly prejudicial to Ford to permit Easterling to offer and rely on a new expert opinion long after both parties' experts have been deposed, discovery has closed,

---

*see also Gooding v. Univ. Hosp. Bldg., Inc.,* 445 So. 2d 1015, 1018 (Fla. 1984) (under Florida law "[a] mere possibility of causation is not enough")).

and *Daubert* challenges have been raised.").

Not only would it be highly and unduly prejudicial to allow Dr. Suite (or any expert, for that matter) to provide expert testimony at the *Daubert* hearing or at trial which is based on a new or different opinion or on new or different source material, but any new opinions or information provided at a *Daubert* hearing are irrelevant. The hearing is designed to facilitate the Court's evaluation about the reliability and helpfulness of an expert's initial opinion, not new ones which he tries to mention for the first time at the very hearing where his first opinion is being assessed. *See Stiffler v. Apple Inc.*, No. 21-cv-523-NR, 2023 WL 1996692, at *5 (W.D. Pa. Feb. 13, 2023) ("Dr. Adams's new opinions at the *Daubert* hearing can't save his old one — he will not be allowed to give any additional opinions that weren't provided in his report, at this late juncture in the case.").

To the contrary, such litigation strategy is sufficient reason to strike an expert because it further emphasizes their unreliability. *See In re Trasylol Prods. Liab. Litig.*-MDL-1928, No. 08-MD-01928, 2010 WL 2541892, at *1, n. 11 (S.D. Fla. June 22, 2010) (striking in part expert because she "considered evidence and formed new opinions the night before the *Daubert* hearing").

Therefore, regardless of whether Smith's experts will be permitted to testify at trial about the opinions they included in their expert reports and depositions, none of them will be permitted to testify at trial about any opinion **not** included in their reports or depositions. This ruling also restricts the experts from basing their opinions on references

and authorities not mentioned in their reports or deposition testimony. Finally, this ruling applies to Carnival's experts as well (although there is no indication that any Carnival expert intends to offer this type of new opinion or to base an opinion on new authorities).

Carnival's Substantive <em>Daubert</em> Challenges to Smith's Experts

The district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993). Federal Rule of Evidence 702 governs the admission of expert testimony, as explained and refined by the United States Supreme Court in *Daubert*, 509 U.S. at 582 and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry: (1) whether the expert is qualified to testify competently; (2) whether the methodology used to reach the conclusions is sufficiently reliable; and (3) whether the testimony assists the trier of fact to understand the evidence or to determine a fact at issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005).

As an overarching principle, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256. "In order to be admissible, an expert's testimony must be based on 'more than subjective belief or unsupported speculation.'" *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (quoting *Daubert*, 509 U.S. at 590). There should be "[s]cientific method; good grounds and appropriate validation." *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1371 (S.D. Fla. 2005).

Reliability of the methodology requires "an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at 1257. That analysis takes into consideration a number of factors, including: (1) whether the expert's methodology can be, and has been, tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method employed has a known rate of error; and (4) whether the technique is generally accepted in the scientific community. *Rink*, 400 F.3d at 1292; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

These reliability factors, however, are non-exhaustive. *Kumho Tire*, 526 U.S. at 150; *Rink*, 400 F.3d at 1292. Thus, "[i]n evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293 n.7. The burden of establishing the reliability of an expert's opinions rests on the proponent of that expert's

testimony. *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004). The party proffering the expert also has the burden of "laying the proper foundation for the admission of the expert testimony . . . and admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

"It is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341. Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. Rather, "**vigorous cross-examination**, presentation of contrary evidence, and careful instruction on the burden of proof are the **traditional and appropriate means of attacking** shaky but admissible evidence." *Quiet Tech. DC–8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596) (emphasis supplied).

A less-than-perfect expert opinion may still be admitted, even if it contains gaps. *See In re Trasylol Prods. Liab. Litig.*, No. 08–MD–01928, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) ("Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.").

Furthermore, courts "must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Id*. at *7 (quoting *Quiet Tech DC–8, Inc.*, 326 F.3d at 1341).

On the other hand, courts do not hesitate to exclude purported expert testimony which does not pass muster. *See Allison*, 184 F.3d 1300 (affirming summary judgment in

favor of silicone breast implant manufacturers and upholding district court's exclusion of proffered expert's causation testimony under *Daubert*); *Rink,* 400 F.3d at 1286 (affirming exclusion of expert testimony in products liability and toxic trespass claims against pesticide manufacturer and therefore affirming summary judgment for defendant); *Frazier,* 387 F.3d at 1244 (finding trial court in criminal case did not abuse its discretion in excluding proffered expert testimony from forensic investigator); *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010) (affirming defense summary judgment for infant car seat manufacturer in products liability lawsuit involving child who sustained traumatic brain injuries and upholding trial court ruling which excluded expert testimony because the experts were not sufficiently reliable).

<u>Dr. Suite</u>

Carnival contends that Dr. Suite's opinion -- that the removal of Plaintiff's cervical collar caused his paralysis -- is unduly speculative, lacks appropriate methodology, would be unhelpful to the jury and is unfairly prejudicial to Carnival.

Concerning the purported speculative nature of Dr. Suite's opinion, Carnival focuses on the fact that Dr. Suite does not know what happened to Plaintiff's neck between 11:00 PM and 4:40 AM, after the collar was removed, to cause his resulting quadriplegia. In other words, Dr. Suite's view is that removal of the collar caused *some* type of neck movement, but he is unable to pinpoint the specific movement and says (in his deposition) that it would be speculative for him to designate a particular type of neck

18

movement:

> Q:      Okay. What happened to him between 11:00 PM, and 4:40 AM?

> A:      Between that time, again, it would be *speculation* because no camera was on him. I was not there to watch him. Only the nurse was who was checking on him ascertained [sic] those findings. So we don't know what happened between [ ] 11:00 PM and 4:40 AM to produce his paralysis, which was discovered around that time.

> Q:      Okay.·So would you agree that there's no evidence that he fell out of bed, right?

> A:      Correct.

> Q:      There was no evidence that anything hit him or he suffered any kind of trauma to his head.

> A:      That's correct.

> Q:      Okay. And so as we sit here today, do you agree that you have no evidence that he moved his neck at all?

>      MR. ARONFELD: Objection to form.

>      THE WITNESS: That's a very big speculation.·I don't know that he did. I know that people were sleeping then moving the bed. I know that his neck was unprotected. It was not stabilized with the collar, and I know that he became paralyzed after having a period of time where he was a party state [sic].

> Q:      Okay. But my question was much more specific. As you sit here today, would you agree that between 11:00 PM and 4:40 AM, you have no evidence that you can point to—to indicate that he moved his neck?

>      MR. ARONFELD: Objection to form.

>      THE WITNESS:·I have no idea. *That would be speculative*.

[ECF No. 135-7, pp. 48:7–50:11 (emphasis supplied)].

Plaintiff's response concedes, as it must, that Dr. Suite did not opine as to the specific movement which caused his injury. But the response emphasizes that, according to Dr. Suite, the quadriplegia was caused by the ship's medical staff removing his cervical collar – which enabled subsequent head movement, such as the ship's medical staff's later manipulation of his head and neck, the routine movement of Smith's head or neck (on his own), or the rocking of the ship. [ECF No. 139, p. 5].

Therefore, Smith notes, Dr. Suite's view is that "some head or neck movement after the removal of the cervical collar must have been the cause of his quadriplegia." *Id.* Furthermore, he argues, "[r]egardless of what specific type or neck movement happened after the removal of the collar, the responsibility still falls on Carnival and Dr. Waris, since if he had his cervical collar in place, [then there would not have been] any subsequent head or neck movement [ ]sufficient to cause his quadriplegia." *Id.* at 5–6.

To be sure, Dr. Suite's opinion lacks a precise type of head and neck movement, but the absence of that conclusion from his opinion does not render it unduly speculative for purposes of deciding whether to *exclude* his entire opinion. Instead, it merely provides Carnival with ammunition (perhaps even substantial ammunition) to cross-examine him with at trial.

Moreover, Dr. Suite's report emphasizes the significance of the decision to remove the cervical collar:

This fell below the standards of the most basic medical care that could be afforded a patient with a cervical spine injury. **It was incumbent upon the**

**shipboard Medical Center staff to ensure that the cervical collar was not removed until a definitive CT scan of the cervical spine could be done**, especially in light of the patient's very worrisome symptoms and new inability to move his extremities following the fall. Their own notes documented the degree of weakness that Mr. Smith was experiencing following the fall. This was considerable weakness, far beyond any weakness that he had suffered prior to the incident and in fact his right side was strong and fully capable of handling all of his activities of daily living. **Following the fall however there was some weakness that developed but there was still movement. That movement was abolished only after the cervical collar was inexplicably removed at 11:00 PM** on January 23, 2024, by the medical providers on board the ship. At 4:00 AM or thereabouts on January 24, 2024, Mr. Smith first reported complete inability to move his right arm and right leg 5+ hours after they had removed his collar.

[ECF No.135-6, p. 10 (emphasis added)].

Dr. Suite's *Daubert* hearing testimony mirrored the opinions in his report about the

significance of removing Plaintiff's cervical collar (regardless of not knowing which post-

removal movement caused the injury):

My opinion, again, based within reasonable medical probability and certainty is that **the removal of the cervical spine collar at 11:00 p.m. caused and contributed** to Mr. Smith's subsequent quadriplegia by virtue of **taking away stability** that was external to an extremely unstable and completely fractured and ankylosed spine, A-N-K-Y-L-O-S-E-D.

***

Once you remove that collar, you **remove the protection that is there for Mr. Smith's neck**, and the **fracture is allowed to do what it will**. And when he moves the head or if it is moved forward in an untoward fashion, he becomes paralyzed because it's an unstable fracture.

[ECF No. 161, p. 43 (emphasis added)].

In the Undersigned's view, Dr. Suite's inability to provide an opinion as to what precise movement caused Plaintiff's injury or who put that movement into motion undermines and weakens his opinion, but it does not justify an Order *excluding* it. Carnival is free to seek to exploit that weakness at trial and to argue to the jury that it should not rely on this causation opinion at all.

For its second attack on Dr. Suite's causation opinion, Carnival argues that his methodology is further flawed because he did not consider an alternative explanation. Carnival emphasizes a line from Dr. Suite's deposition testimony where he said that movement of Smith's neck after removal of the collar "is the only way" he could have become paralyzed. [ECF No. 135-7, p. 49:23]. Specifically, Dr. Suite's deposition testimony is:

> A:    I know that what happened was that he ended up being paralyzed after the – that five hour period and that he was unprotected in the bed and he could have been sitting up and his head jerked backwards as he fell asleep, but that would be speculative. We know that he became paralyzed and there's only one way to become paralyzed when you have a broken neck and it's not stabilized, and that is to move your neck, move your head, and do so in an unprotected fashion.
>
> Q:    That's the only possible way?
>
> A:    In this case, yes.

*Id.* at 49:14–23.

According to Carnival, its two defense experts explain that the explanation for Plaintiff's paralysis is evidenced within his diagnostic imaging studies: a hematoma that

formed as a result of his fall out of his scooter, which occurred hours before the cervical collar was removed in the medical center and was caused by the fracture that occurred in the fall from the motorized scooter. In other words, Carnival contends that there is, in fact, an alternative basis for the paralysis -- but that Dr. Suite did not consider it (because, it argues, he did not interpret CT imaging and was either incapable of, or unwilling, to consider an alternate explanation.

But Dr. Suite explained that he *did* consider other possible causes. He said he ruled out any evidence of hemorrhage in Smith's collar:

Q.      Okay.

A.      I know that what happened was that he ended up being paralyzed after the – that five[-]hour period and that he was unprotected in the bed and **he could have been sitting up and his head jerked backwards as he fell asleep,** but that would be speculative. We know that he became paralyzed and there's only one way to become paralyzed when you have a broken neck and it's not stabilized, and that is to move your neck, move your head, and do so in an unprotected fashion.

Q.      That's the only possible way?

A.      In this case, yes.

Q.      No, I'm talking about in general. You said --

A.      No --

Q.      -- there's only one way that you did suffer any type of an injury, and that would be if you move the neck. **There are <u>other</u> ways**, would you agree?

A.      **Yes – yes**. In this case, though, that is the most medical likely and reasonable way for him to have this happen.

Q.      You're saying that without having seen the pathology as far?

A.·     I'm saying it having seen his acute change at that time, correct.

Q.      Okay. Correct, and you're saying that without having actually seen the anatomy of his body?

A.      That's correct. I've seen the reports, and that's sufficient to make that diagnosis. When I saw the reports, particularly the MRI of the cervical spine that was done later, **I didn't see any evidence of hemorrhage** in the collar or anything like that.

Q.      So the report, not the image --

A.      Correct.

Q.      -- to make sure we're clear on that.

A.      Yes.

Q.      Okay.

A.      I'm not a radiologist.

*Id*. at 49:13–50:22 (emphasis added).

Dr. Suite does not share the same opinions as those of Carnival's experts, and Carnival's experts may have reviewed more records than Dr. Suite, but those points are more appropriately related to what weight, if any, the jury should give to his opinion, rather than its threshold admissibility. *See, e.g., Youngman v. Royal Caribbean Cruises Ltd.*, No. 23-21796-CIV, 2024 WL 4483347, at *9 (S.D. Fla. Sept. 2, 2024) ("This suffices to pass muster under *Daubert*, regardless of whether Dr. Carter directly ruled out every other cause of Plaintiff's sudden neurological decline, or in part considered temporal proximity.").

24

Indeed, the more-prudent course here would be to deny Carnival's motion to exclude Dr. Suite and allow Carnival to pursue its "failure-to-adequately-consider-other-alternatives" challenge through cross-examination. After all, "[w]here a portion of the proffered expert testimony is reliable, wholesale exclusion can constitute an abuse of discretion." *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1281 (11th Cir. 2015) (citing *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341–42 (11th Cir. 2013)).

As noted, Carnival is entitled to draw out these challenged weaknesses in Dr. Suite's opinions before the jury via cross-examination. Carnival may attack other aspects of his opinions, as well, such as the fact that he provided his opinions without reviewing the actual films and studies (and considered only the *reports* of those studies). But its argument about a supposed flawed methodology and an alleged failure to consider other potential causes goes to the weight, not the admissibility, of his opinions. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) (denying *Daubert* motion and noting that "[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility"); *Taylor, Bean & Whitaker Mortg. Corp. v. GMAC Mortg. Corp.*, No. 5:05-CV-260-OC-GRJ, 2008 WL 3819752, at *5 (M.D. Fla. Aug. 12, 2008) ("The certainty and correctness of Mr. Alexander's opinion will be tested through cross-examination and presentation of contrary evidence and not by a *Daubert* challenge.").

25

<u>Dr. Raval</u>

Carnival challenges Dr. Raval's opinion as being unreliably speculative and based on faulty conclusions and methodology. It contends that Dr. Raval's opinion that Plaintiff was rendered "marginally worse" after his neck was moved is "entirely speculative advocacy based upon an erroneous interpretation of someone else's medical notes." [ECF No. 136, p. 14]. In order to understand and assess Carnival's challenge, the Undersigned needs to outline what Dr. Raval's opinion actually is and how he says he reached it.

Dr. Raval is a board-certified emergency room physician who has provided a standard of care opinion. Although Dr. Raval claims he reviewed Plaintiff's shoreside diagnostic imaging studies, he made no mention of any interpretative findings in his expert summary reports or during his subsequent deposition, nor did he rebut any of the interpretative findings of the defense experts.

Dr. Raval did not review either Drs. Keyserling or Zelby's expert summary reports. [ECF No. 137-2, pp. 26:18–27:5]. Dr. Raval stopped short of concluding that the removal of the collar *caused* Plaintiff's paralysis. Instead, Dr. Raval contends that subsequent movement of Plaintiff's neck at 5:00 AM (after he reported a loss of sensation and a nearly complete loss of movement on his right side at 4:40 AM) "marginally" worsened his paralysis.

Dr. Raval explained that the only basis for his conclusion that Plaintiff's paralysis was "marginally" worsened is his interpretation of purportedly differing descriptions of

Plaintiff's condition written in the Carnival medical chart by Dr. Waris and one of the ship's nurses. Specifically, Dr. Raval pointed to a note entry written by Dr. Waris at 4:40 AM (when the reports of paralysis first arose), describing his right sided deficits as "right fingers shows 1/5 power, flexion and extension absent, patient can extend and flex the elbow" and comparing it to a note entry written in the chart by a ship nurse at 10:00 AM (stating that he cannot grip with his right hand). [ECF No.135-4, pp. 24–25].

According to Dr. Raval, the differing descriptions of functionality (written by two different medical staff personnel with significantly different scopes of expertise) is evidence that Plaintiff was made "marginally worse." [ECF No. 137-2, p. 99: 2–14].

As argued by Carnival, Dr. Raval admits that Dr. Waris' initial note written at 4:40 AM specifically documents a **complete** loss of flexion and extension of the right hand, which entirely contradicts his opinion (offered for the first time at deposition) that the ship nurse's description at 10:00 AM noting Plaintiff's inability to grip with his right hand is evidence of his paralysis "*worsening.*" *Id.*

To be sure, Dr. Raval's opinion is not perfect. A jury may reject all of it because it is based on comparing notes of two different health care providers at different times. But a skilled cross-examination will elicit the fault (if any) associated with Dr. Raval's approach – and that scenario is less-risky than an order completely excluding the opinion. *Geyer v. NCL (Bahamas) Ltd.*, 203 F. Supp. 3d 1212, 1217–18 (S.D. Fla. 2016) (even where an expert never obtained a plaintiff's medical records predating a cruise ship accident and

the expert's opinion is based on a plaintiff's medical records following an accident, "credibility issues are for the jury to determine, and [the cruse ship operator] will have the opportunity to cross-examine [the expert] at trial"); *see also LaRocco v. Royal Caribbean Cruises, Ltd.*, No. 23-CV-20777, 2024 WL 2292814, at *4 (S.D. Fla. Mar. 4, 2024) ("Case law has made it clear that an expert medical witness may provide an opinion even if they rely solely on medical records." (citing *Geyer*, 203 F. Supp. 3d at 1217)).

<u>Paul Ramos</u>

Paul Ramos is Plaintiff's Life Care Plan ("LCP") expert. Before analyzing Carnival's primary line of attack (*i.e.*, that Ramos has no viable life expectancy evidence upon which to base any conclusions beyond one year), the Undersigned will initially flag the circumstances surrounding Ramos' involvement in the case.

Ramos was unconventionally forced to complete the Preliminary LCP within eight days of his retention on February 20th in order to meet the Court's Scheduling Order deadline for disclosure on February 28th, an expedited time frame he admitted was "unusual." [ECF No. 137-3, p. 30:1–13]. As a consequence, his Preliminary LCP had not been reviewed by a medical doctor before he disclosed it to Defendant, something he also admits he cannot recall ever happening before. *Id*. at 36: 1–15.

Moreover, his Preliminary LCP also did not provide a life expectancy/total time period for the future medical care needs he was recommending either. Four days later, on March 4th, Plaintiff provided a "Supplemental" LCP authored by Ramos, purportedly

after he conferred with Dr. Suite regarding his recommendations. The Supplemental LCP does not offer a life expectancy/total duration of need because Ramos concedes that he is not qualified to offer such opinions, nor did he receive a life expectancy opinion from any other Plaintiff expert in the case -- including Dr. Suite. As a result, his Supplemental LCP offers a vague description forecasting future care needs for "life," without any specific time period whatsoever.

However, on January 27th, Defendant's retained neurology expert, Dr. Alexander Merkler, a board-certified neurologist and neurointensivist and Assistant Professor of Neurology and Neuroscience from Cornell University, traveled from New York to personally examine Plaintiff in Atlanta, Georgia at Wellstar Hospital's Intensive Care Unit. Following his review of Plaintiff's medical records and personal evaluation, Dr. Merkler opined that, as a result of his numerous co-morbidities and complications he already has and will continue to develop, Plaintiff has "at most one year left to live from the time of [his] evaluation." [ECF No. 136-2, pp. 9–10].

During his deposition, Dr. Suite agreed that "he has not seen (Plaintiff) as recently as Dr. Merkler," and that "his life expectancy is further and considerably reduced beyond the fifteen years [he] had originally estimated" as a result of changes in his medical condition since the time he last saw him. However, although he admitted that he could not state that Dr. Merkler is wrong, he was **unwilling to opine within a reasonable degree of medical certainty that Plaintiff would live only one more year or less**. [ECF

No. 137-1, p. 83:11–18]. In fact, Dr. Suite is now **unwilling to provide any numeric life expectancy opinion at all.** *Id*. at p. 84:10–17.

Framed by this procedural history, it is beyond dispute that the only currently-valid record evidence of Smith's life expectancy is from Dr. Merkler, who opined that his life expectancy is one year from his evaluation -- which would be January 27, 2026.[8]

Plaintiff must be able to prove "the necessity and reasonableness of the charges for medical attendance and treatment" to recover damages for future medical expenses at trial. *Shaw v. Puleo*, 159 So. 2d 641, 644 (Fla. 1964). Florida law is clear that only those future medical expenses "reasonably certain" to be incurred are recoverable as damages in a personal injury action. *Loftin v. Wilson*, 67 So. 2d 185, 188 (Fla. 1953). It is Plaintiff's burden to show that future medical expenses will more probably than not be incurred, a burden that may only be met with competent substantial evidence. *Kloster Cruise, Ltd. v. Grubbs*, 762 So. 2d 552, 556 (Fla. 3d DCA 2000).

Therefore, because a recovery of future medical expenses cannot be grounded on the mere possibility that certain treatment might be obtained in the future, any expert opinions or other evidence couched in terms of "possibilities" cannot be probative of

---

[8]     At the evidentiary hearing, Ramos conceded that Dr. Merkler's opinion of a less-than-one-year life expectancy is the only one he has received indicating a numeric value (*i.e.*, something more specific than merely "life"). [ECF 161, p. 173]. But he said he was not familiar with a representation made by Plaintiff's counsel in a filed motion that it was an imminent likelihood that Smith would pass away in the near future. *Id.* at 174. This representation was included in Plaintiff's Motion to Expedite Trial [ECF No. 105]. The Court denied the motion. [ECF No. 108].

future damages. *Kloster Cruise*, 762 So. 2d at 556; *see also Frei v. Alger*, 655 So. 2d 1215, 1216 (Fla. 4th DCA 1995).

If there are no medical experts on behalf of the Plaintiff who can offer any numeric value to his projected life expectancy, then all of Ramos' future care recommendations are without sufficient evidentiary support for any period beyond January 27, 2026.

Smith's effort to have Ramos provide an LCP for more than one year is illogical and incorrect, and the expert opinion needs to be excluded (for any portion exceeding January 27, 2026). Plaintiff's approach is similar to one criticized and rejected in *Rinker v. Carnival Corporation*, No. 09-23154, 2012 WL 37381 (S.D. Fla. Jan. 6, 2012). In *Rinker*, the plaintiff's expert attempted to offer an LCP that set out costs for future medical care and needs based upon an average life expectancy of a healthy 62-year-old woman.

In support of granting Defendant's motion to exclude opinions regarding plaintiff's future medical expenses, the *Rinker* Court reasoned that the medical evidence in the case (and in the expert life care planner's report) indicated that the plaintiff was not a healthy 62-year-old woman. Thus, the failure to account for recent changes in the plaintiff's medical condition when calculating her life expectancy projections rendered conclusions regarding her future care needs unreliable and unhelpful to the jury because they did not "fit with the facts of [the] case." *Id*. at *1.

The Undersigned is not convinced by Plaintiff's argument that Ramos is not offering an opinion on how long Smith will live because his opinion is that Smith will

need such care "for the rest of his life." But that is the point: the only record evidence is that his life expectancy is January 27, 2026. There is no basis to provide opinions on care beyond the expiration of that numeric life expectancy.

At trial, Ramos may provide expert opinion testimony only for a LCP lasting one year. The Undersigned **excludes** the remainder of his LCP opinion.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on June 30, 2025.

Jonathan Goodman
CHIEF UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
The Honorable Kathleen M. Williams
All Counsel of Record

32